UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEOFFREY CROWTHER,
          Plaintiff,

vs.

CONSOLIDATED RAIL CORPORATION
and CSX TRANSPORTATION, INC.,
          Defendants.

CIVIL ACTION NO.:  05-30140-MAP

### DEFENDANTS, CONSOLIDATED RAIL CORPORATION AND CSX TRANSPORTATION, INC.'S, MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The defendants Consolidated Rail Corporation ("Conrail") and CSX Transportation, Inc. ("CSX"), in support of their *Motion for Summary Judgment*, submit the following *Memorandum of Law*.

## I.     FACTUAL BACKGROUND:

On or about June 17, 2005, the plaintiff filed his *Complaint* alleging, in part, that he suffered bilateral hearing loss caused by the defendants, Conrail and CSX's, negligence in relation to the plaintiff's exposure to excessive noise at the workplace pursuant to the Federal Employers' Liability Act ("FELA").[1]   The plaintiff had been employed by the defendants, Conrail and then CSX, since 1976 as a welder and/or welder foreman, and claimed that his exposure to excessive noise during the course of his employment with these defendants caused his bilateral hearing loss.  Id.  The FELA prescribes a three (3) year statute of limitations from

---

[1] The plaintiff also alleged that he suffered from occupationally induced bilateral carpal tunnel syndrome as the result of the defendants' negligence; however, those claims were dismissed for the plaintiff's failure to comply with the Court's *Revised Scheduling Order* dated May 4, 2006 requiring the plaintiff to designate and disclosure information regarding trial experts as required by Fed. R. Civ. P. 26(a)(2).  *See Order* dated November 22, 2006.

1

the date the action accrues.

As part of the defendants' hearing conservation program, the defendants' employees, including the plaintiff, were consistently tested for hearing loss commencing in the mid 1980's. *See* Deposition Transcript of Geoffrey Crowther dated August 16, 2006, the relevant portions of which are attached hereto as Exhibit "A," at p. 183. The plaintiff was first diagnosed with bilateral hearing loss as early as August 3, 1989, nearly 16 years prior to the date he filed his *Complaint*, by audiologists hired by the defendant, Conrail, to perform testing on its workers. *See* Conrail Audiogram Results for Geoffrey Crowther dated August 3, 1989, attached hereto as Exhibit "B."  In fact, the plaintiff's own expert, Tomma Henckel, an audiologist, testified at her deposition, when shown Exh. B, in her opinion the audiogram results from August, 1989 demonstrated not only that the plaintiff had suffered from bilateral hearing loss, but that the hearing loss was noise induced. *See* Deposition Transcript of Tomma Henckel dated November 10, 2006, the relevant portions of which are attached hereto as Exhibit "C," at pp. 96-98.

At the very least, the plaintiff was aware of his bilateral hearing loss as of April 5, 2001, as the plaintiff was notified of his hearing deficiencies in both ears by TK Group, Inc., who had been retained by the defendant, CSX, to test the plaintiff's hearing.[2]  *See* Letter to G.C. Crowther dated April 5, 2001, attached hereto as Exhibit "E." In fact, the plaintiff signed this letter, acknowledging his receipt of the results. Id.; *see also* Exh. A at pp. 217-218.  Hence, the plaintiff clearly had knowledge of his bilateral hearing loss at least four years before filing his *Complaint*, well beyond the statute of limitations. Further, the plaintiff testified that he attended a lawyer

---

[2] Notably, this information, which was confirmed by the plaintiff at his deposition, was contrary to the information supplied by the plaintiff in his *Answers to Interrogatories*, which are attached hereto as Exhibit "D," wherein the plaintiff stated that he was first diagnosed with bilateral hearing loss on November 6, 2002, which calls into question the plaintiff's credibility.

and/or union sponsored screening event at the Holiday Inn in Greenfield, MA in or about the Spring of 2002 where railroad workers, including the plaintiff, were tested for occupationally induced carpal tunnel syndrome and/or hearing loss, as well as a variety of other possible conditions. Id. at 148-149; 187-188. The plaintiff was tested for hearing loss and received a positive test result on the day of the screening. Id. at p. 190.

Moreover, the plaintiff was fully aware as of April 5, 2001 that his bilateral hearing was or could have been caused by exposure to noise at work. In the April 5, 2001 letter, signed by the plaintiff, it is clearly stated that "[a]bnormal hearing levels may be the result of many causes including noise exposure at work." Exh. E; *see also* Exh. A at pp. 217-218. In addition, the plaintiff testified that he had been aware of claims filed by his coworkers for hearing loss caused by exposure to noise at work as early as the mid 1980's. Id. at pp. 180-183. The plaintiff further testified that information had been circulated about his rights in connection with hearing loss since his date of hire (1971). Id. at 202-203. Thus, the plaintiff was fully aware of both his bilateral hearing loss, and the potential that noise exposure caused his hearing loss, for more than three years before filing his claim.

In addition to filing his claim beyond the three year statute of limitation, the plaintiff has failed to identify a medical expert qualified to testify as to the cause of the plaintiff's hearing loss. The only expert witness identified by the plaintiff in support of his claim was his audiologist, Tomma Henckel, who diagnosed the plaintiff as suffering from noise induced hearing loss based upon the plaintiff's own report of his exposures, rather than her own information or assessment as to the noises the plaintiff was exposed to while working for the

defendants. *See* Hearing Evaluation dated November 6, 2002, attached hereto as Exhibit "F;" *see also* Exh. C at pp. 96-98.

The plaintiff failed to properly disclose this expert.  Ms. Henckel was first identified in the *Plaintiff's Initial Disclosures* dated November 3, 2005, which is attached hereto as Exhibit "G," and the Hearing Evaluation (Exh. F) was produced at that time.  Thereafter, the plaintiff again disclosed Ms. Henckel as his medical expert in support of his alleged noise induced hearing loss; in fact, Ms. Henckel was the only expert ever identified by the plaintiff in support of this claim. See *Plaintiff's Expert Witness Disclosures* dated July 26, 2006, attached hereto as Exhibit "H."  Despite submitting the *Disclosure*, the plaintiff failed to provide anything more than a brief summary of Ms. Henckel's expected testimony and omitted all of the documents required by Fed. R. Civ. P. 26(a)(2) which provides:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness.  The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or in support for the opinions; the qualification of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Instead, the only information received by the defendants concerning Ms. Henckel was the Hearing Evaluation previously produced with the plaintiff's *Initial Disclosures*.[3]  The Evaluation

---

[3]  The plaintiff also identified Steven Wenner, M.D., Michael D. Shinnick, Ed.D., Allan Baustin, M.D., and Mark A. Woodward, M.D. in connection with his carpal tunnel claims; however, he failed to produce even one report in connection with the disclosure.  Instead, the plaintiff produced only the *curriculum vitae* of Michael Shinnick and Dr. Woodward, and nothing else.  The plaintiff has not supplemented this *Disclosure* to date, other than what was produced at Ms. Henckel's deposition, as discussed herein.

4

is completely void of any reference to the data or other information considered by Ms. Henckel, any exhibits to be used in support of the opinions contained therein, her qualifications (although her *curriculum vitae* was produced by the plaintiff's counsel shortly before her deposition), a list of all publication authored by the plaintiff within the preceding ten years, the compensation to be paid or the other cases where she testified as an expert at trial or at a deposition within the preceding four years.

Instead, the only other documents produced in connection with the requirements of 26(a)(2) were produced by Ms. Henckel at her deposition and were publications printed by Ms. Henckel just before she was deposed and long after she authored the Hearing Evaluation, including "Noise Induced Hearing Loss" dated October 27, 2002, "What is audiometric testing" (undated) and "Study of Noise and Hearing in Jute Weaving" dated December, 1964, Graphs from ISO 1999 Data," "Occupational Safety and Health Standards" (undated) and "Criteria For A Recommended Standard – Occupational Noise Exposure" dated June, 1998. Exh. C at pp. 49-61.  In fact, Ms. Henckel testified that she did not rely on any of these documents in preparing the Hearing Evaluation, and that plaintiff's counsel never requested any publications from her. Id. Further, Ms. Henckel surprisingly testified at her deposition that she did not even know, nor had she had any discussion with the plaintiff's counsel, as to what she would be paid to provide her expert opinions. Id. at p. 65. She further testified that she had never served as an expert witness prior to this case. Id.

Ms. Henckel, an audiologist, not a medical doctor, testified that she knew nothing about the plaintiff's employment or his exposures to noise other than what the plaintiff himself relayed to her.  Id. at pp. 96-98; *see also curriculum vitae* of Tomma Henckel, attached hereto as Exhibit

"I."  Moreover, Ms. Henckel admitted that she had not relied on any of the studies she produced

at her deposition in forming her opinions about the cause of the plaintiff's hearing loss, and that

she had not conducted any studies concerning the noises railroad workers, such as the plaintiff,

are exposed to. Id. at pp. 49-61, 96-98.  Ms. Henckel never performed any studies of the noises

that railroad workers, such as the plaintiff, were exposed to in their workplace. Id. at p. 64.  The

plaintiff's audiologist, Ms. Henckel, is the only expert that has ever been identified by the

plaintiff in support of his claim that defendants negligently caused the plaintiff to suffer hearing

loss as a result of noise exposure while in their employ.

## II.    DISCUSSION OF LAW:

A.    **Summary Judgment Standard:**

Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.  Fed. R. Civ. P. 56; *see also* Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).

 Summary judgment is mandated against a party failing to make a showing sufficient to establish

an essential element of the case on which he or she bears the burden of proof.[4]  Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986); Taylor v. Hercules, Inc., 780 F.2d 171, 174 (1st Cir.

---

[4]  A genuine issue is one which a reasonable fact finder could resolve in favor of the nonmoving party.  Id.  "Not every genuine factual conflict, however, necessitates a trial."  Riverdale Mills Corp. v. American Modern Home Insurance Co., 122 F.Supp.2d 114, 116 (D. Mass. 2000).  It is only when a disputed fact has the potential to change the outcome of the matter, under the governing law, if found favorably to the non-movant, that the materiality hurdle is cleared.  Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).  Once the moving party has demonstrated that there exists no genuine issue of material fact, the burden of proof then shifts to the non-moving party to contradict that which has been presented with specific provable facts that establishes that there is a triable issue.  Riverdale Mills Corp., 122 F.Supp.2d at 116-117, *citing* Matos v. Davila, 135 F.3d 182, 185 (1st Cir. 1998).  If, on all of the evidence, it is just as reasonable to suppose the cause is one for which no liability would attach to the defendant as one for which the defendant is liable, then the plaintiff fails to make out her case.  Bigwood v. Boston & Northern Street Railway, 209 Mass. 345, 348 (1991).

1986); Hahn v. Sargent, 523 F.2d 461, 464 (1st. Cir. 1975), *cert. denied*, 425 U.S. 904 (1976).

The role of a summary judgment motion "is to pierce that boilerplate of the pleadings and assay

the parties' proof in order to determine whether trial is actually required." Coyne v. Taber

Partners I, 53 F.3d 454, 457 (1st Cir. 1995).

**B.      The Plaintiff's Hearing Loss Claim Is Barred By The Applicable Statute Of
            Limitations And Therefore Summary Judgment Is Appropriate:**

It is well settled federal law that no action under the FELA survives unless the claim is

filed within three years from the date the action accrues.  45 U.S.C. sec. 56 *et seq*.  The FELA

does not define when a cause of action accrues, but it is often clear from the circumstances of a

case when the statute of limitations begins to accrue.  "'Cases which involve a traumatic injury

or a single breach of duty and immediately manifest injury pose little difficulty in determining

the commencement of the limitations period.'" Matson v. Burlington Northern Railroad, 240

F.3d 1233 (10th Cir. 2001) *quoting* National Railroad Passenger Corp. v. Krouse, 627 A.2d 489,

493-494 (D.C. Cir. 1993).

It is equally well settled that the three year limitation period applies to alleged injuries

sustained over a long period of time.  Albert v. Maine Central Railroad Co., 905 F.2d 541 (1st

Cir. 1990).  The accrual issue, under these circumstances, is "more problematic in cases

involving latent injuries which cannot be discovered immediately or those where the injury has

an indefinite onset and progresses over many years unnoticed." National Railroad Passenger

Corp, 627 A.2d at 494.  In these cases, to determine when a federal cause of action accrues, the

federal courts apply the "discovery rule" as the United States Supreme Court set forth in Urie v.

Thompson, 337 U.S. 163 (1949).  Under this rule, the occupational disease or illness statute of

limitations begins to run when the plaintiff becomes aware of the existence of the disease or

7

illness and its cause. Id., 337 U.S. 163 (1949); Kichline v. Consolidated Rail Corp., 800 F.2d 356

(3rd Cir. 1986); Dubose v. Kansas City Southern Railway Co., 729 F.2d 1026, *cert. denied*, 469

U.S. 854, 83 L. Ed. 2d 113, 105 S. Ct. 1979 (1984).  Awareness is defined as when the plaintiff

knows or, in the exercise of due diligence, has reason to know of the existence and cause of the

injury which is the basis of his action. Albert, 905 F.2d at 544; Indus. Constructors Corp. v.

United States Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994); Mounts v. Grand Truck

RR., 198 F.3d 578 (6th Cir. 2000).

 The discovery rule imposes an affirmative duty on the plaintiff to investigate the

potential cause of his injury and requires only a finding that a plaintiff should have known of an

injury, not that he possess actual knowledge of the injury and its actual cause.  The three year

statute of limitations begins to run when a plaintiff knew, or should have known, of his hearing

loss and its cause.  Albert, 905 F.2d at 544, citing Dubose, 729 F.2d at 1030.  Once the plaintiff

believes he is injured and believes that the injury is work related, he has a duty to diligently

investigate either to confirm or to deny his relief.  Albert, 905 F.2d at 544; Fries v. Chicago &

Northwestern Transportation Co., 909 F.2d 1092, 1095-1096 (7th Cir. 1983) ("[T]o allow a

plaintiff to unilaterally postpone the running of the statute of limitations by negligently failing to

investigate the fact of and cause of his injury would thwart the legislative intent of 45 U.S.C. sec.

56.").

 Since the plaintiff has a duty to investigate, a medical diagnosis is unnecessary for the

statute of limitations to begin to run.  Albert, 905 F.2d at 544; Whitman v. CSX Transportation

Inc., 887 F.Supp. 983, 992 (E.D. Mich. 1995).  When a plaintiff claims work related hearing

loss, the proper question regarding knowledge of causation is at what time did or should the

plaintiff have known that there was a link between his hearing loss and his employment.[5]  *See* Matson, 240 F.3d at 1236.  (The question is not whether the plaintiff knew that the repetitive vibrations in connection with his claim for a work related back injury were the specific cause of the injuries).  Whether a plaintiff may be charged with knowledge that his injury is work related depends on factors including the number of possible causes for the injury, and if the medical advice either suggests an erroneous causal connection or otherwise puts to rest a plaintiff's suspicion regarding his injury.  Albert, 905 F.2d at 544.  Additionally, where more than one cause of injury is possible "the injured plaintiff need not be certain which cause…is the governing cause, but only have need or have reason to know of a potential cause."  Fries, 909 F.2d at 1095; Whitman, 887 F.Supp. at 992. Therefore, once the plaintiff suspects that he is injured, and suspects that his employment is a possible cause of his injury, he is charged with the requisite knowledge necessary for the statute of limitations to run.[6]

Here, for the purposes of the statute of limitations, the plaintiff may be charged with the knowledge that his bilateral hearing loss was work related as early as August 3, 1989, and positively by April 5, 2001.  Accordingly, the plaintiff filed his claim well beyond the applicable three year statute of limitations.

As part of the defendants' hearing conservation program, the defendants' employees, including the plaintiff, were consistently tested for hearing loss commencing in the mid 1980's.

---

[5] Knowledge of the specific cause of a work-related injury is not required to trigger the FELA statute of limitations; the statute begins to run when the plaintiff knew or should have known that there was a causal connection between his employment with Conrail/CSX and his hearing loss – not when he knew that occupational noise exposure was the specific cause of his injury. Matson v. Burlington Northern Santa Fe, 240 F.3d 1233 (10th Cir. 2001).

[6] The plaintiff has the burden of proving that the cause of action was commenced within the three (3) year period. Emmons v. Southern Pacific Transportation Co., 701 F.2d 1112 (5th Cir. 1983)

Exh. A at p. 183.  In connection with this program, the defendant was tested for hearing loss

throughout the 1980's and was first diagnosed with bilateral hearing loss on August 3, 1989 by

an audiologist retained by the defendant's own employer, Conrail. Exh. B.   Clearly, in addition

to being notified of his hearing loss by Conrail, the plaintiff would have started to experience

symptoms of his hearing loss in the late 1980's or early 1990's, thereby making him fully aware

of his injury.

Further, the plaintiff testified that he had been aware of claims filed by his coworkers for

hearing loss caused by exposure to noise at work as early as the mid 1980's. Id. at pp. 180-183.

The plaintiff further testified that information had been circulated about his rights in connection

with hearing loss since his date of hire (1971):

> Q:    Were you given any written information about your rights under the FELA with
>        respect to occupational injuries?
> A:    Well, that stuff is around all – I mean, that's around everywhere.  I mean, I don't
>        have to go to a meeting to get that.
> Q:    Okay. All right, have you ever – so you were aware of those rights prior to this
>        event, given the fact that you'd seen written material. Correct?
> A:    Right.
> Q:    For how – when was the first time you has seen such written material?
> A:    Oh, God. You know, when you first hire on. I mean, you know, you get
>        indoctrinated in the ways of the railroad.
> Q:    And that's by lawyers who represent injured railroad workers?
> A:    That's by guys getting screwed. Yeah.

Id. at pp. 202-203.  Given that hearing loss claims were filed by the plaintiff's coworkers and

settled as early as the mid-1980's, that information was being supplied to the plaintiff by the

defendants in relation to workplace hearing loss and hearing protection,  and that

workplace/noise induced hearing loss was a well-known topic of discussion, it is reasonable to

conclude that the plaintiff knew, or should have known, that his hearing loss, once realized, was

possibly caused (at least in part) by his exposure to noise at the workplace, thereby triggering the

statute of limitations to run in the late 1980's or early 1990's.

Making the plaintiff's knowledge of his injury and its cause even more plain is the letter provided to the plaintiff on April 5, 2001 advising him of hearing deficiencies in both ears. Exh. E.   The letter was given to the plaintiff by TK Group, Inc., who had been retained by the plaintiff's employer, CSX, to test the plaintiff's hearing - the plaintiff signed this letter, acknowledging his receipt of the results. Id.; *see also* Exh. A at pp. 217-218.   Based upon this evidence, and the plaintiff's own testimony, there can be no dispute that the plaintiff was aware of his bilateral hearing loss by April 5, 2001, four years before filing his *Complaint* and well beyond the statute of limitations.

This letter also makes it clear that the plaintiff knew or should have known of the potential cause of his hearing loss, namely exposure to noise at work, by April 5, 2001, as the letter states:

> Your current and/or previous test results indicate that your hearing is not within normal limits at one or more frequencies.  Abnormal hearing levels **may be the result of many causes including noise exposure at work**. You should consult an ear doctor to determine the cause of your hearing loss. (Emphasis supplied).

Exh. E.  The plaintiff cannot possibly argue, after receiving and signing this notice, that he didn't suspect that workplace noise exposure was the potential cause of his hearing loss on April 5, 2001.  Moreover, the plaintiff's audiologist confirmed that the plaintiff began suffering from noise induced hearing loss as early as August, 1989. Exh. C at pp. 117-118. Thus, at the very latest, the statute of limitations began to run on April 5, 2001 and expired on April 5, 2004, more than a year before the plaintiff filed his *Complaint*.

Proof that the plaintiff did in fact suspect or believe that his hearing loss was caused by workplace exposure can also be found in the fact that the plaintiff attended a lawyer/union

sponsored screening event where his hearing was again tested. The plaintiff attended such and event in or about the Spring of 2002 where railroad workers, including the plaintiff, were tested for occupationally induced carpal tunnel syndrome and/or hearing loss, as well as a variety of other possible conditions. Id. at 148-149; 187-188. The plaintiff was tested for hearing loss and received a positive test result on the day of the screening. Id. at p. 190. Clearly, by attending the screening event, sponsored by either lawyers or union representatives in order to determine whether railroad employees had claims against their railroad employers, confirms that the plaintiff at least suspected that the defendants were responsible for his hearing loss.

Armed with the information that the plaintiff possessed, he knew or should have known that his hearing loss may have been caused by noise in the workplace. At the very least, it was the plaintiff's duty to investigate the cause of his hearing loss in order to uncover a possible basis for his claim and comply with the statute of limitations – he failed to do so at the expense of the defendants and filed his claim beyond the statute of limitations. "Statutes of limitations] protects defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise" Albert, at 543, *quoting* United States v. Kubrick, 444 U.S. 111, 117, 62 L. Ed. 2d 259, 100 S. Ct. 352 (1979). Accordingly, the plaintiff's claim must be barred as it was filed well beyond the three year statute of limitations, and the defendants respectfully request that summary judgment enter in its favor.

**C.**   **The Plaintiff Failed To Properly Disclose Any Expert In Support Of His Claim For Noise Induced Hearing Loss And Summary Judgment Is Therefore Appropriate:**

In his *Complaint*, the plaintiff alleges that he suffered bilateral hearing loss as a result of excessive noise exposure associated with his work activities while employed by the defendants,

12

Conrail and CSX.  *See Complaint* at ¶ 21.  However, the plaintiff has failed to adequately disclose any expert to prove causation or damages in this matter.

In cases such as this, involving complex medical and liability issues, where the causal connection is not obvious to a layman, "such as a broken leg from being struck by an automobile," expert testimony is required.  <u>Schmaltz v. Norfolk & Western Ry.</u>, 896 F. Supp. 180 (N.D.Ill. 1995) *quoting* <u>Moody v. Maine Central Railroad Co.</u>, 823 F. 2d 693, 695 (1st Cir. 1987); *see also* <u>Claar v. Burlington Northern Railroad Co.</u>, 29 F.3d 499, 503 (9th Cir. 1994) ("where special expertise is necessary to draw a causal inference, expert testimony is necessary."); 4 F. Harper, F. James, O. Gray, <u>The Law of Torts</u>, 269.  Expert testimony is also necessary to prove that the defendant's hearing conservation program was inadequate, that the plaintiff's workplace was unsafe and that these deficiencies somehow caused the plaintiff's alleged bilateral hearing loss.

In order to recover in this case, the plaintiff must present some evidence that his alleged hearing loss was caused by the defendants' negligence.  As expert testimony is required on the issue of causation, any lay witness called to testify in this case, including the plaintiff and arguably the plaintiff's audiologist, as discussed more fully below, must be precluded from testifying about the cause of the plaintiff's injuries or about any other issues which would normally require expert testimony. The deadline for the plaintiff to disclose his experts per the *Revised Scheduling Order* dated May 4, 2006 was August 2, 2006.  Specifically, the *Order* provided that the "plaintiff shall designate and <u>disclose information regarding his trial experts as required by Fed. R. Civ. P. 26(a)(2)</u> by August 2, 2006, and depositions of those experts shall be completed by September 1, 2006." (Emphasis Supplied).  Other than the documents which were

later produced at the deposition of the plaintiff's proposed expert, the plaintiff has never supplemented this disclosure.

The *only* expert identified by the plaintiff in connection with the plaintiff's claim for hearing loss was his audiologist, Tomma Henckel. *See* Exh. H. This Disclosure, however, was entirely deficient, and the defendants were forced to depose Ms. Henckel, at their own expense, in order to receive only part of the information that should have been produced by the plaintiff pursuant to Rule 26(a)(2). Specifically, the plaintiff failed to produce a report prepared by Ms. Henckel as required by the Rule. Instead, they relied only upon the Hearing Evaluation which was prepared by Ms. Henckel in connection with her examination of the plaintiff and produced along with the plaintiff's *Initial Disclosures*. *See* Exhs. F and G.

In violation of Rule 26(a)(2), the Hearing Evaluation lacks any information concerning the data utilized by Ms. Henckel in forming her opinions, the exhibits to be used, her qualifications, her publications, her fee schedule or her experience as an expert. Instead, Ms. Henckel took it upon herself to collect a variety of documents loosely related to the topic of noise induced hearing loss in preparation for her deposition (although she did not rely on any of these documents in forming the opinions contained in the Hearing Evaluation). Exh. C at 49-61. Moreover, only during Ms. Henckel's deposition did the defendants learn that Ms. Henckel and the plaintiff had not yet reached any agreement (or even discussed) as to her compensation. Id. at 65. To date, despite the defendants' repeated requests, none of this information has been supplied by the plaintiff.

Had Ms. Henckel not been deposed at the expense of the defendants, it is reasonable to assume that the defendants would have never obtained any of this information. The Rule is not

14

designed to require parties, such as the defendants in this case, subsequent to an expert being

identified by an opposing party, to search and dig for the information it mandates the opposing

party supply in the hopes of learning more about the expert.

Based upon the plaintiff's failure to comply with the applicable rules, as well as the

information that the plaintiff continues to fail to produce, the plaintiff's expert, his audiologist,

must be excluded. Since she is the only expert identified by the plaintiff, his claim must fail and

summary judgment should enter.

**D.**     **The Plaintiff's Only Expert Must Be Precluded From Supplying Expert Testimony,**
        **As An Audiologist Is Not Competent To Diagnose Noise As The Cause Of The**
        **Plaintiff's Hearing Loss:**

Even if the plaintiff's expert audiologist is not excluded on the grounds that the plaintiff

failed to properly disclose the expert, Ms. Henckel, although perhaps skilled as an audiologist, is

not competent to diagnose occupational noise as the cause of the plaintiff's hearing loss. As

such, her expert testimony must be precluded, and since she is the plaintiff's only expert,

summary judgment should enter based on the plaintiff's inability to establish his cause of action.

The law is plain in regard to the qualifications of audiologists in hearing loss cases. An

audiologist is an insufficient expert to establish causation in noise-induced hearing loss cases.

Piper v. Missouri Pacific RR Co., 847 S.W.2d 907, 909-910 (Mo. Ct. App. 1993). In Piper, the

plaintiff produced two witnesses in order to support causation – the first was his treating

physician, and the second was an audiologist but not a medical doctor. The plaintiff's treating

physician was excluded by the trial court on the basis that his opinion was insufficient to support

the plaintiff's contention that his hearing loss was caused by noise. Left with only his audiologist

to support his claims, the trial allowed the plaintiff to proceed with only his testimony, and the

defendant challenged the audiologist's testimony as insufficient. The Appellate Court agreed stating:

> The audiologist is not a medical doctor and does not have the medical expertise to assess the medical factors required to make a diagnosis that noise was the cause of the plaintiff's hearing problems. That determination requires medical training beyond that received by the witness here.

Id. at 909. The Court went on to hold that because of his training and expertise, the audiologist in that case was qualified to testify as to the types, quality, duration and loudness of the sounds necessary to cause hearing loss once it has been established that the loss of that the plaintiff sustained was noise induced. Id. at 910, *citing* Linberry v. State, 1990 WL 16313, 8 (Tenn. App.).[7]

Here, the plaintiff has failed to produce *any* evidence of the cause of the plaintiff's hearing loss. Instead, the only evidence produced by the plaintiff is the in connection with the plaintiff's alleged hearing loss (although not its cause) are the medical records and deposition testimony of an audiologist, Tomma Henckel. As an audiologist, Ms. Henckel is not qualified to opine as to the cause of the plaintiff's hearing loss.

Moreover, unlike the audiologist in the Piper case, Ms. Henckel is admittedly not even qualified to testify as to the sounds to which the plaintiff was exposed. At her deposition, Ms. Henckel testified that she had never performed any studies of the noises that railroad workers, such as the plaintiff, were exposed to in their workplace. Exh. C. at p. 64. Shockingly, Ms. Henckel was unaware of what noises the plaintiff was exposed to beyond his own self-serving

---

[7] Based upon the audiologist's testimony that the sounds to which the plaintiff was exposed in his workplace would cause hearing loss such as sustained by the plaintiff, coupled with the defendant's expert's testimony that noise exposure was the primary cause of the hearing loss in both of the plaintiff's ears, the Court held that there was sufficient evidence to establish causation. Id. Here, the plaintiff can produce no such evidence, and as such, his claim must fail.

representations:

Q:    Have you ever been in the engineering department of CSX Railroad?
A:    No.
Q:    Any have you ever been around any railroad track workers?
A:    No.
Q:    Okay.. while they are doing their job?
A:    No.
Q:    And have you ever been around railroad workers while they are making repairs other than, like, passing in your car?
A:    No.

.    Q:    … You also note that he's now working as a welding foreman? What did you understand his responsibilities to be as a welding foreman? Let me phrase it another way. Do you understand what he did as a welding foreman?
A:    I assumed he was responsible for a group of people who were welding tracks, including himself.
Q:    Okay, and did you know for sure whether he actually participated in any of the welding?
A:    No, I don't know for sure.

Q:    You also state that he's often around loud construction equipment; is that correct?
A:    Correct.
Q:    Do you know what particular construction equipment he was around?
A:    No.
Q:    And how did you know that it was loud construction equipment?
A:    This is all based on his report.
Q:    So it's everything he told you?
A:    Everything he said.
Q:    Do you know how often he was around loud construction equipment>
A:    No.
Q:    It also states that he uses company radio equipment frequently. The radios are also very loud, correct?
A:    Correct.
Q:    Did you ever listen to the radios that he listened to?
A:    No.
Q:    And do you know specifically how loud the radios were?
A:    No.
Q:    No. That information came specifically from Mr. Crowther, correct?
A:    Yes.

Id. at pp. 96-98. Clearly, the only information that the plaintiff's claimed expert possessed concerning the noises that the plaintiff was exposed to while working for the defendant came from the plaintiff himself.  Accordingly, based on the fact that Ms. Henckel is not a medical doctor and is unqualified to testify about the cause of the plaintiff's hearing loss, coupled with the plain evidence that she does not know anything about the plaintiff's work environment, including his exposure to noise, beyond what was supplied by the plaintiff himself, she is not competent to testify as to the cause of the plaintiff's hearing loss and must be excluded.

As the only expert disclosed, albeit improperly, by the plaintiff, the plaintiff cannot possibly establish the cause of his hearing loss based on Ms. Henckel's testimony – simply put, the plaintiff cannot prove his case.  In the absence of medical evidence to establish that the plaintiff's noise in the workplace was the cause of his hearing loss, the plaintiff's claim must fail, and summary judgment must be granted.

### III. CONCLUSION:

WHEREFORE, for the foregoing reasons, the parties respectfully request that the instant *Motion* be GRANTED.

Respectfully submitted,
The Defendants,
Consolidated Rail Corporation and
CSX Transportation, Inc.
By Their Attorneys:
s/Lori A. Wirkus_____
Michael B. Flynn, BBO #559023
Lori A. Wirkus, BBO #635525
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated: January 16, 2007

G:\F & A\CASE FILES\CSX OCCUPATIONAL\CARPAL TUNNEL\CROWTHER\pleadings\Memo in Support of MSJ.1.12.07.doc

# EXHIBIT "A"

Page 1

1                   UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3               Department of the Trial Court

4

5  *******************************

6  GEOFFREY CROWTHER,              *

7              Plaintiff        *   Civil Action No.

8  vs.                          *   05-30140-MAP

9  CONSOLIDATED RAIL CORPORATION *

10 and CSX TRANSPORTATION, INC., *

11              Defendants       *

12 *******************************

13

14          DEPOSITION OF GEOFFREY CROWTHER

15                   Volume I

16                  Taken at the

17    Sturbridge Host Hotel & Conference Center

18                366 Main Street

19            Sturbridge, Massachusetts

20               August 18, 2006

21           11:25 a.m. - 3:08 p.m.

22

23            Deborah Leonard Lovejoy

24        Registered Professional Reporter

**GEOFFREY CROWTHER**
**August 18, 2006**

38 (Pages 146 to 149)

| Page 146 |
|---|
| 1 know specifically what they -- what the x-rays |
| 2 were of. He just -- we just zeroed -- you know, |
| 3 he just zeroed in on -- you know, they're busy |
| 4 people. |
| 5    Q.    Didn't they show degenerative |
| 6 changes? |
| 7    A.    That's not -- that's not any word |
| 8 that I remember. I don't know what that means. |
| 9    Q.    Okay. Dr. Rehman, what was his |
| 10 first name? |
| 11    A.    You know, I -- I don't remember. |
| 12    Q.    Where was his office? |
| 13    A.    His office was in Westfield. |
| 14    Q.    All right. What street address? |
| 15    A.    I want to say like -- maybe it's |
| 16 like Westfield Road, or something like that. |
| 17    Q.    Is it out there -- |
| 18    A.    Route 20. |
| 19    Q.    -- by Popoli Honda? |
| 20    A.    Yes. |
| 21    Q.    The Agway? |
| 22    A.    Yes. |
| 23    Q.    The building across the street -- |
| 24    A.    Yes. |

| Page 147 |
|---|
| 1    Q.    -- from the motorcycle joint? |
| 2    A.    Right. |
| 3    Q.    What was the name of his practice; |
| 4 do you remember? |
| 5    A.    I think that was Hampshire |
| 6 Orthopedic? Or something like that. |
| 7    Q.    How many times did you see |
| 8 Dr. Rehman? |
| 9    A.    I saw him a few times. |
| 10    Q.    Okay. |
| 11    A.    I don't remember how many, but -- |
| 12    Q.    What treatments did he prescribe for |
| 13 you? |
| 14    A.    He gave me a prescription for -- I |
| 15 can't remember. It was Naprosyn or naproxen. I |
| 16 had a prescription and -- and I did physical |
| 17 therapy. |
| 18    Q.    Where did you go for the physical |
| 19 therapy? |
| 20    A.    I don't remember the name of the |
| 21 place. |
| 22    Q.    Where was it located? |
| 23    A.    On -- oh, excuse me. I want to say |
| 24 Elm Street in West Springfield, but I think |

| Page 148 |
|---|
| 1 they've moved now. You know. |
| 2    Q.    You don't remember the name of the |
| 3 outfit? |
| 4    A.    No, I don't. |
| 5    Q.    What part of your body were you |
| 6 receiving therapy for? |
| 7    A.    I understood it was for the -- you |
| 8 know, the carpal tunnel. |
| 9    Q.    Okay. |
| 10    A.    All right. |
| 11    Q.    Did you miss any time from work due |
| 12 to any of the injuries you claim to have suffered |
| 13 in this lawsuit? |
| 14    A.    Well, not -- not officially, no. |
| 15    Q.    Okay. |
| 16    A.    Yeah. |
| 17    Q.    Did you -- let's go back to the |
| 18 nerve conduction studies. You said the first one |
| 19 was in the spring of 2002. That's the one you |
| 20 referred to as the start date for this litigation |
| 21 and the first time you realized that you had |
| 22 carpal tunnel syndrome. Where was that |
| 23 conducted? |
| 24    A.    That was in Greenfield, |

| Page 149 |
|---|
| 1 Massachusetts. |
| 2    Q.    At a Holiday Inn? |
| 3    A.    I guess so. I don't remember. You |
| 4 know. |
| 5    Q.    Okay. Was it at a screening -- was |
| 6 that an event that was sponsored by the lawyers |
| 7 that you've retained in this case? |
| 8    A.    Yes. Well, I guess so, yes. |
| 9    Q.    Okay. You received a flyer, did you |
| 10 not, to come to that event? |
| 11    A.    No. |
| 12    Q.    Then how did you get aware -- how |
| 13 were you made aware of that event? |
| 14    A.    I was complaining about my -- I was |
| 15 complaining about my hands -- |
| 16    Q.    Okay. |
| 17    A.    -- to somebody at work. |
| 18    Q.    Who? |
| 19    A.    I don't remember -- really, I don't |
| 20 remember. And somebody said, "Hey, you know, |
| 21 they're having" -- you know, because I said, you |
| 22 know, "What's with this?" you know, and it was |
| 23 like -- and they said, "Well, go to Greenfield." |
| 24 You know. |

**GEOFFREY CROWTHER**
**August 18, 2006**

46 (Pages 178 to 181)

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  did you see there?
2     A.    I don't know.  Maybe a dozen.
3     Q.    All right.  Did you receive any
4  literature at all about the event prior to going
5  to it?
6     A.    No.
7     Q.    Okay, but you did understand that --
8  your understanding was that it was sponsored by
9  your union?
10    A.    Yep.
11    Q.    Do you have an understanding as to
12  whether or not it was, in whole or in part,
13  sponsored by any law firm?
14    A.    No.
15    Q.    When you went to the event, were
16  there any representatives of any law firm
17  present?
18    A.    Well, a representative?  Probably,
19  yeah.  Yep.  Yeah.
20    Q.    Well, describe to me what happened
21  once you went into the building.  What happened
22  next?  You go up to Greenfield.
23    A.    I go up to Greenfield.
24    Q.    Oh, let me ask you this.  I'm sorry.

**Page 179**

1  Before you answer that question.
2         How long before this event did the
3  conversation with the coworker occur?
4     A.    I think it was just like -- it
5  wasn't that day, but it was pretty close.
6  Because it was like, you know, there were -- it
7  was just like -- I remember this being like a
8  spur of the moment thing.  You know, I've always
9  kind of just pshawed that kind of stuff.  But I
10  knew that I had a problem.
11    Q.    What do you mean, you always pshawed
12  that kind of stuff?
13    A.    Well, like I said, you get aches and
14  pains and they go away.
15    Q.    But I mean "pshawed."  What -- had
16  you heard about these types of events before?
17    A.    Sure.
18    Q.    Okay.  When was the first time you
19  heard about one of these types of events, these
20  union-sponsored screening events?
21    A.    I think -- I think with the hearing
22  loss.  I think when -- you know, when -- most
23  everybody on the railroad settled the -- settled
24  the hearing loss case.

**Page 180**

1     Q.    Okay, so --
2     A.    Yeah.
3     Q.    -- you were aware prior to June --
4  May, June of '02 that your coworkers on the
5  railroad had made hearing loss claims and settled
6  them.  Correct?
7     A.    Right.
8     Q.    And you were aware -- when did you
9  first become aware of that?
10    A.    Oh, I don't know.  Really.  I don't
11  know.
12    Q.    Years before May and June of '02?
13    A.    I know that, you know -- I was aware
14  back in, you know -- I mean, you're always aware
15  of, you know, like, you know, if somebody gets --
16  gets something and they just get disabled, or
17  whatever.  I mean, you're always aware of that
18  stuff.
19    Q.    Well, guys talk, right?
20    A.    Right.  Guys talk.
21    Q.    Okay.  How far back do you remember
22  first hearing talk, on the railroad, that guys
23  were filing hearing loss claims or lawsuits,
24  alleging that they suffered hearing loss as a

**Page 181**

1  result of railroad work activities?
2     A.    Well, I mean, like I would say
3  probably the last twenty years.
4     Q.    Okay.
5     A.    You know, I mean -- I mean, you're
6  just -- I know hearing loss is a problem.
7     Q.    Okay.
8     A.    We didn't have -- we didn't have
9  hearing protection.
10    Q.    But that's not what I'm asking.
11    A.    We weren't issued hearing
12  protection, okay.
13    Q.    You were in the early to mid '80s.
14  Correct?
15    A.    If you say so.
16    Q.    Well, I mean --
17    A.    I mean, if you say so.
18    Q.    No, I'm asking.  Is that when you
19  remember first being issued hearing protection?
20  Back in the early to mid '80s?
21    A.    I know that hearing protection, you
22  know, became -- you know, we had to wear it.  I
23  mean, if you were going to do something, you had
24  your hearing protection on.  Right, yeah.

**GEOFFREY CROWTHER**
**August 18, 2006**

47  (Pages 182 to 185)

Page 182

1    Q.    And when did that first become
2  policy on the railroad?
3    A.    Like whenever you said, in the mid
4  '80s, maybe. I don't know. Sometime back then.
5    Q.    And is that about the same time that
6  you had started to hear about guys filing hearing
7  loss claims?
8    A.    Well, I wouldn't characterize it
9  like that. You know --
10    Q.    How would you characterize it?
11    A.    I would just say a guy -- you
12  realize a guy is half deaf, and you tell him,
13  "Hey, man" -- you know what I mean, like you're
14  trying to get his attention and, you know, yell
15  at him. So, I mean, there's -- that happens all
16  the time.
17    Q.    Okay, but then you heard about these
18  lawsuits that were being filed. Let me ask you,
19  first, the question. When do you first remember
20  hearing about hearing loss claims or lawsuits?
21  On the railroad.
22    A.    Probably around that time.
23    Q.    Okay.
24    A.    That's why they issued the hearing

Page 183

1  protection.
2    Q.    All right. And was it your
3  understanding that the allegations that were
4  being made in those claims or lawsuits was that
5  your coworkers on the railroad were claiming to
6  have suffered loss of hearing as a result of the
7  activities -- being exposed to noise in the work
8  environment on the railroad?
9    A.    Well, I guess in a general sense,
10  yes.
11    Q.    Okay. You've known that going back
12  to the mid '80s, correct?
13    A.    Doesn't take a genius to figure
14  that's the only time anything gets addressed --
15    Q.    Okay.
16    A.    -- is from an injury.
17    Q.    All right, and you in fact had been
18  tested throughout the '80s and the '90s, correct?
19  Right into the present date. Correct?
20    A.    Yep.
21    Q.    And that testing started back in the
22  mid '80s. Correct?
23    A.    I guess so.
24    Q.    Okay. Well, let me table hearing

Page 184

1  loss for a second. I want to get back to this
2  event that you went to at the Holiday Inn in
3  Greenfield.
4         All right. So your coworker told
5  you about this event. It wasn't that day. Was
6  it the day before or a few days before? What's
7  your best estimate?
8    A.    You know, I can remember right where
9  I was. I was in CP 100 in West Springfield. I
10  think it was like the next day. Because I had to
11  like finesse my way to get out of there, to
12  get --
13    Q.    Is your best estimate that the day
14  before --
15    A.    Yeah.
16    Q.    -- this event, whenever it
17  occurred --
18    A.    Yep.
19    Q.    -- was when you first heard about
20  it. Correct?
21    A.    The first knowledge I had that there
22  was, you know, this -- "Go up and see. The test"
23  -- just "Go up and see if you got it." That's
24  what it was: "Go up and see if you got it."

Page 185

1    Q.    All right.
2    A.    Okay? You know.
3    Q.    All right, and so the next day you
4  went to the testing event.
5    A.    Right.
6    Q.    Did you receive, before going to the
7  event, any literature at all?
8    A.    No.
9    Q.    All right. You had heard about
10  prior events with respect to hearing loss.
11  Correct?
12    A.    Yep.
13    Q.    But you had never gone to them.
14  Right?
15    A.    No.
16    Q.    And these were events where either
17  your union or a law firm would actually rent out
18  room space in a hotel, kind of like we're at
19  today, and have testing machines set up to
20  actually test workers to see if they had one of
21  these -- had hearing loss. Correct?
22    A.    Yeah. I mean, in a general sense --
23  yeah, I'm generally aware of it? Yeah.
24    Q.    Had you ever heard about a screening

**GEOFFREY CROWTHER**
**August 18, 2006**

48 (Pages 186 to 189)

## Page 186

1  event specifically for carpal tunnel syndrome or
2  repetitive stress injuries prior to the one you
3  went to at the Greenfield Holiday Inn?
4      A.   I don't think so.  I don't pay --
5  you know, I don't pay attention to that stuff --
6      Q.   All right.
7      A.   -- to tell you the truth.
8      Q.   Now, when you walked in the door,
9  tell me what happened.
10     A.   Well, I think they ask you what
11 you're there for.  And I was there for -- you
12 know, to be tested for carpal tunnel.
13     Q.   Were they testing -- who asked you
14 that question?
15     A.   Whoever the representative was.
16     Q.   Okay.
17     A.   Whoever -- you know.
18     Q.   So you walk in.
19     A.   Yeah.
20     Q.   All right.  And is there a room?  A
21 sign?  Is it right in the middle of the lobby?
22 What is it?  How'd it work?
23     A.   Yeah, it was like -- yeah, it was
24 a -- like a suite, maybe, or like a -- like a

## Page 187

1  room like this, a couple rooms like this,
2  adjoining rooms.
3      Q.   All right.
4      A.   Okay?
5      Q.   Were they testing for other
6  conditions?
7      A.   I don't think so.  I just think it
8  was hearing and carpal tunnel.
9      Q.   Okay.
10     A.   That's all.
11     Q.   Were these testing for asbestosis?
12     A.   Oh, yeah.  Yes.  Yes.  Right.
13     Q.   Were they testing for silicosis?
14     A.   Well, I -- well, I think that's what
15 it was.  Silicosis.  I mean, I know -- yeah.
16     Q.   Were they testing for any other
17 conditions?
18     A.   See, I forgot about that part.
19 Yeah, best I can remember.  I didn't remember --
20 I think I had a chest x-ray.  Or something.  I
21 think so.  Yeah, I'm pretty sure I did.
22     Q.   Tell me all the tests you had that
23 day.
24         First of all, were you tested for

## Page 188

1  hearing loss?
2      A.   I had -- I went there for the carpal
3  tunnel.  And --
4      Q.   So you were tested for that.
5      A.   Right.
6      Q.   And that was the nerve conduction
7  study we talked about earlier.  Right?
8      A.   Right.
9      Q.   Okay.  What else were you tested
10 for?
11     A.   Hearing.  I had a hearing test.
12     Q.   Okay.  Anything else?
13     A.   Well, now that I think of it, I'm
14 pretty sure I had a chest x-ray.
15     Q.   Were your hearing loss test results
16 positive?  In other words, did they show you had
17 hearing loss?
18     A.   Yes.
19     Q.   Okay.  So that was that day.
20     A.   Yep.
21     Q.   Okay.  And did you get the -- did
22 you get the results that day?
23     A.   No.
24     Q.   Okay.  When did you get the results

## Page 189

1  of your hearing lost test?
2      A.   Well, sometime after.
3      Q.   Did you actually get the results?
4  Or did somebody call you and tell you that the
5  results showed that you had hearing loss?
6      A.   I know I don't remember.
7      Q.   Okay.  Did you ever get the results
8  of the nerve conduction study?
9      A.   It was -- I think it was the same --
10 I think it was the same way.  I think I -- I
11 might have gotten something in the mail.  I
12 don't -- you know, really, to tell it honestly, I
13 don't remember.  I think I got --
14     Q.   This is very important.  I have to
15 ask you to --
16     A.   Yes.
17     Q.   -- really try to give me your memory
18 on that.
19     A.   You know --
20     Q.   With respect to the carpal --
21     A.   You've got to understand, you know,
22 like I have mail now -- that's why I went home
23 last night.  I got mail like this (Indicating).
24 You know what I mean?  It's just how it is at my

**GEOFFREY CROWTHER**
**August 18, 2006**

49 (Pages 190 to 193)

| Page 190 | Page 192 |
|---|---|

**Page 190**

1  house.
2  Q.    Okay.
3  A.    Okay?
4  Q.    All right.  That's fine.
5  A.    I mean -- all right?
6  Q.    All I'm asking you is --
7  A.    Boy.
8  Q.    -- you have the nerve conduction
9  study done that day at the event.  Right?
10  A.    Yeah.
11  Q.    Did somebody tell you what the
12  results of that nerve conduction study were
13  before you left the Holiday Inn that day?  Yes or
14  no.
15  A.    Before I left the Holiday Inn, I
16  know that the guy said, you know, that I had a
17  definite hearing deficit.  I know that he said --
18  because it was like, you know, right there.
19  Q.    Okay.
20  A.    It's like a -- okay?  And the carpal
21  tunnel, you know, I don't think so.  I know
22  Dr. Rehman was able to tell me right away, but I
23  don't --
24  Q.    But I'm just asking about the event.

**Page 191**

1  A.    Okay.
2  Q.    Okay?
3  A.    All right.  I don't know if they
4  were able to tell me right away.  I might have
5  gotten -- I know I received something in the
6  mail.  So I probably did.  I probably received it
7  in the mail.  Because, now that I'm thinking
8  about it, I received something in the mail
9  about -- about the -- about the chest x-ray.
10  Q.    What were the results of your chest
11  x-ray?
12  A.    I was fine, I guess.
13  Q.    Okay.
14  A.    I didn't have whatever --
15  Q.    You were -- did you --
16  A.    ----, whatever.
17  Q.    Did you or did you not receive
18  something in the mail -- in the mail about your
19  nerve conduction study?
20  A.    I probably did, too.  I probably --
21  you know, I'm --
22  Q.    No, I'm --
23  A.    -- assuming.  I don't know.  I
24  can't --

**Page 192**

1  Q.    You can't recall?
2  A.    No.
3  Q.    Okay.
4  A.    Okay.
5  Q.    Did anyone tell you that day what
6  the results of your nerve conduction study were
7  before you left the Holiday Inn?
8  A.    You know, I don't remember.  I can't
9  recall.
10  Q.    All right.  But they did tell you
11  what your hearing loss test result was.
12  A.    Yeah.  They were able to tell me,
13  like -- yeah.
14  Q.    I'm going to show you what's been
15  marked as Exhibit 4 and 5.  4 is my
16  interrogatories to you.  5 are your answers.  I'm
17  going to ask you about number 9.  Would you take
18  an opportunity to look at that with your counsel.
19  Take a look at it first.
20  A.    Oh, okay.  Well, November 6th.
21  Right?  Well --
22  Q.    Let me ask you this question before
23  you --
24  A.    What?

**Page 193**

1  Q.    Have you read Interrogatory 9 and
2  Answer No. 9 from Exhibits 4 and 5?
3  A.    Oh, 9?
4  Q.    Yeah.  Have you have an opportunity
5  to read that?
6  MS. SCHMIDT:  He's asking, did you
7  read this question and did you read this
8  answer.
9  A.    Well, let me -- let me read it.  Let
10  me -- you know, I just --
11  THE WITNESS:  Okay, well, what's
12  this -- what's this date?  Is that when I
13  went to the Amherst center?
14  Q.    (By Mr. Flynn)  So let me ask you
15  this question.  Let me ask you the questions,
16  okay?
17  A.    See, you're trying to have it both
18  ways.
19  Q.    No, I'm just trying to ask you
20  questions.
21  A.    No, you're trying to have it both
22  ways.  You really are.
23  Q.    Let me ask you the question.  First
24  of all, have you had opportunity to read

**GEOFFREY CROWTHER**
**August 18, 2006**

52 (Pages 202 to 205)

| Page 202 |
|---|

1    A.    You know, I'm not sure. It
2  wasn't -- it wasn't anybody in there that was in
3  -- if the test was in West Springfield, I could
4  answer these questions for you. But it was just
5  I was a stranger.
6    Q.    It wasn't your local chairman then?
7    A.    No. No.
8    Q.    Were you provided at the event,
9  either when you showed up or at any time you were
10  there or when you left, or before you left, with
11  any written materials?
12    A.    I don't think so.
13    Q.    Were you given any pamphlets?
14    A.    No.
15    Q.    Were you given any written
16  information about your rights under the FELA with
17  respect to occupational injuries?
18    A.    Well, that stuff is around all -- I
19  mean, that's around everywhere. I mean, I don't
20  have to go to a meeting to get that.
21    Q.    Okay. All right, have you ever --
22  so you were aware of those rights prior to this
23  event, given the fact that you'd seen this
24  written material. Correct?

| Page 203 |
|---|

1    A.    Right.
2    Q.    For how -- when was the first time
3  you had seen such written material?
4    A.    Oh, God. You know, when you first
5  hire on. I mean, you know, you get indoctrinated
6  in the ways of railroad.
7    Q.    And that's by lawyers who represent
8  injured railroad workers?
9    A.    That's by guys getting screwed.
10  Yeah.
11    Q.    Did you fill out a questionnaire
12  when you were at that event?
13    A.    You know, I might have. I don't --
14  I don't recall.
15    Q.    Did you sign a contingent fee
16  agreement when you were at that event?
17    A.    Did -- I'm sorry.
18    Q.    Did you sign a contingent fee
19  agreement when you were at that event?
20    A.    I don't recall.
21    Q.    Do you recall filling anything out
22  when you were at that event?
23    A.    I think it was just -- you know, my
24  name -- you know, just my general information.

| Page 204 |
|---|

1    Q.    So, obviously, you remember filling
2  something out.
3    A.    Yeah. I remember that I was just
4  there to be tested and that's what I want -- I
5  was just there for the information.
6    Q.    Okay, but you did fill something
7  out.
8    A.    I filled something out, yes.
9    Q.    Did you keep a copy of it?
10    A.    I don't think -- no.
11    Q.    Did that thing that you filled out
12  ask you what kind of symptoms you were
13  experiencing?
14    A.    I'm sorry, I got to get -- this air
15  conditioner is --
16    Q.    Do you want to move?
17    A.    No, as long as I'm -- I'm all right
18  like this. I can -- I can hear you now.
19    Q.    The document you filled out, were
20  there any questions on it asking you how long you
21  had been experiencing these symptoms?
22    A.    I don't recall. Have you got the
23  document?
24    Q.    I'm just asking you, sir.

| Page 205 |
|---|

1    A.    Oh, okay.
2    Q.    I'm asking you what your memory is.
3    All right. Did you receive a phone
4  call from the lawyer, following this event?
5    A.    No.
6    Q.    Did you ever see the results of your
7  nerve conduction study?
8    A.    Yes.
9    Q.    Okay. When did you first see the
10  results of that nerve conduction study?
11    A.    Well, same time, I guess, I got
12  the -- you know, the letter about the chest
13  x-ray.
14    Q.    Who did that letter come from?
15    A.    I guess it was from this -- my law
16  firm.
17    Q.    It was the Hannon and Joyce firm?
18    A.    Yes.
19    Q.    Do you still have a copy of that
20  letter?
21    A.    No.
22    Q.    Threw it out?
23    A.    Oh, sure.
24    Q.    Okay. What was contained in the

**GEOFFREY CROWTHER**
**August 18, 2006**

55  (Pages 214 to 217)

Page 214

1  and what railroad I was from and what job I held,
2  and what jobs -- you know, general things
3  like -- you know. I mean, there's nowhere on
4  there, on that form that says, "Are you exposed
5  to," you know, "trains going fifty miles an hour
6  around a sharp curve and the screeching that
7  results?" They don't ask that question on those
8  railroad forms.
9       Q.     Based on what it says in Exhibit 5
10  and the testimony you gave earlier, Answer No. 9,
11  you say that was the first time, November 6th,
12  2002, when you were tested at UMass, that you
13  realized that you had hearing loss and that it
14  was related to your work on the railroad.
15  Correct?
16      A.     That's when I -- that's for me --
17  for me -- I mean, I had general information. But
18  when I had the second opinion, which -- which I'm
19  sure you would want for your -- yourself and your
20  family, that's when -- yeah, that's when it was
21  a -- it was a serious thing.
22          MR. FLYNN: I'm going to have marked
23  as the next document, medical history form,
24  Conrail, dated -- date of exam, March 31st,

Page 215

1  1998. That will be Exhibit 6.
2       And Exhibit 7 will be a two-page
3  document from T.K. Group, Incorporated, a
4  letter to Mr. Crowther, dated April 5,
5  2001.
6
7       (Exhibit 6, 3/31/98 Conrail medical
8       history form, marked)
9       (Exhibit 7, report of 4/5/01 hearing
10      test by T.K. Group, Inc., marked)
11
12      Q.     (By Mr. Flynn) I'm going to show
13  you a report of your periodic exam -- or your
14  medical history form, March 1998, that's been
15  marked as Exhibit 6. Have you ever seen this
16  form before?
17      A.     No. Have I seen this document
18  before?
19      Q.     Yeah.
20      A.     No. No.
21      Q.     Let me show you Exhibit 7. This is
22  a letter -- first of all, on the second page
23  that's your signature, right? G.C. Crowther?
24      A.     Yep.

Page 216

1       Q.     Okay.
2       A.     All right. May I flip it over and
3  read it?
4       Q.     Take a look at it. I'm going to ask
5  you, first, if you have read it. And then my
6  next question will be whether or not you've ever
7  seen it before today.
8       A.     Yeah, okay.
9       Q.     You had a chance to read Exhibit 7?
10      A.     Yeah.
11      Q.     Do you recall receiving that?
12      A.     No.
13      Q.     That is your signature on the second
14  page, though.
15      A.     Yep.
16      Q.     And I'll represent to you that on
17  this form, on this exhibit, as with the previous
18  exhibits, any of the highlighting is mine. I put
19  it there.
20      A.     Yeah. Yeah, okay.
21      Q.     This document --
22      A.     But you didn't -- you didn't
23  highlight the part that would benefit me, is that
24  "The evaluation will be at your own expense. You

Page 217

1  may wish to contact your insurance carrier to
2  extent" -- "to determine the extent of your
3  coverage under your policy." Your policy.
4       And so I took -- I take hearing
5  tests. I mean, all this means is that that day,
6  it could have been a -- it could have been a
7  hearing test conducted in the yard and the
8  switchers -- I mean, they come sometimes with
9  nice equipment in vans and it's quiet, and
10  sometimes it's not. You know.
11      Q.     In any event, this document, which
12  bears your signature --
13      A.     Yep.
14      Q.     -- and is written by T.K. Group,
15  Incorporated --
16      A.     Yep.
17      Q.     -- has results of hearing tests
18  which was, ostensibly, done on you in April of
19  2001. Correct?
20      A.     Yeah.
21      Q.     And it says, quote, "Your current
22  and/or previous test results indicate that your
23  hearing is not within normal limits at one or
24  more frequencies. Abnormal hearing levels may be

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

56 (Pages 218 to 221)

### Page 218

1 the result of many causes, including noise
2 exposure at work."
3    A.    Right.
4    Q.    "You should consult an ear doctor to
5 determine the cause of your hearing loss."
6 That's the end of my quote.
7    A.    Yeah.
8    Q.    And then the remainder of the
9 paragraph is the language you read, about --
10    A.    Right.  You should consult your --
11 you should consult your doctor.
12    Q.    It goes on to say, quote, "This test
13 represents a change in hearing levels compared to
14 your previous tests.  According to guidelines
15 established by the American Academy of
16 Otolaryngology (AAO), you have a hearing loss
17 that should be evaluated by a physician."
18    Did I read that correctly?
19    A.    Yeah.
20    Q.    And you remember -- although you
21 might not remember receiving this one, you do
22 remember that following those periodic exams that
23 Conrail, and later CSX, conducted, that you would
24 receive a report like this.  Correct?

### Page 219

1    A.    Well, they give you a little yellow
2 form.
3    Q.    Okay.
4    A.    Yeah.
5    Q.    But once CSX came in, they used a
6 different company to do the hearing loss tests.
7 Right?
8    A.    Yeah.  I don't think they're as good
9 as Conrail's.
10    Q.    Okay.  In any event, when they did
11 their test results, CSX's people, they'd send you
12 a report like this.  Correct?
13    A.    You know what?  If I had to sign
14 that, then I don't know how that -- I really
15 don't know how my signature got on that.  I mean
16 because every -- when I -- the way I recall the
17 hearing test is, if you have a bad -- if you have
18 a bad hearing test or, you know, they suspect,
19 you know, severe hearing loss, they kind of hold
20 you back afterwards and talk to you and -- you
21 know.  That never talked happened to me.
22    Q.    Sir, my question to you, although
23 you don't remember receiving and/or signing this
24 Exhibit 7 --

### Page 220

1    A.    Yeah.
2    Q.    -- do you remember that as part of
3 CSX's hearing testing program that when you were
4 tested, they would then send you a letter like
5 this, following your test, to tell you what the
6 results were?
7    A.    Yeah.
8    Q.    Do you remember that?
9    A.    No.
10    Q.    Okay.
11    A.    But I know that that's -- I'm
12 sure -- is that the only one?  Because it
13 probably is.  I haven't received any others, and
14 I've been tested --
15    Q.    No, I -- I can mark them later.
16 We're kind of in a time crunch.  I do have
17 others.
18    A.    All right.
19    Q.    Okay?
20    A.    Yeah.
21    Q.    I'll show them to you.  All right?
22 My only question, though, is, do you remember
23 receiving documents like this one?
24    A.    No.

### Page 221

1    Q.    All right.
2    A.    No, I don't.
3    Q.    Okay.  But, in any event, the
4 language that I read does indicate that you did
5 have a hearing lost, as a result of this test in
6 April of '01.  Correct?
7    A.    That's what it says.
8    Q.    That's what it says.
9    A.    Yeah.
10    Q.    And that this could have been caused
11 by exposures to noise in the workplace.  Correct?
12    A.    Could have.
13    Q.    Right.
14    A.    Could have been.
15    Q.    But that's what it's telling you.
16    A.    Well, yeah, it could have been, and,
17 you know -- that's what it says: It could; it
18 could be.
19    Q.    And it's telling you --
20    A.    Could also be just, you know,
21 normal -- normal hearing range loss.  And it
22 could also be that, you know, it wasn't quiet in
23 the room, or whatever, either.
24    Q.    And it's also telling you that,

# EXHIBIT "B"

Send Carbon Copy To:
HCNC
Data Center
1721 Pine St.
Philadelphia, Pa. 19103

# CONSOLIDATED RAIL CORPORATION

DIVISION/SHOP _____ Occupational Health

| | RIGHT | | LEFT | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| Is Eardrum Visible | | | | |
| Is Perforation Present | | | | |
| Is Drum Normal | | | | |
| Is Other Present | | | | |

LOCATION _Berkshire_
STATE _Pittsfield MA_
NAME _Geoffery R._
DATE OF BIRTH _05 / 07 / 51_
month / day / year
SERVICE DATE _8-3-89_

EMPLOYEE # _718771_
SOCIAL SECURITY # _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_
SEX _M_

## INITIAL OTOLOGIC HISTORY

| Enter test No. | Date and Time | RIGHT EAR | | | | | | | | LEFT EAR | | | | | | | | Serial # Make Model | Dept. Tick No. | Reas. test code | Job Ident. | Years on present job code | Noise level code | Time lapse code | Hear. prot. code | TESTER Sign and print name | Tester cert no. or certif. date (HCNC use) | Data processed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 | | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | 8000 | | | | | | | | | | |
| 1 | 8/3/89 | 5 | 10 | 5 | 0 | 25 | 15 | | | 10 | 10 | 5 | 5 | 30 | 10 | | MA 27 10875 | | | Trk Forem 14 | | | | Spalding | 2453 | |

### UPDATE OTOLOGIC HISTORY (enter test number)

| | * | * | * | * | * | * | * | * | | * | * | * | * | * | * | * | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

### OTOLOGIC HISTORY    DATE _8/3/89_    (Explain All "Yes" Answers)

| | NO | YES |
|---|---|---|
| 1. Ever had noises in ears? | | ✓ |
| 2. Ever had dizziness? | ✓ | |
| 3. Ever had fullness in ears? | ✓ | |
| 4. Ever had pain in ears? | ✓ | |
| 5. Have you had fluctuating hearing loss? | ✓ | |
| 6. Have you had sudden or rapid hearing loss? | ✓ | |
| 7. Have you had ear infections? | ✓ | |
| 8. Have you been to an ear specialist? | ✓ | |
| 9. Ear surgery recommended or performed? | ✓ | |
| 10. Have you had head injury or unconsciousness? | ✓ | |
| 11. Did you ever hunt or shoot? | ✓ | |
| 12. Do you have any noisy hobbies? | ✓ | |
| 13. Do you presently have other noisy job? | ✓ | |
| 14. Have you had myalns, quining, excessive aspirin? | ✓ | |
| 15. Ever had hearing tested before? | ✓ | |
| When? _1988_ Where? _BMC_ | | |
| 16. Family history of hearing loss? | ✓ | |
| 17. Do you now have difficulty hearing? | ✓ | |
| 18. Ever had 1. Measles 2. Mumps 3. Chick. Pox 4. Scar. Fev. 5. Dipth. | | ✓ |
| 19. Yrs. Military Serv.  Branch _BMC_  Job | | ✓ |
| 20. Have you ever had a prior noisy job? | | ✓ |

**UPDATE INSTRUCTIONS:** Enter only "Yes" responses. Indicate with ✓ through number entered at top of column 1 to show that all questions were asked. The purpose of the update is to discover new developments or worsening of old complaints. Use phrases such as "Do you now have a new complaint of" or "Since the last test" to elicit new information.

### UPDATE OTOSCOPIC OBSERVATION

| a. Are ear canals obstructed? |
|---|
| b. Are perforations present? |
| c. Is other present? |

| OTOLOGIC & OTOSCOPIC COMMENTS | Test Number | Question Number |
|---|---|---|

AUG 07 1989

MD 55 (Rev.) 2-84
HCNC 1983 DF #1 ©
Rev. 1-83

# EXHIBIT "C"

Case 3:05-cv-30140-MAP   Document 30-4   Filed 01/16/2007   Page 2 of 99

RECEIVED BY
DEC 2 9 2006
FLYNN & ASSOCIATES, P.C.


Page 1

1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3

4

5

6    * * * * * * * * * * * * * * *

7    GEOFFREY CROWTHER,              *

8              Plaintiff            *

9    v.                             * No. 05-30140-MAP

10   CONSOLIDATED RAIL CORPORATION  *

11   AND CSX TRANSPORTATION, INC.,  *

12             Defendants           *

13   * * * * * * * * * * * * * * *

14

15

16        DEPOSITION OF:  TOMMA HENCKEL

17         Catuogno Court Reporting

18            1414 Main Street

19         Springfield, Massachusetts

20     November 10, 2006        10.14 a.m.

21

22

23         Jessica M. DeSantis

24           Court Reporter

**TOMMA HENCKEL**
**November 10, 2006**

Page 49

```
 1        A.      I know I don't have anything, no.

 2        Q.      Okay.

 3        A.      The only thing we got was with him.

 4   He brought with him is the audiogram to fill

 5   out.

 6        Q.      Okay.  Great.  And we'll go over

 7   that.  That's contained in his report, correct?

 8        A.      Yup.

 9             MS. WIRKUS:  And you also brought in

10        your folder what I'm going to have marked

11        as Exhibit No. 5, please.

12             It's entitled noise-induced hearing

13        loss and it's dated October 27, 2002.

14             And it is four pages; is that right?

15             THE WITNESS:  Yes.

16             MS. WIRKUS:  Okay.

17

18             (Exhibit 5, document dated October

19             27, 2002)

20

21        Q.      (By Ms. Wirkus)  Could you identify

22   Exhibit No. 5 for me and tell me what it is?

23        A.      Yes, it's a printout that I got

24   about noise-induced hearing loss by the American
```

**TOMMA HENCKEL**
**November 10, 2006**

Page 50

```
 1   College of Occupational and Environmental
 2   Medicine.
 3        Q.     Okay.  And when did you get the
 4   printout?
 5        A.     This actual copy I just got after I
 6   learned about the deposition.
 7        Q.     And why did you get this particular
 8   publication?
 9              In other words, why is it in your
10   file about Mr. Crowther?
11        A.     Because it described his hearing
12   loss.
13        Q.     Okay.  His type of hearing loss; is
14   that right?
15        A.     His type of hearing loss, yes.
16        Q.     Okay.  Did you have this article at
17   the time that you examined Mr. Crowther in
18   November of 2002?
19        A.     Not specifically, no.
20        Q.     Okay.  In fact, it was actually
21   published, it looks like, probably about a week
22   and a half before his --
23        A.     Before, yeah.
24        Q.     Okay.  Thank you.
```

**TOMMA HENCKEL**
**November 10, 2006**

Page 51

1        MS. WIRKUS:  Okay.  If I can have

2    marked as Exhibit No. 6, please.  It's a

3    series of documents.

4        The first is entitled, what is

5    audiometric testing.

6        The second is, what is baseline

7    audiogram.

8        Third is, what are annual

9    audiograms.        Forth is, what is an

10   employer required to do following an

11   audiogram evaluation.

12       And next is, when is an employer

13   required to provide hearing protectors.

14       The next is, what training is

15   required.

16       And next is, what exposure and

17   testing records must employers keep.

18       And it goes from numbers -- page

19   three to page eight; is that correct?

20       THE WITNESS:  Yes.

21       MS. WIRKUS:  Okay.  And that's all

22   Exhibit 6.

23

24       (Exhibit 6, documents, marked)

**TOMMA HENCKEL**
**November 10, 2006**

Page 52

1        Q.     (By Ms. Wirkus)  I'll show you

2  what's been marked Exhibit 6.

3           And if you can identify that for the

4  record.

5        A.    It's from -- I'm not sure where it's

6  from.  I just printed it out in conjunction with

7  employee testing I was doing at UMass, but also I

8  figured it might be relevant.

9           And it describes, what is testing.

10  What is audiometric testing.  What is a baseline

11  audiogram or an annual audiogram.  What is an

12  employer required to do following an audiogram

13  evaluation.  When is an employer required to

14  provide hearing protectors.  What training is

15  required.  What exposure and testing records must

16  employers keep.

17        Q.    And when did you print that out?

18        A.    Within the last two or three

19  months.

20        Q.    And are those documents documents

21  that you utilized when you were testing Mr.

22  Crowther?

23        A.    No.

24        Q.    And do you know where pages one and

TOMMA HENCKEL
November 10, 2006

Page 53

1     two of that set are?

2          A.     No.

3          Q.     Okay.   Thank you.

4          A.     I don't know where it came from.

5               MS. WIRKUS:   I'm going to have

6     marked as Exhibit 7, please, a publication

7     entitled Study of Noise and Hearing in Jute

8     Weaving.   And it is dated December 14th of

9     1964.

10

11               (Exhibit 7, publication dated

12               December 14, 1964)

13

14          Q.     (By Ms. Wirkus)   I'll show you what

15    has been marked as Exhibit No. 7.   And you have a

16    copy as well, correct?

17          A.     Correct.

18          Q.     And can you identify that as well?

19          A.     Yes, it's an article about Study of

20    Noise and Hearing in Jute Weaving.

21          Q.     And what is jute weaving?

22          A.     It's a weaving of -- jute is a

23    fiber, so.

24          Q.     And is there a machine that's used

**TOMMA HENCKEL**
**November 10, 2006**

Page 54

1   in jute weaving?

2        A.    No.

3        Q.    **And why is that in Mr. Crowther's**

4   **file?**

5        A.    Because I was looking for articles

6   about the effects of noise, long-term exposures

7   to noise on hearing.

8        Q.    **Okay.  And in an occupational**

9   **setting.  Is that fair to say?**

10       A.    Yes.

11       Q.    **Do you know if Mr. Crowther was ever**

12  **involved in any jute weaving?**

13       A.    No, I don't know.

14       Q.    **Okay.**

15             MS. WIRKUS:  Next exhibit I'm going

16        to have marked as Exhibit No. 8.  And this

17        is a series of sketches.  And it's entitled

18        graphs from ISO 1999, data.

19

20             (Exhibit 8, graphs from ISO 1999,

21             data, marked)

22

23       Q.    **(By Ms. Wirkus)  And if you could**

24  **identify what Exhibit No. 8 is for me, please.**

**TOMMA HENCKEL**
**November 10, 2006**

Page 55

1        A.      It's graphs from ISO 1999, data.

2        **Q.      And you had mentioned off the record**

3   **that this was not a complete set of graphs; is**

4   **that right?**

5        A.      Right, it's based on a study that

6   was done in our -- some students had done for

7   their -- I think it may have been a doctoral

8   thesis.  It might have been a master's thesis in

9   audiology.

10            Again, studying the effects of

11  long-term noise exposure, occupational noise

12  exposure.

13       **Q.      And do you have the complete study**

14  **some place?**

15       A.      I'm not sure I can get my hands on

16  it.

17       **Q.      And is this a study that you**

18  **utilized in testing Mr. Crowther?**

19       A.      No.

20       **Q.      And why is that in Mr. Crowther's**

21  **file?**

22       A.      Because I forgot to take it out.

23            No, because I had it in there given

24  to me by the same person who gave me the jute

**TOMMA HENCKEL**
**November 10, 2006**

Page 56

1    weaving article.

2         Q.    **And who is that person?**

3         A.    Faculty member on my -- in my

4    department.

5         Q.    **Okay.  And did you discuss this**

6    **deposition with that faculty member?**

7         A.    No.

8         Q.    **Okay.  And what was his or her**

9    **name?**

10        A.    Richard Fryman.

11        Q.    **Okay.  Why did he give you the**

12   **article?**

13        A.    Because I had just asked for studies

14   on the effects of noise exposure.

15        Q.    **Okay.  And when did you ask him**

16   **that?**

17        A.    Two months ago.

18        Q.    **So sometime after receiving the**

19   **first Notice of Deposition?**

20        A.    Mm-hmm.

21              MS. WIRKUS:  Okay.  Next I'm going

22         to have marked as Exhibit No. 9.  It's a

23         series of documents entitled Occupational

24         Safety and Health Standards.

**TOMMA HENCKEL**
**November 10, 2006**

Page 57

1              I don't know how to identify it so

2       I'll have Ms. Henckel identify it.

3              THE WITNESS:  I think that's what it

4       is.  Occupational Safety and Health

5       Standards.

6              MS. WIRKUS:  Okay.

7

8              (Exhibit 9, Occupational Safety and

9              Health Standards, marked)

10

11      Q.      (By Ms. Wirkus)  Okay.  I'll show

12   you what was marked as Exhibit 9.

13              You have a copy of that as well,

14   correct?

15      A.      Mm-hmm.

16      Q.      Okay.  And can you tell me what this

17   set of papers actually is?

18      A.      I was looking for materials on

19   occupational safety and health standards and what

20   permissible noise exposures were.

21              And in looking that up, this, I came

22   upon that.  So I just printed the whole thing

23   out.

24      Q.      Okay.

**TOMMA HENCKEL**
**November 10, 2006**

Page 58

```
 1        A.      But it's not necessarily --

 2        Q.      Okay.

 3        A.      Mostly for the graph in the front.

 4   The permissible noise exposure graph.

 5        Q.      Okay.  And you're referring to table

 6   G-16, which is entitled permissible noise

 7   exposure, correct?

 8        A.      Yes.

 9        Q.      Did you use this particular report

10   in examining Mr. Crowther?

11        A.      No.

12        Q.      And when did you print this off?

13        A.      Two months ago.

14        Q.      Okay.  And, again, after receiving

15   the Notice of Deposition, correct?

16        A.      Right, I believe so.  Yes.

17        MS. WIRKUS:  Okay.  I'm going to

18   have marked Exhibit No. 10.  And it's table

19   G-16, which is permissible noise exposure.

20   And I think that's actually the same graph

21   that was contained --

22        THE WITNESS:  Yeah, right.  And so I

23   was just kind of double checking it I

24   guess.
```

**TOMMA HENCKEL**
**November 10, 2006**

Page 59

1              MS. WIRKUS:  Sure.

2              THE WITNESS:  To make sure it was

3      accurate.

4

5              (Exhibit 10, table G-16, marked)

6

7              THE WITNESS:  Maybe I figured out

8      how to print it alone without all the other

9      stuff.

10        **Q.     (By Ms. Wirkus)  So the table that's**

11  **contained in Exhibit No. 10 is really what you**

12  **were looking at and looking to print, correct?**

13        A.     Right, correct.

14              MS. WIRKUS:  And the last one I'm

15      going to mark is Exhibit 11.  It's entitled

16      Criteria for Recommended Standard.  And

17      it's dated June of 1998.

18

19              (Exhibit 11, Criteria for

20              Recommended Standard, marked)

21

22        **Q.     (By Ms. Wirkus)  I'll show you**

23  **what's been marked as Exhibit No. 11.**

24              **Can you identify that?**

**TOMMA HENCKEL**
**November 10, 2006**

Page 60

1      A.      It's the Criteria for Recommended

2  Standards for occupational noise exposure revised

3  1998, put out by US Department of Health and

4  Human Services.

5      Q.      Did you utilize that particular

6  publication in examining Mr. Crowther?

7      A.      No.

8      Q.      Okay.  And did you also obtain that

9  about two months ago?

10      A.      Yes, on the 13th of September.

11      Q.      Okay.  You're referring down to the

12  bottom corner?

13      A.      Yes.

14      Q.      And it's September 13 about 8.42

15  p.m. God bless you for working that late on this.

16              Okay.  Did you provide any of the

17  publications that we've just gone over from your

18  file to Attorney Joyce's office?

19      A.      No.

20      Q.      Okay.  And have they requested any

21  publications from you?

22      A.      No.

23      Q.      Have you, at any time, provided any

24  publications to them?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

Page 61

1       A.      No, except maybe the report.

2       **Q.      Okay.   Just the report?**

3       A.      That's it.

4               MS. WIRKUS:  Okay.  Speaking of

5       which, I'm going to have marked as Exhibit

6       No. 12, a document entitled evaluation,

7       which is three pages.  And also attached to

8       that is an audiogram.  And a Hanan and

9       Joyce hearing test program sheet, a letter

10      to Mr. Crowther dated November 7, 2002.

11      And a letter to Hanan and Joyce dated

12      November 7, 2002.  All as part of the same

13      Exhibit 12 packet.

14

15              (Exhibit 12, documents, marked)

16

17      **Q.      (By Ms. Wirkus)  Ms. Henckel, I'll**

18      **show you what has been marked as Exhibit 12.**

19              **You also have a copy of that,**

20      **correct?**

21      A.      Yes.

22      **Q.      And this also came from your file;**

23      **is that right?**

24      A.      Correct.

**TOMMA HENCKEL**
**November 10, 2006**

Page 64

1    Q.    Any railroad workers?

2    A.    No.  UMass railroad.

3    Q.    UMass doesn't have a railroad.

4    A.    Buses, but not --

5    Q.    Okay.  Prior to examining and/or

6    screening Mr. Crowther, had you ever screened any

7    other railroad workers before?

8    A.    I'm not sure.

9    Q.    Do you work with any other companies

10   providing screening services for any companies

11   other than UMass?

12   A.    In terms of occupational noise?

13   Q.    Yes.  In other words, do you do

14   screenings for any other corporations?

15   A.    I don't think so; although, we would

16   if we had a contract.

17   Q.    Have you ever, prior to examining

18   Mr. Crowther, had you ever done any studies of

19   the noises that railroad workers were exposed

20   to?

21   A.    No.

22   Q.    Have you ever reviewed any studies

23   of railroad workers prior to examining Mr.

24   Crowther?

**TOMMA HENCKEL**
**November 10, 2006**

Page 65

1      A.      I'm not sure.   I mean, it may have

2  been as part of a hearing conservation class that

3  that came up.

4      Q.      Okay.   But you don't specifically

5  remember any?

6      A.      No.

7      Q.      Have you ever served as an expert

8  witness before?

9      A.      No.

10      Q.      Congratulations.

11              And do you know what you are being

12  paid by Hanan and Joyce to serve as an expert?

13      A.      No.

14      Q.      Have you had any discussions with

15  them about payment?

16      A.      No.

17      Q.      How far did you travel to get here

18  today?

19      A.      25 miles, one way.

20      Q.      Thank you.

21              Again, have you been paid anything

22  from Hanan and Joyce to date?

23      A.      I am not sure.   I think our office

24  may have gotten something from handling the

**TOMMA HENCKEL**
**November 10, 2006**

Page 96

1    going to go step by step.

2                    First of all, did I read that

3    correctly?

4        A.    Yes.

5        Q.    Have you ever been in the

6    engineering department of CSX Railroad?

7        A.    No.

8        Q.    And have you ever been around any

9    railroad track workers?

10       A.    No.

11       Q.    Okay.  While they are doing their

12   job?

13       A.    No.

14       Q.    And have you ever been around

15   railroad workers while they are making repairs

16   other than, like, passing by in your car?

17       A.    No.

18       Q.    Okay.

19       A.    Train tracks go behind my house.

20       Q.    Okay.  You also note that he's now

21   working as a welding foreman?

22                    What did you understand his

23   responsibilities to be as a welding foreman?

24                    Let me phrase it another way.

**TOMMA HENCKEL**
**November 10, 2006**

Page 97

1          Do you understand what he did as a

2    welding foreman?

3          A.    I assumed he was responsible for a

4    group of people who were welding tracks,

5    including himself.

6          Q.    Okay.  And do you know whether he

7    actually participated in any of the welding?

8          A.    No, I don't know for sure.

9          Q.    Okay.  Do you remember whether you

10   asked him that or not?

11         A.    No.

12         Q.    You also state that he's often

13   around loud construction equipment; is that

14   correct?

15         A.    Correct.

16         Q.    Do you know what particular

17   construction equipment he was around?

18         A.    No.

19         Q.    Did you ask him what kind of

20   construction equipment?

21         A.    I don't remember.

22         Q.    And how do you know that it was loud

23   construction equipment?

24         A.    This is all based on his report.

**TOMMA HENCKEL**
**November 10, 2006**

Page 98

| | | |
|---|---|---|
| 1 | Q. | So it's everything he told you? |
| 2 | A. | Everything he said. |
| 3 | Q. | Do you know how often he was around |
| 4 | loud construction equipment? | |
| 5 | A. | No. |
| 6 | Q. | It also states he uses company |
| 7 | radios frequently.  The radios are also very | |
| 8 | loud, correct? | |
| 9 | A. | Correct. |
| 10 | Q. | Did you ever listen to the radios |
| 11 | that he listened to? | |
| 12 | A. | No. |
| 13 | Q. | And do you know specifically how |
| 14 | loud the radios were? | |
| 15 | A. | No. |
| 16 | Q. | No. |
| 17 | | That information came specifically |
| 18 | from Mr. Crowther, correct? | |
| 19 | A. | Yes. |
| 20 | Q. | Okay.  It also goes on to say in |
| 21 | relation to his hearing protection. | |
| 22 | | That it was not until the 1990s when |
| 23 | CSX started screening their employees hearing and | |
| 24 | providing ear protection. | |

**TOMMA HENCKEL**
**November 10, 2006**

Page 117

1          A.      Yes.

2          Q.      Okay.  And in these results there's

3   also a printout of his audiograms, is that right,

4   for -- I'm sorry.  Turn it around.  5.25.84,

5   4.5.01, and 4.2.02; is that correct?

6          A.      Correct.

7          Q.      Okay.  And the 04.02.02 test that's

8   referenced.

9                  Does that indicate noise-induced

10  hearing loss also?

11         A.      Yes.

12         Q.      And did Mr. Crowther bring this

13  document with him when he came to visit you?

14         A.      No.

15         Q.      Do you know if this was the document

16  that he was referring to in connection with

17  recently being told that he was suffering from

18  hearing loss from CSX?

19         A.      I don't know.

20         Q.      Okay.  And is it your opinion within

21  a reasonable degree of medical certainty that Mr.

22  Crowther started suffering from noise-induced

23  hearing loss in approximately 1989, based on the

24  documents that you've just reviewed?

**TOMMA HENCKEL**
**November 10, 2006**

Page 118

1      A.      Yes.

2      **Q.      That's it.   I have --**

3      A.      Well, that's when it showed up.  I

4    don't know when he started suffering from it.

5      **Q.      Okay.   But that's when it first**

6    **reared its ugly head, so to speak?**

7      A.       Right.

8              MS. WIRKUS:  Fair enough.  Thank you

9    very much.  I appreciate it.

10             THE WITNESS:  That's it?

11             MS. WIRKUS:  I'm all set unless

12   Elizabeth has some questions.

13             MS. SCHMIDT:  No, I don't have

14   anything.

15             MS. WIRKUS:  Great.  Okay.

16

17             (Deposition concluded at 12.40 p.m.)

18

19

20

21

22

23

24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GEOFFREY CROWTHER                    CIVIL ACTION

          Plaintiff

                           NO.  05-30140-MAP

    vs.

CONSOLIDATED RAIL
CORPORATION, et al.

          Defendants

## PLAINTIFF'S ANSWERS TO
## DEFENDANTS' INTERROGATORIES

Plaintiff, by and through his undersigned attorney, hereby answers Defendants' Interrogatories as follows:

1.      Geoffrey Crowther
        119 Massasoit Street
        Northampton, MA 01060
        DOB: 5/7/51
        SS#: 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
        Height: 6'1"
        Weight: 210 lbs.

2.      Married to Sally Crowther from 1976 to present.

3.      Plaintiff began his railroad employment in 1975 with Penn Central, and has been employed with its successors Conrail and CSX, respectively, ever since. Plaintiff's craft was/is trackman/welder/track foreman in the maintenance of way department, covering territory in the New England Division. Plaintiff works full-time, 8-10 hours per day, 4-5 days per week, not including overtime. Plaintiff's current supervisor is Roy Squires. Past supervisors have included Mike Wotaj and Dick Ross. See Plaintiff's railroad employment files in Defendants' possession.

4.      Plaintiff developed occupational injuries to his upper extremities, as further described in Interrogatory answers below, from performing everyday job functions on the railroad. As a trackman/welder/track foeman, Plaintiff's tasks included, but were not limited to, the repair and maintenance of railroad track, utilizing certain tools and equipment such as tamping guns, grinders,

impact wrenches, pry bars, hammers, etc. These tasks required Plaintiff to do an extreme amount of repetitive work, as well as using force, and working in awkward postures. Plaintiff was also required to lift heavy objects and was exposed to vibration. There is no one specific date or location of injury. See Plaintiff's railroad employment files in Defendants' possession.

5.     See answers to Interrogatory Nos. 3 & 4 above.

6.     See answers to Interrogatory Nos. 3 & 4 above.

7.     Plaintiff has not served in the military.

8.     Plaintiff has been provided with hearing protection by the railroad, which he wears on the job. Outside the railroad, Plaintiff wears hearing protection whenever he needs to use a chain saw for yard work.

9.     Plaintiff first realized that he had sustained a hearing loss injury, and that noise exposure was the cause of the injury, on or about November 6, 2002. See copy of Plaintiff's audiogram/medical reports previously provided.

10.     Plaintiff is presently unable to recall ever making any formal complaints to Defendants in regard to his work environment, however plaintiff believes he made oral complaints during general conversations with his co-workers and/or supervisors regarding noise at work and/or lack of manpower, etc.

11.     In the past, Plaintiff has participated in baseball/softball and football, but these were back when he was in school. Plaintiff also enjoyed cycling in the past, but has not done so in over 10 years. Presently, Plaintiff's activities include yard work such as mowing his lawn, walking his dog, swimming, golfing and fishing.

12.     See answer to Interrogatory No. 11 above.

13.     Plaintiff believes he had chicken pox as a child. He recalls he sustained a right shoulder injury while playing high school football, which required surgery. In approximately 1977, Plaintiff sustained an injury to his back while working at the railroad when he fell off a boom truck. Plaintiff recalls he settled a claim for this injury. Plaintiff recalls injuring his left pinky finger sometime in the 1980s when he tripped and fell. In approximately the mid-1980s, Plaintiff sustained an injury to his right knee while working at the railroad when he was struck with a track jack. Plaintiff recalls he settled a claim for this injury. In approximately the late 1980s, Plaintiff sustained an injury to his forehead while working at the railroad when he was struck by a truck door. Plaintiff recalls he settled a claim for this injury. In approximately 2002, Plaintiff sustained further injury to his back while working at the railroad when he slipped and fell on ice/snow. Plaintiff believes he has been diagnosed with

some arthritis in his right knee. Plaintiff currently experiences ringing in his ears.

14.    See answer to Interrogatory No 13 above.

15.    See copy of Plaintiff's audiogram/medical reports dated November 6, 2002, previously provided.

16.    Plaintiff is right-handed.

17.    In regard to his hearing loss injury, Plaintiff's symptoms include ringing in his ears and occasional loss of equilibrium. In regard to his upper extremity injuries, Plaintiff's symptoms include numbness, tingling and discomfort in his hands, wrists, arms and shoulder. Plaintiff has also experienced pain in his left thumb and his neck. Plaintiff's symptoms wake him from sleep at night.

18.    See answers to Interrogatory Nos. 17 above & 19 below.

19.    On or about June 19, 2002, Plaintiff was diagnosed with bilateral carpal tunnel syndrome. See copy of Plaintiff's medical record/report previously provided. Plaintiff consulted his primary physician Dr. Baustin of Hadley, Massachusetts, in regard to his injuries. Dr. Baustin referred Plaintiff to a hand specialist. Plaintiff believes his name was Dr. Roman. Dr. Roman diagnosed Plaintiff with bilateral carpal tunnel syndrome as well as injuries to his shoulder. Plaintiff was instructed on certain physical therapy exercises and was prescribed medication. Plaintiff's symptoms seemed to abate at that time. In approximately 2005, Plaintiff's symptoms in his hands, wrists, arms and shoulder returned. Plaintiff further noted pain and discomfort in his left thumb and his neck. Plaintiff consulted orthopedic surgeon Dr. Wenner of Springfield, Massachusetts. Dr. Wenner diagnosed Plaintiff with injuries to his left thumb and his neck. Copies of additional medical records/reports to be provided.

20.    See answer to Interrogatory No. 19 above.

21.    Dr. Wenner has discussed the possibility of cervical surgery, although Plaintiff has not undergone surgery to date.

22.    See answer to Interrogatory No. 21 above.

23.    Plaintiff's primary physician is Dr. Baustin of Hadley, Massachusetts.

24.    Witnesses in regard to this matter include plaintiff's railroad co-workers and/or supervisors, as well as plaintiff's treating physicians. See copies of Plaintiff's medical records/reports previously provided. Copies of additional medical records/reports to be provided. Plaintiff further intends to call certain

corporate officers of the Defendants to testify in this matter on the issue of liability, as well as ergonomic expert, Dr. Michael Shinnick.  Expert witness disclosures to be provided in accordance with the Court's deadlines.

25.    On or about June 19, 2002, Plaintiff was diagnosed with bilateral carpal tunnel syndrome.  On or about November 6, 2002, Plaintiff was diagnosed with hearing loss.  See also answers to Interrogatory Nos. 4, 9, 17, 19 & 21 above.  See copies of Plaintiff's medical records/reports previously provided.  Copies of additional medical records/reports to be provided.

26.    Plaintiff's injuries were not the result of a single traumatic incident.  There is no one specific date or location of injury.

27.    Plaintiff has not lost any earnings to date as a result of his injuries alleged herein.  However, a loss of earnings claim is expected to arise in the future should Plaintiff undergo surgery for his injuries.

28.    Copies of Plaintiff's income tax returns to be provided should a wage loss claim arise in the future in this matter.

29.    Plaintiff has not applied for any sickness and/or disability benefits to date as a result of his injuries alleged herein.

30.    None that Plaintiff is presently able to recall and/or is presently in Plaintiff's possession.


       Plaintiff reserves the right to amend or supplement Plaintiff's Answers to Defendants' Interrogatories prior to trial.



Dated: 6/27/06                    By: _____
                                      THOMAS J. JOYCE, III, ESQUIRE
                                      900 Centerton Road
                                      Mount Laurel, NJ 08054
                                      (856) 914-0220
                                      Attorney for Plaintiff

# EXHIBIT "E"

TK GROUP, INC — ROCKFORD, IL

Date:......... 04/05/2001
Company:...... CSX TRANSPORTATION — JACKSONVILLE, FL
Location:..... MA31 MAINTENANCE OF WAY, SIG & COMM
Department:... ENG                                    Work Shift: 1
             16
Test date:.... 04/05/2001


G C CROWTHER                                  SS#: 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
119 MASSASOIT ST
NORTHAMPTON, MA 01060



Your hearing was recently tested as part of the CSX Transportation,
Inc. Hearing Conservation Program.  Your test results are set out
below:

|  | | Left Ear | | | | | | | Right Ear | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | .5K | 1K | 2K | 3K | 4K | 6K | 8K | .5K | 1K | 2K | 3K | 4K | 6K | 8K |
| Curr 04/05/01 | 20 | 25 | 20 | 30 | 60 | 40 | 35 | 25 | 20 | 15 | 20 | 60 | 35 | 40 |
| Prev 04/13/00 | 15 | 20 | 15 | 20 | 55 | 30 | 20 | 20 | 20 | 10 | 5 | 60 | 30 | 40 |
| Base 05/25/84 | 10 | 15 | 5 | 10 | 15 | 20 | 5 | 10 | 10 | 10 | 10 | 20 | 20 | 15 |

Your current and/or previous test results indicate that your hearing
is not within normal limits at one or more frequencies. Abnormal
hearing levels may be the result of many causes including noise
exposure at work. You should consult an ear doctor to determine the
cause of your hearing loss. The evaluation would be at your own
expense. You may wish to contact your insurance carrier to determine
the extent of coverage under your policy.

This test represents a change (worse) in hearing levels when compared
to your previous test.

According to guidelines established by the American Academy of
Otolaryngology (AAO), you have a hearing loss that should be
evaluated by a physician.

We recommend that you obtain an annual hearing examination which is
available to you through your company-sponsored Hearing Conservation
Program.

CSX Transportation, Inc., has available to its employees a wide
variety of hearing protection.  You should protect your hearing by
wearing hearing protection in those areas where hearing protection is
mandatory and whenever you are exposed to loud noise either on the job
or at home.

If you have any questions, please contact the Medical Department,
500 Water Street, Jacksonville, Florida 32202, (904) 359-1500.



G C CROWTHER                                SS#: 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
04/05/2001

Sincerely,

Hearing Conservation Division
TK Group, Inc.
for
Thomas J. Neilson, M.D., M.B.A.
Chief Medical Officer
CSX Transportation, Inc.


Signature _____

# EXHIBIT "F"



UNIVERSITY of
MASSACHUSETTS

17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

Center for Language, Speech
and Hearing

413.545.2565

| | |
|---|---|
| Client's Name: Geoffrey Crowther | Date of Visit: 11/6/02 |
| Client's Address: 119 Massasoit St. | Birthdate: 5/7/51 |
| Northampton, MA 01060 | File Number: 21602 |
| Phone Number: 413-586-7188 | Referral: Hannon & Joyce |
| | Curtis Center Suite 450 |
| | Independence Square West |
| | Philadelphia, PA 19106 |

## Hearing Evaluation

### Statement of Problem

Mr. Crowther visited the Center for Language, Speech and Hearing on November 6, 2002 through a referral from Hannon & Joyce. He recently had his hearing screened at work, which is the CXS Railroad, where he has worked for twenty-seven years. In his most recent screening, his thresholds had risen significantly since the previous year so he wanted to follow-up with a full hearing evaluation.

### Background Information

Mr. Crowther worked in the engineering department at CXS Railroad up until about ten years ago. He built tracks and made repairs. He now works as a welding foreman. He is often around loud construction equipment. He also uses company radios frequently. The radios are also very loud. It was not until the 1990s that CXS started screening their employees' hearing and providing ear protection. Mr. Crowther reported that he wears ear plugs at work about 50% of the time that he spends in loud noise. He stated that for safety reasons, he cannot wear the ear protection 100% of the time.

Mr. Crowther reported that his family, specifically his children, seem to notice the hearing loss the most. His children often complain that the television volume is too high. Mr. Crowther reported that he has the most difficulty hearing in dinner situations, in the presence of background noise, and during introductions. He stated that he often does not hear names. He reported that he also has trouble at work. Mr. Crowther said that there have been times when he has not heard the radio, and it has lead to arguments with his boss.

Mr. Crowther does not have ear pain, but he has been experiencing tinnitus for a few years. The tinnitus is constant and is heard as a ringing in both ears. However, Mr. Crowther stated that he seems to experience more tinnitus in the right ear. He also has



Page 1 of 3: GC

The University of Massachusetts is an Affirmative Action/Equal Opportunity Institution          ♻ Printed on Recycled Paper

been experiencing equilibrium problems for a few years. Mr. Crowther loses his balance when he makes quick movements or ceases movement too quickly.

Mr. Crowther reported no family history of hearing loss. He has never had any head or neck surgery or injury. He reported no chronic medical conditions, and he is not on any medications.

## Tests Administered

Pure tone air conduction thresholds were found to be on the low end of normal in both the right and left ears between 250 and 2000 Hz. These thresholds fell between 20 and 25 dB HL. At 3000 Hz pure tone thresholds began to rise. The right ear threshold was found at 30 dB HL, and the left ear threshold was found at 40 dB HL. At 4000 Hz, Mr. Crowther's thresholds rose even higher to 65 dB HL and 60 dB HL in the right and left ears respectively. The thresholds began to drop again at 6000 and 8000 Hz creating a noise notch in the audiogram. At 6000 Hz the right and left ear thresholds were found at 45 dB HL. At 8000 Hz the right ear threshold was found at 40 dB HL and the left ear at 35 dB HL. Three frequency pure tone averages for the right and left ears were found at 23 dB HL. Pure tone bone conduction thresholds were found to be normal.

Speech reception thresholds were found at 20 dB HL for both the right and left ears. Speech discrimination was administered at 40 dB SL in both ears. Mr. Crowther was able to correctly discriminate 96% of words in the right ear and 92% of words in the left ear.

Tympanometric testing was administered and found to be normal in both ears. Acoustic reflexes and acoustic reflex decay were tested in response to Mr. Crowther's equilibrium difficulties. Acoustic reflexes were present at normal and reduced sensation levels ipsilaterally and contralaterally for both ears. Contralateral reflex decay at 10 dB SL at 1000 Hz was negative bilaterally.

## Assessment

Mr. Crowther's thresholds reveal normal low frequency hearing sloping to moderate sensorineural hearing loss in the high frequencies. The notch found in the high frequencies confirms that noise exposure is likely the cause of the hearing loss. Middle ear function was found to be normal. Acoustic reflex and acoustic reflex decay testing revealed that retro-cochlear function is normal. However, the presence of reflexes at lower sensation levels suggest that the loss is cochlear in nature.

## Recommendations

The following recommendations were made to Mr. Crowther.

Page 2 of 3:  GC

1. Mr. Crowther should return have his hearing re-evaluated yearly to monitor any change in thresholds.

2. Mr. Crowther should continue to wear his ear protection as often as possible to conserve his hearing ability.

3. Mr. Crowther should see his physician regarding his imbalance problems.

Cc: Geoffrey Crowther
    119 Massasoit St.
    Northampton, MA 01060

Cc: Hannon & Joyce
    Curtis Center Suite 450
    Independence Square West
    Philadelphia, PA 19106-3323

*Natalie Sitko*

Natalie Sitko, B.S.
Graduate Clinician

*Tomma Henckel*

Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist

Page 3 of 3:  GC

UNIVERSITY of
MASSACHUSETTS

17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

UMASS.

Center for Language, Speech
and Hearing

413.545.2565

NAME _Geoffrey Crowther_ AGE _51_ BIRTHDATE _5/7/51_ SEX _M_
ADDRESS _119 Massasoit St. Northampton_ AUDIOLOGIST _NS/TH_ TEST NO. _1_
REFERRED BY _Hannon & Joyce_ MA 01060 FILE NO. _21602_ DATE _11/6/02_



PURE TONE AUDIOGRAM

TYMPANOGRAM

**STAPEDIUS REFLEX THRESHOLD**

| | Contralateral | | | | Ipsilateral | |
|---|---|---|---|---|---|---|
| | .5K | 1K | 2K | 4K | 1K | 2K |
| R | 105 | 95 | 90 | NR | 90 | 95 |
| Decay | | 105 | CI= | | | |
| L | 100 | 95 | 90 | 110 | 90 | 90 |
| Decay | | 105 | CI= | | | |

**SPEECH AUDIOMETRY**

| Test | R | L | SF | |
|---|---|---|---|---|
| Sp. Reception Threshold (SRT) | 20 dB | 20 dB | dB | dB |
| SL | 40 dB 96 | 40 dB 92 | | |
| S/N | | | | |
| Masking Level          dB | dB | dB | dB | dB |
| Tolerance Level | dB | dB | dB | dB |
| Most Comfortable Loudness | dB | dB | dB | dB |

MLV ☑   RECORDING ☐          W-22 ☐      NU-6 ☑

_Tamma Henckel, MA CCC-A_
SUPERVISOR

**PURE TONE AVERAGES**
(500, 1000, 2000 Hz)

| EAR | BETTER TWO FREQ. | ALL THREE FREQ. |
|---|---|---|
| RIGHT | 23 | 23 |
| LEFT | 23 | 23 |

**AUDIOGRAM CODE**

| EAR | AIR | | BONE | | |
|---|---|---|---|---|---|
| | Un-Masked | Masked | Un-Masked | Masked | Color |
| R | O—O | △—△ | <‑< | [‑[ | Red |
| L | X—X | □—□ | >‑> | ]‑] | Blue |

Patient Name: Geoffrey Crowther

Social Security No.: 026362353

Street Address: 19 Massasoit St. Northampton

City/State/Zip: Northampton, MA 01060

Telephone: (413) 586-7188

Date of Birth: 5/7/51

Railroad: CSX

Union: _____

Are you Retired: no   If so, what year _____

## AUDIOLOGIC EVALUATION



0dB = 1969
ANSI THRESHOLDS

FREQUENCY IN HERTZ

Speech Threshold: R 20 dB   L 20 dB

Discrimination Score: dBSL R 96 %   dBSL L 92 %

Audiologist Name: Tomma Henckel
Center for Language, Speech & Hearing

Address: 17 Arnold House
UMass

City/State/Zip: Amherst, MA  01003-0410
(413) 545-2565

Date of Test 11/6/02

## AUDIOGRAM CODE

|                        | R | L |
|------------------------|---|---|
| Air Conduction         | O | X |
| Masked Air Conduction  | ▲ | ■ |
| Bone Conduction        | [ | ] |
| No Response            | ↓ | ↓ |
| Could Not Test         | CNT |   |

Hearing Aid Use _____

_____

_____

Please return this form to Hannon & Joyce, The Curtis Center, Suite 450, Independence Square West
Philadelphia, Pennsylvania 19106 ATTN: Hearing Testing Program (215) 446-4460

**UNIVERSITY of MASSACHUSETTS**
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

**UMASS.**

Center for Language, Speech and Hearing

413.545.2565

November 7, 2002

Mr. Geoffrey Crowther
119 Massasoit St.
Northampton, MA 01002

Dear Mr. Crowther,

Enclosed please find a copy of your Hearing Evaluation Report. Please contact our office at 413-545-2565 should you have any questions or need additional information.

Sincerely,

Natalie Sitko, B.S.
Graduate Clinician

Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist



**UNIVERSITY of MASSACHUSETTS**
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

Center for Language, Speech
and Hearing

413.545.2565

November 7, 2002

Hannon & Joyce
Curtis Center Suite 450
Independence Square West
Philadelphia, PA 19106-3323

To Whom It May Concern,

Enclosed please find a copy of Geoffrey Crowther's Hearing Evaluation Report. Please contact our office at 413-545-2565 should you have any questions or need additional information. Thank you for the referral. It was a pleasure working with Mr. Crowther.

Sincerely,

_____
Natalie Sitko, B.S.
Graduate Clinician

_____
Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist

# EXHIBIT "G"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Springfield Division

---

GEOFFREY CROWTHER,                    :
                                       :
            Plaintiff                  :
                                       :        No. 05-30140-MAP
v.                                     :
                                       :
CONSOLIDATED RAIL                      :
CORPORATION, et al.                    :
                                       :
            Defendant                  :

---

## PLAINTIFF'S INITIAL DISCLOSURES

Plaintiff, Geoffrey Crowther, by and through his attorneys, Hannon & Joyce, submits Plaintiff's Initial Disclosures as follows:

1.    A.    <u>WITNESSES:</u>

      1.    Geoffrey Crowther

      2.    Geoffrey Crowther's co-workers.

      B.    <u>DOCUMENTS:</u>

      1.    Geoffrey Crowther's personnel file within the possession of Consolidated Rail Corporation.

      2.    Geoffrey Crowther's medical file within the possession of Consolidated Rail Corporation.

      3.    University of Massachusetts medical records

      C.    <u>DAMAGES:</u>

Geoffrey Crowther suffers from hearing loss in both ears.  See

attached medical records.

D.    INSURANCE AGREEMENTS:

Consolidated Rail Corporation is self-insured.

2.    EXPERTS WITNESSES:

1.    Tomma Henckel, M.A., CCC-A


HANNON & JOYCE

Date: November 3, 2005        By:_____
                              THOMAS J. JOYCE, III, ESQUIRE
                              Public Ledger Building, Suite 1000
                              150 S. Independence Mall West
                              Philadelphia, PA   19106
                              215-446-4460
                              Attorney for Plaintiff


                              MICHAEL J. McDEVITT, ESQUIRE
                              Lawson & Weitzen
                              88 Black Falcon Avenue, Suite 345
                              Boston, MA   02210
                              617-439-4990
                              Local Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, THOMAS J. JOYCE, III, hereby certify that I forwarded a true and correct copy

of Plaintiff's Initial Disclosures to Lori A. Wirkus, Esquire, Flynn & Associates, 400

Colony Drive, Quincy, MA, 02169, attorney for Defendant, by depositing same in United

States Mail, first class, postage prepaid, this 3rd day of November, 2005.

THOMAS J. JOYCE, III



**UNIVERSITY of MASSACHUSETTS**
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

**UMASS**

Center for Language, Speech
and Hearing

413.545.2565

November 7, 2002

Hannon & Joyce
Curtis Center Suite 450
Independence Square West
Philadelphia, PA 19106-3323

To Whom It May Concern,

Enclosed please find a copy of Geoffrey Crowther's Hearing Evaluation Report. Please contact our office at 413-545-2565 should you have any questions or need additional information. Thank you for the referral. It was a pleasure working with Mr. Crowther.

Sincerely,

Natalie Sitko, B.S.
Graduate Clinician

Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist



UNIVERSITY of
MASSACHUSETTS
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

Center for Language, Speech
and Hearing

413.545.2565

| | | | |
|---|---|---|---|
| Client's Name: | Geoffrey Crowther | Date of Visit: | 11/6/02 |
| Client's Address: | 119 Massasoit St. | Birthdate: | 5/7/51 |
| | Northampton, MA 01060 | File Number: | 21602 |
| Phone Number: | 413-586-7188 | Referral: | Hannon & Joyce |

Hannon & Joyce
Curtis Center Suite 450
Independence Square West
Philadelphia, PA 19106

## Hearing Evaluation

### Statement of Problem

Mr. Crowther visited the Center for Language, Speech and Hearing on November 6, 2002 through a referral from Hannon & Joyce.   He recently had his hearing screened at work, which is the CXS Railroad, where he has worked for twenty-seven years.  In his most recent screening, his thresholds had risen significantly since the previous year so he wanted to follow-up with a full hearing evaluation.

### Background Information

Mr. Crowther worked in the engineering department at CXS Railroad up until about ten years ago.  He built tracks and made repairs.  He now works as a welding foreman.  He is often around loud construction equipment.  He also uses company radios frequently.  The radios are also very loud.  It was not until the 1990s that CXS started screening their employees' hearing and providing ear protection.  Mr. Crowther reported that he wears ear plugs at work about 50% of the time that he spends in loud noise.  He stated that for safety reasons, he cannot wear the ear protection 100% of the time.

Mr. Crowther reported that his family, specifically his children, seem to notice the hearing loss the most.  His children often complain that the television volume is too high.  Mr. Crowther reported that he has the most difficulty hearing in dinner situations, in the presence of background noise, and during introductions.  He stated that he often does not hear names.  He reported that he also has trouble at work.  Mr. Crowther said that there have been times when he has not heard the radio, and it has lead to arguments with his boss.

Mr. Crowther does not have ear pain, but he has been experiencing tinnitus for a few years.  The tinnitus is constant and is heard as a ringing in both ears.  However, Mr. Crowther stated that he seems to experience more tinnitus in the right ear.  He also has

Page 1 of 3:  GC

been experiencing equilibrium problems for a few years. Mr. Crowther loses his balance when he makes quick movements or ceases movement too quickly.

Mr. Crowther reported no family history of hearing loss. He has never had any head or neck surgery or injury. He reported no chronic medical conditions, and he is not on any medications.

**Tests Administered**

Pure tone air conduction thresholds were found to be on the low end of normal in both the right and left ears between 250 and 2000 Hz. These thresholds fell between 20 and 25 dB HL. At 3000 Hz pure tone thresholds began to rise. The right ear threshold was found at 30 dB HL, and the left ear threshold was found at 40 dB HL. At 4000 Hz, Mr. Crowther's thresholds rose even higher to 65 dB HL and 60 dB HL in the right and left ears respectively. The thresholds began to drop again at 6000 and 8000 Hz creating a noise notch in the audiogram. At 6000 Hz the right and left ear thresholds were found at 45 dB HL. At 8000 Hz the right ear threshold was found at 40 dB HL and the left ear at 35 dB HL. Three frequency pure tone averages for the right and left ears were found at 23 dB HL. Pure tone bone conduction thresholds were found to be normal.

Speech reception thresholds were found at 20 dB HL for both the right and left ears. Speech discrimination was administered at 40 dB SL in both ears. Mr. Crowther was able to correctly discriminate 96% of words in the right ear and 92% of words in the left ear.

Tympanometric testing was administered and found to be normal in both ears. Acoustic reflexes and acoustic reflex decay were tested in response to Mr. Crowther's equilibrium difficulties. Acoustic reflexes were present at normal and reduced sensation levels ipsilaterally and contralaterally for both ears. Contralateral reflex decay at 10 dB SL at 1000 Hz was negative bilaterally.

**Assessment**

Mr. Crowther's thresholds reveal normal low frequency hearing sloping to moderate sensorineural hearing loss in the high frequencies. The notch found in the high frequencies confirms that noise exposure is likely the cause of the hearing loss. Middle ear function was found to be normal. Acoustic reflex and acoustic reflex decay testing revealed that retro-cochlear function is normal. However, the presence of reflexes at lower sensation levels suggest that the loss is cochlear in nature.

**Recommendations**

The following recommendations were made to Mr. Crowther.

Page 2 of 3: GC

1. Mr. Crowther should return have his hearing re-evaluated yearly to monitor any change in thresholds.

2. Mr. Crowther should continue to wear his ear protection as often as possible to conserve his hearing ability.

3. Mr. Crowther should see his physician regarding his imbalance problems.

Cc:  Geoffrey Crowther
     119 Massasoit St.
     Northampton, MA 01060

Cc:  Hannon & Joyce
     Curtis Center Suite 450
     Independence Square West
     Philadelphia, PA 19106-3323

Natalie Sitko, B.S.
Graduate Clinician

Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist

Page 3 of 3:  GC



**UNIVERSITY of MASSACHUSETTS**
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

**UMASS.**

Center for Language, Speech and Hearing

413.545.2565



NAME _Geoffrey Crowther_ AGE _51_ BIRTHDATE _5/7/51_ SEX _M_
ADDRESS _19 Massasoit St Northampton, MA_ AUDIOLOGIST _NSITH_ TEST NO. _1_
REFERRED BY _Hannon + Joyce_ FILE NO. _21602 01060_ DATE _11/6/02_



## PURE TONE AUDIOGRAM
### Frequency in Hz

### TYMPANOGRAM

### SPEECH AUDIOMETRY

| Test | | R | L | SF | |
|---|---|---|---|---|---|
| Sp. Reception Threshold (SRT) | | 20 dB | 20 dB | dB | dB |
| | SL | 40 dB | 40 dB | | |
| | S/N | | | | |
| Masking Level | dB | dB | dB | dB | dB |
| Tolerance Level | | dB | dB | dB | dB |
| Most Comfortable Loudness | | dB | dB | dB | dB |

MLV ☑   RECORDING ☐       W-22 ☐       NU-6 ☑

### STAPEDIUS REFLEX THRESHOLD

| | | Contralateral | | | | Ipsilateral | |
|---|---|---|---|---|---|---|---|
| | .5K | 1K | 2K | 4K | 1K | 2K | |
| R | 105 | 95 | 90 | NR | 90 | 95 |
| Decay | 105 | CI= | | | | |
| L | 100 | 95 | 90 | 110 | 90 | 90 |
| Decay | 105 | CI= | | | | |

### PURE TONE AVERAGES
(500, 1000, 2000 Hz)

| EAR | BETTER TWO FREQ. | ALL THREE FREQ. |
|---|---|---|
| RIGHT | 23 | 23 |
| LEFT | 23 | 23 |

### AUDIOGRAM CODE

| EAR | AIR | | BONE | | |
|---|---|---|---|---|---|
| | Un-Masked | Masked | Un-Masked | Masked | Color |
| R | O—O | △—△ | <—< | [—[ | Red |
| L | X—X | ☐—☐ | >—> | ]—] | Blue |

_Tammy Henckel, MA/CCC_
SUPERVISOR

## HANNON & JOYCE HEARING TESTING PROGRAM

Patient Name: Geoffrey Crowther                    Social Security No.: 028362353

Street
Address: 119 Massasoit St. Northampton          City/State/Zip: Northampton, MA

Telephone: (413) 586-7188                          Date of Birth: 5/7/51        01106

Railroad: CSX                    Union: _____     Are you Retired: No    If so, what year _____

### AUDIOLOGIC EVALUATION



OdB = 1969
ANSI THRESHOLDS        FREQUENCY IN HERTZ

Speech Threshold: R 20 dB    L 20 dB

Discrimination Score: dBSL R 96 %    dBSL L 92 %

Audiologist Name: Tomma Henckel

Address: Center for Language, Speech & Hearing
17 Arnold House
UMass

City/State/Zip: Amherst, MA   01003-0410
(413) 545-2565

Date of Test: 11/6/02

### AUDIOGRAM CODE

|                         | R / O | L / X |
|-------------------------|-------|-------|
| Air Conduction          | O     | X     |
| Masked Air Conduction   | ▲     | ■     |
| Bone Conduction         | [     | ]     |
| No Response             | ↓     | ↓     |
| Could Not Test          | CNT   |       |

Hearing Aid Use _____

_____

_____

Please return this form to Hannon & Joyce, The Curtis Center, Suite 450, Independence Square West
Philadelphia, Pennsylvania 19106 ATTN: Hearing Testing Program (215) 446-4460

# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GEOFFREY CROWTHER                    CIVIL ACTION

        Plaintiff

                      NO.  05-30140-MAP

vs.

CSX TRANSPORTATION, et al.

        Defendants

## PLAINTIFF'S EXPERT WITNESS DISCLOSURES

Plaintiff hereby submits the following expert witness disclosures pursuant to Rule

26(a)(2) of the Federal Rules of Civil Procedure.  Plaintiff specifically reserves the right

to call additional witnesses and to otherwise supplement these disclosures as further

information becomes available.

1.      Steven M. Wenner, M.D.
        New England Orthopedic Surgeons
        300 Birnie Avenue, Suite 201
        Springfield, MA 01107
        Dr. Wenner, Plaintiff's treating physician and medical expert, to testify as
        to Plaintiff's medical history, diagnosis of injuries sustained, cause of
        Plaintiff's injuries, treatment and prognosis.  A copy of Dr. Wenner's
        CV to be provided.

2.      Michael D. Shinnick, Ed.D.
        Dynamics Research Group
        Research Park, Suite 201
        670 Sunshine Farm Lane
        Blacksburg, VA 24060
        Dr. Shinnick, Plaintiff's ergonomic expert, to testify as to risk factors at
        the railroad, foreseeability and liability of Defendant railroad.  A copy of
        Dr. Shinnick's CV is attached hereto.



3.  Allan Baustin, M.D.
    Hadley Family Practice
    234 Russell Street, Suite 7
    Hadley, MA 01035
    Dr. Baustin, Plaintiff's treating physician and medical expert, to testify as
    to Plaintiff's medical history, diagnosis of injuries sustained, cause of
    Plaintiff's injuries, treatment and prognosis. A copy of Dr. Baustin's
    CV to be provided.

4.  Mark A. Woodward, M.D.
    UMD of New Jersey
    42 E. Laurel Road, Suite 1100A
    Stratford, NJ 08084
    Dr. Woodward, Plaintiff's diagnosing physician and medical expert, to
    testify as to Plaintiff's medical history, diagnosis of injuries sustained,
    cause of Plaintiff's injuries, and prognosis. A copy of Dr. Woodward's
    CV is attached hereto.

5.  Tomma Henckel, M.A., CCC-A
    University of Massachusetts
    Center for Language, Speech & Hearing
    17 Arnold House
    715 N. Pleasant Street
    Amherst, MA 01003
    Ms. Henckel, Plaintiff's diagnosing audiologist and medical expert, to
    testify as to Plaintiff's medical history, diagnosis of injuries sustained,
    cause of Plaintiff's injuries, treatment and prognosis. A copy of Ms.
    Henckel's CV to be provided.

6.  All individuals identified in Defendant's disclosures.


                                THE LAW OFFICE OF THOMAS J. JOYCE, III


Dated: 7/26/06                  BY: _Thomas J Joyce III_
                                THOMAS J. JOYCE, III, ESQUIRE
                                900 Centerton Road
                                Mount Laurel, NJ 08054
                                (856) 914-0220
                                Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GEOFFREY CROWTHER                    CIVIL ACTION

        Plaintiff
                                     NO.  05-30140-MAP
  vs.

CSX TRANSPORTATION, et al.

        Defendants

## CERTIFICATE OF SERVICE

I, THOMAS J. JOYCE, III, hereby certify that I forwarded a true and correct copy of Plaintiff's Expert Witness Disclosures to Lori A. Wirkus, Esquire, attorney for Defendants, at Flynn & Associates, 400 Crown Colony Drive, Suite 200, Quincy, MA 02169, by depositing same in United States Mail, this 26th day of July 2006.

THOMAS J. JOYCE, III, ESQUIRE

# Dynamics Research Group

**Dr. Michael D. Shinnick, Director**

HOME - CURRICULUM VITAE - TESTIMONY LIST - TASK MASTER - RECENT PUBLICATIONS - PRESENTATIONS - COMPANIES/CONSUMERS - DRG HISTORY - MODAPTS - PHOTO ALBUM

## Curriculum Vitae (Current to July 2002)

### Michael D. Shinnick

**OFFICE ADDRESS:**

Dynamics Research Group
Research Park, Suite 201
670 Sunshine Farm Lane
Blacksburg, Virginia 24060

Tel. (540) 951-1950
Fax (540) 951-0519
Mobile (540) 230-5912
E-Mail: DRG@Drshinnick.com

EDUCATION
PROFESSIONAL CERTIFICATIONS
PROFESSIONAL WORK EXPERIENCE
PROFESSIONAL SERVICES
CONSULTING AND TRAINING
GRANTS AND CONTRACTS
HONORS AND AWARDS
PUBLICATIONS
TRAINING/RESOURCE MANUALS
PRESENTATIONS & SEMINARS 96/01
OTHER EXPERIENCES, COMPETENCIES, AND ACTIVITIES

## EDUCATION

Post Doctoral - Auburn University, Industrial Engineering. (Work Measurement and Ergonomics) 1979-1981

Ed.D. Auburn University, 1977. College of Education, Department of Rehabilitation and Special Education. (Specializing in Service Systems for Individuals with Severe Handicapping Conditions)

M.Ed. Auburn University, 1971. (Rehabilitation Counseling and Psychology)

B.S. Florida State University, 1968. (School of Business)

## PROFESSIONAL CERTIFICATIONS

Human Factors and Ergonomics Society, Member 2002 to 2007.

Certified Member of The American Railway Engineering and Maintenance-of-Way Association

Certified Vocational Evaluator, Commission on Certification of Work Adjustment and Vocational Evaluation, 1984 to 2005, Certificate No. 00844.

Certified Work Adjustment Specialist, Commission Certification of Work Adjustment and Vocational Evaluation, 1984 to 2005, Certificate No. 00324.

Certified Rehabilitation Provider, Board of Professional Counselors, Department of Health Professionals, Commonwealth of Virginia, 1995. License NO:0715002936

Board Certified Work Measurement and Ergonomics Trainer, International MODAPTS Association, 1990 to 2005, awarded for five year periods.

The American Board of Forensic Examiners, Diplomate: Board Certified Forensic Examiner, Specialty: Ergonomics, Work Injury Management, Rehabilitation. 1994 to 2003. I.D. No:00567

Registered Vocational Expert, Social Security Administration, Bureau of Hearings and Appeals, 1980 to present.

Senior Disability Analyst and Diplomat, American Board of Disability Analysis, 1999 - 2004, Diploma Certificate No: 6319-99.

## PROFESSIONAL WORK EXPERIENCE

Director, Dynamics Research Group, 1981 to Present.

> Productivity, work injury & disability management, ergonomics, both office and production environments, gain sharing, and work measurement consultation with business, industry, financial institutions and service agencies; ergotecture/ergonomics software systems development and marketing; federal contracting; staff development training; employee assistance programming; assessment of residual employability; transferability of skills analysis; employability access; expert witness reporting; case management; life care plans for individuals with catastrophic injuries; functional capacity evaluation; and maritime services.

Associate Professor of Rehabilitation and Director of the Rehabilitation Continuing Education Program, Dept. of Rehabilitation and Special Education, Auburn University, 1983-1986.

> Director of the Rehabilitation Facility Administration Project, the Vocational Evaluation and Work Adjustment Project, and the State Department of Education Special Needs Assessment Project. Graduate faculty member and coordinator of Rehabilitation Extension and Continuing Education activities. Graduate instruction in rehabilitation and procurement of extramural funds. Manager of budgets (averaging $500,000 annually), direct staff, administration of grants and contracts, and coordinator of services to vocational rehabilitation agencies in eight southeastern states.

Assistant Professor and Director of the Rehabilitation Administration Program, Dept. of Rehabilitation, College of Education, Auburn University, 1978-1983.

> Direct staff in the teaching, development of, and research in the area of rehabilitation facility administration. Direct masters and doctoral committees, conduct research, develop course manuals, teach pre-service classes and in-service courses.

Director of Independent Living Project, Auburn University, 1979-1981.

> Direct staff in the development of an Independent Living Resource Manual for the severely

handicapped. Coordinated development of independent living in-service training and a national materials distribution network for the development of programs for the severely handicapped.

**Assistant Professor and Associate Project Director of the Region IV Rehabilitation Facility Training Program, Dept. of Rehabilitation, College of Education, Auburn University, 1977-1978.**

> Coordinator of Rehabilitation Management Training Programs; training representative for Vocational Rehabilitation Agencies in Georgia, Florida and Mississippi; assisted in the administrative and funding activities of the training programs for facility personnel, i.e., vocational instructors, production supervisors, vocational adjustment specialists, vocational evaluators, administrators; instructor of graduate and undergraduate students in vocational rehabilitation.

**Extension Associate, Rehabilitation and Special Education Department, Auburn University, 1973-1977.**

> Instructed professional rehabilitation facility personnel in techniques of vocational evaluation, work adjustment, and management. Coordinated administration workshops. Assistant project director of the Region IV Rehabilitation Facility Training Program.

**Graduate Research Assistant, Rehabilitation and Special Education Dept., Auburn University, 1973-1975.**

> Instructor in vocational evaluation, work adjustment, work injury management, and vocational placement techniques.

**Vocational Evaluator and Work Adjustment Services Coordinator, State of Alabama Dept. of Education, Division of Vocational Rehabilitation at the Achievement Center, Opelika, Alabama, 1971 to 1973.**

> Responsible for providing individual and group counseling to rehabilitation clients and developing, organizing and directing the program and staff of the Vocational Rehabilitation Center. The program consisted of vocational evaluation, work adjustment services, work measurement, vocational training and placement.

## PROFESSIONAL SERVICES

Research and Demonstration Site Coordinator for Ergonomics Systems, Bissell Health Care Systems, Lafayette Instruments 1993 to 1995.

Montgomery Regional Hospital & Pulaski Community Hospital Advisory Counsel for Occupational Health and Safety, 1994.

National Association of Forensic Economics, research contributor & member 1993 to 1996.

Pain Management Consortium of Southwest Virginia, Council Member, 1992 to present.

International MODAPTS Association (IMA) Chairman of the Board of Directors and President, IMA holds the English speaking copyrights for the MODAPTS system, Western Michigan University, 1989 to 1992.

International MODAPTS Board - Function as one of the twelve international members of the governing body, Sydney, Australia, 1986 to present.

Editorial Advisory Board - Vocational Evaluation and Work Adjustment Bulletin, 1977 to 1984.

The President's Committee on Employment of People with Disabilities, Washington, D.C., 1981-1985.

Governor's Advisory Council on Facilities and Information Network Development, 1979-1982.

State Department of Education Committee on Handicapped Children Early Childhood Education Program, 1980.

Chairman of the Peer Review Panel for Rehabilitation Facility Administration Grants, R.S.A., H.E.W., Washington, D.C., 1979.

Research Editor of the National Association of Rehabilitation Instructors Bulletin. 1979.

National Rehabilitation Administration Association Accreditation Standards Committee, 1979-1982.

Peer Review Panel for Independent Living Part B Projects. Dept. of Education, Washington, D.C., 1979.

## CONSULTING AND TRAINING

Worked with over 400 community, state and federal agencies as a rehabilitation of the severely handicapped systems expert, ergotecture and ergonomics expert. Services have been provided to business, industry and financial institutions. Internationally, projects have been conducted in New Zealand, Australia, Central America, and the Caribbean Basin. In legal services, over 250 cases have been developed and data presented.

Management, Productivity, and Ergonomics Consultant to over 300 industries, businesses, financial institutions and service agencies including Ford Motor Company, General Motors, Abbot Labs, Brunswick Defense, and the U.S. Department of Justice, Southeast Bank, 1985-2002.

Virginia Department of Rehabilitative Services - Rehabilitation Engineer Consultant, provided assessment, implementation and follow-up for over 200 DRS clients. Services provided included work site accommodation, assistive devise needs, and independent function facilitation, 1995-1999.

Conducted over 90 training programs on work measurement and ergonomics. Participants represented financial, manufacturing, human services, and educational institutions.

Florida Association of Rehabilitation Facilities, Work Injury Management Consultant, 1984-1985.

Australian Department of Rehabilitation, conducted seminars in Vocational Assessment, 1984.

Massey University, Massey, New Zealand, visiting lecturer, 1984.

Alabama State Department of Mental Health. Provided a series of Staff Development Programs for State Institution Staff, 1982.

Georgia Department of Human Resources. Conducted a Series of Methods Analysis and Time Study Workshops, 1981-1983.

Kentucky Bureau for Blind Services, Training Consultant, 1980-1982.

State Department of Education - Handicapped Children Work Activities Training, 1980.

Conducted over 35 workshops on Interpersonal Skills and Communications Training as a consultant to various agencies and organizations, 1977-1990.

Program Development Consultant to Tennessee Blind Services Agency, 1977-83.

Federal Technical Assistance Consultant to Rehabilitation Services Administration, 1976 to present.

Consultant to Cornell University in developing rehabilitation adjustment services programs and in conducting management training, 1973 to 1986.

Consultant to South Carolina University Rehabilitation and Counseling Department's Seminar on Innovations in Work Adjustment. Orangeburg, South Carolina, 1976.

Special Education Consultant to Macon, Russell, and Perry County Boards of Education, 1975-1986.

North Carolina Blind Services Agency, Staff Development, 1975, 1979.

Cornell University's Labor Relations Think Tank on Work Adjustment and Rehabilitation Services, 1975.

Adjunct Instructor to Tuskegee Institute's Drug Abuse Human Services Program, 1975.

Special Education and Gifted Diagnosis Consultant for the Alabama State Department of Education, 1973-1986.

## GRANTS AND CONTRACTS

Since 1973, have secured over six million dollars in contracts and grants for providing training, product development, work measurement, work injury management program development, ergonomic assessment, human factors studies, and OSHA/NIOSH compliance reviews. Specific grants and contracts include:

General Motors, 1990, 1991, 1994; Brunswick Defense, 1990, 1991; Ford
Motor Company, 1988 - 2002; Boeing Aircraft Company, 1991, 1992;
Bridgestone Tire Company, 1993, 1994; Abbott Laboratories, 1992 -1995;
Intermet Foundries, 1990-1993; American College Pathologists, 1992; Federal
Bureau of Prisons, 1988 - 1995; Special Needs Development and Training
Program, 1985, 1986; Roadway Express, Inc., 1992 - 1999; Virginia
Department of Rehabilitative Services, 1994 - 1999; National Industries for the
Severely Handicapped, 1988 - 1999; Wabash Magnetics Control Products, 2000
- 2001; Vecta Industries, 2001; Indiana Association of Rehabilitation Facilities,
1990, 2000; Verizon, 2001 - 2002; Bassett Furniture, Co., 2000 - 2002.

Partners of the Americas, - developed an industrial contracting training program for the
Rehabilitation Training Center, Guatemala City, Guatemala, 1985, 1995, 1997.

The World Rehabilitation Fund - researched the application of industrial engineering work
measurement to vocational rehabilitation. Sidney, Brisbane, and Perth, Australia; Massey
University and Hamilton, New Zealand, 1984;

Facility Administration In-service Grant, funded by Rehabilitation Services Administration,
1982 through 1986;

Vocational Evaluation and Work Adjustment In-Service Training, funded by RSA, 1982
through 1986;

The Alabama State Department of Education - training in vocational evaluation, work
measurement and work adjustment, 1981 through 1983;

The Alabama State Department of Mental Health - training and consulting in work
measurement, 1981;

The Alabama Department of Youth Services - communications training for vocational
instructors, 1981;

The Georgia Division of Mental Health and Mental Retardation - work measurement, 1981.

## HONORS AND AWARDS

Director Emeritus, International MODAPTS Association and the International Labour
Organization, Geneva, Switzerland, April 1999;

Selected for the Who's Who National Directory Executives and Professionals, 1997;

Recipient of the G. Christopher Heyde Award for international contributions to research in
work measurement and work injury assessment. International MODAPTS Association,
1994;

Disability Management & Work Injury Assessment Seminar - program consultant and
speaker, Sidney, Australia, 1990;

International MODAPTS Association Chairman & President 1989-91;

United States Representative to Partners of the Americas Employment Congress for Central and South America, Guatemala, 1985.

World Rehabilitation Fund International Exchange of Experts Fellowship, Australia & New Zealand 1984.

## PUBLICATIONS

Garratt, Charles., Garratt, Steven., Shinnick, Michael., TaskMaster 2000, *Gray Owl Software*, Dynamics Research Group, January 2000, TaskMaster Version 3, 2002.

Shinnick, M.D., Lanphear, M.J., An Expert Examines Daubert in the Context of Cumulative Trauma Disorders, Publication www.drshinnick.com.

Wickstrom, Richard J., Shinnick, Michael D., Industrial Standards for the Jamar Physical Agility Test Battery, *Lafayette Instruments and Ergonomics Systems*, Bissell HealthCare 1995.

Garratt, Charles, Shinnick, Michael D., TaskMaster for Windows, *Gray Owl Software*, 1995.

Shinnick, Michael D., Stone, Victoria Jordan, Vocational Aspects of Personal Injury Litigation, *On Science and Technology* - International MODAPTS Association, June 1993.

Shinnick, Michael D., Disability Management: Background, Process, and Aims, International MODAPTS Association, 1992.

Shinnick, Michael D., Stone, Victoria J., Empirical Data Helps to Prove Vocational Loss in Personal Injury Cases, *Lawyers Weekly*, December 1992.

Garratt, Charles, Shinnick, Michael D., TaskMaster - Advanced Software for MODAPTS-based Work Standards, *Gray Owl Software*, 1991.

Shinnick, Michael D., Erwin, Walter E., Work Measurement System Creates Shared Responsibility Among Workers at Ford, *Industrial Engineering*, August 1989, Vol. 21, No. 8.

Shinnick, Michael D., Vocational and Rehabilitation Expert Testimony Objectified Through the Application of Ergotecture, *Lawyer's Weekly*, June 1988, Vol. III, No. 4.

Shinnick, Michael D., and Gerber, Donald L., A Common Language for Analyzing Work, *Journal of Systems Management*, Vol. 36, No. 4, pp. 8-13, 1986.

Black, J., Shinnick, M., Welsh, J., A Work Measurement Approach to Functional Assessment, *Issues Papers: National Forum on Issues in Vocational Assessment*, Materials Development Center, University of Wisconsin-Stout; Menomonie, Wisconsin, 1985.

Shinnick, Michael D., Improving the Effectiveness of Rehabilitation Services Through a Common Language for Practitioners, *Journal of Rehabilitation*, Aug. - Sept., 1985, pp. 33-38.

Shinnick, Michael D., Black, J.B., Decker, Roger S., "A Partnership: Vocational Evaluation and Industrial Engineering." *Vocational Evaluation and Work Adjustment Bulletin*, Vol. 16, No. 1, 1983.

Shinnick, Michael D., Black, J.B., The Application of Industrial Engineering, *Vocational Evaluation, Work Adjustment and Independent Living Services for the Severely Disabled*, Robert Lassiter, Ed. Springfield, IL: Charles Thomas, 1983.

Shinnick, Michael D., Sallenger, Sabra H., Burdg, Nancy B., "Guidelines for the Development of Independent Living Services in Rehabilitation Facilities." *Vocational Evaluation, Work Adjustment and Independent Living for Severely Disabled*, Robert Lassiter, Ed. Springfield, IL: Charles Thomas, 1983.

Shinnick, M.D., Sallenger-Hoffman, S., Innovations in Vocational Evaluation and Work Adjustment - Independent Living: A Resource Manual, *Vocational Evaluation and Work Adjustment Bulletin*, Vol. 14, No. 1, Spring 1981.

Carter, J., Shinnick, M.D., McDaniel, R.S., The Impact of In-Service Training in Rehabilitation Facility Administration. *Journal of Rehabilitation Administration*. Vol. 5, No. 4, 1981.

McDaniel, R.S., Burdg, N.B., Shinnick, M.D., The Relationship Between Vocational Evaluator Initial Perceptions and Their Recommendation for Adjudicated Youths, *Vocational Evaluation and Work Adjustment Bulletin*. Vol. 14, No. 4, 1981,

Shinnick, M.D., Floyd, M.R., A Reliability Study Using Semantic Differential for Short-Term Workshop Evaluation, *National Association of Rehabilitation Instructors*. Vol. 3, No. 5, June 1980.

Shinnick, M., Carter, J., and Anderson, J., "Directory of Region IV Vocational Rehabilitation Facilities - A Descriptive Analysis" Auburn University, 1979.

Shinnick, M.D., A System for the Evaluation for Short-Term Training for Rehabilitation Facility Personnel, *AURORA*. Vol. 10, No. 1, January 1978.

Shinnick, Michael D., The Follow-up Evaluation of Rehabilitation Facility Short-Term Training, *Vocational Evaluation and Work Adjustment Bulletin*. Vol. II, No. 2, June 1977.

Allen, Conrad M., and Shinnick, Michael D., Placement Through a Job Trial Approach to Vocational Evaluation, *Placement Services and Techniques*, Bowman, J. R. and Graves, W.H. January 1976.

Shinnick, M.D., "The Effects of Time Interval Between Conclusion of Training and Follow-Up," Auburn University, 1976.

Shinnick, Michael D., The Stone Masonry and Tile Setting Work Sample, Work Sample Clearing House, Materials Development Center, University of Wisconsin, January 1974.

Allen, Conrad M., and Shinnick, Michael D., Successful Placement Through a Job Trial Approach to Vocational Evaluation, *Vocational Evaluation and Work Adjustment Bulletin*.

Vol. 7, No. 4, 1973.

## TRAINING/RESOURCE MANUALS

Garratt, Charles and Shinnick, Michael D., TaskMaster 2000 - Applied Work Standards and Ergonomic Work Methods, *Gray Owl Software*, January, 2000, 2002.

Garratt, Charles., Cooper, David., Shinnick, Michael D., "TaskMaster - The Program for Understanding Work, Artifacts Software," Dynamics Research Group, 1990, 92, 95.

Shinnick, Michael D., "MODAPTS Resource and Training Manual," Dynamics Research Group, 1989, 1991.

Sechrist, T., Spitznagel, R., Shinnick, M., "Contract Procurement and Cost Estimating," Auburn University, 1983.

Shinnick, M.D., Spitznagel, R., "Methods Analysis and Work Measurement," Auburn University, 1983..

Shinnick, Michael D., "Production Practices for Human Service Programs," Auburn University, July 1981. Revised 1983.

Wilson, D.L., Shinnick, M.D., Carter, J., "Rehabilitation Facility Administration Practices and Procedures II, Management of the Organization," Auburn University, 1979. Revised by Wilson, D.L., Spitznagel, R., Shinnick, M.D., 1983.

Helm, J.P., Shinnick, M.D., Carter, J., "Program Evaluation for Rehabilitation Facilities," Auburn University, 1979. Revised by Spitznagal, R., Brabham, A., Shinnick, M.D., 1983.

Wilson, D.L., Shinnick, M.D., Carter, J., "Rehabilitation Facility Administration Practices and Procedures I, Personnel Management," Auburn University, 1978. Revised by Wilson, D.L., Shinnick, M.D., Spitznagal, R., 1983.

Shinnick, M.D., Floyd, M.R., "Communication Effectiveness Skills for Rehabilitation Facility Training Grant," 1977. Revised 1980, 1983.

Hoffman, S.J., Shinnick, M.D., Willoughby, M., "Independent Living Resource Manual," Auburn University, March 1980.

Brolin, J., Smith, T., Shinnick, M., "Production Practices in Rehabilitation Facilities," Auburn University, 1979.

McDaniel, R.S., Anderson, J.L., and Shinnick, M.D., "Vocational Evaluation Resource and Training Manual," Auburn University, 1977.

Anderson, J.L., McDaniel, R.S., and Shinnick, M.D.," Adjustment Services Resource and Training Manual" Auburn University, 1977.

## PRESENTATIONS & SEMINARS 96/02

*Ergonomics of Office Equipment, Seating, Furnishings and Work Practices,* Dallas, Texas, January 29-30, 2001, March 4-5, 2002.

*Ergonomics and Work Measurement,* Wabash Magnetics Control Products, Fort Wayne, Indiana, October 12-14, 2000

*MODAPTS, The Language of Work Injury Management,* INARF, Indianapolis, Indiana, September 12-13, and October 11-12, 2000

*Carpal Tunnel Syndrome and Hearing Loss, Epidemiology, Biomechanics, Causation, Prevention and Cost,* Virginia Senate Commerce & Labor Subcommittee, October 16, 1996; House of Delegates Commerce & Labor Subcommittee, October 21, 1996, Richmond, Virginia.

*Management of Work Related Upper Extremity Injuries, An Ergonomic & Rehabilitation Perspective,* August 23, 1996, Calgary, Canada.

*Assessment of Work Related Upper Extremity Risk Factors,* MODAPTS Symposium, March 23, 1996, Cocoa, Florida.

MODAPTS Seminar, *The Language of understanding Work,* Reno, Nevada, March 11-15, 1996

MODAPTS & Ergonomics Seminar: St. Augustine, Florida, January 96; New Orleans, March 97; St. Louis, October 97; Nashville, June 98; St. Louis, June, 1999.

Work Injury & Ergonomics, Ford Motor Company, Louisville, KY, Jan. - April, 1996, Dearborn, MI, February-August 1997, January-March 1998; Kentucky Truck, May – July 1998; Twin Cities, February-March 1999. June 2000, February-March 2001.

Special Health & Safety, Projects, Ford Motor Company, Dearborn, MI, March 1999. "*An Historical Perspective of Ergonomics, Work Injury Management and MODAPTS*" International MODAPTS Association Symposium, Cocoa, Florida, April 16, 1999.

*Ergonomics and Work Injury Management, An interdisciplinary Mandate for the Millennium,* International Symposium, Cocoa, Florida, April 13, 2000.

**OTHER EXPERIENCES, COMPETENCIES, AND ACTIVITIES**
Registered Psychometrist, 1977 to present.
Federal Technical Assistance Consultant - R.S.A, 1977 to present.
Participant, co-leader, and leader of personal growth labs, marathons, and communications conferences, 1970 to 1992.
Captain of a 110' private charter yacht, 1987.
Owner of a 48' sailing vessel, 1985-1987.
Extensive travel in the Caribbean Basin, Central America, 1982 to present.
Licensed Master by the United States Coast Guard for vessels up to 100 tons. 1984 to present.
Participant in the National Trust for Historic Preservation, 1974 -1985.
Completed the Rehabilitation Facility Administration Certificate Program, 1981.
Licensed Effectiveness Trainer, 1977.

· Certified Water Safety Instructor and Scuba Diver, 1981 to present.
· Conducted restoration of a historic southern antebellum plantation, 1975-1986.

. Contributed to undergraduate & graduate education expenses by employment as:

   hotel front desk manager, hardware store clerk, service station attendant, car salesman, life
   guard, recreation director, Fuller Brush salesman, painter, assistant manager of grocery store,
   census taker, bartender, yacht captain, furniture repairer, and carpenter.

## BACK TO THE TOP

---

**Dynamics Research Group**
Research Park, Suites 201-203, 670 · Sunshine Farm Lane · Blacksburg VA 24060
Telephone: 540-951-1950 · FAX  540-951-0519 · E-Mail: drg@drshinnick.com

# CURRICULUM VITA

**MARK A. WOODWARD, M.D.**
University of Medicine & Dentistry of New Jersey
School of Osteopathic Medicine
42 East Laurel Road, Suite 1100A
Stratford, New Jersey 08084

Work: 856-566-6843
Home: 856-566-5601

## PROFESSIONAL TRAINING AND EXPERIENCE

**2001-present**  **Assistant Professor of Neurology**
University of Medicine and Dentistry of New Jersey School of
Osteopathic Medicine, Stratford, NJ

**General Neurology Consultant and Attending Physician**
Kennedy Health System, Southern New Jersey

**2000-2001**  **Neurology, Electromyography, EEG**
Private Practice, Neurologic Group of Bucks/Montgomery County
North Wales, PA

**General Neurology Consultant and Attending Physician**
Doylestown Hospital, Doylestown, PA
Grandview Hospital, Sellersville, PA
North Penn Hospital, North Wales, PA

**1997-2000**  **General Neurology Consultant**
Forensic Unit, St. Francis Medical Center, Trenton, NJ and New Jersey
State Department of Corrections

**1996-2000**  **Neurology, Electromyography, EEG**
Private Practice, Elmer, NJ

**General Neurology Consultant and Attending Physician**
South Jersey Hospital – Elmer Division, Elmer, NJ

**1995-1996**  **Neurology, Electromyography, EEG**
Neuro-Medical Associates, Trenton, NJ

**General Neurology Consultant and Attending Physician**
St. Francis Medical Center, Trenton, NJ

**1994-1995**  **Fellowship in Clinical Neurophysiology (EEG, EMG) and Sleep
Disorders**
Crozer-Chester Medical Center, Upland, PA
Hahnemann University School of Medicine, Philadelphia, PA

**1992-1994**  **Behavioral Neurology Consultant and Attending Physician**
Head Injury Recover Center at Hillcrest, Milford, PA

MARK A. WOODWARD, M.D.
Page Two

**1990-1992**  **Assistant Professor of Neurology**
University of Maryland School of Medicine, Baltimore, MD

**Attending Physician**
Neurorehabilitation Unit, Kernan Hospital, Baltimore, MD

**1989-1990**  **Behavior Neurology Consultant and Attending Physician**
New Medico Head Injury Center at Lewis Bay, Hyannis, MA and Forest
Manor Neurological Rehabilitation Center, Middleboro, MA

**1988-1989**  **Fellowship in Behavioral Neurology**
Boston/Bedford VA Medical Centers and Boston University School of
Medicine, Boston, MA

**1987-1989**  **Medical Officer; Consultant in Neurology (1988-89)**
Medfield State Psychiatric Hospital, Medfield, MA

**1985-1988**  **Resident in Neurology**
Affiliated Hospital Training Program in Neurology
Boston University School of Medicine, Boston, MA

**1984-1985**  **Medical Internship**
Crozer-Chester Medical Center, Upland, PA
Diplomate, National Board of Medical Examiners, (July 1985)

## EDUCATION AND HONORS

**1988-1989**  **Boston University Graduate School, Boston, MA**
Courses in neuropsychological assessment in partial fulfillment of PhA.
Requirements in Behavioral Neurosciences

**1980-1984**  **Hahnemann University School of Medicine, Philadelphia, PA**
Doctor of Medicine, (June 1984)
Certificate of Distinction in Neurology
Certificate of Honor in Neuroanatomy and Neurosurgery

**1975-1980**  **Temple University, Philadelphia, PA**
B.A. in Biology, (August 1980)
Magna Cum Laude
Phi Beta Kappa
Graduate courses in neurobiology, neurobiological research techniques
(intracellular recording), and electron microscopy.

*Board Certified in Neurology by the American Board of Psychiatry and
Neurology, Inc., with added qualifications in Clinical Neurophysiology.*

*Board Eligible in Sleep Medicine*

**MARK A. WOODWARD, M.D.**
Page Three

## MILITARY EXPERIENCE

1971-1975    Active Duty, United States Marine Corps
Aviation Ordinance Technician
Highest Rank, Sergeant (E-5)
Honorable Discharge 1977

## CURRENT LICENSURE

1991-Present      Pennsylvania State Medical License

1995- Present     New Jersey State Medical License

1999-Present      Delaware State Medical License

## PROFESSIONAL ASSOCIATIONS

American Medical Association

New Jersey Medical Association

Mercer County Medical Association

American Clinical Neurophysiology Society

American Sleep Disorders Association

American Association of Electrodiagnostic Medicine

American College of Occupational and Environmental Medicine

American Society of Neurorehabilitation

Revised: 3/3/2001

TOTAL P.04

# EXHIBIT "I"

### Resume for:
# TOMMA HENCKEL, MA, CCC-A

**Address:**  38 Hedgerow Lane  
Amherst, MA 01002

**Tel:** (413) 256-6076  
**e-mail:** thenckel@comdis.umass.edu

**Work Experience:**

**Full-time CLINICAL INSTRUCTOR and AUDIOLOGIST**  
University of Massachusetts – Amherst, MA                          Jan 1996-present

Conducted a wide range of diagnostic testing and hearing rehabilitation, including managing a full hearing aid program. Conducted direct service and extensive clinical supervision of up to 6 Audiology students every semester.

Supervision of students includes, but is not limited to, clinical supervision, editing all clinical reports, conducting student evaluations, placing students in off-campus internship sites, acting as liaison with off-campus supervisors, and conducting a regular clinicians' meeting/group.

Managed a hearing screenings program in the public schools for surrounding towns and coordinating presentations to area senior and community centers as well as health fairs.

Initiated community outreach programs, generated referrals and marketed our clinic to the public.

**CONSULTING AUDIOLOGIST**  
Veterans Administration Medical Center – Leeds, MA            Dec 1994-Nov 2005

Initially conducted all diagnostic testing of veterans and referred for further follow-up, medical and rehabilitative. Also performed regular screenings of the VA employees. Later on, once the site was approved for fitting hearing aids for the vets, set up a hearing aid fitting program, including making recommendations on programming, testing and verification equipment to order.

**CLINICAL AUDIOLOGIST**  
ENT Associates of Springfield, MA                              Apr 1992-Dec 1995

Performed a wide range of diagnostic testing, including ENG and ABR testing as well as interpretations. Worked together with the other audiologists, the physicians and the office staff to help the office run as smoothly as possible.

**Part-time CLINICAL SUPERVISOR**  
University of Massachusetts – Amherst, MA                     Sep 1994-Dec 1995

**CFY SUPERVISOR & SUPERVISOR of Graduate Interns**  
ENT Associates of Springfield, MA                            Jun 1993-Jul 1995

**AUDIOLOGY INTERNSHIPS**

Weldon Center - Mercy Hospital, Springfield, MA       Sep-Dec 1991

Mercy Hospital Mobile Hearing Test Van                Sep-Dec 1991

Holyoke Hospital, Holyoke, MA                         Jun-Aug 1991

UMass Communication Disorders Clinic                  Sep1990-May 1991

**AUDIOMETRIC TECHNICIAN**  
Hampshire Eye & Ear Associates, Northampton, MA        Sep 1989-Aug 1990



**Other Work Experience:**

RESEARCH ASSISTANT in psychology for various postgraduate psychology students

ASSISTANT OFFICE MANAGER
Boston Institute for Psychotherapy, Inc., an outpatient mental health clinic and post-graduate training facility for psychotherapists

STUDENT MANAGER
SAGA Foodservices, Hampshire College

TEACHER'S AND RESEARCH ASSISTANT
Summer Studies in Mathematics at Hampshire College

ACADEMIC and RESIDENTIAL COUNSELOR
Summer Studies in Mathematics at Hampshire College

**Education:**

MASTERS OF ARTS/Audiology – Univ. of Mass/Amherst; Dec 1991.

BACHELOR OF ARTS/Communications & Cognitive Science (Linguistics) Hampshire College – Amherst, MA; May 1985

ABITUR: John-F.-Kennedy-School; a bilingual, bicultural school in Berlin, Germany; Dec 1980.

**Publications:**

ON THE CONJUNCTION OF COORDINATE STRUCTURES in University of Massachusetts Occasional Papers in Linguistics, Vol. 6, 1984.

**Memberships:**

American Speech-Language-Hearing Association (ASHA)

Massachusetts Speech-Language-Hearing Association (MSHA)

American Academy of Audiology (AAA)