UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————

GEOFFREY CROWTHER                    CIVIL ACTION

        Plaintiff

                              NO.  05-30140-MAP

   vs.

CSX TRANSPORTATION, et al.

        Defendants

———————————————————————

**PLAINTIFF'S RESPONSE WITH MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION:**

This is a personal injury action brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (FELA), 45 U.S.C. Section 51 et seq.  Plaintiff, Geoffrey Crowther, specifically claims occupational hearing loss as a result of his railroad employment with Defendants.

Defendants have filed a Motion for Summary Judgment in this matter on the basis of: (1) alleged expiration of the statute of limitations; (2) alleged failure of Plaintiff to properly disclose his expert witness; and (3) alleged incompetence of Plaintiff's expert to testify as to the cause of Plaintiff's hearing loss.  For the reasons set forth below, Defendant's motion must be denied.

II.    **FACTUAL SUMMARY:**

Plaintiff, Geoffrey Crowther, whose date of birth is May 7, 1951, is presently age 55. Geoffrey Crowther has sustained occupational hearing loss as a result of noise exposure while working in the course and scope of his employment with Defendants, CSX Transportation, Inc. (CSX), and its predecessor, Consolidated Rail Corporation (Conrail).  Geoffrey Crowther has

worked for Defendants as a trackman/welder/foreman, building and repairing railroad track lines

since 1976.  In the performance of his job tasks for Defendants, Plaintiff has worked with and in

the vicinity of heavy equipment, power and manual tools, and running train engines, horns, bells

and whistles.  Many times Plaintiff was required to perform his job tasks without adequate

hearing protection.

On June 19, 2002, Plaintiff attended a union sponsored screening in Greenfield.  It was at

this screening, which Plaintiff had attended for the primary purpose of a carpal tunnel syndrome

test, that Plaintiff was first notified of a potential hearing loss.  On November 6, 2002, Mr.

Crowther presented to Tomma Henckel, MA, CCC-A, for examination and testing.  Plaintiff

provided Ms. Henckel with his medical history as well as a history of his exposure to noise.

Based upon the history provided by the patient and the results of the examination and testing,

Ms. Henckel, a certified audiologist and clinical instructor, opined that Plaintiff suffered from

hearing loss as a result of exposure to occupational railroad noise.  (Exhibit 3, Records/Reports

of Tomma Henckel, MA, CCC-A)

Geoffrey Crowther testified at a discovery deposition on August 18, 2006, in pertinent

part, as follows:

Q.     Now, did – in answer to – Interrogatory No. 9 asks you when – the first time it

was that you were – that you knew you had hearing loss.[1] Correct?

A.     Yeah.

Q.     All right. And your answer – the answer that was provided in your behalf was

November 6, 2002. Correct?

A.     Okay. Well that's –

---

[1] Defendants' Interrogatory No. 9 asks, in pertinent part: "Please state when you first learned, believed ,became aware of or realized that you had been injured (sustained a hearing loss), and that the injury was work related…"

Q.      Just yes or no. Is that –

A.      I did – I guess that's there, so –

Q.      Hold on.

A.      All right.

Q.      But what you told me here today was that somebody actually told you you had hearing loss the day that you went to that event at the Greenfield Holiday Inn, in May or June of 2002. Correct?

A.      Right.

Q.      This answer to interrogatories is inaccurate by about –

A.      No.

Q.      It's not.

A.      No. No, it's not.

Q.      How can it – how are those two things consistent?

- - -

A.      Well, then, all right. That was when I went to the learning center – I mean – this is the learning center. The Amherst hearing and – hearing center. When I had the test done by an unbiased, you know, audio whatever.  You know. It's a – it's a hearing and audio center, you know, related with UMass.  And I went there. And I trusted them.

(Exhibit 1, Plaintiff's Deposition, pages 197-199)

Defendants in this matter have produced a two-page document dated April 5, 2001, by which they claim they notified Plaintiff of the results of an abnormal railroad hearing test.  With regard to this document, Plaintiff testified as follows:

Q.      Let me show you Exhibit 7. This is a letter – first of all, on the second page that's your signature, right? G.C. Crowther?

A.      Yep.

- - -

Q.      Do you recall receiving that?

A.      No.

- - -

Q.      And do you remember – although you might not remember receiving this one, you do remember that following those periodic exams that Conrail, and later CSX, conducted, that you would receive a report like this. Correct?

A.      Well, they give you a little yellow form.

- - -

Q.      Okay, In any event, when they did their test results, CSX's people, they'd send you a report like this. Correct?

A.      You know what? If I had to sign that, then I don't know how that – I really don't know how my signature got on that. I mean because every – when I – the way I recall the hearing test is, if you have a bad – if you have a bad hearing test or, you know, they suspect, you know, severe hearing loss, they kind of hold you back afterwards and talk to you and – you know. That never talked happened to me.

(Exhibit 1, Plaintiff's Deposition, pages 215-119)

As noted above, Plaintiff has identified Tomma Henckel, MA, CCC-A, to be called as an expert medical witness in the trial of this matter.  Plaintiff has provided Defendants with a complete copy of the records/reports of Tomma Henckel, MA, CCC-A (Exhibit 3), as well as a

copy of Ms. Henckel's Curriculum Vitae (Exhibit 4).  Ms. Henckel is not a "professional expert" or "hired gun", and has never previously been called as an expert witness.  Tomma Henckel, is, however, by virtue of her extensive experience, most certainly qualified to testify as an expert medical professional.  Ms. Henckel testified at a discovery deposition on November 10, 2006, in great detail as to her background, education, training and qualifications, which are too lengthy to fully reiterate herein[2].  Select excerpts from the deposition testimony of Tomma Henckel, MA, CCC-A, are as follows:

Q.     You had mentioned earlier that you examine employees at UMass. Can you give me the context of those examinations?

A.     Yeah, we do employee screenings for people who are working in high-noise areas.

- - -

Q.     Okay, prior to examining and/or screening Mr. Crowther, had you ever screened any other railroad workers before?

A.     I'm not sure.

- - -

Q.     Have you ever reviewed any studies of railroad workers prior to examining Mr. Crowther?

A.     I'm not sure. I mean, it may have been as part of a hearing conservation class that came up.

(Exhibit 2, Deposition of Tomma Henckel, MA, CCC-A, pages 62-65)

---

[2] A complete copy of the deposition of Tomma Henckel, MA, CCC-A, is provided herewith as Exhibit 2.

Tomma Henckel, MA, CCC-A, further testified:

Q.    Prior to evaluating Mr. Crowther, had you done a significant amount of work in relation to noise-induced hearing loss?

A.    I have seen a lot. I had seen a lot of people who have –

Q.    Okay.

A.    Similar.

Q.    What kind of training did you receive in connection with evaluating noise-induced hearing loss?

A.    It's part of the general training to tease that apart from other hearing losses.

Q.    Okay. And was that part of your course work while you were getting your master's?

A.    Yes.

Q.    Okay. And did you take any continuing education courses in that area of noise-induced hearing loss?

- - -

A.     After I graduated. I'm not sure.

Q.     Do you remember any specifically?

A.    I remember, you know, during my master's degree a hearing conservation course.

- - -

Q.    Have you reviewed any particular studies in relation to noise-induced hearing loss or hearing conservation from the time that you graduated to the time that you treated Mr. Crowther?

A.    Yes, but I can't be more specific than that.

(Exhibit 2, Deposition of Tomma Henckel, MA, CCC-A, pages 80-82)

With regard to her examination of Mr. Crowther, Tomma Henckel testified:

Q.    Okay. When Mr. Crowther came in to meet with you, did you take some sort of history from him?

A.    Yes.

Q.    And how did you go about the process of taking a history?

A.    My student and I interviewed him directly.

- - -

Q.    . . . Okay, You went over, to some extent, what Mr. Crowther's background was, correct? In connection with his employment; is that correct?

A.    Correct.

(Exhibit 2, Deposition of Tomma Henckel, MA, CCC-A, pages 92-95)

III.    ARGUMENT:

Rule 56(c) of the Federal Rules of Civil Procedure is controlling with regard to Defendants' Motion for Summary Judgment.  In pertinent part, Rule 56(c) states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), F.R.C.P.

The Court must view all inferences in a light most favorable to the non-moving party. Continental Insurance Company v. Bodie, 682 F. 2d 436 (3rd Cir. 1982).  The Court must resolve all doubts against the moving party.  Gans v. Mundy, 762 F. 2d 338 (3rd Cir.), cert denied, 106 S. Ct. 537 (1985).  The Court must take as true all allegations of the non-moving party that conflict with those of the movant.  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505 (1986).

This is a personal injury action brought pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51, et seq.   This is a federal statute enacted by the United States Congress that applies solely to railroads.  It permits an injured railroad worker to bring a lawsuit against the employing railroad for full damages, including economic loss, physical and mental pain and suffering, and loss of enjoyment of life.  The FELA applies to all railroads engaged in interstate commerce.  As a worker covered by the FELA, Mr. Crowther is not entitled to recover under state workers' compensation law.  Rather, his only recourse to file suit under the FELA.

Congress and the United States Supreme Court have, over the years, consistently stated the purpose of the FELA is to protect and benefit railroad employees injured on the job.  The FELA is to be liberally construed to allow railroad workers, such as Geoffrey Crowther, who are injured in the course of their employment to recover from the railroad even where the railroad's negligence is minimal.  Rodriguez v. Deloroy Connecting Railroad Company, 473 F. 2d 819 (6th Cir, 1973).  Defendants were required to provide Geoffrey Crowther with a safe place to work.  This duty is a non-delegable and affirmative duty.  Ellis v. Union Pacific Railroad Company, 329 US 649 (1947).  Therefore, Defendants had a positive obligation to provide Geoffrey Crowther with a safe place to work, including finding any defect or hazard which would normally be revealed within the workplace.  Williams v. Atlantic Coastline Railroad Company, 190 F. 2d 744 (5th Cir. 1951).

The inquiry in an FELA case rarely presents for practical purposes more than a question of whether the negligence of the railroad or its supervisors or its foremen or its employees played any part, however small, in causing the Plaintiff's personal injuries.  The question becomes simply whether the evidence justifies with reason the conclusion that CSX/Conrail's negligence

played any part, even the slightest, in causing Geoffrey Crowther's hearing loss for which he seeks damages. Rogers v. Missouri Pacific Railroad Company, 352 US 500 (1957).

Plaintiff's burden of proof in an FELA case is much less than is required for a plaintiff to sustain a recovery in an ordinary negligence action brought under state tort law. Boeing Company v. Shipman, 411 F.2d 65 (11 Cir.1969). Plaintiff does not have to prove that Defendant's negligence was a substantial contributing factor in causing Plaintiff's injuries. Rather, in an FELA case, Plaintiff is only required to prove that the railroad's negligence, in whole or in part, caused or contributed to Plaintiff's injuries. The obvious purpose of the FELA is to enlarge the remedy of railroad workers injured as a result of the hazards in their workplace. Metropolitan Coal Company v. Johnson, 265 F. 2d 173 (1st Cir. 1959). Due to the unique nature of the FELA, the Plaintiff does not need to provide a liability expert witness to sustain a claim. Stevens v. New Jersey Transit, 356 N.J. Super. 311 (2003).

In the instant matter before this Honorable Court, Defendants have moved to preclude Plaintiff's certified audiologist, Tomma Henckel, MA, CCC-A, from testifying. Under Federal Rule of Civil Procedure (F.R.C.P.) 26(a)(2), any witness, not just those experts retained or specially employed to provide expert testimony, who will provide expert testimony at trial must be properly designated. See Hamburger v. State Farm Mut. Auto Ins. Co., 361 F.3d 875 (5th Cir. 2004).

Tomma Henckel, MA, CCC-A, is a highly qualified medical professional with significant experience and knowledge as to occupational noise-induced hearing loss. Tomma Henckel has been timely identified as Plaintiff's medical expert, and her CV and records/reports have been produced to Defendants. Tomma Henckel's testimony will properly assist the trier of fact to understand critical evidence in this FELA action. As stated above, Mr. Crowther provided Ms.

Henckel with a full patient history, including a history of his exposure to noise, which information was customarily and properly considered by Ms. Henckel as a medical professional in the support of the opinions contained in her records/reports.  Any arguments by Defendants that Ms. Henckel's diagnoses/opinions with regard to Plaintiff are improperly founded, simply because she did not conduct noise studies to confirm Plaintiff's history, are without merit.

In the matter of CSX Transportation, Inc. v. Bryant, 589 So.2d 706, 708 (Ala. 1991), the Supreme Court of Alabama held that the jury's finding that CSX was negligent and that its negligence was the cause of plaintiff's injury was supported by the evidence, where the plaintiff employee testified as to noise of engine, whistles, bells, and an audiologist testified that plaintiff's hearing loss was significant and could have been called noise-induced permanent threshold shift caused by workplace noise.

In the matter of Texas Employers Ins. Association v. Fisher, 667 S.W.2d 589 (Tex.App. 9th Dist. 1984), the Court of Appeals of Texas held that an audiologist with a Ph.D. in education and a certification of clinical competency in speech pathology was properly permitted to testify as an expert as to the extent and causes of injury to claimant's loss of hearing.  The Supreme Court of Kentucky has held that testimony concerning the cause of a hearing impairment that is made by an audiologist is admissible in Workers' Compensation actions even though audiologists are not physicians.  Bright v. American Greetings Corp., 62 S.W.3d 381 (Ky. 2001). See also, Wallace v. Nicholson, Slip Copy, 2007 WL 671320 (Vet.App. 2007), recognizing that an audiologist is qualified to offer medical opinions addressing hearing disorders.

In the matter of Tucker v. American Telephone & Telegraph Corp., 794 F.Supp. 240 (W.D.Tenn. 1992), the United States District Court for the Western District of Tennessee went so far as to hold that a physicist and experimental psychologist, who was not a medical doctor or

audiologist, was competent to testify on the issue of medical causation in a products liability suit

claiming loss of hearing from noise heard over the phone.

This Honorable Court should not rule as a matter of law that Tomma Henckel, MA,

CCC-A, is not qualified to testify as Plaintiff's expert medical witness.  Rather, the Court should

allow Plaintiff's expert to testify and be subjected to Defendants' cross-examination, as it should

be for the jury to decide whether Tomma Henckel is adequately qualified to provide causation.

Defendants' challenge as to Tomma Henckel should not go to admissibility but rather to the

weight of her evidence.  The jury must be allowed to hear from Tomma Henckel.

In the instant matter, Defendants also base part of their summary judgment motion on 45

U.S.C. §56, which requires a railroad employee bring an action "within three years from the day

the cause of action accrued."  When, as here, the specific date of injury cannot be determined

because the injury results from continual exposure to a harmful condition over a period of time, a

plaintiff's cause of action accrues when the injury manifests itself.  Urie v. Thompson, 337 U.S.

163, 170, 69 S.Ct. 1018, 1025 (1949).  "To further the remedial purposes of the FELA, Urie

granted an extension of time to a claimant who was unaware of his injury." Kichline v.

Consolidated Rail Corporation, 800 F.2d 356 (3rd Cir. 1986).  This "discovery rule" was further

refined in DuBose v. Kansas City Southern Railway Company, 729 F.2d 1026 (5th Cir. 1984),

cert. Denied, 469 U.S. 854, 105 S.Ct. 179 (1984), when the Court reasoned that the statute of

limitations does not run "whenever a plaintiff is not aware of the critical facts of his injury *and*

its cause." Id. at 1030 (emphasis added).  Therefore, a claim accrues only when the plaintiff is

aware of the critical facts about his injury and its causation.  Bealer v. Missouri Pacific Railroad

Company, 951 F.2d 38, 39 (5th Cir. 1991), see also, Stokes v. Union Pacific R.R. Co., 687

F.Supp. 552 (D. Wyo. 1988) and Jones v. Maine Central R.R. Co., 690 F.Supp. 76 (D. Me.

1988).  "It would be impossible to even choose a defendant, let alone commence an action,

without having knowledge of both."  Courtney v. Union Pacific R.R. Co., 713 F.Supp. 305, 308

(E.D. Ark. 1989).

The record evidences that Geoffrey Crowther was not aware that he had an

occupationally related injury until November 6, 2002, when he was examined by Tomma

Henckel, MA, CCC-A.  Plaintiff's testimony is clear.  Defendants' motion as to alleged

expiration of the statute of limitations is without merit.  This is not a case where the plaintiff

admitted that he knew he had noise-induced hearing loss more than three years before his lawsuit

was filed.  Rather, the Plaintiff's evidence, Geoffrey Crowther's deposition testimony, creates a

genuine issue of material fact for the jury to decide.  The Court should not rule as a matter of law

on the statute of limitations.  The Court should provide the jury the opportunity to consider the

statute of limitations question in the form of a specific verdict question and allow the jury to be

the finder of fact on this important issue.

A court's role is not to evaluate the weight of the evidence, to judge the credibility of

witnesses, or to determine the truth of the matter, but instead to determine whether there is a

genuine issue of triable fact. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 477 U.S. 242,

249-50 (1986).

IV.    CONCLUSION:

Based on the forgoing analysis, Defendants' Motion for Summary Judgment should be

denied as Defendants have failed in their burden.  Plaintiff has presented sufficient evidence

under the FELA to proceed to trial.  A jury must be permitted to hear the testimony of Tomma

Henckel, MA, CCC-A, and consider the issues of the timeliness of Plaintiff's claim and the

causation of his hearing loss, as they are genuine issues of material fact.

Plaintiff respectfully requests oral argument.

WHEREFORE, Plaintiff, Geoffrey Crowther, respectfully requests this Honorable Court to enter an Order denying Defendants' Motion for Summary Judgment.

Respectfully submitted,
Plaintiff,
GEOFFREY CROWTHER
By his attorneys,

 /s/Thomas J. Joyce, III
THOMAS J. JOYCE, III, ESQUIRE
Law Office of Thomas J. Joyce, III
900 Centerton Road
Mount Laurel, NJ 08054
(856) 914-0220
tjoyce@tjoycelaw.com


/s/Michael J. McDevitt
MICHAEL J. McDEVITT, ESQUIRE
BBO #564720
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02110
(617) 439-4990
Local Counsel
mmcdevitt@lawson-weitzen.com


DATED: March 16, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

GEOFFREY CROWTHER                    CIVIL ACTION

          Plaintiff

                        NO.  05-30140-MAP

   vs.

CSX TRANSPORTATION, et al.

          Defendants
_____

CERTIFICATE OF SERVICE

I, Michael J. McDevitt, Esquire, hereby certify that I electronically filed the foregoing Plaintiff's Response with Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, and Plaintiff's Response in Opposition to Defendants' Statement of Material Facts with accompanying Exhibits, with the Clerk of Court using the ECF system, which sent notification of such filing to Lori A. Wirkus, Esquire, attorney for Defendants.  I have further served a copy of the foregoing by sending same by first class mail, postage prepaid, to Lori A. Wirkus, Esquire, attorney for Defendants, as follows:

     Lori A. Wirkus, Esquire
     Flynn & Associates
     400 Crown Colony Drive, Suite 200
     Quincy, MA 02169

SO CERTIFIED this 16th day of March 2007.

                                */s/Michael J. McDevitt*
                                MICHAEL J. McDEVITT

**GEOFFREY CROWTHER**
**August 18, 2006**



Page 1

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3          Department of the Trial Court

4

5   ********************************

6   GEOFFREY CROWTHER,                *

7              Plaintiff      *    Civil Action No.

8   vs.                       *    05-30140-MAP

9   CONSOLIDATED RAIL CORPORATION *

10  and CSX TRANSPORTATION, INC., *

11            Defendants        *

12  ********************************

13

14          DEPOSITION OF GEOFFREY CROWTHER

15                  Volume I

16                Taken at the

17   Sturbridge Host Hotel & Conference Center

18               366 Main Street

19          Sturbridge, Massachusetts

20              August 18, 2006

21           11:25 a.m. - 3:08 p.m.

22

23           Deborah Leonard Lovejoy

24       Registered Professional Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# GEOFFREY CROWTHER
## August 18, 2006

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 |  |
| 3 | Representing the Plaintiff: |
| 4 | LAW OFFICE OF THOMAS J. JOYCE, III |
| 5 | 900 Centerton Road |
| 6 | Mount Laurel, New Jersey 08054 |
| 7 | BY: ELIZABETH L. SCHMIDT, ESQ. |
| 8 | (856) 914-0220  FAX (856) 914-0429 |
| 9 | E-MAIL eschmidt@tjoycelaw.com |
| 10 |  |
| 11 | Representing the Defendants: |
| 12 | FLYNN & ASSOCIATES, P.C. |
| 13 | 160 State Street, 8th Floor |
| 14 | Boston, Massachusetts 02109 |
| 15 | BY: MICHAEL B. FLYNN, ESQ. |
| 16 | (617) 773-5500  FAX (617) 773-5510 |
| 17 | E-MAIL mbflynn@flynnassoc.com |
| 18 |  |

|  | Page 4 |
|---|---|
| 1 | GEOFFREY CROWTHER, Deponent, having first |
| 2 | been duly sworn, deposes and states as follows: |
| 3 |  |
| 4 |  |
| 5 | EXAMINATION BY MR. FLYNN: |
| 6 |  |
| 7 | Q.   Would you please state your name for |
| 8 | the record, sir. |
| 9 | A.   Geoffrey Cairns Crowther. |
| 10 | Q.   And would you spell those three |
| 11 | names, please? |
| 12 | A.   G-E-O-F-F-R-E-Y C-A-I-R-N-S |
| 13 | C-R-O-W-T-H-E-R. |
| 14 | Q.   Okay. |
| 15 | MR. FLYNN: Just for the record, |
| 16 | before we get started with actual |
| 17 | questioning, what we've agreed to prior to |
| 18 | beginning the deposition is, given the fact |
| 19 | that -- from our point of view that there |
| 20 | are a number of documents which haven't |
| 21 | been -- which have yet to be obtained |
| 22 | and/or produced, let me put it that way, a |
| 23 | number of which are the subject of motions |
| 24 | which are currently pending before the |

|  | Page 3 |
|---|---|
| 1 | I N D E X |
| 2 | Volume I |
| 3 | DEPONENT: GEOFFREY CROWTHER |
| 4 | EXAMINATION BY                    PAGE |
| 5 | Mr. Flynn                    4 |
| 6 | (Suspended) |
| 7 |  |
| 8 | EXHIBIT                           PAGE |
| 9 | Exhibit 1, 8/17/00 letter, Neilson, M.D., to |
| 10 | Crowther................................ 22 |
| 11 | Exhibit 1A, 6/26/00 letter, Goldman, M.D., to |
| 12 | Crowther................................ 23 |
| 13 | Exhibit 2, 3/30/92 Conrail medical examination |
| 14 | report................................ 159 |
| 15 | Exhibit 3, 6/19/02 electrodiagnostic report |
| 16 | from Mark A. Woodward, M.D............. 176 |
| 17 | Exhibit 4, defendants' interrogatories....... 176 |
| 18 | Exhibit 5, plaintiff's answers to |
| 19 | interrogatories........................ 176 |
| 20 | Exhibit 6, 3/31/98 Conrail medical history |
| 21 | form................................... 215 |
| 22 | Exhibit 7, report of 4/5/01 hearing test by |
| 23 | T.K. Group, Inc........................ 215 |
| 24 | (Exhibits were kept by Attorney Flynn.) |

|  | Page 5 |
|---|---|
| 1 | court, and given the fact that we have an |
| 2 | upcoming discovery deadline, that we |
| 3 | have -- we are taking this deposition |
| 4 | because of the impending discovery |
| 5 | deadline, but we have an agreement from |
| 6 | counsel that it will be suspended at the |
| 7 | conclusion of today's taking and be resumed |
| 8 | at a later date, pending the obtaining of |
| 9 | those documents, to question Mr. Crowther |
| 10 | about information which is contained in |
| 11 | those documents. |
| 12 | I want to be clear to counsel and |
| 13 | Mr. Crowther that I'm agreeing that I'm not |
| 14 | going to go over at a second convening, if |
| 15 | we need one, issues that are solely here |
| 16 | today.  It will be about things in the |
| 17 | documents, with, obviously, the caveat that |
| 18 | if there's something in the documents which |
| 19 | is different from something said today, |
| 20 | then obviously we'll explore that. |
| 21 | That's agreed to? |
| 22 | MS. SCHMIDT:  Agreed. |
| 23 | MR. FLYNN:  All right.  Just to be |
| 24 | fair to Mr. Crowther, I know that before we |

**GEOFFREY CROWTHER**
**August 18, 2006**

3 (Pages 6 to 9)

Page 6

1  went on the record he expressed some dismay
2  about this, himself personally, because he
3  apparently has done some -- spent some of
4  his own time getting records. And I wanted
5  to make sure the record acknowledges that
6  as well.
7       THE WITNESS: Good.
8       MR. FLYNN: Fair enough?
9       THE WITNESS: Sure.
10      Q.  (By Mr. Flynn) Okay. All right,
11  now, sir, you just took an oath to tell the
12  truth. Correct?
13      A.  Yes.
14      Q.  All right. And you understand what
15  that means, right?
16      A.  Yep.
17      Q.  You understand that you're being
18  asked questions about a lawsuit that you filed in
19  this case. Correct?
20      A.  Yes.
21      Q.  All right. And you understand that
22  the answers you are to give here today should be
23  given as if you were asked in a court of law.
24  Correct?

Page 7

1      A.  Yes.
2      Q.  All right. I'm going to tell you
3  that if you don't understand a question, ask me
4  to rephrase it. All right? Okay?
5      A.  Yep.
6      Q.  Because there's going to be an
7  understanding that if you don't ask me to
8  rephrase a question that you understood it.
9  Okay?
10      A.  Correct.
11      Q.  Okay. Please answer all of my
12  questions with a verbal response, as opposed to a
13  grunt or a groan or a shake of the head. Okay?
14      A.  Correct.
15      Q.  Okay. Now, where do you currently
16  live, sir?
17      A.  119 Massasoit Street, Northampton,
18  Mass.
19      Q.  And for how long have you lived
20  there?
21      A.  Twenty-six years.
22      Q.  Do you own the house?
23      A.  Yes.
24      Q.  Single-family?

Page 8

1      A.  Yep.
2      Q.  For how long have you -- well,
3  you've owned it since you moved in, or was it
4  your parents' house?
5      A.  No, it's -- no. It's not my
6  parents' house.
7      Q.  Okay. Are you married?
8      A.  Yes.
9      Q.  Do you own any other properties?
10      A.  Yes.
11      Q.  Okay. What are the addresses of the
12  other properties you own?
13      A.  Wilcott Road, Chesterfield.
14      Q.  Is that the only other one?
15      A.  Yep.
16      Q.  You live at the Massasoit address in
17  Northampton?
18      A.  Yes.
19      Q.  Okay. And what about the
20  Chesterfield? What's that?
21      A.  That's a -- I don't know what to
22  describe it. It's just some property that I
23  like.
24      Q.  Is there a house on it, or anything

Page 9

1  like that?
2      A.  No.
3      Q.  Okay, what do you use it for?
4      A.  Relaxation.
5      Q.  Any activities that you do there?
6      A.  Not really.
7      Q.  What's the address on Wilcott Road?
8      A.  I don't -- I don't -- I don't have a
9  street address. It's just Wilcott Road.
10      Q.  And this is just an unimproved piece
11  of property.
12      A.  Correct.
13      Q.  It's in the woods?
14      A.  Yes.
15      Q.  Do you camp there?
16      A.  Yeah, I -- yes.
17      Q.  Do you hunt there?
18      A.  No.
19      Q.  Fishing?
20      A.  There's no fishing there. Down in
21  the valley.
22      Q.  Snowmobiling?
23      A.  No.
24      Q.  ATV riding?

**GEOFFREY CROWTHER**
**August 18, 2006**

4  (Pages 10 to 13)

---

Page 10

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Motorcycling? |
| 3 | A. | I don't believe in that stuff. |
| 4 | Q. | You don't believe in it? |
| 5 | A. | No. |
| 6 | Q. | From a philosophical point of |

7  view --
8      A.    Right.
9      Q.    -- or religious point of view?
10     A.    Yes, I don't believe in it.
11     Q.    Too loud?
12     A.    Too loud?  Yeah.  It ruins the
13  woods.
14     Q.    Ruins -- ruins the woods.  All
15  right.  So you go to this Chesterfield property
16  and just set up a chair and sit --
17     A.    And chill out, watch the sunset.
18     Q.    That's it.  Do you own it with
19  anyone else?
20     A.    Nope.
21     Q.    Chesterfield, Massachusetts, right?
22     A.    Right.
23     Q.    Okay.  And is the property improved
24  in any way, shape, or form, either by a house, a

---

Page 11

1  structure, a lean-to, or anything?
2      A.    Well, yeah.  I mean, I've -- you
3  know, I've paid to have a road and a well put in.
4      Q.    Okay.  Do you plan to build on it at
5  some point --
6      A.    Yeah.
7      Q.    -- in time?
8      A.    I'm hoping to.
9      Q.    You just haven't done that yet.
10     A.    No.
11     Q.    When did you purchase the property
12  in Chesterfield?
13     A.    Oh, gosh.  This is -- well, three
14  years ago.  It would be 2003, I guess.  Yeah.
15     Q.    Okay.
16     A.    May of 2003.
17     Q.    All right.  And the plan is to put a
18  house up on it at some point.
19     A.    Yeah.
20     Q.    Okay.
21     A.    Might have been -- you know what,
22  I'm just thinking.  It might have been 2004.
23  This is the third summer I've had it, so what
24  does that make it.  2004?

---

Page 12

1      Q.    Okay.
2      A.    Yeah.
3      Q.    All right.
4      A.    Red Sox won the World Series.  Yeah.
5      Q.    Can't forget that, huh?
6      A.    No.
7      Q.    No.  All right.
8            MR. FLYNN:  Elizabeth, you don't
9  care about that.  But it's big for us.
10     Q.    (By Mr. Flynn)  All right, now, you
11  said you're married.  What's your wife's name?
12     A.    Sally.
13     Q.    Sally?
14     A.    Mm-hmm.  Yes.
15     Q.    First wife, second wife?  How does
16  that go?
17     A.    First.
18     Q.    First and only?
19     A.    Yep.
20     Q.    All right.  Children?
21     A.    Three.
22     Q.    Names and ages.
23     A.    I have twin daughters, Sarah and
24  Kate, twenty -- soon to be twenty-seven.  Call

---

Page 13

1  them twenty-seven.  And I have a son, Daniel,
2  twenty-four.
3      Q.    Do they live at -- do any of your
4  children still live at the house?
5      A.    No.
6      Q.    They're all on their own?
7      A.    Mm-hmm.
8      Q.    Where do they live?
9      A.    Kate lives in Poulspo, Washington
10  state.
11     Q.    Married?
12     A.    Yep.  Mm-hmm.
13     Q.    Sarah?
14     A.    Sarah lives in Dover, Vermont.
15     Q.    Married?
16     A.    Nope.
17     Q.    Daniel?
18     A.    Daniel lives in Dorchester, Mass.
19     Q.    Is he married?
20     A.    Nope.
21     Q.    I think I asked you.  You don't own
22  any other properties.
23     A.    No.
24     Q.    All right.  How long have you been

---

**GEOFFREY CROWTHER**
**August 18, 2006**

5 (Pages 14 to 17)

---

Page 14

1 married, by the way? When did you get married?
2     A.    I got to say thirty, thirty-one
3 years.
4     Q.    You have to know the exact date.
5 She'll be reading this transcript.
6     A.    That's all right.
7     Q.    I'm kidding you. I'll withdraw the
8 question.
9         Do you own any vehicles?
10     A.    Two.
11     Q.    And what are they?
12     A.    I have a 2001 Mitsubishi Montero.
13 And I have a 1990 Volvo wagon.
14     Q.    Anything else?
15     A.    No.
16     Q.    Do you own any time shares or
17 vacation properties?
18     A.    Nope.
19     Q.    Have you ever?
20     A.    No.
21     Q.    Okay. Have you ever owned, in the
22 last fifteen years, any properties other than the
23 two that you've told me about so far?
24     A.    No.

---

Page 15

1     Q.    Okay. Do you have any plans,
2 currently, to buy any other properties?
3     A.    No.
4     Q.    With respect to the house in
5 Northampton, has that been improved at all,
6 either internally or externally, since you've
7 owned it?
8     A.    Since I've owned it? Yeah.
9     Q.    Okay. What's been done to it?
10     A.    Well -- what's been done to it? Did
11 over the -- this was years ago, but -- you know,
12 did over the third floor, added a bathroom.
13     Q.    What kind of a house is it?
14     A.    It's -- it's a walk-up attic. Oh,
15 what's the term, what's the word. I don't know.
16 What's the -- it was built in the '20s and
17 it's -- you know, it looks bigger than it is. I
18 don't know. It's got a porch and -- I don't
19 know, it's not Gothic. I forget what the term --
20 you know, but it's early -- Early American.
21 Early twentieth century.
22     Q.    Okay.
23     A.    You know? I don't know. Two and a
24 half stories.

---

Page 16

1     Q.    All right.
2     A.    Walk-up attic.
3     Q.    All right, and so three years ago
4 you had the attic turned into a living space?
5     A.    Yes.
6     Q.    All right. Did you do that work
7 yourself?
8     A.    No.
9     Q.    All right, you hired a contractor?
10     A.    Right.
11     Q.    When was that done?
12     A.    I don't know. Like, I would say,
13 the late '80s.
14     Q.    Okay. Any other work done to the
15 house in Northampton?
16     A.    I had a deck put on. I didn't do
17 it.
18     Q.    You had a contractor do that?
19     A.    Yes.
20     Q.    Have you done -- yourself, have you
21 done any work on the house at all?
22     A.    No, the only thing I do is do the
23 plumbing and the -- you know, toilet plumbing
24 when the -- take care of that stuff.

---

Page 17

1     Q.    Who was the contractor that did the
2 third floor?
3     A.    Oh, gosh. Paul Tacy.
4     Q.    Casey, C-A --
5     A.    Tacy.
6     Q.    How do you spell that?
7     A.    T-A-C-Y.
8     Q.    T-A-C-Y.
9     A.    Yep.
10     Q.    Okay. Does he have a company, or is
11 it just --
12     A.    Well, he doesn't --
13     Q.    -- Paul Tacy?
14     A.    He's out of the business now. I
15 don't know -- I don't even know where he is.
16     Q.    Okay.
17     A.    But he did all the demolition or
18 whatever needed to be done.
19     Q.    Who actually did the physical work,
20 putting up the walls and --
21     A.    Oh, he did.
22     Q.    -- all of that?
23     A.    He did everything.
24     Q.    He did all that.

---

**GEOFFREY CROWTHER**
**August 18, 2006**

6 (Pages 18 to 21)

Page 18

1    A.    He did everything.  Yeah.
2    Q.    When was that done, by the way?
3    A.    Huh?
4    Q.    When was that done?
5    A.    The late '80s.
6    Q.    All right.
7    A.    Sometime in --
8    Q.    What about the deck?  When was that
9  done?
10    A.    That might have been soon after I
11  bought the house.
12    Q.    So we're going back twenty-six years
13  ago.
14    A.    Yeah.
15    Q.    All right.  And who did that, if you
16  remember?
17    A.    Gordon -- oh, God.  I don't know.
18  That's -- I can't --
19    Q.    Can't remember?
20    A.    I will.  You know, I will when I
21  leave here, I'll remember --
22    Q.    But you can't --
23    A.    -- but I can't remember right now.
24    Q.    That makes a good point, by the way,

Page 19

1  while you're on it.  If during the deposition you
2  answer a question you can't remember something
3  and it's up there in your head --
4    A.    Yep.
5    Q.    -- later in the deposition it comes
6  to you, either at a break or otherwise, just feel
7  free to tell me.  Okay?
8    A.    Yeah.
9    Q.    Or tell your counsel and have her
10  tell me.  All right?
11    A.    All right.
12    Q.    Do you have a criminal record, sir?
13    A.    No.
14    Q.    Never been arrested?
15    A.    Yeah, I think I was, but I think it
16  got expunged.
17    Q.    Okay, when was that?
18    A.    Oh --
19    Q.    First of all, when were you
20  arrested?
21    A.    That might have been like 1970.
22  1969, 1970.
23    Q.    What was that for?
24    A.    Oh, I think disorderly conduct.

Page 20

1    Q.    I haven't even asked you this.
2  What's your date of birth?
3    A.    05/07/51.
4    Q.    May 7th, 1951, which makes you,
5  what, forty-five and a half, or so, today?
6    A.    No, fifty-five.
7    Q.    Fifty-five.  I'm awful at math.
8  That's why I became a lawyer.  Okay.  Fifty-five
9  years old today, or as of May of '06.  All right,
10  so back in '69 you were a young kid, just kind of
11  screwing around.
12    A.    Yeah.  Somebody started a some
13  ruckus in a late-night restaurant, and the cops
14  took everybody away.
15    Q.    All right.  Have you been arrested
16  since then?
17    A.    No.
18    Q.    Are you currently under indictment?
19    A.    No.
20          Oh, I just remembered.  I did get
21  picked up for hitchhiking on the Mass. Pike.
22    Q.    When was that?
23    A.    That might have been 1968 or 1969.
24    Q.    Were you going to UMass at the time?

Page 21

1    A.    I was going to school in Boston.
2    Q.    All right.  Well, we won't -- I've
3  done that too.  I'm not going to hold that
4  against you.
5    A.    Yeah.
6    Q.    Have you ever -- let me ask you
7  this.  Back in 2000, do you remember that you
8  refused to take a toxicology test, failed to
9  provide a urine specimen for a toxicology test
10  which was necessary to become a DOT truck driver?
11    A.    In 2000?
12    Q.    Yeah.
13    A.    No.  Not at all.
14    Q.    Let me ask you --
15    A.    No, that's strange.  I've never
16  heard that.  I've never --
17    Q.    Let me show you --
18    A.    That's brand-new to me.
19    Q.    Let me show you a document which
20  we'll mark as Exhibit 1.  It's a letter dated
21  August 17, 2000 to you from Tom Neilson, who is
22  CSX's chief medical officer at the time.  Okay.
23    A.    Oh, okay.  All right.  Well --
24    Q.    Let me just have this document

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

7 (Pages 22 to 25)

Page 22

1　marked.
2　　A.　All right. All right.
3
4　　　　(Exhibit 1, 8/17/00 letter, Neilson,
5　M.D., to Crowther, marked)
6
7　　Q.　(By Mr. Flynn) I'm going to show
8　this letter to your counsel, but -- before I ask
9　you my question. Just by mentioning that letter,
10　did it refresh your memory?
11　　A.　Well, I know I got a letter. I
12　mean --
13　　Q.　Just yes or no: Did it refresh your
14　memory about something about toxicology testing?
15　　A.　Not about toxicology. About a DOT
16　physical.
17　　Q.　Okay.
18　　　　You know, I mean, there's a --
19　　Q.　You got a -- you remember getting a
20　letter about that back around 2000.
21　　A.　No. I remember seeing a --
22　receiving a -- remember that -- getting a letter
23　from the chief medical officer, saying I
24　wouldn't -- I wasn't -- I wouldn't be allowed to

Page 23

1　drive CDL vehicles if I didn't have a physical.
2　　Q.　CDL being vehicles that weighed
3　over --
4　　A.　Right.
5　　Q.　-- over 26,000 pounds.
6　　A.　And at the time I didn't -- you
7　know, I didn't care about that.
8　　Q.　Okay. Let me get another document,
9　which is dated June 26th, 2000. It's a letter to
10　you from Stephen Goldman, CSX's chief medical
11　officer at that time, marked as Exhibit 1A.
12
13　　　　(Exhibit 1A, 6/26/00 letter,
14　Goldman, M.D., to Crowther, marked)
15
16　　Q.　(By Mr. Flynn) I'm going to show
17　this letter to your counsel and have you and
18　counsel take a look at both of those letters
19　before I ask any questions about it.
20　　A.　Well, am I supposed to supposed to
21　respond to this?
22　　Q.　No. Let me ask you a question.
23　　　　Have you had an opportunity to
24　review those letters?

Page 24

1　　A.　Excuse me. Well --
2　　　　Yeah.
3　　Q.　Okay. So you've had an opportunity
4　to review these?
5　　A.　Yes.
6　　Q.　All right.
7　　A.　I mean, briefly, yeah.
8　　Q.　Yeah.
9　　A.　I'm not a lawyer.
10　　Q.　No, no, I'm not asking that.
11　　A.　Okay.
12　　Q.　And are either of these the letters
13　that you received getting -- or received from
14　them?
15　　A.　Oh, I recall -- I recall --
16　　Q.　You recall receiving.
17　　A.　Yes. I recall that that came up.
18　　Q.　Okay. Do you remember receiving
19　both of these letters?
20　　A.　No.
21　　Q.　Which one do you remember receiving?
22　　A.　Mmm, I can't -- I can't tell you
23　that. I know that I eventually had a -- had a --
24　you know, it's a two-year DOT physical; you have

Page 25

1　it every two years.
2　　Q.　Mm-hmm.
3　　A.　So I guess my anniversary might have
4　been like in April, or something, and it just --
5　you know, when you do something every two years,
6　you think you did it last year. You know. It's
7　up to the person, the individual, to make the
8　appointment.
9　　Q.　Let me make sure we're clear.
10　　A.　So --
11　　Q.　There are federal regulations which
12　govern whether or not you can qualify for a CDL
13　license. Correct?
14　　A.　Right.
15　　Q.　Okay. And among those regulations
16　there are regulations which say that you have to
17　be drug-tested before you can be approved for
18　that license. Correct?
19　　A.　Right. Yeah.
20　　Q.　Because they don't want you driving
21　one of these large vehicles if you're under the
22　influence of some kind of drug. Correct?
23　　A.　Right.
24　　Q.　Okay. Had you ever -- have you ever

**GEOFFREY CROWTHER**
**August 18, 2006**

8 (Pages 26 to 29)

Page 26

1    had a CDL license?
2        A.    Oh, I've had a CDL license for --
3    well, let me think. I don't know. At least
4    thirty years.
5        Q.    Okay. And was there some period of
6    time that you --
7        A.    As long as I've been on the
8    railroad. Maybe before.
9        Q.    And you have to take that drug test
10   every two years to requalify for the CDL license.
11   Right?
12       A.    Yeah.
13       Q.    Okay. And has there been any period
14   of time when you have not had a CDL license?
15       A.    No.
16       Q.    Do you currently have one?
17       A.    Yep.
18       Q.    Okay. Well, let me show you this
19   letter, Exhibit 1. This letter says, at least in
20   part, "To date you have failed to" -- well, it
21   says -- let me back up. "In that letter I
22   requested that you return to a company examiner
23   and provide a urine specimen for federal
24   toxicology testing. To date you have failed to

Page 27

1    do so. Therefore, I find you medically
2    unqualified as a DOT truck driver." Did I read
3    that correctly?
4        A.    Yeah.
5        Q.    Okay. Was there -- does this
6    refresh your memory that there was a period of
7    time where you failed to provide the requisite
8    urine sample?
9        A.    No, no. It wasn't a failure on my
10   part. I didn't have a job that required me to
11   drive a 26,000 or over gross weight truck.
12       Q.    So you allowed the CDL license --
13       A.    Yeah. There was --
14       Q.    -- to expire?
15       A.    Yeah, there was no -- you know, when
16   you're a foreman or you're doing something, you
17   tell your roadmaster that, "Hey, I got to take
18   tomorrow off because I've got to have a physical
19   for a DOT," and he thinks it's not a good idea,
20   you don't do that.
21       Q.    Okay, but all I'm asking you, so
22   there was a period of time where because you
23   failed to provide this sample that your CDL
24   license was not renewed. Correct?

Page 28

1        A.    Right. But it didn't affect my job.
2        Q.    I'm not asking you that.
3        A.    Okay.
4        Q.    Just listen to my question.
5        A.    All right. Yeah.
6        Q.    All right, don't try to figure out
7    where you think I might be going.
8        A.    Oh, okay.
9        Q.    Okay? Just answer my question.
10            So there was a period of time back
11   in 2000 where because you did not provide this
12   urine specimen your CDL license was not renewed.
13   Correct?
14       A.    Right.
15       Q.    Have you taken any precautions --
16       A.    No, no, no, no, no. No, it didn't.
17       Q.    Okay, what happened?
18       A.    No. It's not that my CDL -- the CDL
19   -- it's my license.
20       Q.    Mm-hmm.
21       A.    And I look at it as providing a
22   service for the company.
23       Q.    No, all I'm asking --
24       A.    The company didn't get the license

Page 29

1    for me. It's a very -- I don't know if you're --
2    you know, you're probably not familiar with --
3    getting a CDL license is very difficult and it's
4    time-consuming, and everything else. It's my
5    license.
6        Q.    Understood. I understand that.
7        A.    It's not -- the company didn't
8    provide me with the license.
9        Q.    I understand that.
10       A.    Okay.
11       Q.    But in order to renew it, you have
12   to provide this urine specimen. Correct?
13       A.    Right.
14       Q.    And you didn't in 2000. You did
15   not. Correct?
16       A.    Right.
17       Q.    Okay. Why not?
18       A.    I didn't need to.
19       Q.    Okay.
20       A.    There was no -- there was no reason
21   to.
22       Q.    And have you --
23       A.    For my employment.
24       Q.    Have you in the last six years since

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

9 (Pages 30 to 33)

| Page 30 |
| --- |

1  2000 --
2      A.    Oh, yeah.
3      Q.    -- provided a urine sample?
4      A.    Yeah. In -- I don't know. Might
5  have been in February, March, April of this year.
6      Q.    Why -- do you need to do that now?
7  Do you need to drive one of these large vehicles
8  now as part of your job?
9      A.    No. But --
10     Q.    What's changed? And why was it not
11 necessary in 2000 because of your job --
12     A.    Because -- well.
13     Q.    -- but now it was okay to provide
14 the sample.
15     A.    Okay. Well, I got a thing in 2000.
16 I was doing something like inspecting track or --
17 we call it -- I don't know. We call it a pilot
18 here, but now it's called flagging for different
19 things, you know, providing on-track protection
20 for work crews, you know.
21     Q.    Mm-hmm.
22     A.    So that's probably why. It was just
23 something that I didn't -- you know, driving a
24 truck now is like, probably, the worst job on the

| Page 31 |
| --- |

1  railroad. So there's really no incentive to, you
2  know, drive a truck.
3      Q.    Why is truck driving the worst job
4  on the railroad?
5      A.    Well, it's the lowest paid and it
6  has the most restrictions and the most
7  responsibility and the most, you know, paperwork
8  and just gobbledygook and all that. It's just
9  it's a terrible job.
10     Q.    It's a lot less physical than a
11 track worker, though. Correct?
12     A.    No.
13     Q.    It's not?
14     A.    No.
15     Q.    Truck driver's job --
16     A.    Truck drivers -- everybody on the
17 railroad is a trackman, you know, laborer.
18 Everybody. You know, if you -- the foreman is
19 the laborer. And then the truck driver drives
20 you. That's why it's the worst job: You got to
21 load the stuff up and operate the boom and all
22 the other equipment, drive to the job, which
23 might take an hour or two, and then when you get
24 there, jump into action.

| Page 32 |
| --- |

1      Q.    Okay.
2      A.    So it's not -- you know.
3      Q.    Have you applied -- in the last five
4  years have you applied for any disability,
5  annuity, retirement, or health-related benefits?
6      A.    In the last -- excuse me?
7      Q.    In the last five years.
8      A.    The last five years? No.
9      Q.    Okay. Have you ever?
10     A.    I think back in 1977. '78.
11     Q.    What did you apply for, and what
12 were the circumstances of that incident -- of
13 having to apply for those?
14     A.    Well, I got knocked off a boom
15 truck. I was a -- I was a truck driver, and I
16 got knocked off of one.
17     Q.    And what did you apply for back
18 then?
19     A.    Well, I had to have -- I had a back
20 injury and a knee injury.
21     Q.    What benefits did you apply for,
22 though?
23     A.    Sickness and supplemental sickness
24 benefits.

| Page 33 |
| --- |

1      Q.    Through the IRB?
2      A.    Yeah.
3      Q.    And did you receive them?
4      A.    Yeah.
5      Q.    For how long?
6      A.    About a year and a half -- about a
7  year, year and a half. Something like that.
8      Q.    So you were out of work for that
9  long?
10     A.    Yep.
11     Q.    That was in 1977?
12     A.    Yeah. I think '77 was when I got
13 hurt, yeah.
14     Q.    That's what I have in my records.
15     A.    Yeah.
16     Q.    Okay. Prior to -- well, when did
17 you start with the railroad?
18     A.    8/5/75.
19     Q.    What was your Conrail ID number, if
20 you can remember?
21     A.    God, I used to know it. 718771.
22     Q.    Okay. Was it Conrail that you
23 started with in seventy --
24     A.    Penn Central.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

10 (Pages 34 to 37)

| Page 34 | Page 36 |
|---|---|
| 1    Q.    Started with Penn Central? | 1    you're a track laborer, there are periods of time |
| 2    A.    Yep. | 2    in the wintertimes when that kind of work slows |
| 3    Q.    And that became Conrail in '76? | 3    down on the railroad? |
| 4    A.    Yes. | 4    A.    Oh, yeah. |
| 5    Q.    You went right from Penn Central to | 5    Q.    And it is a common practice, or at |
| 6    Conrail? | 6    least it was on Conrail back in the '70s, early |
| 7    A.    Right. | 7    '80s, that track workers would be laid off for |
| 8    Q.    Okay.  And is it fair to say that | 8    the winters.  Correct? |
| 9    you worked for Conrail from that point in time | 9    A.    Yep. |
| 10    till the point in time CSX took over? | 10    Q.    Okay.  And you've acknowledged that |
| 11    A.    Yes. | 11    that's happened to you, by your memory, at least |
| 12    Q.    And that was June 1st of 1999? | 12    one time.  Right? |
| 13    A.    Yes. | 13    A.    Yeah, I would -- I would think twice |
| 14    Q.    And that you've worked -- in that | 14    during the -- that -- Reagan's recession. |
| 15    period between '76 and '99, there were some | 15    Q.    Yeah.  I know.  And that was during |
| 16    periods that you were furloughed?  Correct? | 16    the period of time when you were actually a track |
| 17    A.    Furloughed?  I think I got | 17    laborer.  Correct? |
| 18    furloughed in -- I don't know, like '82 and '83, | 18    A.    Yeah, I think -- when you say track |
| 19    or somewhere like that, for a month or two. | 19    laborer, I was doing a truck driver's job at that |
| 20    Q.    Well, my records would indicate that | 20    time.  A boom truck, you know, a section gang. |
| 21    every winter from '80 through '85 you were | 21    You know, four or five guys, you know, in a truck |
| 22    furloughed. | 22    and, you know, doing that kind of -- with a boom |
| 23    A.    Really? | 23    and all that, you know. |
| 24    Q.    Yep. | 24    Q.    All right, we'll get to that a |

| Page 35 | Page 37 |
|---|---|
| 1    A.    Well -- | 1    little bit later. |
| 2         MR. FLYNN:  Excuse me. | 2    A.    Okay. |
| 3         (Telephone interruption) | 3    Q.    All right, and you know that the |
| 4         MR. FLYNN:  Sorry. | 4    word that they used on the railroad back then for |
| 5    Q.    (By Mr. Flynn)  Yeah, my records | 5    that winter layoff was called a furlough, |
| 6    indicate furloughs every winter from '80 to '85. | 6    correct? |
| 7    That doesn't jibe with your memory? | 7    A.    Yes. |
| 8    A.    Well, you know, that might be true. | 8    Q.    All right.  Just bear with me for a |
| 9    I don't think my retirement months would reflect | 9    second. |
| 10    that.  I think I probably might have been laid | 10         And you also had back then some |
| 11    off but worked -- got into work some time so I | 11    periods of time where you were injured, correct? |
| 12    got the retirement credit.  You know, but -- | 12    A.    Mmm -- well, are we talking about |
| 13    Q.    Well, I'm not talking whether or not | 13    the injury that I referred to earlier? |
| 14    you got the retirement.  I'm talking about | 14    Q.    Well, let me withdraw the question. |
| 15    whether or not you were furloughed those periods | 15    Let me ask it this way.  Okay.  All right.  Let's |
| 16    of time. | 16    have this document marked as -- |
| 17    A.    I really -- I really don't think -- | 17         Before you started with the railroad |
| 18    I mean, honestly, I don't think I -- I don't | 18    in '75, would you tell me what your employment |
| 19    think I was -- I got laid off or furloughed five | 19    history was up until that point in time?  In |
| 20    years in a row. | 20    other words, where did you work?  What did you |
| 21    Q.    Well, as I'm looking through the | 21    do? |
| 22    records -- let me ask you this question. | 22    A.    Let's see.  I worked for the town |
| 23    A.    Yeah. | 23    of -- the city of Northampton. |
| 24    Q.    Isn't it fair to say that when | 24    Q.    From '73 to '75? |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

11 (Pages 38 to 41)

Page 38

```
 1     A.    Yes.
 2     Q.    Let me back up even further than
 3  that, before that. You graduated from -- where
 4  did you grow up, by the way?
 5     A.    I grew up in Florence,
 6  Massachusetts.
 7     Q.    Okay. By the way, is Frank Crowther
 8  your brother?
 9     A.    Yes.
10     Q.    Do you have any other relatives that
11  work for the railroad?
12     A.    I have a nephew, Peter.
13     Q.    Crowther?
14     A.    Yeah.
15     Q.    That Frank's son?
16     A.    Yeah.
17     Q.    Okay. You graduated from what high
18  school in Florence? Is that a regional high
19  school?
20     A.    Northampton High School.
21     Q.    Okay. And when was that?
22     A.    1969.
23     Q.    All right. What did you do after
24  high school? College?
```

Page 40

```
 1     A.    I think I had ADD.
 2     Q.    ADD?
 3     A.    Yeah. That's what I think now.
 4  Yeah.
 5     Q.    Okay. You weren't diagnosed with
 6  that --
 7     A.    No.
 8     Q.    -- back then.
 9     A.    No.
10     Q.    You weren't diagnosed with ADD?
11     A.    No.
12     Q.    Just looking back on it, you think
13  you just had a hard time concentrating.
14     A.    Yeah.
15     Q.    Okay. How close to graduating were
16  you?
17     A.    I don't know, probably within a
18  semester or two.
19     Q.    Really.
20     A.    Yeah.
21     Q.    You were a semester away, and then
22  you just decided --
23     A.    Yeah, yeah.
24     Q.    -- not to do it?
```

Page 39

```
 1     A.    Yep.
 2     Q.    Curry and then UMass?
 3     A.    Well -- yeah.
 4     Q.    And you didn't graduate.
 5     A.    Nope.
 6     Q.    Okay. No degree.
 7     A.    No.
 8     Q.    Have you ever gone back to get some
 9  credits toward a degree?
10     A.    Oh, yeah. I went to continuing ed.
11  and stuff like that.
12     Q.    When was that? And where?
13     A.    At UMass. During that -- from
14  whenever your records say --
15     Q.    Okay.
16     A.    -- I quit to when I hired on the
17  railroad.
18     Q.    Okay. But you never got the degree.
19     A.    No.
20     Q.    Okay. In -- so you were going to
21  college, and then sometime you decided to drop
22  out.
23     A.    Drop out? Yeah, well -- yeah.
24     Q.    Why?
```

Page 41

```
 1           It wasn't a disciplinary thing, was
 2  there?
 3     A.    No. It was -- teachers were making
 4  nine thousand a year, and my first year on the
 5  railroad I made, you know, sixteen or seventeen
 6  thousand.
 7     Q.    And what you mean by that is that
 8  you were studying to become a teacher and decided
 9  not --
10     A.    Well, I -- I didn't know, but
11  that's -- you know. I mean, maybe I would
12  have --
13     Q.    Well, my records indicate that
14  that's what your field of study was. Education,
15  right?
16     A.    Yeah. Well, I think a lot of
17  literature and stuff like that.
18     Q.    Okay. So your first job out of
19  college was working with the city of Northampton?
20     A.    Mmm. You know what? I don't know.
21  I know that -- first job out of college. Trying
22  to think of what I did. Trying to separate the
23  summer jobs from -- I think I worked for a couple
24  months for a company that made like trailer
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

12 (Pages 42 to 45)

| Page 42 |
|---|
| 1 housing for a -- for the military. |
| 2    Q.    What is the name of that company? |
| 3    A.    Oh, gosh. You know, I don't know. |
| 4 I mean, I could guess, but, you know, it's been |
| 5 so long. |
| 6    Q.    I don't want you to guess. I don't |
| 7 want you to guess at anything. |
| 8    A.    All right. |
| 9    Q.    Just tell me what you know. |
| 10    A.    Okay. |
| 11    Q.    All right. You had this summer job, |
| 12 maybe a couple summer jobs. What did you do for |
| 13 this trailer housing company? |
| 14    A.    I think I ran a forklift. |
| 15    Q.    Okay. All right, anything else? |
| 16    A.    I used to drive -- you know, I had |
| 17 the CDL. |
| 18    Q.    Yeah. |
| 19    A.    So I would drive a little bit. |
| 20    Q.    When did you first get the CDL? |
| 21    A.    I think when I first dropped out. |
| 22    Q.    All right. And were you -- do you |
| 23 feel that you were exposed to any repetitive |
| 24 stresses with respect to your work environment |

| Page 44 |
|---|
| 1    A.    You know. |
| 2    Q.    Okay. Well, were you provided -- |
| 3 was it a noisy environment? |
| 4    A.    Well, not -- if you were -- if you |
| 5 were involved with the carpentry end of it, |
| 6 maybe. But I was never involved with that. |
| 7    Q.    Well, when you picked -- picked the |
| 8 materials up in your forklift, were you near the |
| 9 carpentry end of it? |
| 10    A.    Well, maybe a little bit. |
| 11    Q.    Okay. Well, did you have hearing |
| 12 protection back then? |
| 13    A.    No. |
| 14    Q.    Okay. Was it a gas-powered forklift |
| 15 or an electrical? |
| 16    A.    You know, I don't remember. |
| 17    Q.    Back then, would you agree with me |
| 18 they were pretty much mostly gas-powered? |
| 19    A.    Yeah, probably. |
| 20    Q.    Okay. Chances are, then, your best |
| 21 memory is it was a gas-powered forklift? |
| 22    A.    (Indicating) |
| 23    Q.    And -- yes? You're nodding your |
| 24 head. I'm just asking you. |

| Page 43 |
|---|
| 1 back then? |
| 2    A.    No. |
| 3    Q.    All right. You were driving a |
| 4 forklift, though? |
| 5    A.    Well, that's what I remember doing. |
| 6    Q.    Okay. All right. |
| 7    A.    You know, like driving a forklift |
| 8 and driving a truck, you know, like locally, to |
| 9 get insulation or whatever, and stuff like that. |
| 10    Q.    And were you required to take |
| 11 equipment and actually put it on the forklift? |
| 12 Or was that mostly pallets? Or how did that |
| 13 work? |
| 14    A.    Well, there was a regular -- it was |
| 15 like a production thing, so everything was |
| 16 just -- the way I remember, it was just -- you |
| 17 know, it was ready for you to pick up and take |
| 18 somewhere. |
| 19    Q.    Okay. This was in the warehouse or |
| 20 the -- |
| 21    A.    Yeah, it was kind of -- |
| 22    Q.    -- manufacturing facility? |
| 23    A.    -- like a -- yeah, a little plant. |
| 24    Q.    Yep. |

| Page 45 |
|---|
| 1    A.    Well, yeah. I mean -- |
| 2    Q.    And did you wear hearing protection |
| 3 when you operated that forklift? |
| 4    A.    No. |
| 5    Q.    You didn't notice any problems with |
| 6 your hearing back then. |
| 7    A.    No. |
| 8    Q.    Is there a reason why you haven't |
| 9 brought a claim against that entity or the |
| 10 manufacturer of that forklift with respect to |
| 11 hearing loss? |
| 12    A.    Is there a reason? No. There's no |
| 13 reason. |
| 14    Q.    Do you think that they might be |
| 15 responsible for some of the hearing loss you're |
| 16 claiming in this case? |
| 17    A.    No. |
| 18    Q.    Why not? |
| 19    A.    Because it was a short period of |
| 20 time and it wasn't a consistent, you know, |
| 21 constant exposure. |
| 22    Q.    Well, you operated the forklift |
| 23 every day, right, that you were at work? |
| 24    A.    No, not -- no, not every -- you |

**GEOFFREY CROWTHER**
**August 18, 2006**

13 (Pages 46 to 49)

Page 46

1  know, I wouldn't say every day or eight hours a
2  day. No. I wouldn't. No.
3      Q.    What about the city of Northampton?
4  What did you do there? Oh, strike that.
5          Is there a reason why you haven't
6  brought any claim for repetitive stress type
7  injuries, carpal tunnel or shoulder, with respect
8  to your employer back then or a manufacturer of
9  any of the equipment that you used?
10     A.    No. There's no reason, no.
11     Q.    Do you feel that they might be
12  responsible for some of your claimed repetitive
13  stress injuries?
14     A.    No.
15     Q.    Why not?
16     A.    Why not? Because when I joined the
17  railroad, when I was hired, I was screened very
18  carefully. And I was given all kinds of battery
19  of tests, and they found me suitable for
20  employment.
21     Q.    Well, has it been explained to you
22  that -- well, strike that.
23          So is it your testimony, then, that
24  what the railroad found in their medical records

Page 47

1  is important to determining whether or not you've
2  suffered repetitive stress injury, that being
3  carpal tunnel syndrome or some other one?
4      A.    The railroad -- I don't understand
5  that question.
6      Q.    Well, I'd asked you -- you know, you
7  worked for -- you drove this forklift and
8  operated a truck back -- all the way back to the
9  early '70s, and you've made a claim here where
10  you allege that the railroad caused your hearing
11  loss and that the railroad caused your repetitive
12  stress injury. And what I'm saying is, you know,
13  you're able to sue the railroad without blushing
14  too much about it. I'm asking you, why haven't
15  you sued these other entities? And with respect
16  to the manufacturer, military manufacturer,
17  you're saying, "Well, after I worked there, I
18  went to the railroad and they put me some through
19  some medical tests." Right?
20     A.    Yep.
21     Q.    "And those medical tests proved that
22  I was able to work." Correct?
23     A.    Right.
24     Q.    "And that there wasn't anything

Page 48

1  wrong with me from that perspective." Correct?
2      A.    Right. Hearing and physically.
3      Q.    Yeah. So you're pointing to the
4  medical records that the railroad has put
5  together with respect to you when you began to be
6  employed there. Correct?
7      A.    Well, I thought we were --
8      Q.    Just yes or no.
9      A.    No.
10     Q.    Just answer.
11     A.    No. Yes or no? I guess I don't
12  understand the question --
13     Q.    Okay.
14     A.    -- then.
15     Q.    All right. Well, what you're
16  saying, you're saying, "Well, they tested me, and
17  I didn't have anything wrong with me when I
18  started working for the railroad." Right?
19     A.    Right.
20     Q.    Okay. And they tested you
21  consistently thereafter. Correct?
22     A.    Yes. Every two years.
23     Q.    All right. And your hearing loss
24  was done -- for instance, they started testing

Page 49

1  back in the early to mid '80s for hearing loss,
2  correct?
3      A.    If you say so.
4      Q.    Well, does that jibe with your
5  memory?
6      A.    Well, it's sometime then, yeah.
7  Yeah.
8      Q.    But, I mean, that's consistent with
9  your memory, right?
10     A.    Excuse me?
11     Q.    That's consistent with your memory,
12  isn't it?
13     A.    Yeah. Okay.
14     Q.    Well, my records indicate, I think
15  the first test you had was '84. Is that
16  consistent with your memory?
17     A.    I would say I wouldn't bet against
18  it.
19     Q.    Okay.
20     A.    You know?
21     Q.    And they also had you go through a
22  physical every couple of years, correct?
23     A.    Yes.
24     Q.    All right. Where, among the things

**GEOFFREY CROWTHER**
**August 18, 2006**

14 (Pages 50 to 53)

Page 50

1  that they asked you about was whether or not you
2  were complaining of problems with your joints.
3  Correct?
4      A.   Yeah.  Yeah, sure.
5      Q.   Problems with your shoulders.
6  Correct?
7      A.   Yeah.
8      Q.   Problems with your back.  Right?
9      A.   Yeah.
10     Q.   Arthritis.  Right?
11     A.   Well, I don't know -- I don't know
12  if arthritis ever --
13     Q.   All right.
14     A.   I don't know.  I mean --
15     Q.   But, in any event, they gave you an
16  opportunity to complain about the things that you
17  were experiencing.  Right?
18     A.   Well, I don't know.  They made you
19  do, you know, physical things to -- you know, I
20  mean, "Do this.  Do that."
21     Q.   No, I'm only asking you about the
22  medical exams that you, yourself, have pointed
23  to.  I'm saying, in those medical exams they
24  actually asked you for a history.  Correct?

Page 51

1      A.   Correct.
2      Q.   Okay.  And they asked you if you
3  were experiencing these things, such as problems
4  with your joints, problems with your shoulders,
5  problems with your back.  Right?
6      A.   I don't remember the specific
7  questions.  I mean, are you going --
8      Q.   I'll show you some of the records
9  later, but --
10     A.   Okay.
11     Q.   -- you do recall them asking you
12  those types of questions.  Right?
13     A.   Yes.
14     Q.   So you had the opportunity to tell
15  them if you were complaining of those symptoms.
16  Correct?
17     A.   Sure.
18     Q.   All right.  And you yourself -- and
19  with hearing loss, there was a questionnaire that
20  you filled out, or answered questions, and it
21  asked you if you had been experiencing a
22  tingling -- or a ringing in your ears or
23  fluctuating hearing loss, things like that.
24  Correct?

Page 52

1      A.   Mmm.  You know, I don't -- I don't
2  remember that.
3      Q.   Okay.  Well, they actually tested
4  you too, right?
5      A.   Oh, yeah.  They give you a hearing
6  test.  Oh, yeah.
7      Q.   All right.  And then they sent you
8  the results of the hearing test.  Right?
9      A.   Well, when they would come with the
10  hearing van.  But, you know, when you take that
11  DOT physical, your hearing is tested also.
12     Q.   Okay.  But, in any event, the
13  railroad would also test you every two years.
14  Right?
15     A.   I think the railroad's every year.
16     Q.   Okay.  And then they --
17     A.   And the DOT's every two years, which
18  is a more --
19     Q.   Okay.  But when the railroad --
20     A.   -- thorough --
21     Q.   -- tested you, they sent you a
22  notice, telling you what your results were.
23  Correct?
24     A.   No.  I think you received it that

Page 53

1  day.
2      Q.   All right, in any event, it was a
3  piece of paper that said --
4      A.   Right.
5      Q.   -- either you have hearing loss you
6  or you don't.  Right?
7      A.   Yeah.
8      Q.   Okay.  And you, yourself, have
9  pointed to those records and said, "Well, the
10  reason why I didn't sue anybody before the
11  railroad" -- correct me if I'm wrong -- "is
12  because when I went to the railroad, and through
13  my periodic exams with the railroad, they found
14  me to be okay."  Correct?
15     A.   The railroad?  Sure.
16     Q.   Okay.  So those records are
17  important, in your mind.  Correct?  And by "those
18  records" I'm referring to the railroad's --
19     A.   Well --
20     Q.   -- medical --
21     A.   I think --
22     Q.   -- records.  Right?
23     A.   I think any record is important.
24     Q.   All right.  But those records are

**GEOFFREY CROWTHER**
**August 18, 2006**

15 (Pages 54 to 57)

Page 54

1  the ones that you've pointed to, to support --
2      A.   When?
3      Q.   Well, you just said.  When I asked
4  you, "Why didn't you sue the other places?" you
5  said, "Well, because those records would show
6  that, hey, I didn't have these problems."  Right?
7      A.   Right.
8      Q.   Okay.  All right.
9           Now, after this military
10 manufacturer, you went to the city of
11 Northampton.  Right?
12     A.   Mm-hmm.
13     Q.   Yes?
14     A.   Yes.
15     Q.   And you worked there for about a
16 year and a half.  Correct?
17     A.   Yes.
18     Q.   And what did you do there?  What was
19 your position?
20     A.   I was a truck driver, all-around
21 guy.  Snowplow operator, that kind of stuff.
22     Q.   Snowblower?
23     A.   Nope.
24     Q.   What other tools did you work with

Page 55

1  when you were at the city of Northampton?  Other
2  than the snowplow and a truck.
3      A.   A construction rake.
4      Q.   Construction rake.
5      A.   Yeah.  You know, like raking out
6  asphalt, and stuff.
7      Q.   Oh, did that make any noise?
8      A.   No.
9      Q.   Was it a power tool?
10     A.   No.  It was just a tool.
11     Q.   Was it pneumatic tool.
12     A.   No.  It was just --
13     Q.   A rake.
14     A.   -- a heavy-duty rake.
15     Q.   I'm being a bit facetious.
16     A.   Yeah.
17     Q.   It was just a rake that -- okay.
18     A.   Yeah, I mean --
19     Q.   You can go buy one at Home Depot.
20     A.   Yeah.  That's the crew I was on when
21 we --
22     Q.   All right.
23     A.   You know.
24     Q.   So you raked.  You plowed snow with

Page 56

1  the -- what I'm imagining -- a big dump truck --
2      A.   Yeah.
3      Q.   -- with a plow on it.
4      A.   Yep.
5      Q.   And drove that dump truck without
6  the plow on it.
7      A.   Right.
8      Q.   Okay.  How often did you rake?
9      A.   Well, you know, during the summer we
10 would, you know, do small repairs to the roads or
11 the streets, or whatever, and so we'd -- I'd
12 go -- I'd go to the asphalt company and get a
13 load of asphalt and bring it to the job, and we'd
14 dump it accordingly and rake it out and roll it.
15     Q.   Okay.  Every -- so you operated one
16 of those steam rollers, too?
17     A.   No.
18     Q.   Okay.  You didn't operate one of
19 those.
20     A.   No.
21     Q.   So, say, every day in the summer you
22 did that?
23     A.   No.  No.
24     Q.   How often?

Page 57

1      A.   Well, maybe a couple times a week.
2      Q.   All right.  What would you do the
3  other time?
4      A.   Mmm --
5      Q.   And I'll say this:  I worked for the
6  DPW in Westfield.
7      A.   Yeah.  Yeah.
8      Q.   And, you're right --
9      A.   Yeah.
10     Q.   -- about two days of the week we'd
11 do something --
12     A.   Yeah.
13     Q.   -- and rest of the time we were
14 hiding out, doing nothing.  Right?
15     A.   Yeah.  No.  No, you know, I'm trying
16 to think.  You know, we -- you're right, though.
17 I mean, you'd get an hour and a half for lunch
18 and --
19     Q.   Yeah.
20     A.   That's -- you know, that's nice.
21 That's when I was going night school, so.
22     Q.   So you weren't really doing that
23 much.
24     A.   Right.

**GEOFFREY CROWTHER**
**August 18, 2006**

16 (Pages 58 to 61)

| Page 58 | Page 60 |
|---|---|
| 1    Q.    All right. Then you went from the<br>2  city of Northampton to Roadway Freight Company.<br>3  Right?<br>4    A.    Oh, yeah? Yep. Jeez, I forgot<br>5  about that.<br>6    Q.    That was after the city?<br>7    A.    Huh? It was some -- it was<br>8  somewhere in there. I forget. I forgot about<br>9  that.<br>10    Q.    But you only worked there for about<br>11  six months. Actually, no. You worked at Roadway<br>12  Freight before the city of Northampton. Right?<br>13    A.    Yeah.<br>14    Q.    All right.<br>15    A.    Somewhere, yeah. Yeah.<br>16    Q.    About six months.<br>17    A.    I guess so. If you say.<br>18    Q.    What did you do there?<br>19    A.    I operated a forklift.<br>20    Q.    Anything else?<br>21    A.    Sometimes I'd drive the truck around<br>22  to a different dock, or something.<br>23    Q.    Did you work with any other tools,<br>24  other than the forklift and a truck? | 1    A.    Is that Oklahoma City?<br>2    Q.    I don't know.<br>3    A.    I think that's right. Yeah. I<br>4  mean, Transcontinental is in Oklahoma City.<br>5  That's where I got my --<br>6    Q.    CDL?<br>7    A.    No. That's where I got my Teamsters<br>8  card.<br>9    Q.    Yeah. You still with Teamsters?<br>10    A.    Well, my union now is joined with<br>11  the Teamsters.<br>12    Q.    That was the BM --<br>13    A.    BMWE and the train engineers.<br>14    Q.    That was just recently, though,<br>15  right?<br>16    A.    Yeah.<br>17    Q.    Yeah, all right. Okay, so did you<br>18  actually work in Oklahoma for Transcon?<br>19    A.    Yeah.<br>20    Q.    All right.<br>21    A.    That was --<br>22    Q.    Just for a few months.<br>23    A.    Well, you said -- yeah, a few<br>24  months. Right. |

| Page 59 | Page 61 |
|---|---|
| 1    A.    Well, maybe like one of those hand<br>2  forklifts or something.<br>3    Q.    Was that a power --<br>4    A.    No. Just --<br>5    Q.    Motorized?<br>6    A.    No.<br>7    Q.    Pneumatic?<br>8    A.    No.<br>9    Q.    Electric?<br>10    A.    No.<br>11    Q.    Just manual.<br>12    A.    Yep.<br>13    Q.    Manual hydraulic.<br>14    A.    Yeah.<br>15    Q.    It's got a -- got a couple of wheels<br>16  on it.<br>17    A.    Yeah, a little hydraulic jack.<br>18  Yeah.<br>19    Q.    A lot like a car jack. A heavy-duty<br>20  car jack.<br>21    A.    Right.<br>22    Q.    Okay. My records would indicate,<br>23  for about three months before that, you worked<br>24  for Transcon Freight Company. Remember that? | 1    Q.    What did you do there?<br>2    A.    I worked the night shift and did<br>3  pretty much what I did at Roadway.<br>4    Q.    Forklift and truck?<br>5    A.    Right.<br>6    Q.    Sometimes a hand --<br>7    A.    Yeah, I was like a yard jockey a lot<br>8  of time. You know. Yeah, this was a big place<br>9  in Oklahoma City and, you know, so -- the<br>10  trucks -- you know, you had like a smaller<br>11  version of a semi, and you'd just take -- hook it<br>12  onto a trailer and put it through another door.<br>13    Q.    Now, have we mentioned, so far, all<br>14  of the jobs that you remember having between<br>15  college and the railroad? That you can remember.<br>16    A.    Well, you put me -- I don't know. I<br>17  mean, I -- I wouldn't have -- if you had asked<br>18  me, I wouldn't have remembered Roadway, but --<br>19    Q.    Are there any others?<br>20    A.    What?<br>21    Q.    Are there any others that you<br>22  remember?<br>23    A.    No.<br>24    Q.    Okay. Why did you leave Transcon |

**GEOFFREY CROWTHER**
**August 18, 2006**

17 (Pages 62 to 65)

Page 62

1  Freight?
2      A.   I was only there temporarily,
3  visiting my brother who was living in Oklahoma
4  City.
5      Q.   Was it a disciplinary issue or
6  anything like that?
7      A.   Well, that's the thing. Part of it,
8  yeah, in a way. You're asking that question, so
9  sure. Well, you're pretty well-informed. I was
10  close to getting my -- my -- my qualifying time
11  to become a teamster.
12      Q.   And?
13      A.   So what they do is they hire you,
14  and just before you could qualify for membership,
15  they'd, you know, find some reason that, you
16  know -- I was told this was going to happen to
17  me. And I was okay with that because it was just
18  a temporary thing anyway.
19      Q.   So you used them for training. They
20  used you to fill a void. But when you actually
21  come up to become a -- to get on a list, they
22  tell you they don't want you.
23      A.   Right.
24      Q.   Was that a disciplinary issue or

Page 63

1  just kind of the way the Teamsters worked?
2      A.   Well, that's just how it worked down
3  there.
4      Q.   Okay. Roadway Freight, why did you
5  leave there? If you can recall.
6      A.   Oh, yeah. Working nights. I
7  can't -- I can't do it.
8      Q.   Okay. Any disciplinary issue there?
9      A.   No.
10      Q.   City of Northampton. Why'd you
11  leave there?
12      A.   For the railroad.
13      Q.   More money?
14      A.   Oh, yeah.
15      Q.   Any disciplinary issue there?
16      A.   Nope.
17      Q.   Okay. Now, at Transcon and Roadway,
18  part of your job was working inside. Is that
19  fair to say?
20      A.   Yeah.
21      Q.   Operating gas- and/or diesel-powered
22  equipment. Correct?
23      A.   Yeah.
24      Q.   Were you ever given hearing loss

Page 64

1  protection -- ear protection, hearing protection,
2  while you worked at either of those entities?
3      A.   No.
4      Q.   Did you ever use them?
5      A.   No.
6      Q.   Use hearing protection.
7      A.   No, there was no -- there was no
8  reason to.
9      Q.   Why not?
10      A.   Because it was working at night, and
11  it was just -- there was nobody around. It was
12  quiet.
13      Q.   But you were inside. Right?
14      A.   Well, I mean, inside not a room like
15  this.
16      Q.   A big warehouse, right?
17      A.   Yeah. Huge.
18      Q.   All right. And that's where you
19  spent most of the time that you weren't over the
20  road, was actually in the warehouse. Right?
21      A.   Yep.
22      Q.   All right, how many days a week?
23      A.   Well, I think -- I don't think
24  either job was, you know, a forty-hour job. It

Page 65

1  was, you know, like I was on a list.
2      Q.   So how many hours a week would you
3  be working on these jobs, on average, over the
4  course of that year or so?
5      A.   Oh, I don't know. I would say it
6  was -- to the best of my knowledge, it would be
7  like part-time.
8      Q.   Twenty? Thirty?
9      A.   Yeah, you know, maybe -- yeah, maybe
10  twenty hours. Or like a couple days a week. You
11  know, like a couple nights a week. Or maybe
12  three -- like maybe twenty-four hours, or
13  something like that.
14      Q.   All right.
15      A.   A few nights a week.
16      Q.   And the city, you were mostly
17  outside?
18      A.   Outside, yep.
19      Q.   Now, at any of these jobs would you
20  use power tools, other than the ones you've
21  already told me about?
22      A.   I'm trying to think. The city.
23  Naw, naw, with the city it was -- you know. I
24  mean, there were chainsaws and stuff but, you

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

18 (Pages 66 to 69)

Page 66

1  know, that was the tree -- the tree crew, and
2  stuff like that. So, no, I basically drove my
3  foreman around.
4      Q.    Okay. Did you do any activities
5  which required repetitive motion with your hands
6  and/or arms at any of those three jobs?
7      A.    No.
8      Q.    Okay. Did you use pneumatic tools,
9  air-powered tools --
10     A.    No.
11     Q.    -- at any of those three jobs?
12     A.    Nope.
13     Q.    All right. Now, I'm going to ask
14 you some questions about the railroad. You
15 started in '75 at Penn Central, correct?
16     A.    Yes.
17     Q.    All right, and you started out as a
18 trackman. Correct?
19     A.    Yes.
20     Q.    That would be maintenance of way
21 department?
22     A.    Yes.
23     Q.    The department you worked in was
24 known as maintenance of way when it was Conrail,

Page 67

1  as well?
2      A.    Yes.
3      Q.    All right. At CSX that department
4  is called the engineering department. Correct?
5      A.    Right.
6      Q.    Same thing, though. Right?
7      A.    Yes.
8      Q.    And what you do in the maintenance
9  of way department is you're responsible --
10 depending on what your position is, obviously,
11 but the overall mission of that department --
12     A.    Sure.
13     Q.    -- is to repair, inspect, and
14 maintain the tracks and the railroad's
15 right-of-way. Correct?
16     A.    Yes.
17     Q.    Okay. That may involve making -- or
18 installing new tracks. Correct?
19     A.    Yep.
20     Q.    But most of the time it has to do
21 with repairing and maintaining existing tracks.
22 Correct?
23     A.    Yes.
24     Q.    Okay. Especially in this area,

Page 68

1  where -- well, I'll strike that.
2            There may be, from time to time,
3  track renewal projects. Correct?
4      A.    Yes.
5      Q.    But those are done by rail gangs,
6  correct?
7      A.    Large gangs, yeah.
8      Q.    And, usually, those railroad gangs
9  travel from area to area.
10     A.    Yes.
11     Q.    And that's all they do. Correct?
12     A.    Yes.
13     Q.    Have you ever worked on one of those
14 gangs?
15     A.    Yes.
16     Q.    Okay. Back in the early part of
17 your career?
18     A.    Yes.
19     Q.    When was the last time you worked on
20 a rail gang?
21     A.    Well, I'm working with a rail gang
22 right now.
23     Q.    When was the last time you worked on
24 one?

Page 69

1      A.    Oh. Worked on one?
2      Q.    Yeah, in other -- you understand the
3  difference?
4      A.    Yeah.
5      Q.    Okay. When you're part of a rail
6  gang, you're actually operating the machinery --
7      A.    Yeah.
8      Q.    -- the tools that are used on the
9  track --
10     A.    Yeah.
11     Q.    -- renewal project. Correct?
12     A.    Yeah.
13     Q.    Okay. And we'll go over that in a
14 second. But when you're working with them as a
15 foreman -- that's what you're referring to?
16     A.    Yeah. Right now, yeah.
17     Q.    Okay. You oversee what they're
18 doing. Correct?
19     A.    Yes.
20     Q.    As they're coming into your
21 territory, where you're assigned, from someplace
22 else. Correct?
23     A.    Yeah.
24     Q.    All right. You got to make sure

**GEOFFREY CROWTHER**
**August 18, 2006**

19 (Pages 70 to 73)

---

Page 70

1  that they keep in line --
2     A.    Yeah.
3     Q.    -- with your particular needs and
4  responsibilities in your geographic
5  responsibility, as a foreman. Correct?
6     A.    Correct.
7     Q.    But you don't actually operate the
8  machines and do that kind of stuff.
9     A.    No. Not now.
10    Q.    All right. All right, well, let's
11  go back a little. When you started with the
12  railroad in '75 -- let's just go through the
13  period of time you were at Penn Central.
14    A.    Okay.
15    Q.    All right? Obviously, you start,
16  you're low man on the totem pole. Correct?
17    A.    Correct.
18    Q.    All right, so you're doing all the
19  crappy jobs on the track. Correct?
20    A.    Right.
21    Q.    All right. And for that year or so
22  that you worked for Penn Central, from the time
23  you started in '75 until the time it became
24  Conrail in April of '96 -- or '76, were you

---

Page 72

1     Q.    In other words, you didn't do it by
2  hand. Right?
3     A.    Oh, yeah.
4     Q.    Okay.
5     A.    Oh, yeah.
6     Q.    All right. Well, what -- during
7  that year did you work on a tie gang the whole
8  time?
9     A.    The first year? I got to say yes.
10    Q.    Okay. And how often did you work?
11    A.    As much -- every day. As much as I
12  could.
13    Q.    Seven days a week?
14    A.    No. You know, four or five days a
15  week.
16    Q.    Okay. How many hours a day?
17    A.    Ten hours. Ten hours a day.
18    Q.    All right. Did you operate
19  machinery during that period of time?
20    A.    No.
21    Q.    Okay, what did you do during that
22  first year at Penn Central?
23    A.    I set spikes behind the tie gang.
24    Q.    Okay. So the tie gang comes through

---

Page 71

1  working on a rail gang or on some other job?
2     A.    I was working on a tie gang, tie
3  production gang.
4     Q.    Okay.
5     A.    And then a --
6     Q.    That's a form of a rail gang, is it
7  not?
8     A.    No. A rail gang -- when you speak
9  of a rail gang, they just -- they just replace
10  rail.
11    Q.    Okay. What's a tie gang do?
12    A.    Tie gang replaces ties.
13    Q.    Okay. All right. So when you --
14    A.    And a surfacing gang smooths it all
15  out.
16    Q.    All right. So the tie gang -- you
17  guys lift up the rails, slide out the old ties,
18  put in new ones.
19    A.    Yeah.
20    Q.    Okay. And there's a number -- even
21  back then, there were a number of pieces of
22  machinery that assisted you in doing that.
23  Correct?
24    A.    Right.

---

Page 73

1  with their machinery to lift the rail to move the
2  old rail -- old ties and put in new ones.
3  Correct?
4     A.    Right.
5     Q.    And what you do is you set the
6  spikes up that actually hold the rail to the tie.
7  Correct?
8     A.    Right.
9     Q.    And you're the one who sets those in
10  place so that they can be driven in by somebody
11  else.
12    A.    Yeah, in those days? Yeah, we did
13  that by hand.
14    Q.    Okay, so there was a guy with a
15  sledgehammer that drove those in.
16    A.    Well, yeah, it's called a -- no.
17  No.
18    Q.    Okay.
19    A.    We had the thing called a setting
20  hammer. You started the spike. And then they
21  had these machines that worked, you know, back of
22  you a ways, that drove them down.
23    Q.    Okay. So there was another machine
24  that actually drove over the rails that would

---

**GEOFFREY CROWTHER**
**August 18, 2006**

20 (Pages 74 to 77)

Page 74

1  bang those into place.
2      A.    Right.
3      Q.    Okay.  So that wasn't done by hand.
4      A.    No.
5      Q.    All right.  And your job was to put
6  the spike in place, just to get it started, so
7  that the machine could come back and drive it in.
8      A.    Right.
9      Q.    Okay.  And what were the tools that
10  you used to do that?
11      A.    A hammer.  Like a sawed-off hammer.
12      Q.    Okay.  And was that specially
13  designed for this purpose?
14      A.    Sort of.  It was kind of like a
15  mason's hammer, or something.
16      Q.    What was it made out of?
17      A.    Wood and steel.
18      Q.    And what was the handle made out of?
19      A.    Wood.
20      Q.    Okay.  Was it curved in any fashion?
21      A.    No.
22      Q.    Just a straight piece of wood?
23      A.    Yeah.
24      Q.    Do you still have one today?

Page 75

1      A.    No.
2      Q.    When was the last time you saw one
3  of those hammers on the railroad?
4      A.    Probably in the -- probably in the
5  early '80s.
6      Q.    Okay.  What happened to it?
7      A.    Well, they got better equipment.
8  The railroad -- the railroad bought better
9  equipment.
10      Q.    How is the equipment -- so they took
11  these hammers out and they replaced it with
12  better hammers, in your opinion.
13      A.    No.  They replaced it with spiking
14  machines.
15      Q.    Okay.  So that you didn't
16  actually --
17      A.    Nobody had to set spikes anymore.
18      Q.    All right.  So they got rid of the
19  hammers altogether.
20      A.    Yeah.
21      Q.    All right.  And that was an
22  improvement, in your opinion.
23      A.    Oh, sure.
24      Q.    Okay.  And --

Page 76

1      A.    And I also got to say, I also drove
2  the bus.
3      Q.    Oh, to get to the actual scene?
4      A.    Yeah.  I drove the bus.
5      Q.    All right.
6      A.    Yep.
7      Q.    All right, and the way this would
8  work, you'd show up at a central location, let's
9  say West Springfield.
10      A.    Yep.
11      Q.    Right?
12      A.    Yep.
13      Q.    Is that where you -- is that where
14  you reported to?
15      A.    Well, a lot of times, yeah.  But you
16  could report, you know, to Boston, you could
17  report to Worcester, or wherever -- you know.
18      Q.    But, in any event, you'd report to a
19  certain yard.
20      A.    Right.
21      Q.    And then from the yard, you'd get
22  the crew together, get on the bus, and go to
23  wherever the site was --
24      A.    Yeah.

Page 77

1      Q.    -- where the work was being
2  performed.  Correct?
3      A.    Yeah.
4      Q.    Okay.
5          MR. FLYNN:  You need a break?
6          (Brief off-record conversation)
7      Q.    (By Mr. Flynn)  All right.  So every
8  day that you were working, there was a period of
9  time that you had to travel to the site.
10  Correct?
11      A.    Right.
12      Q.    And that could be anywhere from
13  fifteen minutes to an hour.  Right?
14      A.    Yes.
15      Q.    You also had to wait for the crew to
16  show up.  Correct?
17      A.    No.
18      Q.    All right.  And at the end of the
19  day there was a certain amount of travel time to
20  get back to your reporting yard.  Correct?
21      A.    Right.
22      Q.    Okay.  So, all together, it's
23  somewhere between a half an hour and two hours a
24  day, going back and forth to the job site.

**GEOFFREY CROWTHER**
**August 18, 2006**

21 (Pages 78 to 81)

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  Correct?
2      A.    Mmm -- oh, well, generally --
3      Q.    And you were --
4      A.    -- I would say.
5      Q.    You were a member of the union back
6  then.  Correct?
7      A.    Right.
8      Q.    And your job was subject to a
9  collective bargaining agreement.  Correct?
10      A.    Yes.
11      Q.    And that union was the Maintenance
12  of Way Employees, is what they call them?
13      A.    BMWE.
14      Q.    BMWE.  Brotherhood of Maintenance of
15  Way Employees.  And you're still a member of that
16  union.
17      A.    Yes.
18      Q.    Although it's now part of the
19  Teamsters.
20      A.    Right.
21      Q.    Has it been the same local all the
22  time that you've been on it?
23      A.    Yeah.
24      Q.    Which is what?

**Page 79**

1      A.    612.
2      Q.    Have you ever been involved in the
3  organization -- in the -- you know, as a chairman
4  or other --
5      A.    I was, briefly, a treasurer.
6      Q.    When was that?
7      A.    Oh, gosh.  I don't know.  In the
8  '80s sometime.
9      Q.    Of your local?
10      A.    Yeah.
11      Q.    Where are they out of?  West
12  Springfield?
13      A.    Yes.
14      Q.    Okay.  That's it?  Other than that,
15  you've never been in the cadre of the union?
16      A.    No.  No.
17      Q.    Have you ever been a member of
18  any -- did you -- have you ever held any position
19  with respect to the International?
20      A.    No.
21      Q.    Okay.  So Penn Central, you're doing
22  the spike setting.  Oh, strike that.
23          Also, you were -- you had mandatory
24  breaks during the day.  Correct?

**Page 80**

1      A.    No.
2      Q.    All right.  You didn't have that in
3  your collective bargaining agreement?
4      A.    No.
5      Q.    No lunch break?
6      A.    Oh, a lunch break?  Yeah.
7      Q.    An hour-long lunch break.
8      A.    No.
9      Q.    How long?
10      A.    About twenty-nine minutes.
11      Q.    Twenty-nine minutes.
12      A.    Yeah, twenty-nine minutes.
13      Q.    All right.  And then they get you
14  back going, right?
15      A.    That's right.
16      Q.    All right.  So at any given day you
17  had somewhere between an hour and two hours of
18  downtime, where you were traveling or having
19  lunch.
20      A.    No.  I was driving the bus.
21      Q.    Oh, you were driving the bus.
22      A.    Yeah.
23      Q.    Okay.  All right.  Are you claiming
24  that the bus somehow contributed to your

**Page 81**

1  repetitive stress injury?
2      A.    No.  You're asking me if I bought
3  downtime.
4      Q.    Yeah, okay.  All right.  But the
5  bus, it wasn't vibrating, or anything like that,
6  was it?
7      A.    Just with noise.
8      Q.    Okay.  All right.  So it was noisy.
9      A.    Oh, yeah.
10      Q.    All right.  But you're not claiming
11  that the bus was --
12      A.    Well --
13      Q.    -- subjected you to excessive
14  repetitive stress, are you?  Or vibration?
15      A.    I'm -- I don't know, yes or no.  I
16  mean, how can I say that?
17      Q.    Just based on your observations.
18  Did it appear to be -- to excessively vibrate
19  when you were driving that bus?
20      A.    Well, sure.  If you're on the
21  right-of-way, if you're driving miles and miles
22  on the right-of-way and where you got to get in
23  and out of and, you know, over rough terrain,
24  sure.  I mean, sure.

**GEOFFREY CROWTHER**
**August 18, 2006**

22 (Pages 82 to 85)

---

Page 82

1    Q.    And you found it noisy.
2    A.    I meant with people, guys talking.
3    Q.    Oh, guys talking. Not the motor,
4  itself.
5    A.    No.
6    Q.    All right. Okay. Now, did you
7  complain about either of those conditions to
8  anybody when you were at Penn Central?
9    A.    Nope.
10   Q.    Did you complain about the -- your
11  tools when you -- to anybody when you were at
12  Penn Central?
13   A.    No.
14   Q.    And did you experience any problems
15  with the tools? Numbness and tingling in your
16  hands, pain in your joints, or any other
17  associated problems?
18   A.    Not that I recall.
19   Q.    Okay. And basically what you did,
20  other than driving the bus, was to set these
21  spikes into place. Correct?
22   A.    Amongst other duties, yeah. I mean,
23  that was --
24   Q.    What were those other duties?

---

Page 83

1    A.    Well, whatever they needed you to
2  do, I mean. You know. I mean, you could be
3  throwing plates. You know, these plates that
4  weighed twenty-five pounds, twenty-six pounds.
5    Q.    And the way that works is that
6  there's a dolly that goes along the tracks that
7  has these things on them, these plates on them.
8  Correct?
9    A.    Well, now -- see --
10   Q.    No, I'm talking about back then.
11   A.    Back then it was old -- it was old
12  school and it was very physical.
13   Q.    Well, how did it work?
14   A.    Well, you had -- how did it work?
15  You had these guys that use these machines, like
16  from the '30s, that pull the spikes. They were,
17  like, with handlebars and things and -- you know,
18  and you got over the spike and you -- I mean,
19  there's a hydraulic thing and it would grab the
20  spike and do that (Indicating) and then -- you
21  know. And you'd pull spikes. You'd have guys
22  pulling spikes. And then if you weren't pulling
23  fast enough, guys, you know, would be -- do it
24  with things called claw bars so that you could

---

Page 84

1  get -- get, you know, a head start on -- get some
2  distance opened up, for the gang to, you know,
3  work.
4    Q.    Okay. Well, let me back up a little
5  bit. Let's be clear. When you talk about a
6  gang, there are different sections of this gang.
7  Correct?
8    A.    Correct.
9    Q.    All right. And the first section
10  does what?
11   A.    The front end?
12   Q.    Yeah.
13   A.    Takes the track apart.
14   Q.    Okay. And there are pieces of
15  machinery that actually travel over the rails --
16   A.    Right.
17   Q.    -- that do this. Right?
18   A.    Yeah.
19   Q.    What are those pieces of machinery
20  called?
21   A.    Well -- well, the names never really
22  change.
23   Q.    Back in '76.
24   A.    Back then. All right. Well, it's

---

Page 85

1  spike pullers.
2    Q.    All right, this is a mechanical
3  device that pulled the old spikes out.
4    A.    Right.
5    Q.    All right, what's the next big piece
6  of machinery in line, back in '76?
7    A.    Back then it was the tie shearer.
8    Q.    Okay. What did that do?
9    A.    That would cut the tie in thirds.
10   Q.    Okay. What's the next piece of
11  machinery?
12   A.    The butt pusher.
13   Q.    What does that do?
14   A.    That would push the ends of the tie
15  out from under the rail.
16   Q.    Okay. Next in line? Or is that the
17  end of that section?
18   A.    The next in line would be the
19  throwing plates.
20   Q.    Okay.
21   A.    You'd have to go into the gauge and
22  get the plate and put it out to the side. Or
23  just walk along inside -- you know.
24   Q.    All right, let me back up.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

GEOFFREY CROWTHER
August 18, 2006

23 (Pages 86 to 89)

Page 86

1    A.    Yep.
2    Q.    The first three things are,
3    actually, pieces of machinery --
4    A.    Correct.
5    Q.    -- that go over the rails. Right?
6    A.    Yep.
7    Q.    Okay. Now, are those pieces of
8    machinery still being used on the railroad?
9    Spike puller, tie shearer, and butt pusher.
10    A.    Spike pullers only.
11    Q.    Okay. What happened to the tie
12    shearers?
13    A.    Well, it got replaced by a better
14    piece of equipment.
15    Q.    When was the last time you saw the
16    tie shearers that you were using back in '76?
17    A.    Oh, probably in the mid '80s.
18    Q.    Okay. So in the mid '80s the
19    railroad did away with the old tie shearers and
20    replaced them with what you call better tie
21    shearers.
22    A.    Well, it was just better equipment.
23    I mean, we had a thing called -- I don't know
24    what they call it. It's a TR-10. It just takes

Page 87

1    the whole tie out. The whole tie just comes out.
2    It just grabs it and pulls it out.
3    Q.    Okay. What about the butt pusher?
4    A.    That's a relic. That's gone.
5    Q.    It's all gone altogether.
6    A.    Yeah.
7    Q.    So the railroad did away with that.
8    A.    Yep.
9    Q.    Back in the mid '80s?
10    A.    Yeah.
11    Q.    And is it fair to say that now the
12    TR-10 does the -- performs the functions that the
13    tie shearer and butt pusher both did?
14    A.    Yeah.
15    Q.    Okay. Now, how many guys operated
16    the spike puller, the tie shearer, and the butt
17    pusher?
18    A.    Well, in the early days, you'd
19    have --
20    Q.    Back in '76.
21    A.    Back in '76?
22    Q.    Yeah.
23    A.    You'd have -- you'd have maybe two
24    to four spike pullers. But they weren't -- I

Page 88

1    mean, they were standing -- you know, you were
2    standing up, with a machine that ran on the --
3    you know, a small -- a small motored hydraulic
4    equipment that you pushed along like -- you know,
5    almost like motorcycle handlebars, and you pushed
6    it along until you -- you know? And it had like
7    brakes on a bicycle and you -- you know, when you
8    got ready to pull the spike, you got over -- you
9    got on that spike, you'd squeeze the handles.
10    And the pressure -- you know, it activated the
11    pressure and pulled the spike out.
12    Q.    Okay.
13    A.    And then --
14    Q.    And what was that replaced with, the
15    spike puller?
16    A.    That was replaced with a machine
17    that you just -- you sit on it and you've kind of
18    got like joysticks now.
19    Q.    When was the spike puller replaced
20    with the -- what is that new machine called, by
21    the way?
22    A.    A spike puller.
23    Q.    Okay. When was that -- when was the
24    old spike puller that you remember being used

Page 89

1    back in '76 replaced with new equipment?
2    A.    Oh, about the same time.
3    Q.    Mid '80s?
4    A.    Yeah.
5    Q.    And, now, this one has eliminated
6    the hand brakes that you've demonstrated.
7    A.    Yeah, that's right.
8    Q.    So you don't have to squeeze with
9    your hands. Correct?
10    A.    Right.
11    Q.    It's eliminated the handlebars
12    altogether. Correct?
13    A.    Right.
14    Q.    And it's eliminated the need to walk
15    behind it. Correct?
16    A.    Well, yeah. For that particular
17    person, yeah. Yeah, yeah.
18    Q.    So the new -- the new spike puller,
19    you actually sit down and drive it, almost like a
20    bulldozer. Correct?
21    A.    Well, yeah. Or a backhoe or
22    something like that.
23    Q.    Because you'd agree with me that
24    those two devices also --

**GEOFFREY CROWTHER**
**August 18, 2006**

24 (Pages 90 to 93)

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  A.  Yeah.
2  Q.  -- use joysticks.
3  A.  Yeah.  You got -- you know, you got
4  levers that you're manipulating.
5  Q.  Okay.
6  A.  Yeah.
7  Q.  All right, so you don't have the
8  handlebars anymore, which require you to twist
9  your wrists to a parallel or a horizontal
10  position.  You have joysticks, which allow you to
11  keep your wrists in a vertical position.
12  Correct?
13  A.  Yeah.
14  Q.  Okay.  And you don't have hand
15  brakes that you have to actually squeeze in this
16  device.  The brakes are operated, on the new
17  device, or the replacement spike puller, with --
18  A.  A foot pedal.
19  Q.  -- foot pedals.  Correct?
20  A.  Okay.
21  Q.  So you don't use your hands at all
22  for the braking on this.  Correct?
23  A.  No.
24  Q.  Or at least since the mid '80s.

**Page 92**

1  the spike puller?
2  A.  Oh, yeah.
3  Q.  All right.  The replacement spike
4  puller, though, would you agree with me that
5  that -- that the device they replaced that with
6  in the mid '80s vibrated less than the old one?
7  A.  Oh, yes.
8  Q.  A lot smoother running machine,
9  correct?
10  A.  Yes.
11  Q.  And that was because it was actually
12  on the rails.  Right?
13  A.  Yeah -- yeah.
14  Q.  And because you didn't have to grip
15  it with your hands as tightly.  Correct?
16  A.  Right.
17  Q.  Okay.  Now, the tie shearer.
18  Explain to us how that operated back in '76 when
19  you were on Penn Central?
20  A.  Well, it had like hydraulic scissors
21  that would just close over the tie -- down into
22  the ballast, over the tie, and just squeeze it
23  and cut it.
24  Q.  Okay.  All right, and how was

**Page 91**

1  Right?
2  A.  Mm-hmm.
3  Q.  Okay.  Now, both of these machines,
4  both the old spike pullers and the mid-'80s spike
5  pullers were gas-powered.  Correct?
6  A.  Yes.
7  Q.  All right.  And there were some
8  hydraulics involved in them, as well?
9  A.  Yes.
10  Q.  Okay.  All right.  Did the spike
11  puller you remember being used in the '70s and up
12  to the mid '80s, did that vibrate at all?
13  A.  Oh, sure.
14  Q.  Yeah.  Okay.  Did the replacement
15  spike puller vibrate?
16  A.  I don't know.  I never ran one.
17  Q.  You never ran one.
18  A.  No.
19  Q.  Okay.  Is that because you had moved
20  out of the position of trackman by that time?
21  A.  Yeah.  I'm just not interested, I
22  guess.
23  Q.  All right.  All right.  When you
24  were with Penn Central in '76, did you operate

**Page 93**

1  that -- how was that operated?  Let me back up.
2  The spike puller had one operator
3  per spike puller?
4  A.  Yeah, but -- if you're talking about
5  machines.  But men are spike pullers too.  I
6  mean, you know, it's -- everybody's a spike
7  puller.
8  Q.  Maybe supplemented --
9  A.  Yes.  Right.
10  Q.  Okay.  So guys would go along, what,
11  before the machine or after it?
12  A.  Well, usually ahead.
13  Q.  Okay.  And they'd pull some spikes
14  with claw bars?
15  A.  Yeah.
16  Q.  Okay.  Are claw bars still being
17  used?
18  A.  Oh, yeah.  Oh, yeah.
19  Q.  Do they have -- are they the same
20  claw bars now that you used -- as were back then?
21  A.  They're, actually, heavier.
22  Q.  They're heavier?
23  A.  Yes.
24  Q.  Are they designed differently?

**GEOFFREY CROWTHER**
**August 18, 2006**

25 (Pages 94 to 97)

Page 94

1    A.    They got a little better claw on
2    them, or something, you know.
3    Q.    What about the handle?
4    A.    That's the same.
5    Q.    Okay. What's the handle made of?
6    A.    Steel.
7    Q.    Okay. Now, the tie shearer, is that
8    something that had handlebars, as well?
9    A.    No. That was a sit-down piece of
10    equipment.
11    Q.    Okay. And the TR-10 that replaced
12    it, that's also a sit-down piece of equipment?
13    A.    Yeah, that's -- that's a
14    different -- that's the machine operators' craft.
15    Q.    All right, so that's different than
16    maintenance of way.
17    A.    No, no, no. That's just -- there's
18    different rosters.
19    Q.    Okay.
20    A.    And so when they replaced -- before,
21    with the old spike pullers, that's what -- you
22    know, that's what the new guys did, or the strong
23    -- you know, a few ended up doing that. Then,
24    you know, you were -- it wasn't good for you,

Page 95

1    so -- but when they replaced them, then they
2    became machines and then there's -- you know, the
3    roster guys, they'd get -- you know, got the
4    jobs.
5    Q.    Why wasn't the old spike puller good
6    for you, as you just said?
7    A.    Why wasn't it good for you?
8    Q.    Yeah. I think you just said the
9    reason you --
10    A.    Yeah. Well, it just meant -- I
11    mean, that was -- that was a tough job.
12    Q.    Why?
13    A.    Because you had to stay ahead.
14    Q.    Oh, I see. Okay. All right.
15          What about the tie shearer? How did
16    -- explain to me how that old tie shearer worked.
17    You sat down. Then what did you do?
18    A.    Well, I mean, you just sat down and
19    you pulled the levers, and the hydraulic scissors
20    cut the ties, you know, in --
21    Q.    Have these levers --
22    A.    -- two places in the gauge.
23    Q.    These levers were actual -- were
24    they handlebars, or were they --

Page 96

1    A.    No, just, you know --
2    Q.    Joysticks.
3    A.    Joystick kind of levers.
4    Q.    Vertical?
5    A.    Right.
6    Q.    Okay. Was there anything you had to
7    squeeze with those, or just manipulate them?
8    A.    You know, I don't remember. I
9    didn't operate it.
10    Q.    Never operated a tie shearer.
11    A.    No, I never to operated a tie
12    shearer.
13    Q.    Okay. Did you ever operated a butt
14    pusher?
15    A.    No.
16    Q.    Okay. But, in any event, the tie
17    shearer and the butt pusher were replaced with
18    the TR-10. Correct?
19    A.    Right.
20    Q.    All right. And the TR-10 is
21    operated how?
22    A.    Well, basically, it's a large piece
23    of equipment. It's comfortable. It's got a, you
24    know, enclosed cab. And after they pull the

Page 97

1    spikes, it just grabs onto the tie and slides it
2    out, pulls it out.
3    Q.    And what does the operator of the
4    TR-10 have to do with his hands?
5    A.    He's got to manipulate -- you know,
6    he operates, you know, levers.
7    Q.    Levers.
8    A.    Yeah. Well, for the sake of
9    argument, we'll call them joysticks.
10    Q.    Okay.
11    A.    It escapes me what else you could
12    call them, right now.
13    Q.    Well, he sits in a cab which is
14    air-conditioned and heated?
15    A.    Yep.
16    Q.    Okay.
17    A.    Pretty much.
18    Q.    In a comfortable chair.
19    A.    Yeah. Yep.
20    Q.    Okay. The machine does most of the
21    work. Right?
22    A.    Yes. No, but you know what? They
23    still -- here's the thing about the railroad.
24    There are still guys that have to throw those

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

26 (Pages 98 to 101)

Page 98

1  plates out --
2      Q.    All right.
3      A.    -- and collect them.  And they still
4  tell somebody to go grab a claw bar.
5      Q.    Correct.
6      A.    All right?  That's -- don't ever
7  forget that about the railroad.
8      Q.    From time to time.
9      A.    Well, no.  Depends on who you're
10  working for.
11      Q.    All right.
12      A.    You know.
13      Q.    Well, let's go back to '76.  You
14  threw tie plates, you operated the spike puller,
15  and you set spikes.  Correct?
16      A.    Yeah.  And forked ballast.
17      Q.    Okay, anything else?  This is back
18  at Penn Central, I'm talking.
19      A.    Yeah.  Yeah, forked ballast --
20      Q.    Did you ever --
21      A.    -- and stuff.
22      Q.    -- use the claw bars to pull spikes?
23      A.    Oh, yeah.
24      Q.    Okay.  Were there any other tasks

Page 99

1  you performed back during your Penn Central days?
2      A.    Yep.  We used to have to -- when we
3  surfaced the track, it was a tie gang/surfacing
4  gang combination.  We did the tie work, and then
5  we did the smoothing of the track.  And back in
6  those days we used to have to manually jack the
7  track up.
8      Q.    With a hydraulic jack?
9      A.    Nope, with a mechanical jack.  It
10  was just one click at a time.
11      Q.    Like what you change your car with.
12      A.    Sort of, yeah.
13      Q.    You get a flat tire, you get a
14  mechanical jack --
15      A.    Right.
16      Q.    -- for most cars.  Right?
17      A.    Yeah.
18      Q.    Okay.  So it's something you can't
19  do that.
20      A.    Yes.  Well, very heavy.
21      Q.    Anything else?
22      A.    Probably about forty pounds.  Huh?
23      Q.    Anything else?
24      A.    An aligning bar -- oh, you mean as

Page 100

1  far as work?
2      Q.    Yeah.
3      A.    Yeah.  I mean, aligning ties.  You
4  know, I used to have to -- you know, like
5  sledgehammers, spiking mauls.
6          MR. FLYNN:  Why don't we take a
7  break right there.
8
9          (A recess was taken.)
10
11          MR. FLYNN:  The situation is this:
12  Elizabeth has a flight for five o'clock and
13  has made diligent attempts to try to
14  reschedule it for a later flight so that we
15  could continue and complete as much as
16  possible, subject to the original
17  reservation and agreement.  But that's not
18  going to be possible, Elizabeth?
19          MS. SCHMIDT:  Yeah.  I mean, it's
20  not looking like it's going to happen.  I
21  mean, and if you're --
22          MR. FLYNN:  We're coming back
23  anyway.
24          MS. SCHMIDT:  -- feeling that you're

Page 101

1      going to need to come back anyway, then --
2          MR. FLYNN:  Great.  Okay, so then
3  what we've agreed is go to about three
4  o'clock, which is another hour and fifty
5  minutes, and suspend at that point and
6  bring Mr. Crowther back at a later date.
7  Is that fair?
8          MS. SCHMIDT:  Agreed.
9          MR. FLYNN:  A fair -- that's agreed.
10  Okay.
11      Q.    (By Mr. Flynn)  So let me continue.
12  What I'd like to do, though, is shift gears to a
13  subject that I was going to cover in a while, but
14  I did want to get into today.  Let me ask you
15  this:  Now, do you recall --
16          Let me ask you, Mr. Crowther, when
17  was the first time -- I want to focus on the
18  claims you're making in this case.  One of the
19  claims you're making is that you have carpal
20  tunnel syndrome in both wrists.  Correct?
21      A.    Yes.
22      Q.    Okay.  Is there another repetitive
23  stress type claim, repetitive stress injury that
24  you're making in this case?

**GEOFFREY CROWTHER**
**August 18, 2006**

27 (Pages 102 to 105)

| Page 102 |
| --- |

1    A.    No.
2    Q.    Are you claiming that your shoulders
3 have been injured as a result of your working on
4 the railroad?
5    A.    I don't think this is -- that's the
6 case we're talking about today.
7    Q.    Okay. Do you have another case, in
8 which you're claiming shoulders were injured by
9 your activities at the railroad?
10    MS. SCHMIDT: That's something
11    that's being discussed with his attorneys
12    at this time, so --
13    A.    Yeah, I don't -- yeah, I don't think
14 there's -- I don't know. I don't know how to
15 answer.
16    Q.    (By Mr. Flynn) Well, let me ask you
17 this: Do you feel that you've suffered some type
18 of injury to your shoulder as a result of your
19 work activities on the railroad?
20    A.    I don't think I made that claim.
21    Q.    That's not what I asked you. I'll
22 ask you that in a second.
23    A.    What?
24    Q.    What I'm asking you is, do you feel,

| Page 103 |
| --- |

1 as you sit here today, that you have some injury
2 in your shoulder which has been caused by your
3 railroad work activities? Railroad work activities.
4    A.    Well, you know, I'm not sure. I'm
5 not -- I'm not -- I can't answer that.
6    Q.    Okay. You are claiming to have
7 suffered injuries to those -- to your shoulder,
8 though, in this case. Correct?
9    A.    I don't think so. I don't think
10 that's my claim.
11    Q.    All right. Are you claiming to have
12 injured your neck as a result of your work
13 activities?
14    A.    I think we're just here for the
15 carpal tunnel and the hearing loss.
16    Q.    Okay.
17    A.    I mean, that's --
18    Q.    Let me ask, just make sure we're
19 clear on that. You are claiming in this case, in
20 this lawsuit, to have suffered hearing loss as a
21 result of your work activities. Correct?
22    A.    Yes.
23    Q.    So at least based on the testimony
24 you've given thus far, your claims in this case

| Page 104 |
| --- |

1 are that you suffered hearing loss and that
2 you've suffered carpal tunnel syndrome in both
3 hands, both wrists, as a result of your work
4 activities with Conrail and CSX. Correct?
5    A.    Yes.
6    Q.    All right. You have not sued Penn
7 Central. Correct?
8    A.    Can I?
9    Q.    Well, you haven't.
10    A.    I mean -- what?
11    Q.    You haven't. Correct?
12    A.    No.
13    Q.    All right. So you're not making any
14 claim against Penn Central at this point in time.
15 Correct?
16    A.    No.
17    Q.    That's correct. Right?
18    A.    Correct.
19    Q.    Okay. Is that because you don't
20 feel that Penn Central is responsible?
21    A.    I guess not.
22    Q.    And just to make sure that your
23 testimony thus far has been clear, you do not --
24 you are not claiming, as far as you know right

| Page 105 |
| --- |

1 now, to have suffered -- you're not claiming that
2 you've suffered a shoulder injury as a result of
3 your work-related railroad -- your railroad work
4 activities. Correct?
5    Do you understand the question?
6    A.    No. I really --
7    Q.    All right.
8    A.    I don't.
9    Q.    Let me rephrase it.
10    A.    I don't.
11    Q.    It is not -- as you sit there today,
12 it is not one of the claims you're making in this
13 case that you have suffered any shoulder injury
14 as a result of work-related railroad -- or
15 railroad work activities. Correct?
16    A.    I'm here today for carpal tunnel and
17 hearing loss. I'm not a medical expert.
18    Q.    All right. Are you currently
19 experiencing any symptoms with respect to your
20 shoulder?
21    A.    Not -- not that I -- well, as far as
22 carpal tunnel, I mean --
23    Q.    No. As far as your shoulder goes.
24    MS. SCHMIDT: He's not asking if you

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# GEOFFREY CROWTHER
# August 18, 2006

28 (Pages 106 to 109)

## Page 106

1  have, you know, a claim right now, but
2  just --
3      THE WITNESS: Yeah.
4      MS. SCHMIDT: -- you know, have you
5  had any problems with your shoulder or --
6      A.  Well, that's -- you know, that's
7  what I mean: It's hard -- it's hard to say.
8      Q.  (By Mr. Flynn) Okay. Let me --
9      A.  You know, it's like --
10     Q.  Let me try to explain, further,
11 where --
12     A.  Yeah.
13     Q.  -- I'm coming from.
14     A.  All right, fine.
15     Q.  Maybe it will make --
16     A.  Yeah.
17     Q.  -- clarify things for you.
18     A.  Yeah. Okay.
19     Q.  You have filed a lawsuit. Correct?
20     A.  Yes.
21     Q.  You've alleged in that lawsuit that
22 you've been injured as a result of being exposed
23 to cumulative trauma in the workplace. Correct?
24     A.  Correct.

## Page 107

1      Q.  Okay. You've claimed in your
2  lawsuit that you suffer hearing loss as a result
3  of your exposure to noise in your railroad
4  workplace. Correct?
5      A.  Correct.
6      Q.  And you're also claiming that you
7  suffered bilateral carpal tunnel syndrome as a
8  result of being exposed to repetitive stresses
9  involved in the work activities on the railroad.
10 Correct?
11     A.  Correct.
12     Q.  All right. But at least as far as
13 you know right now, one of the things you're not
14 claiming currently in your lawsuit is that you've
15 suffered shoulder injuries as a result of those
16 activities. Correct?
17     A.  I'm not here to talk about what may
18 or may not. I'm here because of carpal tunnel
19 and the hearing loss. That's --
20     Q.  So, as far as you understand it, the
21 shoulder has nothing to do with your current
22 lawsuit. Correct?
23     A.  I don't know.
24     Q.  Based on your understanding, is that

## Page 108

1  a claim you're making in this case?
2      A.  No, my understanding is that there's
3  more than -- there's carpal tunnel and there's
4  some -- two or three other kinds of things that
5  you can get. But we all call it "carpal tunnel,"
6  so --
7      Q.  What are the two or three other
8  things --
9      A.  I don't know.
10     Q.  -- that you can get?
11     A.  I'm not -- I'm not sure. Maybe you
12 can tell me. But there's some kind of cuticle
13 thing. And there's -- you know, I mean,
14 there's -- carpal tunnel is an umbrella thing,
15 and pain is an umbrella. And for me to answer
16 and for you to pinpoint something, I can't do
17 that.
18     Q.  Well, no, sir. See, that's the
19 problem. Okay.
20     A.  Yeah.
21     Q.  Because a couple of things. Number
22 one, you are here to answer the questions that
23 that I ask.
24     A.  Right.

## Page 109

1      Q.  All right.
2      A.  Yes.
3      Q.  Number two is you have filed a
4  lawsuit. Okay?
5      A.  Yep.
6      Q.  And I'm entitled, in defending my
7  client, to try to figure out exactly what it is
8  you're claiming. All right. So, yeah, you've
9  got to know this.
10     So what I'm saying -- let me ask you
11 this question: You said carpal tunnel is an
12 umbrella, as far as you understand it?
13     A.  Yeah, and I'm just -- I'm a -- I'm a
14 railroad worker.
15     Q.  You don't have to give me --
16     A.  You know.
17     Q.  -- that caveat.
18     A.  What? Yeah.
19     Q.  I understand you're not a doctor.
20     A.  Okay. Okay.
21     Q.  I understand you're not a
22 neurologist or an orthopedic doctor. All right?
23 I'm just asking -- when I ask this question, I'm
24 asking your understanding. Okay?

# GEOFFREY CROWTHER
# August 18, 2006

29 (Pages 110 to 113)

| Page 110 |
| --- |

1    A.   Uh-huh.
2    Q.   As far as you understand it, carpal
3  tunnel, as you described it, was an umbrella
4  condition?
5    A.   Yes.
6    Q.   And that would include problems you
7  might be having with your shoulder?
8    A.   You know, I don't know that.
9    Q.   Is that your --
10    A.   I don't --
11    Q.   Is that your understanding?
12    A.   My understanding is that --
13        MS. SCHMIDT:  I'm going to have to
14  stop this for a minute.
15        THE WITNESS:  Yeah, can you jump in
16  here?
17        MS. SCHMIDT:  Because -- I just -- I
18  just want to say, I think that the witness
19  is confused.  I think that he's answered
20  the question.  I think that the lawsuit
21  that was filed, as it reads, specifically
22  says that this is a claim for carpal tunnel
23  syndrome as well as a hearing loss count.
24  And that's his understanding as to what he

| Page 111 |
| --- |

1  is here for today.  And that is what he is
2  claiming as of right now.
3    Q.   (By Mr. Flynn)  All right.  Do you
4  plan in the future to file a separate claim for
5  injuries you have suffered to your shoulders?
6    A.   No.
7    Q.   Okay.  Without getting into the
8  specifics, have you had discussions with anyone
9  in that regard?
10    A.   No.
11    Q.   Have you discussed that with your
12  lawyers?  And, again, I don't want to know the
13  substance; I just want to know the answer, yes or
14  no:  Have you discussed with your lawyers the
15  prospect of bringing another lawsuit, in addition
16  to this one, for injuries you've suffered to --
17  you claim to have suffered to your shoulders as a
18  result of your railroad work activities?
19    A.   Can I -- can I talk to her?  Or is
20  that --
21    Q.   Not while a -- not while a question.
22  is pending.
23    A.   Oh, not while the question is
24  pending?

| Page 112 |
| --- |

1    Q.   No.
2    A.   Shoulders, no.
3    Q.   Okay.  Have you had discussions with
4  your attorneys or anyone else -- well, let me
5  strike that.
6        Have you had discussions with anyone
7  about filing a separate lawsuit, in addition to
8  this one, about injuries you have suffered to any
9  other part of your body that you claim was caused
10  by your work -- your railroad work activities?
11    A.   Will I make another claim?  Yes.
12    Q.   Okay.  What is that claim?
13    A.   I don't know yet.
14    Q.   Well, you just said, "Yes, I will
15  make another claim."  As you understand it, what
16  is the other claim that you will make?
17    A.   Well, when -- when I understand what
18  the problem is, then I will -- you know, then
19  I'll address it.
20    Q.   Well, what do you mean by that?
21    A.   I'm not sure.  It's like -- it's
22  like finding out that I had carpal tunnel.  That
23  was -- you know, that was a revelation.  So.
24    Q.   All right.  Do you have -- are you

| Page 113 |
| --- |

1  currently experiencing symptoms to any part of
2  your body that you think are or may be caused --
3  may have been caused by your railroad work
4  activities?
5    A.   Yes.
6    Q.   Okay.  What -- give me them all.
7    A.   Do I have to?
8    Q.   Yes.
9    A.   Why?  I'm not here -- I'm here for
10  carpal tunnel and hearing loss.
11    Q.   I don't have to answer the question
12  as to why.
13    A.   Well --
14    Q.   I'll tell you this --
15    A.   Yeah.
16    Q.   -- that the rules say that you have
17  to answer any questions which are reasonably
18  calculated to lead to the discovery of admissible
19  evidence.  And that question that I just asked,
20  you would certainly be.
21    A.   Well, I think I did.  You know, I
22  don't mean to be combative.  When I understand
23  what -- because it's all just -- you know, I
24  mean, I'm just taking it one at a time --

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**GEOFFREY CROWTHER**
**August 18, 2006**

30 (Pages 114 to 117)

Page 114

1     Q.    As you said, sir --
2     A.    -- you know, and --
3     Q.    As you said, sir, you're not a
4 doctor.
5     A.    Right.
6     Q.    Okay? You don't know what was
7 caused by what or where these things come from.
8 All right? But you have told me that you --
9 you've acknowledged that you are suffering from
10 other conditions, other symptomatology, that you
11 just told me that you will file a lawsuit on.
12 And I'm entitled to know what those are so I can
13 explore whether or not they're related to what's
14 going on in this case.
15     A.    Right.
16     Q.    Okay?
17     A.    And I can tell you that, yes -- like
18 I did say, yes. And I don't really understand it
19 all myself yet. You know, to be really honest.
20 I mean --
21     Q.    What parts of your body do you
22 feel -- what parts of your body, in addition to
23 your carpal tunnel syndrome and your hearing
24 loss, are you currently experiencing problems

Page 115

1 with?
2     A.    My hand.
3     Q.    Okay.
4     A.    My left hand and my neck.
5     Q.    All right. What is the problem
6 you're experiencing in your left hand?
7     A.    I have a thumb condition and I have
8 a neck condition.
9     Q.    What's your thumb condition?
10     A.    I'm not sure what the -- what it is.
11 It's -- I don't know.
12     Q.    Okay.
13     A.    I mean, you know, it's --
14     Q.    When did you first begin
15 experiencing problems with your thumb?
16     A.    Two thousand and -- whenever I saw
17 Dr. Wenner. Whenever -- whenever that was.
18     Q.    So you didn't begin experiencing
19 problems with your thumb until you actually saw
20 Dr. Wenner?
21     A.    Well, that's when -- I mean, it was
22 that -- a few months before that, a couple months
23 before that. I mean, I would say like in August,
24 maybe. I don't know. I'm not sure when I saw

Page 116

1 him. But I know in August my -- my job changed.
2     Q.    Okay, how did your job change?
3     A.    Oh, I went from being a track
4 inspector to building track in New Bedford.
5     Q.    That was August of when?
6     A.    2005.
7     Q.    And it was around that time was the
8 first time you saw Dr. Wenner?
9     A.    Yeah, I don't know. You've got the
10 records. I don't know when I saw him. September
11 or October or something.
12     Q.    All right.
13     A.    I don't know.
14     Q.    See, that was the issue that we
15 talked about at the beginning.
16     A.    What?
17     Q.    I don't have Dr. Wenner's records.
18     A.    Oh. Oh, okay. Well, you should
19 have them.
20     Q.    I don't.
21     A.    Oh.
22     Q.    Have you obtained those records?
23     A.    Yes.
24     Q.    You have in your possession

Page 117

1 Dr. Wenner's records?
2     A.    Not in my possession, no.
3     Q.    What did you do with them?
4          Well, let me ask you this.
5     A.    What?
6     Q.    When did you obtain Dr. Wenner's
7 records?
8     A.    I think I obtained them like in --
9 December of 2005?
10     Q.    Okay. Did you actually physically
11 go to his office to get those records?
12     A.    No. They sent them to me.
13     Q.    Okay. You asked for them?
14     A.    Yep.
15     Q.    Why?
16     A.    Because I wanted -- I wanted to try
17 to understand what -- what's ailing me.
18     Q.    Okay. Were you asked by your
19 counsel to get those records?
20     A.    No.
21     Q.    What did you do with them?
22     A.    Discussed them with my wife.
23     Q.    Where are they now?
24     A.    I think they're in the glove

**GEOFFREY CROWTHER**
**August 18, 2006**

31 (Pages 118 to 121)

| Page 118 |
|---|
| 1  compartment of the other car. |
| 2       Q.    Not your car? |
| 3       A.    I have a company vehicle today. |
| 4       Q.    You drove a company vehicle to this |
| 5  deposition. |
| 6       A.    Yes. |
| 7       Q.    That's a CSX vehicle? |
| 8       A.    Yep. |
| 9       Q.    All right.  Are you authorized to do |
| 10  that? |
| 11       A.    Well, I'm on my way to -- sort of. |
| 12  I got work to do if I can get out of here, yeah. |
| 13       Q.    Okay.  So you drove your company |
| 14  vehicle to this deposition. |
| 15       A.    Yep. |
| 16       Q.    And the records -- Dr. Wenner's |
| 17  records are in the glove box of what vehicle? |
| 18       A.    The Mitsubishi.  I think.  I mean, |
| 19  you know. |
| 20       Q.    Have you given copies of those |
| 21  records to your counsel? |
| 22       A.    You know what?  You know, I don't |
| 23  know.  You know, I know I discussed them with |
| 24  him.  I'm not sure if -- I'm not sure -- |

| Page 120 |
|---|
| 1  times before December of 2005.  Correct? |
| 2       A.    You know, I don't know.  To be |
| 3  perfectly honest, I know I saw him at least three |
| 4  times, but I'm not sure how the -- how it went, |
| 5  you know, but -- |
| 6       Q.    Have you -- did you obtain his |
| 7  records after the last time you saw him, in |
| 8  February of '06? |
| 9       A.    No.  I told you, I saw -- I got |
| 10  those in -- somewhere around December. |
| 11       Q.    So you do not have a complete set of |
| 12  Dr. Wenner's records. |
| 13       A.    No.  No. |
| 14       Q.    All right.  Has your counsel |
| 15  obtained a complete set of Dr. Wenner's records? |
| 16       A.    Not that I'm aware of. |
| 17       Q.    Because at the outset or -- before |
| 18  we started this deposition, off the record you |
| 19  said something about you, yourself, traveling |
| 20  around to get these records. |
| 21       A.    Yeah.  That was -- right. |
| 22       Q.    Okay.  What -- what records have you |
| 23  physically attempted to obtain? |
| 24       A.    The hearing records.  You know, from |

| Page 119 |
|---|
| 1       Q.    When was the first time you saw |
| 2  Dr. Wenner? |
| 3       A.    Well, I'd have to say it was the |
| 4  fall of 2005. |
| 5       Q.    Okay.  How many times have you seen |
| 6  Dr. Wenner since then? |
| 7       A.    I think I've seen him a total of |
| 8  three times. |
| 9       Q.    When was the last time you saw him? |
| 10       A.    I saw him, I think, in February of |
| 11  this year. |
| 12       Q.    February of '06. |
| 13       A.    Yes. |
| 14       Q.    So that was after you obtained those |
| 15  records. |
| 16       A.    Yeah. |
| 17       Q.    Have you -- |
| 18       A.    I mean, they're my records.  They're |
| 19  my records. |
| 20       Q.    His records of treatments with you. |
| 21       A.    My records.  Yeah.  They're my -- |
| 22  they're my medical records. |
| 23       Q.    Have you obtained -- |
| 24            So I take it you saw him a couple |

| Page 121 |
|---|
| 1  the hearing center, in Amherst. |
| 2       Q.    Yep. |
| 3       A.    And my primary care, Dr. Baustin, in |
| 4  Hadley. |
| 5       Q.    B-A-U-S-T-I-N? |
| 6       A.    Yes. |
| 7       Q.    Anybody else's records? |
| 8       A.    Anybody else's records.  Yes. |
| 9       Q.    Who? |
| 10       A.    I had an MRI, and I got the results |
| 11  of that. |
| 12       Q.    Where was the MRI taken? |
| 13       A.    At -- in -- what was the name. |
| 14  Springfield. |
| 15       Q.    By whom? |
| 16       A.    Dr. Cowan. |
| 17       Q.    At what facility? |
| 18       A.    I'm not sure what they call it. |
| 19  It's a -- you know, it's an MRI center. |
| 20       Q.    Where is it located? |
| 21       A.    In Springfield.  Baystate -- it's |
| 22  affiliated with Baystate Medical Center, I guess. |
| 23       Q.    Is it Baystate MRI Imaging? |
| 24       A.    If you say so. |

**GEOFFREY CROWTHER**
**August 18, 2006**

32 (Pages 122 to 125)

| | |
|---|---|
| Page 122 | Page 124 |

**Page 122**

1  Q.  No, I'm asking you.
2  A.  I mean, if you say so.  I don't
3  know.
4  Q.  I'm trying to jog your memory.
5  A.  Well, you know -- you know, I don't
6  -- I have a pretty good memory, but not for stuff
7  like that.
8  Q.  What part of your body was imaged?
9  A.  My neck.
10  Q.  What part of your neck?
11  A.  I guess, from the results, it was
12  both sides.
13  Q.  What were the results of the MRI?
14  A.  Well, from a layman's point of view?
15  Q.  Do you have a copy of the MRI
16  report?
17  A.  No.
18  Q.  Have you reviewed a copy of the
19  report?
20  A.  Yes.
21  Q.  Where and when?
22  A.  Right after I received it.
23  Q.  So you received it in the mail?
24  A.  No.  I went to the office and -- you

**Page 124**

1  the carpal tunnel?
2  A.  Well, in -- my understanding is that
3  what brought me to Dr. Wenner was I was -- I was
4  experiencing some discomfort.
5  Q.  In your left thumb.
6  A.  In my left arm.
7  Q.  Okay.
8  A.  Let's say in my left arm.
9  Q.  And?
10  A.  Excuse me?
11  Q.  Who referred you to him?  Who
12  actually said, "Go to see Dr. Wenner"?
13  A.  Mmm, you know, I don't know.  I
14  might have called, you know, Dr. Baustin.  You
15  know, I mean, I might have called there.  Or
16  maybe my wife would have talked to him.  I don't
17  know.  You know, really.
18  Q.  Has anyone --
19  A.  I know he's a hand guy.
20  Q.  Has anyone --
21  A.  I didn't have a hand -- my doctor,
22  Rehman, moved to Florida.
23  Q.  What was Dr. Rehman's specialty?
24  R-E-H-M-A-N, correct?

**Page 123**

1  know.
2  Q.  Okay.  When was the MRI conducted?
3  A.  I think in February.
4  Q.  Of '06?
5  A.  Yes.
6  Q.  Why did you have the MRI done?
7  A.  Good question.  To understand, you
8  know, my medical condition.  You know, to
9  understand, you know, I mean, where I'm at.
10  Q.  Who referred you to Dr. Wenner for
11  your thumb condition?
12  A.  Nobody.
13  Q.  Has Dr. Wenner been treating you for
14  anything other than your thumb condition?
15  A.  Well, I went to him for the carpal
16  tunnel.  That's what -- that's what brought me to
17  Dr. Wenner.
18  Q.  Yet the first time you saw him was
19  when your job changed from track inspector to
20  actually working on a track job in New Bedford in
21  August of 2005.  Correct?
22  A.  Right.
23  Q.  Okay.  So is the thumb condition, as
24  far as you're concerned, one and the same with

**Page 125**

1  A.  Right.
2  Q.  What was his specialty?
3  A.  I guess he was a hand guy.  You
4  know.
5  Q.  All right.  Let me get back to, have
6  you seen any other doctor -- well, did you see
7  Dr. Rehman for your carpal tunnel syndrome?
8  A.  Yes.
9  Q.  Who referred you to see Dr. Rehman?
10  A.  Dr. Baustin.
11  Q.  Who referred you to see Dr. Cowan
12  for the MRI of your neck in February of '06?
13  A.  Dr. Wenner.
14  Q.  All right.  So Dr. Wenner has not
15  treated you for your neck.  Correct?
16  A.  No.
17  Q.  All right.  Have you received any
18  treatment for your neck, other than -- other than
19  the MRI?
20  A.  Have I received any treatment?
21  Q.  Yeah.
22  A.  No.
23  Q.  Have you had any other diagnostic
24  tests taken?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

33 (Pages 126 to 129)

| Page 126 |
|---|
| 1    A.    Well, there were some x-rays. |
| 2    Q.    Taken by whom, where, and when? |
| 3    A.    I think Dr. Wenner took some x-rays. |
| 4    Q.    Of what part of your body? |
| 5    A.    That's a good question. You know, I |
| 6  don't know. I mean -- |
| 7    Q.    Have you seen those x-ray reports? |
| 8    A.    No. |
| 9    Q.    Are they among the documents which |
| 10 are in your glove box? |
| 11    A.    I don't think so. You know, |
| 12 truthfully, I don't think so. You know, it was |
| 13 just -- it was mostly just written -- just |
| 14 written, you know, a written report. I mean, |
| 15 there was, you know -- |
| 16    Q.    As far as you understand, what were |
| 17 the results of the MRI of your neck? |
| 18    A.    The MRI on my neck is that -- well, |
| 19 that's the thing I'm going to find out. I was |
| 20 supposed to -- you know, I'm -- I'm going to |
| 21 find -- I'm -- |
| 22    Q.    How are you going to find that out? |
| 23    A.    Huh? |
| 24    Q.    How are you going to, quote/unquote, |

| Page 127 |
|---|
| 1  find that out? |
| 2    A.    Well, I was going to see him today. |
| 3  But, you know, we had to schedule this today. |
| 4    Q.    See who? Dr. Cowan? |
| 5    A.    Sure. |
| 6    Q.    You have an appointment scheduled |
| 7  with Dr. Cowan today. |
| 8    A.    I did. |
| 9    Q.    You did. |
| 10    A.    Yep. |
| 11    Q.    If I call his office and ask him |
| 12 that, or get his records, they'll reflect you had |
| 13 an appointment scheduled for today that you had |
| 14 to cancel for this deposition? |
| 15    A.    Yes. |
| 16    Q.    Okay. Then how is it, sir -- |
| 17 reminding you that you're under oath. How is it |
| 18 that you were planning on using your company |
| 19 vehicle to go to work when in fact you had a |
| 20 deposition and, before that, a doctor's |
| 21 appointment scheduled? |
| 22    A.    All right. Is this what we're going |
| 23 to do? We're going to get hung up on me using a |
| 24 company vehicle? |

| Page 128 |
|---|
| 1    Q.    No, sir. |
| 2    A.    What? |
| 3    Q.    But we are going to -- |
| 4    A.    What? |
| 5    Q.    -- explore your credibility. |
| 6    A.    All right. |
| 7    Q.    Okay? |
| 8    A.    Okay. |
| 9    Q.    You're under the penalties -- |
| 10    A.    Yep. |
| 11    Q.    -- and pains of perjury. |
| 12    A.    Okay. |
| 13    Q.    You've seen how -- how people get -- |
| 14 can get in problems with perjury. Correct? |
| 15    A.    Oh, yes. |
| 16    Q.    You know Barry Bonds. Right? |
| 17    A.    Oh, yes. |
| 18    Q.    You followed that story? |
| 19    A.    Yep. |
| 20    Q.    You followed President Clinton's |
| 21 impeachment. Correct? |
| 22    A.    Yeah. |
| 23    Q.    For perjury. Right? Right? |
| 24    A.    Sure. |

| Page 129 |
|---|
| 1    Q.    You know the importance of telling |
| 2  the truth under oath. Correct? |
| 3    A.    Sure. |
| 4    Q.    And you know the importance of -- |
| 5  you know that you can be prosecuted for failing |
| 6  to do so. Correct? |
| 7    A.    Yep. |
| 8    Q.    And you know the importance of -- in |
| 9  our system of justice, of obtaining truth. |
| 10 Correct? |
| 11    A.    Right. |
| 12    Q.    So you've told me today that, you |
| 13 know, you bring your company vehicle to this -- |
| 14 to this deposition. Correct? Right? |
| 15    A.    Yes. |
| 16    Q.    And you know that you're not |
| 17 authorized to use the company vehicle for |
| 18 personal business. Correct? |
| 19    A.    Yes. |
| 20    Q.    And the rules say that. So you |
| 21 can't do that. Right? |
| 22    A.    Well -- |
| 23    Q.    Well, I'll withdraw the question. |
| 24    A.    What? |

# GEOFFREY CROWTHER
## August 18, 2006

34 (Pages 130 to 133)

### Page 130

1    Q.    This is your personal business here
2  today. Correct?
3    A.    Yes.
4    Q.    All right. And then when I asked
5  you about that, you said you were planning on
6  doing some work for the company in New Bedford?
7    A.    No, not in New Bedford. I'm on my
8  way -- I've been -- I've been like a week and a
9  half from my house, working with a rail gang in
10  Boston, in the Framingham area. And I was going
11  to see -- I was going to take yesterday and today
12  off. I was going to have -- the deposition was
13  going to -- our deposition was supposed to have
14  been last Thursday or Friday. I forget, the
15  seven -- what's today, the 18th? It was supposed
16  to be the 10th. Okay?
17        So I took today off. I took the
18  morning off to come here. But I had to go home,
19  do my laundry, get -- do stuff -- you know, go to
20  the bank. And now -- and when I leave here, I'm
21  going to Worcester to walk some track and figure
22  out how we're going to do the job for Monday.
23  I'm working tomorrow and Sunday in Westborough.
24  But Monday we're going to be moving up to

### Page 131

1  Worcester, and I got to figure out what we're
2  doing there. And that's why, you know, you
3  can -- you know. You can call it unauthorized
4  use of a vehicle if you want, but I say it's just
5  common sense.
6    Q.    When did you make this appointment
7  with Dr. Cowan to talk about your February '06
8  MRI?
9    A.    I'm sorry, could you -- I'm a little
10  upset right now. Could you just say that again?
11    Q.    Well, earlier, you said you had this
12  appoint -- you had this appointment scheduled
13  with Dr. Cowan to discuss your February '06 MRI.
14  Correct?
15    A.    I saw Dr. Wenner.
16    Q.    No. But you had an MRI in February
17  '06. Correct?
18    A.    It was February. It might
19  have been March or, you know, late January.
20  Let's say February. Right. Okay.
21    Q.    Your testimony was February. Right?
22    A.    Okay. I'm just -- yeah. But if
23  you're going to -- you know. Fine. February.
24    Q.    And then you also testified,

### Page 132

1  earlier, that you were scheduled -- you had an
2  appointment with Dr. Cowan to see him today.
3    A.    Today.
4    Q.    August 18th.
5    A.    Yep.
6    Q.    To talk about your February '06 MRI.
7  Correct?
8    A.    Correct.
9    Q.    Okay. Even though we had the
10  deposition scheduled today. Correct?
11    A.    You know what? I didn't know about
12  today until -- it was probably Tuesday afternoon.
13    Q.    And regardless of whether we -- the
14  deposition -- even though, as you've just
15  explained to me, you had all this work to do,
16  from Boston to Worcester --
17    A.    Right.
18    Q.    -- that you were going to take this
19  appointment to go see Dr. Cowan, even though you
20  were working out of Boston?
21    A.    I rescheduled. As soon as I knew
22  that -- if I could have worked overtime today,
23  I'd be working overtime. But I'm here, to this,
24  for this. I would have canceled the appointment

### Page 133

1  for Dr. Cowan, too, to make a few extra dollars.
2  That's the nature of my job.
3    Q.    Did you return to see Dr. Cowan --
4    A.    No.
5    Q.    -- after the day that your MRI was
6  taken?
7    A.    I haven't spoken to him since. Oh,
8  yes. Yes, I did. I'm sorry. I did speak to
9  him.
10    Q.    Well, that's what I thought you said
11  earlier.
12    A.    Yeah.
13    Q.    I thought you said, earlier, that
14  you had some understanding of what that MRI
15  showed because you've already spoken to him once
16  about it. Correct?
17    A.    Yeah. But it was -- it was very
18  brief and perfunctory.
19    Q.    Brief or perfunctory, the issue is
20  that you did speak to him about the MRI after the
21  results came back. Correct?
22    A.    Right.
23    Q.    Was that at the office or over the
24  phone, or how did that work?

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

35 (Pages 134 to 137)

| Page 134 |
|---|
| 1    A.    I went to his office. |
| 2    Q.    Okay. So you have the MRI sometime |
| 3  in February '06. |
| 4    A.    Yeah. |
| 5    Q.    Right? |
| 6    A.    Yep. |
| 7    Q.    How long after that did you actually |
| 8  go to his office for the second time? |
| 9    A.    I think it was a while. It was like |
| 10  maybe -- it was like a month or more. Because I |
| 11  thought his office was going to call me, or |
| 12  something, and schedule an appointment. |
| 13    Q.    And Dr. Cowan is a doctor -- he's a |
| 14  radiologist. Right? |
| 15    A.    I think he's an orthopedic. |
| 16    Q.    You think he's an orthopedic. |
| 17    A.    I think he's a -- he's the guy that |
| 18  Dr. Wenner sent me to. You know -- |
| 19    Q.    Is it C-O-W-I-N or C-O-W-A-N; do you |
| 20  know? |
| 21    A.    I think it's C-O-W-A-N. |
| 22    Q.    All right. So he doesn't actually |
| 23  practice at the MRI center; he has his own |
| 24  office. Correct? |

| Page 135 |
|---|
| 1    A.    Yes. |
| 2    Q.    And what's it called? Like New |
| 3  England Orthopedic Surgeons, or what is it? |
| 4    A.    Right. |
| 5    Q.    It's New England Orthopedic |
| 6  Surgeons? |
| 7    A.    Yeah. Yeah, I guess so. It's |
| 8  whatever Dr. Wenner, that -- that whole group of |
| 9  people. |
| 10    Q.    So Cowan is in the same practice as |
| 11  Wenner? |
| 12    A.    Mmm, I -- I don't know. I'm not |
| 13  sure how it works. You know, I'm not -- I don't |
| 14  know how it works. |
| 15    Q.    Well, you've been to see Dr. Wenner. |
| 16  Correct? |
| 17    A.    Been to see Dr. Wenner. |
| 18    Q.    His office is in Springfield. |
| 19  Right? |
| 20    A.    Yep. |
| 21    Q.    So you've physically been there. |
| 22  Right? |
| 23    A.    Mm-hmm. |
| 24    Q.    All right. And you physically have |

| Page 136 |
|---|
| 1  been to Dr. Cowan's office. Correct? |
| 2    A.    Yes. |
| 3    Q.    Is it the same office? |
| 4    A.    No. |
| 5    Q.    It's the same building? |
| 6    A.    Yes. |
| 7    Q.    Same floor? |
| 8    A.    No. |
| 9    Q.    Different floors. |
| 10    A.    Yep. |
| 11    Q.    Okay. All right. Different |
| 12  reception areas? |
| 13    A.    Yes. |
| 14    Q.    And what's the address? |
| 15    A.    Oh, gosh. I can't -- I could tell |
| 16  you how to get there. Birnie Avenue? Is it like |
| 17  Birnie Avenue, or something like that? |
| 18    Q.    Don't ask me. I don't -- |
| 19    A.    I think it might be Birnie Avenue. |
| 20    Q.    Do you know what Cowan's first name |
| 21  is? |
| 22    A.    No. |
| 23    Q.    Okay. Wenner is New England |
| 24  Orthopedic Surgeons, 300 Birnie Avenue -- |

| Page 137 |
|---|
| 1    A.    Yes. |
| 2    Q.    -- Suite 201, Springfield, Mass. |
| 3  Correct? |
| 4    A.    I guess so. I mean, I know it's |
| 5  Birnie Avenue. |
| 6    Q.    All right. Have you seen -- have |
| 7  you ever treated with any other physician for any |
| 8  problems with your -- that you claim are related |
| 9  to your carpal tunnel syndrome? |
| 10    A.    Mmm, no. Just -- just Dr. Rehman |
| 11  and Dr. Wenner. |
| 12    Q.    Well, what about Dr. Woodward? |
| 13    A.    Who's he? |
| 14    Q.    You ever heard of Dr. Woodward? |
| 15  Mark Woodward. |
| 16    A.    You know, I'm sorry. I mean, I'm |
| 17  not -- can you help me out with -- can you jog my |
| 18  memory? |
| 19    Q.    I'm just going to ask -- I may in a |
| 20  moment. But have you ever heard of Dr. Mark |
| 21  Woodward, from Haddon Heights, I believe it is. |
| 22  Let me get the exact address here. |
| 23    A.    Oh, was that -- I think I -- |
| 24    Q.    Hold on a second. |

**GEOFFREY CROWTHER**
**August 18, 2006**

36 (Pages 138 to 141)

---

### Page 138

1    A.    All right. I remember I seeing that
2 name on a release that I signed and put in the
3 mail.
4    Q.    I'm asking you a different question.
5    A.    Oh, all right.
6    Q.    Have you ever been treated by a
7 Dr. Mark Woodward, whose office is in New Jersey?
8    A.    No.
9    Q.    Have you ever seen a Dr. Mark
10 Woodward?
11    A.    Nope. I mean, I -- you know what?
12 I don't know. I mean, you're telling me
13 something that --
14    Q.    No, I'm not telling you --
15    A.    I know that --
16    Q.    Sir. I'm not --
17    A.    I mean, I talked to different
18 radiologists and -- you know, I mean, I don't
19 know -- you know, doctors are -- they come in,
20 they tell you their name. I don't -- you know.
21    Q.    I'm not telling you anything.
22    A.    What?
23    Q.    I'm asking you questions.
24    A.    Yeah.

---

### Page 139

1    Q.    All right. You can read as much as
2 you want into my questions. I'm just looking for
3 answers.
4    A.    Okay.
5    Q.    So you have never been treated by a
6 Dr. Mark Woodward. Correct?
7    A.    I don't know.
8    Q.    As far as you recall, you don't ever
9 remember going to see Dr. -- going to an office
10 that was Dr. Mark Woodward's. Correct?
11    A.    I know I've talked to different
12 people. I don't know.
13    Q.    Have you ever gone to an office to
14 see a Dr. Mark Woodward?
15    A.    Specifically?
16    Q.    Yes.
17    A.    No.
18    Q.    Have you ever been to a doctor's
19 office in New Jersey for any reason, ever in your
20 life?
21    A.    Nope.
22    Q.    Have you ever had a nerve conduction
23 study performed on you?
24    A.    I don't know what that is. All

---

### Page 140

1 right?
2    Q.    Have you ever had anyone put
3 electrodes on your hands and your elbow, which
4 was connected to a machine, to try to determine
5 whether or not you had problems with the nerves
6 that run through that area of your arm?
7    A.    Oh, yeah.
8    Q.    Okay.
9    A.    Yeah. Yep.
10    Q.    Who did that?
11    A.    The first time was whatever the --
12 whatever the starting date is on this carpal
13 tunnel suit.
14    Q.    What do you mean by that?
15    A.    Whatever -- I don't know. It was in
16 the spring of 2003, 2002, or --
17    Q.    Well, what do you mean by "the start
18 date of my carpal tunnel suit"?
19    A.    What do I mean by it? Well, that's
20 when I realized that I had carpal tunnel.
21    Q.    Well, where did you get this concept
22 of a start date for your lawsuit?
23    A.    Well, that's why we're here, aren't
24 we?

---

### Page 141

1    Q.    What I'm getting to is you --
2    A.    What? What?
3    Q.    I asked you a question you've
4 answered in an open-ended fashion, and what you
5 said was that was the -- you don't remember
6 seeing -- having this nerve conduction study
7 done. You don't remember the date. But when I
8 asked you, you referred to it as the start date
9 for your carpal tunnel lawsuit. That's what you
10 said, right?
11    A.    That's when I realized that I had
12 carpal tunnel, or whatever -- or whatever, you
13 know, they call it nowadays. Whatever -- you
14 know. Whatever.
15    Q.    Hadn't you been experiencing
16 problems with your hands, wrists, joints in your
17 arm and shoulders prior to that?
18    A.    No. I mean, what do you mean by
19 "prior"?
20    Q.    Anytime before the -- let's get
21 back. You said you had this nerve conduction
22 study done in the spring of 2002. Correct?
23    A.    If that's when I had it done and
24 there -- yes.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

GEOFFREY CROWTHER
August 18, 2006

37 (Pages 142 to 145)

| Page 142 |
| --- |

1    Q.    What's your memory?
2    A.    I think it was 2002.
3    Q.    Okay.  You said that was the first
4 time.  When was the -- how many times --
5    A.    Dr. Wenner also did a test.
6    Q.    Dr. Wenner did -- same test?
7    A.    He gave me some tests.  I don't know
8 if they were the same tests, but --
9    Q.    Did he put electrodes on your arm?
10    A.    Oh, Dr. Rehman.  Excuse me.  Let me
11 back up.  Dr. Rehman.  Dr. Rehman gave me a -- he
12 gave me a pretty good one.
13    Q.    Same test as was done in the spring
14 of 2002?
15    A.    I think it was a little -- you know,
16 a little more involved.  Basically, the same.
17    Q.    When did you first see Dr. Rehman?
18    A.    Hmm.  I want to say -- I don't know.
19 September, or sometime, in 2002.
20    Q.    You know, I forgot something.  Let
21 me back up.  Can you tell what Dr. Cowan's first
22 name is?
23    A.    No, I can't.
24    Q.    You don't know?

| Page 143 |
| --- |

1    A.    No, I don't.
2    Q.    Okay.  You saw Cowan just for the
3 MRI and then the one follow-up.  Right?
4    A.    Right.
5    Q.    Okay.  During that follow-up did he
6 explain to you what was shown in the MRI?
7    A.    You know, not really.  Truthfully,
8 not really.
9    Q.    That was the purpose of your meeting
10 with him that second time.  Correct?
11    A.    Yes.  Well --
12    Q.    All right.
13    A.    But --
14    Q.    What did he tell you?  What was your
15 understanding of what he told you that second
16 time you saw him?
17    A.    He said he had -- I had operable
18 condition.
19    Q.    What was that?
20    A.    I have some bad discs.
21    Q.    Herniated?  What was the --
22    A.    Yeah.
23    Q.    How did he describe it?
24    A.    Yeah.

| Page 144 |
| --- |

1    Q.    Herniated disc where?
2    A.    I don't -- you know, I can't -- I
3 can't recall the exact conversation.  All I know
4 is that that's not what I wanted to hear.
5    Q.    Okay.  So you don't know if he said
6 "herniated" or something else.
7    A.    He said "operable."  I know he
8 said --
9    Q.    Operable discs.
10    A.    I know he said "operable."
11    Q.    In your neck?
12    A.    Yes.
13    Q.    Did he tell you what caused them to
14 be "operable"?
15    A.    No.  Our conversation didn't -- you
16 know.
17    Q.    Did he show you the MRI report?
18    A.    Nope.
19    Q.    Did he tell you that you had
20 degenerative changes --
21    A.    Nope.
22    Q.    -- in your neck?
23         Has anyone ever told you that you
24 have degenerative changes in your neck?

| Page 145 |
| --- |

1    A.    No, I never really discussed the
2 neck.  I saw the x-rays.  I saw -- I've seen all
3 the x-rays.
4    Q.    Whose x-rays?
5    A.    I saw Dr. Cowan's.  And then
6 Dr. Wenner took some x-rays, and Dr. Cowan showed
7 me -- he showed me the x-rays -- I don't know if
8 they're the ones that --
9    Q.    All right, so let me --
10    A.    You know.
11    Q.    Let me back up.  Earlier, you told
12 me Dr. Cowan did an MRI.
13    A.    Right.
14    Q.    You're now telling me that he did
15 x-rays too?
16    A.    I think Dr. -- Dr. Wenner took some
17 x-rays.
18    Q.    What did those show?  These were of
19 your neck?
20    A.    Yeah.
21    Q.    What did they show?
22    A.    Well, I mean, it was my neck,
23 shoulder, back.  I mean, you know, all that
24 stuff.  I mean, he gave me a -- you know, I don't

## GEOFFREY CROWTHER
## August 18, 2006

38 (Pages 146 to 149)

Page 146

1  know specifically what they -- what the x-rays
2  were of. He just -- we just zeroed -- you know,
3  he just zeroed in on -- you know, they're busy
4  people.
5      Q.     Didn't they show degenerative
6  changes?
7      A.     That's not -- that's not any word
8  that I remember. I don't know what that means.
9      Q.     Okay. Dr. Rehman, what was his
10 first name?
11     A.     You know, I -- I don't remember.
12     Q.     Where was his office?
13     A.     His office was in Westfield.
14     Q.     All right. What street address?
15     A.     I want to say like -- maybe it's
16 like Westfield Road, or something like that.
17     Q.     Is it out there --
18     A.     Route 20.
19     Q.     -- by Popoli Honda?
20     A.     Yes.
21     Q.     The Agway?
22     A.     Yes.
23     Q.     The building across the street --
24     A.     Yes.

Page 147

1      Q.     -- from the motorcycle joint?
2      A.     Right.
3      Q.     What was the name of his practice;
4  do you remember?
5      A.     I think that was Hampshire
6  Orthopedic? Or something like that.
7      Q.     How many times did you see
8  Dr. Rehman?
9      A.     I saw him a few times.
10     Q.     Okay.
11     A.     I don't remember how many, but --
12     Q.     What treatments did he prescribe for
13 you?
14     A.     He gave me a prescription for -- I
15 can't remember. It was Naprosyn or naproxen. I
16 had a prescription and -- and I did physical
17 therapy.
18     Q.     Where did you go for the physical
19 therapy?
20     A.     I don't remember the name of the
21 place.
22     Q.     Where was it located?
23     A.     On -- oh, excuse me. I want to say
24 Elm Street in West Springfield, but I think

Page 148

1  they've moved now. You know.
2      Q.     You don't remember the name of the
3  outfit?
4      A.     No, I don't.
5      Q.     What part of your body were you
6  receiving therapy for?
7      A.     I understood it was for the -- you
8  know, the carpal tunnel.
9      Q.     Okay.
10     A.     All right.
11     Q.     Did you miss any time from work due
12 to any of the injuries you claim to have suffered
13 in this lawsuit?
14     A.     Well, not -- not officially, no.
15     Q.     Okay.
16     A.     Yeah.
17     Q.     Did you -- let's go back to the
18 nerve conduction studies. You said the first one
19 was in the spring of 2002. That's the one you
20 referred to as the start date for this litigation
21 and the first time you realized that you had
22 carpal tunnel syndrome. Where was that
23 conducted?
24     A.     That was in Greenfield,

Page 149

1  Massachusetts.
2      Q.     At a Holiday Inn?
3      A.     I guess so. I don't remember. You
4  know.
5      Q.     Okay. Was it at a screening -- was
6  that an event that was sponsored by the lawyers
7  that you've retained in this case?
8      A.     Yes. Well, I guess so, yes.
9      Q.     Okay. You received a flyer, did you
10 not, to come to that event?
11     A.     No.
12     Q.     Then how did you get aware -- how
13 were you made aware of that event?
14     A.     I was complaining about my -- I was
15 complaining about my hands --
16     Q.     Okay.
17     A.     -- to somebody at work.
18     Q.     Who?
19     A.     I don't remember -- really, I don't
20 remember. And somebody said, "Hey, you know,
21 they're having" -- you know, because I said, you
22 know, "What's with this?" you know, and it was
23 like -- and they said, "Well, go to Greenfield."
24 You know.

**GEOFFREY CROWTHER**
**August 18, 2006**

39 (Pages 150 to 153)

| Page 150 |
|---|

1    Q.    At the time -- at the time where
2  were you working out of?
3    A.    West Springfield.
4    Q.    Okay.  Was it at West Springfield
5  that you actually complained to somebody about
6  your hands?
7    A.    Well, to just a coworker.
8    Q.    Okay.
9    A.    Yeah.
10    Q.    And, specifically, what were the
11  complaints that you made?
12    A.    Mmm -- you know, I don't remember.
13  I just know that it had to do with my hands and
14  my elbow.  And I was a welder then.  I was a frog
15  welder at the time.
16    Q.    Okay.  Who were you working at the
17  time?
18    A.    Excuse me?
19    Q.    Who were you working with at the
20  time?  You guys -- you have partners when you do
21  the frog.
22    A.    Yeah.  I mean, they change all the
23  time.  You know.
24    Q.    Was it a fellow named Thomas?

| Page 151 |
|---|

1    A.    Huh?
2    Q.    Ron Thomas?
3    A.    Oh, Ron Thomas has been gone for
4  years and years.
5    Q.    Okay.  So it was before that?
6    A.    What?
7    Q.    Strike the question.
8    A.    Well -- yeah.
9    Q.    Okay.  Do you remember who you were
10  working with at that time?
11    A.    No.  Because I'm the welder foreman
12  and I have good seniority, and then the other --
13  the welder, that's kind of a -- you know, I get
14  different partners, you know, so.
15    Q.    So at the time you were the actually
16  the foreman.
17    A.    A welder foreman.
18    Q.    Right.  So you were overseeing
19  the --
20    A.    No.
21    Q.    -- actual welding.
22    A.    No.
23    Q.    I'll get back to that later.
24    A.    All right.

| Page 152 |
|---|

1    Q.    In any event, so you're complaining
2  to whoever it was about some problems you were
3  having with your hands.  Right?
4    A.    Right.
5    Q.    Were those problems -- did those
6  problems include pain?
7    A.    Yep.
8    Q.    Did those problems include tingling?
9    A.    Yep.
10    Q.    Did those problems include numbness?
11    A.    Yep.
12    Q.    Okay.  Any other problems, other
13  than those three?
14    A.    Oh, my -- you know, my elbows.
15    Q.    What was wrong with your elbows at
16  that time?
17    A.    Just very sensitive and sore and --
18  you know, sensitive and sore.
19    Q.    Did you complain to anyone else,
20  other than this one person in West Springfield,
21  about those problems that we've just described?
22    A.    Well, there might have been a -- it
23  could have been a few guys, you know.  You know,
24  waiting to do a job or finishing a job, or

| Page 153 |
|---|

1  whatever.
2    Q.    Sure.  I mean, you guys --
3    A.    Yeah.
4    Q.    You guys talk.  It's not like --
5    A.    Yeah.
6    Q.    -- you just go out there and just
7  work like --
8    A.    Right.
9    Q.    -- robots.
10    A.    That's right.
11    Q.    All right.  And, you know, you have
12  coffee in the locker room, and all that kind of
13  stuff.  Right?
14    A.    Yeah, well, usually out at the job.
15    Q.    Sure.
16    A.    You know, they hustle you right out.
17  We don't -- we don't get to sit around.
18    Q.    All right.
19    A.    You know.
20    Q.    But you go to lunch --
21    A.    Yeah.
22    Q.    -- and things like that.
23    A.    Right.
24    Q.    Okay.  And it was during these

# GEOFFREY CROWTHER
# August 18, 2006

40 (Pages 154 to 157)

## Page 154

1  periods that you would talk. Right?
2      A.    Yep.
3      Q.    So it wasn't on this just one
4  occasion that you happened to complain to one
5  person. You had complained about these symptoms
6  to other people. Correct?
7      A.    No, not really. I'm not -- I'm not
8  like that.
9      Q.    All right. And, in any event, this
10 one person you complained to said, "There's this
11 thing this Greenfield you ought to go to."
12 Correct?
13     A.    I -- yeah. I mean, that's my
14 recollection, is that somebody said, "Hey, you
15 know, they're" -- "If you want to find out,
16 they're testing in Greenfield."
17     Q.    Okay.
18     A.    For -- you know.
19     Q.    What else -- tell me everything you
20 remember about how that was described to you at
21 that time.
22     A.    In other words, you --
23     Q.    You talked to this person, this
24 coworker of yours. They tell you about

## Page 155

1  Greenfield. Tell me everything they told you
2  about what was going on in Greenfield.
3      A.    Just that there was some testing
4  going on, sponsored by the union, by my union.
5  They're a part of the union up there and that
6  they were testing up there. And, you know, "Go
7  see what you got."
8      Q.    And that was at the Holiday Inn in
9  Greenfield.
10     A.    If you say so. It was Greenfield.
11     Q.    And it was sometime in the winter of
12 2002, was it not?
13     A.    No.
14     Q.    Wasn't it right around the Super
15 Bowl time in 2002?
16     A.    No.
17     Q.    Then when was it?
18     A.    It was -- I think -- I don't know,
19 like May or June. Because it was a -- I had to
20 hustle to get there. So I know it was probably
21 June.
22     Q.    What do you mean, you had to hustle
23 to get there?
24     A.    Well, I just remember I -- you know,

## Page 156

1  we -- I worked hard that day and went up there.
2      Q.    Okay. How long before that event
3  did you have this conversation with the person
4  that told you this thing was coming up?
5      A.    Excuse me?
6      Q.    You have a conversation with
7  somebody.
8      A.    Yeah.
9      Q.    You're complaining about these
10 symptoms in your arms.
11         By the way, did you complain about
12 anything with the shoulder at that time?
13     A.    I don't know. Everybody --
14 everybody complains about stuff. You know, I
15 mean, everybody's got aches and pains, you know?
16     Q.    For how long --
17     A.    I don't know. What?
18     Q.    -- prior to that conversation had
19 you had these aches and pains?
20     A.    Well, it was pretty -- I think, for
21 me to mention it, I think it was pretty -- it was
22 pretty -- it was pretty current, you know, for me
23 to say, you know, "You know, jeez" --
24     Q.    Okay.

## Page 157

1      A.    -- "what the hell is going on?"
2      Q.    In any event --
3         THE WITNESS: Sorry.
4      Q.    (By Mr. Flynn) -- that wasn't
5  the -- the day that you complained to this person
6  wasn't the first day that you had experienced
7  these symptoms. Is that fair to say?
8      A.    Mmm, I don't know. I mean --
9      Q.    Well --
10     A.    I don't -- I don't know that, to
11 tell you the truth.
12     Q.    You have this conversation with this
13 person in West Springfield. Are you saying that
14 you woke up that day and that was the first day
15 you experienced those symptoms?
16     A.    I think the day that I complained,
17 which was just before that test, was -- you know,
18 I mean, for me to say something, it -- you know,
19 it was -- it was current. That's all -- that's
20 all I know. I mean, I'm not one to -- I mean,
21 that's my --
22     Q.    How long --
23     A.    -- you know, my whole thing.
24     Q.    -- prior to that conversation had

**GEOFFREY CROWTHER**
**August 18, 2006**

41 (Pages 158 to 161)

| Page 158 |
|---|
| 1  you been experiencing those symptoms? |
| 2      A.   Oh, maybe a week or two.  I don't |
| 3  know.  I probably started having trouble |
| 4  sleeping, and that's what made me, you know, |
| 5  start talking about it. |
| 6      Q.   Okay.  So for about a week or two |
| 7  prior to this conversation you had been |
| 8  experiencing these symptoms.  Right? |
| 9      A.   Right. |
| 10     Q.   And they also included inability to |
| 11  sleep.  Correct? |
| 12     A.   Right. |
| 13     Q.   It was waking you up at night. |
| 14  Correct? |
| 15     A.   Yes. |
| 16     Q.   And how long had that been going on |
| 17  prior to your conversation with this person in |
| 18  West Springfield? |
| 19     A.   Well, truthfully, counselor, prior |
| 20  to that, doing the work that we do, you get aches |
| 21  and pains that go away. |
| 22     Q.   Yep. |
| 23     A.   So but when they continue to nag at |
| 24  you and don't go away, then you got to start |

| Page 159 |
|---|
| 1  thinking. |
| 2      Q.   Okay.  Well -- all right, you said |
| 3  "truthfully."  That's all I'm looking for. |
| 4      A.   Right. |
| 5      Q.   Truthfully, you had been |
| 6  experiencing these problems going back at least |
| 7  as far as 1992.  Correct? |
| 8      A.   I don't know. |
| 9      Q.   Well, you said you had these aches |
| 10  and pains on the railroad.  Right? |
| 11     A.   Yep. |
| 12     Q.   Okay. |
| 13          MR. FLYNN:  Let me have this |
| 14  document marked as Exhibit 2. |
| 15 |
| 16          (Exhibit 2, 3/30/92 Conrail medical |
| 17  examination report, marked) |
| 18 |
| 19     Q.   (By Mr. Flynn) Let me show you |
| 20  this, a Conrail medical examination report, dated |
| 21  March 30th, 1992.  Would you take a moment to |
| 22  look at this with your counsel.  Okay? |
| 23          This is your signature there, next |
| 24  to -- right in the middle of the form.  Right? |

| Page 160 |
|---|
| 1      A.   Yep. |
| 2      Q.   G.P. Crowther.  Right? |
| 3      A.   G.C. |
| 4      Q.   G.C. I'm sorry.  Cairns, right? |
| 5      A.   Mmm. |
| 6      Q.   And you filled out these checks -- |
| 7  and there's -- right above that, "Have you ever |
| 8  had or do you now have," and there are a number |
| 9  of conditions, and you checked the boxes yes or |
| 10  no.  Correct? |
| 11     A.   Yeah. |
| 12     Q.   All right. |
| 13     A.   I was a dummy, I guess. |
| 14     Q.   And you checked yes, back trouble |
| 15  lumbago, or sciatica.  Correct? |
| 16     A.   Yeah. |
| 17     Q.   That's one of the aches and pains |
| 18  you were having.  Correct? |
| 19     A.   Right. |
| 20     Q.   Then you said -- trouble with |
| 21  shoulder or elbow.  You checked yes.  Correct? |
| 22     A.   Yes. |
| 23     Q.   And then down here you said elbow |
| 24  pain, periodic. |

| Page 161 |
|---|
| 1      A.   Periodic, yep. |
| 2      Q.   Okay? |
| 3      A.   Yep. |
| 4      Q.   So you were having those problems |
| 5  all the way back in '92.  Correct? |
| 6      A.   Well, it depends -- you know, the |
| 7  thing is, it depends on the job you're doing. |
| 8  You know what I mean? |
| 9      Q.   Well, I'm not -- |
| 10     A.   No.  But it does.  It really does. |
| 11     Q.   Yeah. |
| 12     A.   It really does.  Your job, it |
| 13  determines how you are physically. |
| 14     Q.   And what you're saying is, the |
| 15  more -- |
| 16     A.   So -- |
| 17     Q.   -- the more physical your job is at |
| 18  the time, the more pain -- the more symptoms |
| 19  you're going -- you were having.  Right? |
| 20     A.   Well, if you're like, you know, like |
| 21  a boutet welder? |
| 22     Q.   Yeah. |
| 23     A.   You know, that do the rail ends? |
| 24     Q.   Yep. |

**GEOFFREY CROWTHER**
**August 18, 2006**

42 (Pages 162 to 165)

Page 162

1    A.    Those guys are beat up.
2    Q.    I'm just --
3    A.    Those guys --
4    Q.    Well, I don't --
5    A.    Those guys walk like this:
6 (Indicating).
7    Q.    But you agree with what I'm saying.
8    A.    You know? Huh?
9    Q.    You agree with what I'm saying.
10 Because you've been a boutet welder.
11    A.    That's right.
12    Q.    And you had -- and it's been your
13 railroad experience -- at times you've been a
14 trackman. There's other times you've been a
15 foreman.
16    A.    Yeah.
17    Q.    An I&R inspector?
18    A.    Right.
19    Q.    An I&R inspector, that job's nowhere
20 as physically demanding as a trackman. Correct?
21    A.    No, no.
22    Q.    Okay. Most of the time as an I&R
23 inspector, you get into high rail and you drive
24 up and down the tracks. Right?

Page 163

1    A.    Yeah, but -- a lot of time, yeah.
2 There's some times, though, you got to get after
3 it. You know, you're the only person there
4 and -- you know.
5    Q.    And sometimes when you're a foreman,
6 you don't actually have to do as much of the
7 physical labor as the laborers and the trackmen
8 are actually doing. Correct?
9    A.    No, no. The foreman is the best --
10 is the best trackman. That's your job.
11    Q.    But your job is supervision, isn't
12 it?
13    A.    Nah. Not in -- yes. Yes, but
14 you're -- I mean, you're not going to get
15 anywhere with a group of men if you're not
16 working, yourself.
17    Q.    Understood. Okay.
18    A.    Okay? Yeah.
19    Q.    But, as you said earlier, you look
20 at this -- as I'm showing you this Exhibit 2,
21 this March '92 form --
22    A.    Yep.
23    Q.    -- where you had periodic problems
24 with you elbow, you're saying that that's

Page 164

1 directly related to the amount of physical
2 activity that's necessary to perform the
3 functions of your job at the time. Correct?
4    A.    That's right.
5    Q.    All right.
6    A.    Yes. I would say, back then, I
7 was -- I was welding.
8    Q.    Well, you actually put down "track
9 foreman."
10    A.    All right. Okay. Track foreman.
11    Q.    Okay.
12    A.    Well, then maybe I was -- I had a
13 subdivision gang and we were out fixing
14 derailments and, you know, doing, you know,
15 small -- small jobs that are labor-intensive.
16    Q.    Okay.
17    A.    You know?
18    Q.    And you also -- so -- but you have,
19 by your testimony, directly linked the amount of
20 symptoms, the amount of pain that you're
21 experiencing, to the type of job you're
22 performing at the time. Correct?
23       MS. SCHMIDT: I'm going to object,
24       and we're going to take --

Page 165

1    A.    Yeah.
2       MS. SCHMIDT: -- a break.
3       MR. FLYNN: I'm not going to allow a
4 break, Elizabeth.
5    Q.    (By Mr. Flynn) The other thing that
6 you complained of in this form was problems with
7 your -- the joints in your hands.
8       MS. SCHMIDT: You're putting words
9 in the client's mouth.
10       THE WITNESS: Yeah.
11       MS. SCHMIDT: You're hovering over
12 him now. You're standing next to him.
13       THE WITNESS: No, no, that's all
14 right.
15       MS. SCHMIDT: Why can't you just sit
16 down?
17       THE WITNESS: That's all right.
18       MS. SCHMIDT: I mean, this has
19 become so confrontational.
20       THE WITNESS: Yeah.
21       MS. SCHMIDT: I haven't been in a
22 deposition like this in a long time, I will
23 tell you.
24       MR. FLYNN: Well, I --

**GEOFFREY CROWTHER**
**August 18, 2006**

43 (Pages 166 to 169)

Page 166

1    MS. SCHMIDT: This is not a
2  cross-examination.
3    MR. FLYNN: Listen. I disagree with
4  your --
5    MS. SCHMIDT: And I've been
6  keeping --
7    MR. FLYNN: -- characterization.
8    MS. SCHMIDT: -- quiet during all of
9  this.
10    MR. FLYNN: I'm not hovering over
11  the witness.
12    THE WITNESS: Well --
13    MR. FLYNN: I'm standing next to him
14  because the table is a lot larger than most
15  conference tables we have. And I don't
16  have an extra copy of the form and I want
17  to make sure I'm reading it correctly. If
18  you want me to go over there and try to
19  remember what's said on this, I'll do that.
20  But it might not be accurate.
21    THE WITNESS: Well, you know what?
22    MR. FLYNN: Okay?
23    THE WITNESS: You know what? Let's
24  just -- let's just -- let me just say

Page 168

1  anymore.
2    Q.    Things you were doing with your
3  hands. Correct?
4    A.    That's right.
5    Q.    And when was the last time you
6  welded?
7    A.    The last time I welded. I think it
8  was -- I think it was that year. You know, I
9  don't know. I think it was -- when I saw
10  Dr. Baustin. You know, I went to see
11  Dr. Baustin, and he told me, like, "Yeah, just
12  throw your career away and get a different job."
13    Q.    Okay.
14    A.    Okay?
15    Q.    Were you also --
16    A.    And so --
17    Q.    Were you also complaining, back in
18  March '92, at the time that you signed Exhibit 2,
19  of problems in the joints of your hands, wrists,
20  and/or fingers?
21    A.    Yeah. It's "Have you ever
22  experienced." Yeah. It would be like --
23    MS. SCHMIDT: That question is not
24  on this form.

Page 167

1  something.
2    A.    If I asked you to put some heavy
3  steel toe work shoes on and take a walk with me
4  for a couple miles on the shoulder -- you know,
5  on the tracks, on the ballast, on the shoulder,
6  up and down, you would have ankle pain, Achilles
7  pain, calf pain. You would be sore for a couple
8  days.
9    Q.    (By Mr. Flynn) And -- and if I
10  didn't --
11    A.    And then -- but if you didn't do it
12  again, you'd be fine.
13    Q.    And I'd know that that pain was
14  caused by my --
15    A.    That's --
16    Q.    -- work activity.
17    A.    That's right.
18    Q.    So this pain that you were having
19  back in '92, you knew then it was caused by your
20  work activities.
21    A.    I knew there was stuff that I was
22  doing then. It was from welding.
23    Q.    Right.
24    A.    That's why I don't -- I don't weld

Page 169

1    MR. FLYNN: I didn't say that. I
2  just asked him --
3    THE WITNESS: Yeah.
4    MR. FLYNN: -- "Were you
5  experiencing those problems at the time
6  that you filled that out?" Okay.
7    MS. SCHMIDT: You're pointing at the
8  form.
9    MR. FLYNN: I didn't point at the
10  form. I said, "Were you" -- and the record
11  will be clear. "Were you experiencing
12  those problems at the time you filled out
13  that form?"
14    A.    No. It says --
15    Q.    (By Mr. Flynn) And your answer --
16    A.    It says -- it says, "Have you ever
17  or do you have now." You know, I don't think --
18  I think that's like entrapment. I mean, this is
19  a document -- I can see that now: This is a
20  document for this purpose, for what -- you know,
21  I mean, it's just a tool for the company.
22    Q.    You're right.
23    A.    Yeah.
24    Q.    It's --

**GEOFFREY CROWTHER**
**August 18, 2006**

44 (Pages 170 to 173)

Page 170

1    A.    Yeah.
2    Q.    It's a tool that's to be used --
3    A.    Yep.
4    Q.    -- in litigation --
5    A.    That's right.
6    Q.    -- when a person sues and says the
7    onset of their -- the start of their litigation
8    is the time that a doctor fills out a report, a
9    doctor --
10        MS. SCHMIDT: You're being
11   argumentative again.
12        THE WITNESS: Yeah.
13   Q.    (By Mr. Flynn)  -- a doctor they
14   never have seen, when in fact they've been
15   complaining of those symptoms --
16   A.    Well, I could understand --
17   Q.    -- since '92.
18   A.    You know, I could understand --
19        MS. SCHMIDT: There is nothing on
20   this form --
21   A.    I could understand --
22        MS. SCHMIDT: -- that indicates he
23   was complaining of hand pain --
24   A.    I could understand your -- your

Page 171

1    line --
2        MS. SCHMIDT: -- as you're
3    referring.
4    A.    I could understand your line of
5    questioning if I was like five years on the
6    railroad. I've been there thirty-one years. So,
7    you know, I've earned -- I've earned all my aches
8    and pains, okay?
9    Q.    (By Mr. Flynn)  And you've earned --
10   A.    Yeah.
11   Q.    -- the right to file a lawsuit?
12   A.    I've earned the right to protect
13   myself. You know? That's all. That's what I'm
14   doing: I'm protecting myself.
15   Q.    That form does say that you have
16   been experiencing problems with the joints.
17   Correct?
18   A.    "Have you ever had." "Do you have
19   now or have you ever had." You know, I was a
20   fool.
21   Q.    And those joints included your
22   wrists. Correct?
23        MS. SCHMIDT: You're only a fool in
24   that he's trying to read something more

Page 172

1    into it than is there.
2    Q.    (By Mr. Flynn)  Right?
3    A.    You know what? You know why we have
4    better equipment now and everything is ergonomic?
5    Because of the injuries. Because of the --
6    because of the debilitating work that we do. The
7    equipment gets better. They don't even ask us to
8    do the stuff that I did for the first twenty-five
9    years of my career; they don't even think of
10   asking us.
11        And I don't even think -- cross my
12   mind to like -- to do something that would
13   expedite something or -- or, you know, keep the
14   trains running. I don't even think of asking my
15   men to do it. And no one will say anything to me
16   about it. Not one manager will ever say, you
17   know, "How come you didn't do it by hand," you
18   know, "if you can't get the equipment? Do it by"
19   -- that's what Conrail did. Everything -- you
20   know, you just -- you just worked. You were in
21   the dirt, working, all the time. Now CSX is a
22   little more enlightened with the equipment. We
23   have better equipment and everything is
24   ergonomics and, you know, they're not going to --

Page 173

1    in the future there's going to be less of these
2    confrontations. You're going to have to find
3    another line of work.
4    Q.    Okay. So CSX has -- since June of
5    '99 has had better equipment.
6    A.    They have a better -- a little
7    better -- they're a little more humanitarian.
8    Q.    Okay.
9    A.    They're a little more humani --
10   let's put it that way.
11   Q.    And they have more ergonomically
12   designed tools.
13   A.    They're starting to. But when
14   they -- but when they were faced with all the
15   debilitating -- you know, the elbow surgeries and
16   the shoulders and necks -- like rotator cuffs.
17   You know? Everybody on the railroad has a
18   rotator cuff problem.
19   Q.    Yeah.
20   A.    I mean, there's just no way getting
21   around it.
22   Q.    Do you?
23   A.    I don't know.
24   Q.    Okay.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

45 (Pages 174 to 177)

---

Page 174

1     A.    I know that I use a claw bar almost
2  every day that I work.
3     Q.    But at the time you filled out that
4  form, back in '92, you had been experiencing
5  pain, tingling, and numbness in your wrist
6  joints.
7     A.    Probably not that day. You know,
8  and --
9     Q.    And I'm not saying --
10    A.    What?
11    Q.    -- that day. Either --
12    A.    I'm just saying --
13    Q.    -- at that time or for any -- at any
14  time before that.
15    A.    Yeah, but it goes away. It wasn't
16  a -- it wasn't a --
17    Q.    So -- wait a minute. The answer is
18  yes. Correct?
19    A.    The answer is yes, but -- and that
20  says right on the thing. It says right on it,
21  "periodic," something you can get over, something
22  that you take some Aleve, or something, and on
23  you go.
24    Q.    All right.

---

Page 175

1     A.    You know?
2     Q.    And then you have this conversation
3  with this gentleman in West Springfield where,
4  apparently, the symptoms have come back.
5  Correct?
6     A.    They haven't come back.
7     Q.    Then what is it?
8     A.    I have -- I'm starting to have
9  trouble sleeping.
10    Q.    No, no -- okay.
11    A.    Can't get comfortable.
12    Q.    So now these symptoms are waking you
13  up at night.
14    A.    Right.
15    Q.    Okay. All right. And at the time,
16  was this a period of time where the physical
17  activities you were doing on the railroad were
18  more hands-on --
19    A.    Yes.
20    Q.    -- type things?
21    A.    I was a frog welder.
22    Q.    A frog welder. So you were welding
23  at the time.
24    A.    Welding the -- for Elizabeth, you

---

Page 176

1  know, it's the switches. You weld on the
2  switches. It's a two-man gang. Everything's
3  heavy.
4     Q.    Okay.
5          MS. SCHMIDT: Can we take a
6  five-minute break, just to -- everybody to
7  take a break?
8          MR. FLYNN: Yep.
9
10         (A recess was taken)
11         (Exhibit 3, 6/19/02
12  electrodiagnostic report from Mark A.
13  Woodward, M.D., marked)
14         (Exhibit 4, defendants'
15  interrogatories, marked)
16         (Exhibit 5, plaintiff's answers to
17  interrogatories, marked)
18
19    Q.    (By Mr. Flynn) So I'm going to ask
20  you a bit about this event at the Holiday Inn.
21  As you recall, it was when? May or June of 2002?
22    A.    I think it was June.
23    Q.    Okay. Did you go to the event with
24  anybody?

---

Page 177

1     A.    No.
2     Q.    All right. Did you recognize any
3  other coworkers or CSX employees that were there
4  at the time?
5     A.    No.
6     Q.    Were there other employees there at
7  the time?
8     A.    Yes.
9     Q.    How many others?
10    A.    You know, I'm not sure. It was a
11  different railroad, so, I mean --
12    Q.    What do you mean, it was a different
13  railroad?
14    A.    Well, it was the Guilford, the
15  Boston and Maine, or whatever they call
16  themselves.
17    Q.    Oh, so there were --
18    A.    Springfield terminal.
19    Q.    So there were employees from other
20  railroads there --
21    A.    Yeah.
22    Q.    -- as well.
23    A.    Yeah. No one from my railroad.
24    Q.    But how many other railroad workers

---

**GEOFFREY CROWTHER**
**August 18, 2006**

46 (Pages 178 to 181)

---

Page 178

1  did you see there?
2     A.   I don't know. Maybe a dozen.
3     Q.   All right. Did you receive any
4  literature at all about the event prior to going
5  to it?
6     A.   No.
7     Q.   Okay, but you did understand that --
8  your understanding was that it was sponsored by
9  your union?
10    A.   Yep.
11    Q.   Do you have an understanding as to
12  whether or not it was, in whole or in part,
13  sponsored by any law firm?
14    A.   No.
15    Q.   When you went to the event, were
16  there any representatives of any law firm
17  present?
18    A.   Well, a representative? Probably,
19  yeah. Yep. Yeah.
20    Q.   Well, describe to me what happened
21  once you went into the building. What happened
22  next? You go up to Greenfield.
23    A.   I go up to Greenfield.
24    Q.   Oh, let me ask you this. I'm sorry.

---

Page 179

1  Before you answer that question.
2        How long before this event did the
3  conversation with the coworker occur?
4     A.   I think it was just like -- it
5  wasn't that day, but it was pretty close.
6  Because it was like, you know, there were -- it
7  was just like -- I remember this being like a
8  spur of the moment thing. You know, I've always
9  kind of just pshawed that kind of stuff. But I
10  knew that I had a problem.
11    Q.   What do you mean, you always pshawed
12  that kind of stuff?
13    A.   Well, like I said, you get aches and
14  pains and they go away.
15    Q.   But I mean "pshawed." What -- had
16  you heard about these types of events before?
17    A.   Sure.
18    Q.   Okay. When was the first time you
19  heard about one of these types of events, these
20  union-sponsored screening events?
21    A.   I think -- I think with the hearing
22  loss. I think when -- you know, when -- most
23  everybody on the railroad settled the -- settled
24  the hearing loss case.

---

Page 180

1     Q.   Okay, so --
2     A.   Yeah.
3     Q.   -- you were aware prior to June --
4  May, June of '02 that your coworkers on the
5  railroad had made hearing loss claims and settled
6  them. Correct?
7     A.   Right.
8     Q.   And you were aware -- when did you
9  first become aware of that?
10    A.   Oh, I don't know. Really. I don't
11  know.
12    Q.   Years before May and June of '02?
13    A.   I know that, you know -- I was aware
14  back in, you know -- I mean, you're always aware
15  of, you know, like, you know, if somebody gets --
16  gets something and they just get disabled, or
17  whatever. I mean, you're always aware of that
18  stuff.
19    Q.   Well, guys talk, right?
20    A.   Right. Guys talk.
21    Q.   Okay. How far back do you remember
22  first hearing talk, on the railroad, that guys
23  were filing hearing loss claims or lawsuits,
24  alleging that they suffered hearing loss as a

---

Page 181

1  result of railroad work activities?
2     A.   Well, I mean, like I would say
3  probably the last twenty years.
4     Q.   Okay.
5     A.   You know, I mean -- I mean, you're
6  just -- I know hearing loss is a problem.
7     Q.   Okay.
8     A.   We didn't have -- we didn't have
9  hearing protection.
10    Q.   But that's not what I'm asking.
11    A.   We weren't issued hearing
12  protection, okay.
13    Q.   You were in the early to mid '80s.
14  Correct?
15    A.   If you say so.
16    Q.   Well, I mean --
17    A.   I mean, if you say so.
18    Q.   No, I'm asking. Is that when you
19  remember first being issued hearing protection?
20  Back in the early to mid '80s?
21    A.   I know that hearing protection, you
22  know, became -- you know, we had to wear it. I
23  mean, if you were going to do something, you had
24  your hearing protection on. Right, yeah.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

47 (Pages 182 to 185)

| Page 182 | Page 184 |
|---|---|
| 1    Q.    And when did that first become<br>2 policy on the railroad?<br>3    A.    Like whenever you said, in the mid<br>4 '80s, maybe.  I don't know.  Sometime back then.<br>5    Q.    And is that about the same time that<br>6 you had started to hear about guys filing hearing<br>7 loss claims?<br>8    A.    Well, I wouldn't characterize it<br>9 like that.  You know --<br>10    Q.    How would you characterize it?<br>11    A.    I would just say a guy -- you<br>12 realize a guy is half deaf, and you tell him,<br>13 "Hey, man" -- you know what I mean, like you're<br>14 trying to get his attention and, you know, yell<br>15 at him.  So, I mean, there's -- that happens all<br>16 the time.<br>17    Q.    Okay, but then you heard about these<br>18 lawsuits that were being filed.  Let me ask you,<br>19 first, the question.  When do you first remember<br>20 hearing about hearing loss claims or lawsuits?<br>21 On the railroad.<br>22    A.    Probably around that time.<br>23    Q.    Okay.<br>24    A.    That's why they issued the hearing | 1 loss for a second.  I want to get back to this<br>2 event that you went to at the Holiday Inn in<br>3 Greenfield.<br>4        All right.  So your coworker told<br>5 you about this event.  It wasn't that day.  Was<br>6 it the day before or a few days before?  What's<br>7 your best estimate?<br>8    A.    You know, I can remember right where<br>9 I was.  I was in CP 100 in West Springfield.  I<br>10 think it was like the next day.  Because I had to<br>11 like finesse my way to get out of there, to<br>12 get --<br>13    Q.    Is your best estimate that the day<br>14 before --<br>15    A.    Yeah.<br>16    Q.    -- this event, whenever it<br>17 occurred --<br>18    A.    Yep.<br>19    Q.    -- was when you first heard about<br>20 it.  Correct?<br>21    A.    The first knowledge I had that there<br>22 was, you know, this -- "Go up and see.  The test"<br>23 -- just "Go up and see if you got it."  That's<br>24 what it was:  "Go up and see if you got it." |

| Page 183 | Page 185 |
|---|---|
| 1 protection.<br>2    Q.    All right.  And was it your<br>3 understanding that the allegations that were<br>4 being made in those claims or lawsuits was that<br>5 your coworkers on the railroad were claiming to<br>6 have suffered loss of hearing as a result of the<br>7 activities -- being exposed to noise in the work<br>8 environment on the railroad?<br>9    A.    Well, I guess in a general sense,<br>10 yes.<br>11    Q.    Okay.  You've known that going back<br>12 to the mid '80s, correct?<br>13    A.    Doesn't take a genius to figure<br>14 that's the only time anything gets addressed --<br>15    Q.    Okay.<br>16    A.    -- is from an injury.<br>17    Q.    All right, and you in fact had been<br>18 tested throughout the '80s and the '90s, correct?<br>19 Right into the present date.  Correct?<br>20    A.    Yep.<br>21    Q.    And that testing started back in the<br>22 mid '80s.  Correct?<br>23    A.    I guess so.<br>24    Q.    Okay.  Well, let me table hearing | 1    Q.    All right.<br>2    A.    Okay?  You know.<br>3    Q.    All right, and so the next day you<br>4 went to the testing event.<br>5    A.    Right.<br>6    Q.    Did you receive, before going to the<br>7 event, any literature at all?<br>8    A.    No.<br>9    Q.    All right.  You had heard about<br>10 prior events with respect to hearing loss.<br>11 Correct?<br>12    A.    Yep.<br>13    Q.    But you had never gone to them.<br>14 Right?<br>15    A.    No.<br>16    Q.    And these were events where either<br>17 your union or a law firm would actually rent out<br>18 room space in a hotel, kind of like we're at<br>19 today, and have testing machines set up to<br>20 actually test workers to see if they had one of<br>21 these -- had hearing loss.  Correct?<br>22    A.    Yeah.  I mean, in a general sense --<br>23 yeah, I'm generally aware of it?  Yeah.<br>24    Q.    Had you ever heard about a screening |

**GEOFFREY CROWTHER**
**August 18, 2006**

48 (Pages 186 to 189)

| Page 186 |
|---|
| 1  event specifically for carpal tunnel syndrome or |
| 2  repetitive stress injuries prior to the one you |
| 3  went to at the Greenfield Holiday Inn? |
| 4      A.   I don't think so. I don't pay -- |
| 5  you know, I don't pay attention to that stuff -- |
| 6      Q.   All right. |
| 7      A.   -- to tell you the truth. |
| 8      Q.   Now, when you walked in the door, |
| 9  tell me what happened. |
| 10     A.   Well, I think they ask you what |
| 11 you're there for. And I was there for -- you |
| 12 know, to be tested for carpal tunnel. |
| 13     Q.   Were they testing -- who asked you |
| 14 that question? |
| 15     A.   Whoever the representative was. |
| 16     Q.   Okay. |
| 17     A.   Whoever -- you know. |
| 18     Q.   So you walk in. |
| 19     A.   Yeah. |
| 20     Q.   All right. And is there a room? A |
| 21 sign? Is it right in the middle of the lobby? |
| 22 What is it? How'd it work? |
| 23     A.   Yeah, it was like a -- yeah, it was |
| 24 a -- like a suite, maybe, or like a -- like a |

| Page 187 |
|---|
| 1  room like this, a couple rooms like this, |
| 2  adjoining rooms. |
| 3      Q.   All right. |
| 4      A.   Okay? |
| 5      Q.   Were they testing for other |
| 6  conditions? |
| 7      A.   I don't think so. I just think it |
| 8  was hearing and carpal tunnel. |
| 9      Q.   Okay. |
| 10     A.   That's all. |
| 11     Q.   Were these testing for asbestosis? |
| 12     A.   Oh, yeah. Yes. Yes. Right. |
| 13     Q.   Were they testing for silicosis? |
| 14     A.   Well, I -- well, I think that's what |
| 15 it was. Silicosis. I mean, I know -- yeah. |
| 16     Q.   Were they testing for any other |
| 17 conditions? |
| 18     A.   See, I forgot about that part. |
| 19 Yeah, best I can remember. I didn't remember -- |
| 20 I think I had a chest x-ray. Or something. I |
| 21 think so. Yeah, I'm pretty sure I did. |
| 22     Q.   Tell me all the tests you had that |
| 23 day. |
| 24     First of all, were you tested for |

| Page 188 |
|---|
| 1  hearing loss? |
| 2      A.   I had -- I went there for the carpal |
| 3  tunnel. And -- |
| 4      Q.   So you were tested for that. |
| 5      A.   Right. |
| 6      Q.   And that was the nerve conduction |
| 7  study we talked about earlier. Right? |
| 8      A.   Right. |
| 9      Q.   Okay. What else were you tested |
| 10 for? |
| 11     A.   Hearing. I had a hearing test. |
| 12     Q.   Okay. Anything else? |
| 13     A.   Well, now that I think of it, I'm |
| 14 pretty sure I had a chest x-ray. |
| 15     Q.   Were your hearing loss test results |
| 16 positive? In other words, did they show you had |
| 17 hearing loss? |
| 18     A.   Yes. |
| 19     Q.   Okay. So that was that day. |
| 20     A.   Yep. |
| 21     Q.   Okay. And did you get the -- did |
| 22 you get the results that day? |
| 23     A.   No. |
| 24     Q.   Okay. When did you get the results |

| Page 189 |
|---|
| 1  of your hearing lost test? |
| 2      A.   Well, sometime after. |
| 3      Q.   Did you actually get the results? |
| 4  Or did somebody call you and tell you that the |
| 5  results showed that you had hearing loss? |
| 6      A.   I know I don't remember. |
| 7      Q.   Okay. Did you ever get the results |
| 8  of the nerve conduction study? |
| 9      A.   It was -- I think it was the same -- |
| 10 I think it was the same way. I think I -- I |
| 11 might have gotten something in the mail. I |
| 12 don't -- you know, really, to tell it honestly, I |
| 13 don't remember. I think I got -- |
| 14     Q.   This is very important. I have to |
| 15 ask you to -- |
| 16     A.   Yes. |
| 17     Q.   -- really try to give me your memory |
| 18 on that. |
| 19     A.   You know -- |
| 20     Q.   With respect to the carpal -- |
| 21     A.   You've got to understand, you know, |
| 22 like I have mail now -- that's why I went home |
| 23 last night. I got mail like this (Indicating). |
| 24 You know what I mean? It's just how it is at my |

**GEOFFREY CROWTHER**
**August 18, 2006**

49 (Pages 190 to 193)

| Page 190 | Page 192 |
|---|---|
| 1 house.<br>2 Q. Okay.<br>3 A. Okay?<br>4 Q. All right. That's fine.<br>5 A. I mean -- all right?<br>6 Q. All I'm asking you is --<br>7 A. Boy.<br>8 Q. -- you have the nerve conduction<br>9 study done that day at the event. Right?<br>10 A. Yeah.<br>11 Q. Did somebody tell you what the<br>12 results of that nerve conduction study were<br>13 before you left the Holiday Inn that day? Yes or<br>14 no.<br>15 A. Before I left the Holiday Inn, I<br>16 know that the guy said, you know, that I had a<br>17 definite hearing deficit. I know that he said --<br>18 because it was like, you know, right there.<br>19 Q. Okay.<br>20 A. It's like a -- okay? And the carpal<br>21 tunnel, you know, I don't think so. I know<br>22 Dr. Rehman was able to tell me right away, but I<br>23 don't --<br>24 Q. But I'm just asking about the event. | 1 Q. You can't recall?<br>2 A. No.<br>3 Q. Okay.<br>4 A. Okay.<br>5 Q. Did anyone tell you that day what<br>6 the results of your nerve conduction study were<br>7 before you left the Holiday Inn?<br>8 A. You know, I don't remember. I can't<br>9 recall.<br>10 Q. All right. But they did tell you<br>11 what your hearing loss test result was.<br>12 A. Yeah. They were able to tell me,<br>13 like -- yeah.<br>14 Q. I'm going to show you what's been<br>15 marked as Exhibit 4 and 5. 4 is my<br>16 interrogatories to you. 5 are your answers. I'm<br>17 going to ask you about number 9. Would you take<br>18 an opportunity to look at that with your counsel.<br>19 Take a look at it first.<br>20 A. Oh, okay. Well, November 6th.<br>21 Right? Well --<br>22 Q. Let me ask you this question before<br>23 you --<br>24 A. What? |

| Page 191 | Page 193 |
|---|---|
| 1 A. Okay.<br>2 Q. Okay?<br>3 A. All right. I don't know if they<br>4 were able to tell me right away. I might have<br>5 gotten -- I know I received something in the<br>6 mail. So I probably did. I probably received it<br>7 in the mail. Because, now that I'm thinking<br>8 about it, I received something in the mail<br>9 about -- about the -- about the chest x-ray.<br>10 Q. What were the results of your chest<br>11 x-ray?<br>12 A. I was fine, I guess.<br>13 Q. Okay.<br>14 A. I didn't have whatever --<br>15 Q. You were -- did you --<br>16 A. ----, whatever.<br>17 Q. Did you or did you not receive<br>18 something in the mail -- in the mail about your<br>19 nerve conduction study?<br>20 A. I probably did, too. I probably --<br>21 you know, I'm --<br>22 Q. No, I'm --<br>23 A. -- assuming. I don't know. I<br>24 can't -- | 1 Q. Have you read Interrogatory 9 and<br>2 Answer No. 9 from Exhibits 4 and 5?<br>3 A. Oh, 9?<br>4 Q. Yeah. Have you have an opportunity<br>5 to read that?<br>6 MS. SCHMIDT: He's asking, did you<br>7 read this question and did you read this<br>8 answer.<br>9 A. Well, let me -- let me read it. Let<br>10 me -- you know, I just --<br>11 THE WITNESS: Okay, well, what's<br>12 this -- what's this date? Is that when I<br>13 went to the Amherst center?<br>14 Q. (By Mr. Flynn) So let me ask you<br>15 this question. Let me ask you the questions,<br>16 okay?<br>17 A. See, you're trying to have it both<br>18 ways.<br>19 Q. No, I'm just trying to ask the<br>20 questions.<br>21 A. No, you're trying to have it both<br>22 ways. You really are.<br>23 Q. Let me ask you the question. First<br>24 of all, have you had opportunity to read |

# GEOFFREY CROWTHER
# August 18, 2006

50 (Pages 194 to 197)

Page 194

1  Interrogatory No. 9 and Answer No. 9?
2        MS. SCHMIDT: He's just asking you
3  have you had a chance to read them.
4        A.    Yeah, I have.  I've had a chance of
5  to read them, yeah.
6        Q.    (By Mr. Flynn) All right.  Have you
7  ever seen either of these documents before?
8        A.    What documents?
9        Q.    Exhibits 4 or 5, the two that are in
10  front of you.
11        A.    No.  Oh, wait a minute.  This is 4
12  and 5?  Right here?
13        Q.    4 on your right.  5 is on your left.
14        MS. SCHMIDT: Yeah.  Number 4 is the
15  packet of questions.  Number 5 is the
16  answers.
17        A.    Yeah, I got -- I got ADD.  That's
18  why I -- you know.
19        Well, I -- I don't know.  I don't
20  want to answer it because I don't understand
21  where we're -- you know, where we're --
22        Q.    (By Mr. Flynn) My only question
23  is --
24        A.    -- going here.  I don't want to be

Page 195

1  trapped --
2        Q.    -- have you ever seen --
3        A.    -- into -- you know.
4        Q.    Have you ever seen either one of
5  these documents?
6        A.    I don't think I've seen this before.
7  To the best of my recollection.  I don't -- you
8  know.
9        Q.    Have you -- have you ever
10  provided --
11        A.    What?
12        Q.    Have you ever provided information
13  to your counsel regarding answering questions
14  that I submitted to you, my office submitted to
15  your lawyer on behalf of my clients?
16        MS. SCHMIDT: Do you recall --
17        THE WITNESS: No.
18        MS. SCHMIDT: -- anybody calling you
19  and asking you questions pertaining to a
20  questionnaire, over the phone, or anything
21  like that?
22        A.    No.  I don't think I would have --
23  you know.  I mean, if they identified themselves
24  as -- as lawyers for the railroad, I don't think

Page 196

1  I would have talked to them over the telephone.
2        Q.    (By Mr. Flynn) I'm talking about
3  your lawyers.
4        A.    Oh.
5        MS. SCHMIDT: No, he's asking you
6  if --
7        THE WITNESS: What?  What?
8        MS. SCHMIDT: Do you recall us ever
9  contacting you, saying that --
10        THE WITNESS: Yep.
11        MS. SCHMIDT: -- we were asking you
12  questions that had been provided to us by
13  the railroad.
14        A.    I guess -- you know, I don't know.
15  You know what?  I have a million phone -- I mean,
16  I'm not -- I'm not a lawyer.  Just a humble
17  railroad guy.  I have a million things going on
18  all the time, and I can't remember every little
19  specific thing I get.  I mean -- I got -- you
20  know, I got someplace to go, too, after this.
21        Q.    (By Mr. Flynn) Understood.
22        A.    Okay.
23        Q.    But, as you sit here today, you
24  don't recall ever having a conversation with your

Page 197

1  counsel where they called you up and said,
2  "Hey" --
3        A.    What is this November 6th?  What is
4  November 6th?
5        Q.    I'll get to that in a second.
6        A.    Well, tell me.  Then I can tell you.
7  Then maybe I can answer your -- you know.
8        Q.    The first question, though, is --
9        A.    What?
10        Q.    Did you sit down and actually
11  answer -- provide any information to anybody --
12        A.    This is the first time I've sat down
13  with my counsel.
14        Q.    All right.
15        A.    Okay?
16        Q.    Now, did -- in answer to --
17  Interrogatory No. 9 asks you when -- the first
18  time it was that you were -- that you knew you
19  had hearing loss.  Correct?
20        A.    Yeah.
21        Q.    All right.  And your answer -- the
22  answer that was provided in your behalf was
23  November 6th, 2002.  Correct?
24        A.    Okay.  Well, that's --

# CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

GEOFFREY CROWTHER
August 18, 2006

51 (Pages 198 to 201)

| Page 198 | Page 200 |
|---|---|
| 1   Q.   Just yes or no. Is that -- <br> 2   A.   I did -- I guess that's there, so -- <br> 3   Q.   Hold on. <br> 4   A.   All right. <br> 5   Q.   But what you told me here today was <br> 6 that somebody actually told you you had hearing <br> 7 loss the day that you went to that event at the <br> 8 Greenfield Holiday Inn, in May or June of 2002. <br> 9 Correct? <br> 10   A.   Right. <br> 11   Q.   This answer to interrogatories is <br> 12 inaccurate by about -- <br> 13   A.   No. <br> 14   Q.   It's not. <br> 15   A.   No. No, it's not. <br> 16   Q.   How can it -- how are those two <br> 17 things consistent? <br> 18   A.   Because I think it shows you my -- <br> 19 you know -- <br> 20   MS. SCHMIDT: The question isn't <br> 21 just -- <br> 22   THE WITNESS: Yeah. <br> 23   MS. SCHMIDT: -- when did you <br> 24 realize that you had a hearing loss -- | 1   Q.   Unless you were sure about what was <br> 2 going on. <br> 3   A.   Right. <br> 4   Q.   Okay. Now, when you walked into <br> 5 that room at the Holiday Inn in Greenfield, you <br> 6 said -- what was there, like a table set up, with <br> 7 somebody greeting people as they came in? <br> 8   A.   No, it was just -- I went in there <br> 9 and just asked, you know, "Is this the place?" <br> 10 And I introduced myself to some guys. We talked <br> 11 railroad for a while. <br> 12   Q.   Okay. Who were the guys? <br> 13   A.   Just guys that worked for the <br> 14 railroads up in that area. <br> 15   Q.   Okay. <br> 16   A.   Probably different railroads that -- <br> 17   Q.   Did anybody identify themselves to <br> 18 you as being in charge of the event? <br> 19   A.   Maybe in general to the whole crowd, <br> 20 maybe, but I don't remember who that was. <br> 21   Q.   At some point in time was there a <br> 22 speech, at the beginning of this thing? <br> 23   A.   Not that I recall. <br> 24   Q.   Okay. |

| Page 199 | Page 201 |
|---|---|
| 1   THE WITNESS: I think Novem --. <br> 2   MS. SCHMIDT: -- but when and that <br> 3 the injury was work-related. <br> 4   THE WITNESS: Oh. Oh, okay. <br> 5   A.   Well, then, all right. That was <br> 6 when I went to the learning center -- I mean -- <br> 7 this is the learning center. The Amherst hearing <br> 8 and -- hearing center. When I had the -- when I <br> 9 had a test done by an unbiased, you know, audio <br> 10 whatever. You know. It's a -- it's a hearing <br> 11 and audio center, you know, related with UMass. <br> 12 And I went there. And I trusted them. <br> 13   Q.   (By Mr. Flynn) Did you consider <br> 14 that the tests that were given to you at the <br> 15 Holiday Inn were either biased or untrustworthy? <br> 16   A.   I just -- I held my -- I held my -- <br> 17 I held my judgment. <br> 18   Q.   Why did you -- as to whether or not <br> 19 they were fair and unbiased? <br> 20   A.   Right. <br> 21   Q.   Why? <br> 22   A.   Because I didn't want to be sitting <br> 23 across the table from a guy like you. In all <br> 24 honesty. Yeah. | 1   A.   It might have already been going on <br> 2 when I got there, so -- <br> 3   Q.   Was somebody giving a presentation? <br> 4   A.   No. Not to -- no. I think I got <br> 5 there after it had, you know, started. <br> 6   Q.   All right. Did you speak to anybody <br> 7 who was a representative of any law firm? <br> 8   A.   You know, I don't -- a <br> 9 representative of a law firm? Probably, yeah. <br> 10 Yeah. <br> 11   Q.   Do you remember if Ms. Schmidt was <br> 12 there? <br> 13   A.   No. I think it was all -- all men. <br> 14   Q.   Was Tom Joyce there? <br> 15   A.   I don't think so. I don't know. <br> 16   Q.   Was Greg Hannon there? <br> 17   A.   I don't know. <br> 18   Q.   Did somebody give you their card -- <br> 19 did anyone give you a card that indicated they <br> 20 were from a law firm? <br> 21   A.   No. <br> 22   Q.   Was anybody from the union there? <br> 23   A.   Yes. <br> 24   Q.   Who? |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

GEOFFREY CROWTHER
August 18, 2006

52 (Pages 202 to 205)

**Page 202**

1    A.    You know, I'm not sure.  It
2  wasn't -- it wasn't anybody in there that was in
3  -- if the test was in West Springfield, I could
4  answer these questions for you.  But it was just
5  I was a stranger.
6    Q.    It wasn't your local chairman then?
7    A.    No.  No.
8    Q.    Were you provided at the event,
9  either when you showed up or at any time you were
10  there or when you left, or before you left, with
11  any written materials?
12    A.    I don't think so.
13    Q.    Were you given any pamphlets?
14    A.    No.
15    Q.    Were you given any written
16  information about your rights under the FELA with
17  respect to occupational injuries?
18    A.    Well, that stuff is around all -- I
19  mean, that's around everywhere.  I mean, I don't
20  have to go to a meeting to get that.
21    Q.    Okay.  All right, have you ever --
22  so you were aware of those rights prior to this
23  event, given the fact that you'd seen this
24  written material.  Correct?

**Page 203**

1    A.    Right.
2    Q.    For how -- when was the first time
3  you had seen such written material?
4    A.    Oh, God.  You know, when you first
5  hire on.  I mean, you know, you get indoctrinated
6  in the ways of railroad.
7    Q.    And that's by lawyers who represent
8  injured railroad workers?
9    A.    That's by guys getting screwed.
10  Yeah.
11    Q.    Did you fill out a questionnaire
12  when you were at that event?
13    A.    You know, I might have.  I don't --
14  I don't recall.
15    Q.    Did you sign a contingent fee
16  agreement when you were at that event?
17    A.    Did -- I'm sorry.
18    Q.    Did you sign a contingent fee
19  agreement when you were at that event?
20    A.    I don't recall.
21    Q.    Do you recall filling anything out
22  when you were at that event?
23    A.    I think it was just -- you know, my
24  name -- you know, just my general information.

**Page 204**

1    Q.    So, obviously, you remember filling
2  something out.
3    A.    Yeah.  I remember that I was just
4  there to be tested and that's what I want -- I
5  was just there for the information.
6    Q.    Okay, but you did fill something
7  out.
8    A.    I filled something out, yes.
9    Q.    Did you keep a copy of it?
10    A.    I don't think -- no.
11    Q.    Did that thing that you filled out
12  ask you what kind of symptoms you were
13  experiencing?
14    A.    I'm sorry, I got to get -- this air
15  conditioner is --
16    Q.    Do you want to move?
17    A.    No, as long as I'm -- I'm all right
18  like this.  I can -- I can hear you now.
19    Q.    The document you filled out, were
20  there any questions on it asking you how long you
21  had been experiencing these symptoms?
22    A.    I don't recall.  Have you got the
23  document?
24    Q.    I'm just asking you, sir.

**Page 205**

1    A.    Oh, okay.
2    Q.    I'm asking you what your memory is.
3  All right.  Did you receive a phone
4  call from the lawyer, following this event?
5    A.    No.
6    Q.    Did you ever see the results of your
7  nerve conduction study?
8    A.    Yes.
9    Q.    Okay.  When did you first see the
10  results of that nerve conduction study?
11    A.    Well, same time, I guess, I got
12  the -- you know, the letter about the chest
13  x-ray.
14    Q.    Who did that letter come from?
15    A.    I guess it was from this -- my law
16  firm.
17    Q.    It was the Hannon and Joyce firm?
18    A.    Yes.
19    Q.    Do you still have a copy of that
20  letter?
21    A.    No.
22    Q.    Threw it out?
23    A.    Oh, sure.
24    Q.    Okay.  What was contained in the

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

53 (Pages 206 to 209)

---

Page 206

1  package with that letter?
2      A.    In the package? It might have been
3  the contingency thing, you know.
4      Q.    Okay.
5      A.    Right.
6      Q.    What else?
7      A.    I don't know.
8      Q.    Were the results of your nerve
9  conduction study in there?
10     A.    Oh, oh, I'm sorry. Yeah. Well, no,
11  that's what I thought. I'm sorry. You're
12  talking about -- yeah. That hearing loss, I know
13  they told me right away about, you know, having a
14  deficit. And then later, the stuff came in the
15  mail and -- you know, yeah. So yes and yes.
16     Q.    Okay. And you never spoke with a
17  Dr. Mark Woodward.
18     A.    No.
19     Q.    And you never filled out --
20     A.    I mean, I might have. I don't --
21  you know, I mean, you say "never" --
22     Q.    As far as you sit there today --
23     A.    As far as -- yeah. You know.
24     Q.    As far as you sit there today, you

---

Page 207

1  can't recall. Correct?
2      A.    Right.
3      Q.    Or you never -- you don't recall
4  ever speaking with this Dr. Woodward.
5      A.    Right.
6      Q.    And did you ever fill out a
7  questionnaire or an information sheet or any
8  document for Dr. Woodward?
9      A.    The only time I remember -- and this
10  is because it's been recent, and it was for
11  this -- the subpoena of the records, his name
12  was --
13     Q.    No.
14     A.    I saw his name.
15     Q.    What I'm asking is prior to --
16     A.    I remember that.
17     Q.    Prior to June 19th of 2002 did you
18  ever fill out any reports or speak with
19  Dr. Woodward?
20     A.    You know, I spoke with someone --
21  someone called me about, I think, the x-ray.
22     Q.    Mm-hmm?
23     A.    And I think that's the -- and we
24  might have covered the other stuff, and maybe

---

Page 208

1  that was Dr. Woodward. Because somebody did call
2  me.
3      Q.    Somebody called you about your
4  asbestosis screening x-ray.
5      A.    Right.
6      Q.    Okay. I'm talking about --
7      A.    Somebody did.
8      Q.    I'm talking about the nerve
9  conduction test.
10     A.    Oh, well -- see, this -- the more we
11  talk about it, the more I'm remembering. But
12  somebody did call me about the x-ray, and maybe
13  that was Dr. Woodward, and maybe we discussed
14  other things, but -- okay.
15     Q.    Let me back up.
16     A.    Okay.
17     Q.    You received this package in the
18  mail, or this letter in the mail, from the Hannon
19  and Joyce firm. And in that is your nerve
20  conduction study and your test results with
21  respect to your chest x-rays. Correct?
22     A.    To the best of my recollection.
23     Q.    And you also recall that your
24  contingent fee agreement might have been in

---

Page 209

1  there, as well. Correct?
2      A.    Yes.
3      Q.    What do you recall the letter
4  saying?
5      A.    Well, basically, that, you know,
6  they're going to represent me, for 25 percent.
7      Q.    Did the letter also tell you that
8  you, in fact -- that your test results showed
9  that you had carpal tunnel syndrome?
10     A.    Yes. I mean, that's when I knew I
11  had it. I mean, at some point after that test, I
12  knew that I had some -- you know, this test --
13     Q.    I understand.
14     A.    -- the test that they gave me, they
15  said. But I --
16     Q.    What I'm asking you is --
17     A.    What?
18     Q.    -- did the letter you received from
19  the Hannon and Joyce firm, did that letter
20  contain literature, information, words, that told
21  you that your test results showed that you had
22  carpal tunnel syndrome?
23     A.    Well, you know, I can't recall --
24  you know, here's the tough thing: You're asking

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**GEOFFREY CROWTHER**
**August 18, 2006**

54 (Pages 210 to 213)

Page 210

1  me to be specific, and all -- and I can't really
2  be that specific. But -- I mean, I know what the
3  results were. And the results showed that I had
4  it. Not how much -- I don't remember to what
5  degree or to what, you know, severity, or however
6  you want to gauge it --
7  Q.    What did you do --
8  A.    -- but --
9  Q.    What did you after you received that
10 package from the Hannon and Joyce firm?
11 A.    I mulled it over and sat on it.
12 Q.    For how long?
13 A.    I'm not sure. I'm not sure.
14 Q.    What did you ultimately do with
15 those materials, with or in response to those
16 materials?
17 A.    I think that's when I went and I
18 thought about it and -- because I was really very
19 afraid of this. So I went and I saw my doctor
20 and I got tested again.
21 Q.    Before you signed the contingent fee
22 agreement?
23 A.    I don't know. I may -- I might
24 have.

Page 211

1  Q.    When was the first time you spoke
2  with the Hannon and Joyce firm about this?
3  A.    The very first time was probably --
4  I don't know. This is 2006. Probably like in
5  2004.
6  Q.    Okay. So it was a couple years
7  after that event?
8  A.    Yeah. You know, wheels of justice,
9  right?
10 Q.    Okay. Had you at any time before
11 that seen Dr. Woodward's report, Exhibit 3?
12 A.    You know, I probably did. I
13 probably -- you know, because I know they sent me
14 something, and I got a phone call about the
15 x-ray. So, I mean, I know that they followed up.
16 Q.    Did you ever describe to
17 Dr. Woodward what your work history had been up
18 to that point in time, June 19th of 2002?
19 A.    I don't think I had to.
20 Q.    Why not?
21 A.    Because I -- at that point I had
22 about twenty-eight years on the railroad --
23 Q.    But did you ever --
24 A.    -- and learned my craft.

Page 212

1  Q.    But did you ever describe to him
2  what your work history had been?
3  A.    I may -- no. No.
4  Q.    Did you ever describe to him what
5  your work activities were?
6  A.    I don't know. I might have. You
7  know, have we got a document? If there's a
8  document, then you got me. But if there's not
9  any --
10 Q.    No. I'm just asking.
11 A.    You know?
12 Q.    Do you ever recall telling him what
13 your work activities were?
14 A.    They ask you on -- they ask you on
15 the -- you know, like when you're there, like
16 "What job do you do? What jobs are you" -- you
17 know. You know what I mean? It's not like --
18 Q.    At the screening event?
19 A.    Yeah, yeah. It's not like second
20 grade.
21 Q.    Who asked, you know?
22 A.    Huh?
23 Q.    Who asked you that?
24 A.    The people there. They give you --

Page 213

1  you know.
2  Q.    Who?
3  A.    "What are you exposed to? What jobs
4  do you do? Are you a" -- "Are you a welder? Are
5  you a truck driver? Are you a" -- "Are you a,"
6  you know, "a car inspector?"
7  Q.    Okay, so there was an --
8  A.    You know?
9  Q.    -- interview conducted.
10 A.    I mean, there are some guys that are
11 exposed to compressor noise all the time. You
12 know what I'm saying?
13 Q.    So there was -- there was an
14 interview conducted at the screening.
15 A.    Well, if you can call a little
16 questionnaire, like a little -- you know, like
17 who you are and what job you do, okay. I mean --
18 Q.    The person who was asking you those
19 questions, were they filling out the
20 questionnaire? I mean, how --
21 A.    No. I think I filled out --
22 Q.    You filled it out.
23 A.    I had to fill it out, my name, my --
24 you know, my union affiliation and where I worked

**GEOFFREY CROWTHER**
**August 18, 2006**

55 (Pages 214 to 217)

Page 214

1 and what railroad I was from and what job I held,
2 and what jobs -- you know, like general things
3 like -- you know. I mean, there's nowhere on
4 there, on that form that says, "Are you exposed
5 to," you know, "trains going fifty miles an hour
6 around a sharp curve and the screeching that
7 results?" They don't ask that question on those
8 railroad forms.
9    Q.    Based on what it says in Exhibit 5
10 and the testimony you gave earlier, Answer No. 9,
11 you say that was the first time, November 6th,
12 2002, when you were tested at UMass, that you
13 realized that you had hearing loss and that it
14 was related to your work on the railroad.
15 Correct?
16    A.    That's when I -- that's for me --
17 for me -- I mean, I had general information. But
18 when I had the second opinion, which -- which I'm
19 sure you would want for your -- yourself and your
20 family, that's when -- yeah, that's when it was
21 a -- it was a serious thing.
22         MR. FLYNN: I'm going to have marked
23 as the next document, medical history form,
24 Conrail, dated -- date of exam, March 31st,

Page 215

1    1998. That will be Exhibit 6.
2         And Exhibit 7 will be a two-page
3 document from T.K. Group, Incorporated, a
4 letter to Mr. Crowther, dated April 5,
5 2001.
6
7         (Exhibit 6, 3/31/98 Conrail medical
8 history form, marked)
9         (Exhibit 7, report of 4/5/01 hearing
10 test by T.K. Group, Inc., marked)
11
12    Q.    (By Mr. Flynn) I'm going to show
13 you a report of your periodic exam -- or your
14 medical history form, March 1998, that's been
15 marked as Exhibit 6. Have you ever seen this
16 form before?
17    A.    No. Have I seen this document
18 before?
19    Q.    Yeah.
20    A.    No. No.
21    Q.    Let me show you Exhibit 7. This is
22 a letter -- first of all, on the second page
23 that's your signature, right? G.C. Crowther?
24    A.    Yep.

Page 216

1    Q.    Okay.
2    A.    All right. May I flip it over and
3 read it?
4    Q.    Take a look at it. I'm going to ask
5 you, first, if you have read it. And then my
6 next question will be whether or not you've ever
7 seen it before today.
8    A.    Yeah, okay.
9    Q.    You had a chance to read Exhibit 7?
10    A.    Yeah.
11    Q.    Do you recall receiving that?
12    A.    No.
13    Q.    That is your signature on the second
14 page, though.
15    A.    Yep.
16    Q.    And I'll represent to you that on
17 this form, on this exhibit, as with the previous
18 exhibits, any of the highlighting is mine. I put
19 it there.
20    A.    Yeah. Yeah, okay.
21    Q.    This document --
22    A.    But you didn't -- you didn't
23 highlight the part that would benefit me, is that
24 "The evaluation will be at your own expense. You

Page 217

1 may wish to contact your insurance carrier to
2 extent" -- "to determine the extent of your
3 coverage under your policy." Your policy.
4         And so I took -- I take hearing
5 tests. I mean, all this means is that that day,
6 it could have been a -- it could have been a
7 hearing test conducted in the yard and the
8 switchers -- I mean, they come sometimes with
9 nice equipment in vans and it's quiet, and
10 sometimes it's not. You know.
11    Q.    In any event, this document, which
12 bears your signature --
13    A.    Yep.
14    Q.    -- and is written by T.K. Group,
15 Incorporated --
16    A.    Yep.
17    Q.    -- has results of hearing tests
18 which was, ostensibly, done on you in April of
19 2001. Correct?
20    A.    Yeah.
21    Q.    And it says, quote, "Your current
22 and/or previous test results indicate that your
23 hearing is not within normal limits at one or
24 more frequencies. Abnormal hearing levels may be

GEOFFREY CROWTHER
August 18, 2006

56 (Pages 218 to 221)

---

Page 218

1  the result of many causes, including noise
2  exposure at work."
3     A.   Right.
4     Q.   "You should consult an ear doctor to
5  determine the cause of your hearing loss."
6  That's the end of my quote.
7     A.   Yeah.
8     Q.   And then the remainder of the
9  paragraph is the language you read, about --
10    A.   Right.  You should consult your --
11  you should consult your doctor.
12    Q.   It goes on to say, quote, "This test
13  represents a change in hearing levels compared to
14  your previous tests.  According to guidelines
15  established by the American Academy of
16  Otolaryngology (AAO), you have a hearing loss
17  that should be evaluated by a physician."
18        Did I read that correctly?
19    A.   Yeah.
20    Q.   And you remember -- although you
21  might not remember receiving this one, you do
22  remember that following those periodic exams that
23  Conrail, and later CSX, conducted, that you would
24  receive a report like this.  Correct?

---

Page 219

1     A.   Well, they give you a little yellow
2  form.
3     Q.   Okay.
4     A.   Yeah.
5     Q.   But once CSX came in, they used a
6  different company to do the hearing loss tests.
7  Right?
8     A.   Yeah.  I don't think they're as good
9  as Conrail's.
10    Q.   Okay.  In any event, when they did
11  their test results, CSX's people, they'd send you
12  a report like this.  Correct?
13    A.   You know what?  If I had to sign
14  that, then I don't know how that -- I really
15  don't know how my signature got on that.  I mean
16  because every -- when I -- the way I recall the
17  hearing test is, if you have a bad -- if you have
18  a bad hearing test or, you know, they suspect,
19  you know, severe hearing loss, they kind of hold
20  you back afterwards and talk to you and -- you
21  know.  That never talked happened to me.
22    Q.   Sir, my question to you, although
23  you don't remember receiving and/or signing this
24  Exhibit 7 --

---

Page 220

1     A.   Yeah.
2     Q.   -- do you remember that as part of
3  CSX's hearing testing program that when you were
4  tested, they would then send you a letter like
5  this, following your test, to tell you what the
6  results were?
7     A.   Yeah.
8     Q.   Do you remember that?
9     A.   No.
10    Q.   Okay.
11    A.   But I know that that's -- I'm
12  sure -- is that the only one?  Because it
13  probably is.  I haven't received any others, and
14  I've been tested --
15    Q.   No, I -- I can mark them later.
16  We're kind of in a time crunch.  I do have
17  others.
18    A.   All right.
19    Q.   Okay?
20    A.   Yeah.
21    Q.   I'll show them to you.  All right?
22  My only question, though, is, do you remember
23  receiving documents like this one?
24    A.   No.

---

Page 221

1     Q.   All right.
2     A.   No, I don't.
3     Q.   Okay.  But, in any event, the
4  language that I read does indicate that you did
5  have a hearing lost, as a result of this test in
6  April of '01.  Correct?
7     A.   That's what it says.
8     Q.   That's what it says.
9     A.   Yeah.
10    Q.   And that this could have been caused
11  by exposures to noise in the workplace.  Correct?
12    A.   Could have.
13    Q.   Right.
14    A.   Could have been.
15    Q.   But that's what it's telling you.
16    A.   Well, yeah, it could have been, and,
17  you know -- that's what it says:  It could; it
18  could be.
19    Q.   And it's telling you --
20    A.   Could also be just, you know,
21  normal -- normal hearing range loss.  And it
22  could also be that, you know, it wasn't quiet in
23  the room, or whatever, either.
24    Q.   And it's also telling you that,

---

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**GEOFFREY CROWTHER**
**August 18, 2006**

57 (Pages 222 to 225)

| Page 222 |
|---|
| 1 "Hey," you know, "go get another doctor. Go get |
| 2 a second opinion to make sure this is accurate." |
| 3 Correct? |
| 4    A.    Yeah. |
| 5    Q.    Which is exactly what you did |
| 6 following the screening event in Greenfield: You |
| 7 went and got a second opinion. Right? |
| 8    A.    Mmm. Well, I guess that would be my |
| 9 third opinion. |
| 10    Q.    But that was the UMass center. |
| 11 Correct? |
| 12    A.    Yeah, but that was -- I guess if |
| 13 you're going to bring that up, then -- I don't |
| 14 know. I mean, that would be my -- I don't know. |
| 15 Yeah. |
| 16    Q.    Since the UMass -- |
| 17    MS. SCHMIDT: You know what? I |
| 18 think -- |
| 19    THE WITNESS: What? |
| 20    MS. SCHMIDT: I'm really sorry. I |
| 21 don't know what time you guys have, but |
| 22 it's -- I don't know if this is running -- |
| 23    MR. FLYNN: You got to go, you got |
| 24 to go. |

| Page 223 |
|---|
| 1    MS. SCHMIDT: Yeah. |
| 2    MR. FLYNN: I don't want you to miss |
| 3 your plane. |
| 4    So, just to make sure we're clear, |
| 5 we're going to suspend today, given the |
| 6 document issue and Elizabeth's travel |
| 7 schedule. And, if necessary, we will |
| 8 resume to complete the deposition. And, |
| 9 hopefully, we can also cover the ball of |
| 10 the documents. Hopefully, we'll have them |
| 11 by then. Then we won't have to do it a |
| 12 third time. Just the second time will be |
| 13 necessary. Okay? |
| 14    MS. SCHMIDT: Okay. |
| 15    MR. FLYNN: Anything else? All |
| 16 right. |
| 17 (Deposition concluded at 3:08 p.m.) |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 224 |
|---|
| 1    I, DEBORAH LEONARD LOVEJOY, Registered |
| 2 Professional Reporter, a Notary Public in and for |
| 3 the Commonwealth of Massachusetts, do hereby |
| 4 certify that GEOFFREY CROWTHER came before me on |
| 5 the 18th day of August, 2006, at Sturbridge, |
| 6 Massachusetts, and having presented satisfactory |
| 7 evidence of identity, was by me duly sworn to |
| 8 testify to the truth, and nothing but the truth, |
| 9 as to his knowledge touching and concerning the |
| 10 matters in controversy in this cause; that he was |
| 11 thereupon examined upon his oath and said |
| 12 examination was reduced to writing by me; and |
| 13 that the statement is a true record of the |
| 14 testimony given by the witness, to the best of my |
| 15 knowledge and ability. |
| 16    I further certify that I am not a relative |
| 17 or employee of counsel/attorney for any of the |
| 18 parties, nor a relative or employee of such |
| 19 parties, nor am I financially interested in the |
| 20 outcome of the action. |
| 21    WITNESS MY HAND this 18th day of September, |
| 22 2006. |
| 23 Deborah Leonard Lovejoy, RPR, Notary Public |
| 24 My Commission expires May 24, 2007 |

| Page 225 |
|---|
| 1 Today's date:  September 18, 2006 |
| 2 To:       Elizabeth L. Schmidt, Esq. |
| 3 Copied to:   Michael B. Flynn, Esq. |
| 4 From:      Deborah Leonard Lovejoy, RPR |
| 5 Deposition of: Geoffrey Crowther - Volume I |
| 6 Taken:      August 18, 2006 |
| 7 Action:    GEOFFREY CROWTHER |
| 8         vs. CONSOLIDATED RAIL CORPORATION |
| 9         and CSX TRANSPORTATION, INC. |
| 10 |
| 11    Enclosed is a copy of the deposition of |
| 12 Mr. Crowther. Pursuant to the Rules of Civil |
| 13 Procedure, Mr. Crowther has thirty days to sign |
| 14 the transcript from today's date. |
| 15    Please have Mr. Crowther sign the enclosed |
| 16 signature page. If there are any errors, please |
| 17 have him mark the page, line, and error on the |
| 18 enclosed correction sheet. This addendum should |
| 19 be forwarded to all interested parties. |
| 20    Thank you for your cooperation in this |
| 21 matter. |
| 22 |
| 23 |
| 24 |

**GEOFFREY CROWTHER**
**August 18, 2006**

58 (Pages 226 to 227)

---

Page 226

```
 1        UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3        Department of the Trial Court
 4    *******************************
 5    GEOFFREY CROWTHER,         *
 6        Plaintiff    * Civil Action No.
 7    vs.               *  05-30140-MAP
 8    CONSOLIDATED RAIL CORPORATION *
 9    and CSX TRANSPORTATION, INC., *
10        Defendants      *
11    *******************************
12        I, GEOFFREY CROWTHER, do hereby certify,
13    under the pains and penalties of perjury, that
14    the foregoing testimony, taken on August 18,
15    2006, is true and accurate, as transcribed or
16    with the changes noted on the attached
17    corrections sheet, to the best of my knowledge
18    and belief.
19        WITNESS MY HAND, this   day of      ,
20    2006.
21
22        _____
23        GEOFFREY CROWTHER
24    DRL
```

---

Page 227

```
 1        CORRECTION SHEET
 2    DEPONENT:  GEOFFREY CROWTHER
 3    CASE:    GEOFFREY CROWTHER
 4        vs. CONSOLIDATED RAIL CORPORATION
 5        and CSX TRANSPORTATION, INC.
 6    DATE TAKEN: AUGUST 18, 2006
 7    *********************************************
 8    PAGE /LINE / CHANGE OR CORRECTION AND REASON
 9    *********************************************
10    _____/_____/_____
11    _____/_____/_____
12    _____/_____/_____
13    _____/_____/_____
14    _____/_____/_____
15    _____/_____/_____
16    _____/_____/_____
17    _____/_____/_____
18    _____/_____/_____
19    _____/_____/_____
20    _____/_____/_____
21    _____/_____/_____
22    _____/_____/_____
23    _____/_____/_____
24    _____/_____/_____
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

Page 1

1               UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4

5

6  * * * * * * * * * * * * * *

7  GEOFFREY CROWTHER,             *

8             Plaintiff           *

9  v.                            * No. 05-30140-MAP

10 CONSOLIDATED RAIL CORPORATION *

11 AND CSX TRANSPORTATION, INC., *

12           Defendants           *

13 * * * * * * * * * * * * * *

14

15

16        DEPOSITION OF:  TOMMA HENCKEL

17         Catuogno Court Reporting

18            1414 Main Street

19         Springfield, Massachusetts

20     November 10, 2006      10.14 a.m.

21

22

23         Jessica M. DeSantis

24            Court Reporter

**TOMMA HENCKEL**
**November 10, 2006**

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | Representing CSX Transportation, Inc: |
| 4 | FLYNN & ASSOCIATES, P.C. |
| 5 | 400 Crown Colony Drive, Suite 200 |
| 6 | Quincy, MA 02169 |
| 7 | BY LORI A. WIRKUS, ESQ. |
| 8 | 617.773.5500    Fax: 617.773.5510 |
| 9 | EMAIL: lawirkus@flynnassoc.com |
| 10 | |
| 11 | Representing the Plaintiff: |
| 12 | LAW OFFICE OF THOMAS J. JOYCE, III |
| 13 | 900 Centerton Road |
| 14 | Mount Laurel, NJ 08054 |
| 15 | BY ELIZABETH L. SCHMIDT, ESQ. |
| 16 | 856.914.0220    Fax: 856.914.0429 |
| 17 | EMAIL: eschmidt@tjoycelaw.com |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 4 |
|---|---|
| 1 | Exhibit 12, documents....................... 61 |
| 2 | Exhibit 13, resume........................... 83 |
| 3 | Exhibit 14, Conrail report dated 5.25.84.... 105 |
| 4 | Exhibit 15, audiogram dated 12.17.87........ 106 |
| 5 | Exhibit 16, audiogram analysis dated |
| 6 | 1.21.88........................ 107 |
| 7 | Exhibit 17, audiogram dated 12.17.87........ 108 |
| 8 | Exhibit 18, audiogram dated 8.3.89.......... 109 |
| 9 | Exhibit 19, audiogram dated 8.29.89........ 111 |
| 10 | Exhibit 20, audiogram dated 4.24.1990....... 112 |
| 11 | Exhibit 21, audiogram dated 3.31.03......... 114 |
| 12 | Exhibit 22, report dated April 2, 2002...... 116 |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | Page 3 |
|---|---|
| 1 | INDEX |
| 2 | |
| 3 | WITNESS        TOMMA HENCKEL |
| 4 | |
| 5 | |
| 6 | EXAMINATION BY:        PAGE: |
| 7 | Ms. Wirkus        6 |
| 8 | |
| 9 | |
| 10 | EXHIBIT:        PAGE: |
| 11 | Exhibit 1, subpoena ........................ 41 |
| 12 | Exhibit 2, document dated July 26, 2006..... 42 |
| 13 | Exhibit 3, fax dated 10.25.06............... 45 |
| 14 | Exhibit 4, document........................ 46 |
| 15 | Exhibit 5, document dated October 27, 2002.. 49 |
| 16 | Exhibit 6, documents........................ 51 |
| 17 | Exhibit 7, publication dated December 14, |
| 18 | 1964............................ 53 |
| 19 | Exhibit 8, graphs from ISO 1999, data....... 54 |
| 20 | Exhibit 9, Occupational Safety and Health |
| 21 | Standards........................ 57 |
| 22 | Exhibit 10, table G-16...................... 59 |
| 23 | Exhibit 11, Criteria for Recommended |
| 24 | Standard........................ 59 |

|  | Page 5 |
|---|---|
| 1 | MS. WIRKUS:  Usual stipulations? |
| 2 | MS. SCHMIDT:  Yes. |
| 3 | MS. WIRKUS:  Okay.  Would you like |
| 4 | to read and sign? |
| 5 | MS. SCHMIDT:  We'll waive |
| 6 | signature. |
| 7 | MS. WIRKUS:  Okay. |
| 8 | MS. SCHMIDT.  We'll do the usual |
| 9 | stipulations. |
| 10 | MS. WIRKUS:  Legal talk about |
| 11 | objections. |
| 12 | THE WITNESS:  Oh. |
| 13 | MS. WIRKUS:  I could go into it, but |
| 14 | we'll be here a little bit longer. |
| 15 | THE WITNESS:  I'm sorry. |
| 16 | MS. WIRKUS:  That's all right. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | * * * * * * * * |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

# TOMMA HENCKEL
# November 10, 2006

3 (Pages 6 to 9)

Page 6

1    TOMMA HENCKEL, DEPONENT, having first been
2    satisfactorily identified and duly sworn, deposes
3    and states as follows:
4
5
6    EXAMINATION BY MS. WIRKUS:
7
8        Q.    Ms. Henckel, you and I just met a
9    little while ago. I represent the defendants CSX
10   in connection with a lawsuit brought by Geoffrey
11   Crowther.
12           Have you ever been deposed before?
13       A.    No.
14       Q.    No. Okay.
15           Just a couple of groundrules for
16   you.
17           If you, at all, need to take a
18   break, let me know. I don't anticipate this
19   being too, too long, but if, for any reason, you
20   need to get up or stretch or anything, just let
21   me know.
22           The only thing I would ask is if I
23   have a question pending try to answer the
24   question first before asking for a break.

Page 7

1        A.    Right.
2        Q.    If I ask you a question that you
3    don't understand, let me know, and I'll rephrase
4    it. If you don't, then I'll just assume you
5    understood the question. Okay.
6           You have to answer audibly because,
7    of course, the court reporter needs to take
8    everything down.
9        A.    Right.
10       Q.    And you also need to let me actually
11   pose my question on the record. It's human
12   nature to sort of guess where the attorney is
13   going. We're not that bright. So you tend to
14   start to answer as I'm still asking the question.
15   And I would just ask that you let me get the
16   question so that the court reporter can get it
17   down.
18           Okay?
19       A.    Okay.
20       Q.    Okay. Good.
21           Could you state your full name for
22   the record, please?
23       A.    Tomma Henckel.
24       Q.    Okay. And can you spell that,

Page 8

1    please?
2        A.    T-O-M-M-A H-E-N-C-K-E-L.
3        Q.    Okay. And your date of birth?
4        A.    3.18.1962.
5        Q.    Okay. And where are you employed?
6        A.    University of Massachusetts.
7        Q.    And what's your position with the
8    University of Massachusetts?
9        A.    I'm an audiologist and clinical
10   instructor.
11       Q.    Okay. How long have you been with
12   them?
13       A.    Full time for almost 11 years now.
14       Q.    Okay. And have you been doing the
15   same thing for the last 11 years, the audiologist
16   and clinical instructing?
17       A.    Yes.
18       Q.    Okay. And prior to that were you
19   working for them part-time?
20       A.    I was working for them part-time.
21       Q.    And when did you start doing that?
22       A.    Maybe three semesters before that.
23       Q.    Okay. Now, you say semesters.
24           Does your scheduling go on a school

Page 9

1    schedule?
2        A.    It did when I was part-time. Now
3    I'm year round, full time.
4        Q.    Year round. Okay.
5        A.    Yup.
6        Q.    Okay. And what is your office
7    location?
8        A.    Right now it's 358 North Pleasant
9    Street.
10       Q.    And whereabouts? What town?
11       A.    In Amherst on UMass campus.
12       Q.    Okay. Is there a particular
13   building that you're in?
14       A.    Yeah, but it doesn't have a name.
15       Q.    Doesn't have a name.
16           I know there's about 8,000 on that
17   campus.
18       A.    I know.
19       Q.    Okay. What are your typical hours
20   that you work?
21       A.    Typically 8.30 to 5.00.
22       Q.    Okay.
23       A.    But flexible.
24       Q.    I'm going to ask you a couple of

**TOMMA HENCKEL**
**November 10, 2006**

4 (Pages 10 to 13)

Page 10

1  background questions.
2          Where did you go to high school?
3      A.   In New Berlin, Germany.
4      Q.   Oh, my gosh.
5          How long were you in Germany for?
6      A.   I grew up there. So until I was
7  19.
8      Q.   Wow.
9          Were you born in Germany?
10     A.   I was born in the states and then
11  moved there when I was a baby.
12     Q.   Okay. Wow. That's interesting.
13  Okay.
14          And what year did you graduate from
15  high school?
16     A.   1981. I think.
17     Q.   Okay. And what did you do after
18  high school?
19     A.   I went to college here in the
20  states.
21     Q.   Okay. What college did you
22  attend?
23     A.   Hampshire College.
24     Q.   And whereabouts is that located?

Page 11

1      A.   In Amherst.
2      Q.   What years did you attend Hampshire
3  College?
4      A.   '81 to '85.
5      Q.   Okay. And did you graduate with a
6  degree?
7      A.   Yes, bachelor's.
8      Q.   Bachelor's.
9          And what was your major?
10     A.   Linguistics, communication, and
11  cognitive science. They keep on changing the
12  name of it.
13     Q.   Okay. And after graduating from
14  high school did you do any post graduate work?
15     A.   From high school?
16     Q.   I'm sorry. From college.
17     A.   From college.
18          Not immediately. I started my
19  master's program in '88. January, '88.
20     Q.   Okay. And did you obtain your
21  master's?
22     A.   Yes.
23     Q.   What year did you get your
24  master's?

Page 12

1      A.   '91.
2      Q.   And what school did you attend?
3      A.   UMass.
4      Q.   And what's your degree?
5      A.   Master's of Arts. M.A.
6      Q.   Okay. Any other work other than
7  your master's? Any other postgraduate work?
8      A.   No, except for sort of continuing
9  education throughout.
10     Q.   Okay. What did you do upon
11  graduating from college in 1985?
12     A.   I went to the Boston Area and worked
13  for a few years there.
14     Q.   Okay. What did you do for work?
15     A.   I was a secretary/receptionist at a
16  psychotherapist institute.
17     Q.   That must have been interesting.
18     A.   Very interesting.
19     Q.   Do you remember the name of the
20  institution?
21     A.   Boston Institute for
22  Psychotherapy.
23     Q.   And where were they located?
24     A.   In Boston.

Page 13

1      Q.   Do you remember what street?
2      A.   I think it's Commonwealth Avenue.
3      Q.   Okay. How long did you work
4  there?
5      A.   Almost three years.
6      Q.   Did you work full time?
7      A.   Yeah. Two and a half years, I
8  guess.
9          Yes, I did.
10     Q.   All right. And why did you leave
11  that position?
12     A.   Because I wanted to go to grad
13  school.
14     Q.   You had enough stories to tell by
15  then?
16     A.   It wasn't exactly paying great
17  either.
18     Q.   Okay. Did you attend graduate
19  school full time?
20     A.   Yes.
21     Q.   And did you work at all while you
22  were in graduate school?
23     A.   I did. I took a year off to work as
24  an audiometric technician. And that would have

**TOMMA HENCKEL**
**November 10, 2006**

5 (Pages 14 to 17)

| Page 14 |
| --- |

1  been in '89. So the fall of '89 and spring of
2  '90, I believe.
3      Q.   Okay. And where did you work as an
4  audiometric technician?
5      A.   It was at Hampshire Hearing
6  Services.
7      Q.   Okay.
8      A.   Actually, it was at Hampshire Eye
9  and Ear. It was an ENT office.
10      Q.   Okay. Was that a full time
11  position?
12      A.   Yes.
13      Q.   Who was your supervisor at that
14  time, if you can remember?
15      A.   That's what I'm not sure about. It
16  was Dr. Trusswell (phonetic) and Dr. Alcroft
17  (phonetic) were the physicians, but there was an
18  audiologist there who was supervising my
19  audiology work more.
20      Q.   Okay. And do you remember that
21  person's name?
22      A.   His name is Glen Shinner.
23      Q.   Glen Shimmer?
24      A.   Shinner, S-H-I-N-N-E-R.

| Page 15 |
| --- |

1      Q.   Okay. And where was Hampshire Eye
2  and Ear located?
3      A.   Northampton.
4      Q.   Do you remember the street?
5      A.   Locust Street. 61 Locust.
6      Q.   Good.
7           Why did you leave hampshire Eye and
8  Ear?
9      A.   Oh, because I was going back to grad
10  school. It was just a year off.
11      Q.   Okay. So you always planned to just
12  do a year?
13      A.   Mm-hmm.
14      Q.   And was that part of your grad
15  school program or?
16      A.   No, it was -- two reasons. I was
17  not sure whether I wanted to go into speech
18  language pathology or audiology, which would have
19  been the same department.
20           And so it was a way for me to get to
21  know this field in depth. And, also, I had -- I
22  had been on a grant that was cut, state grant
23  that was cut at the time. So I wanted to make
24  some money to go back to grad school. And what

| Page 16 |
| --- |

1  better way to do it than in the field.
2      Q.   Beef up the resume at the same time.
3  That's good.
4      A.   Exactly.
5      Q.   Did that position help you make a
6  decision as to whether or not to go toward the
7  speech language pathology versus audiology?
8      A.   Yes.
9      Q.   And what did you chose?
10      A.   Audiology.
11      Q.   Audiology?
12      A.   Absolutely.
13      Q.   And why was that?
14      A.   Just liked it. I don't know. Just
15  really felt passionate about it.
16      Q.   Okay. Always good to be passionate
17  about what you do.
18      A.   Exactly.
19      Q.   Okay. Then you went back to grad
20  school full time and completed that program in
21  1991, correct?
22      A.   Mm-hmm.
23      Q.   Okay. And what did you do upon
24  graduating from UMass?

| Page 17 |
| --- |

1      A.   For work?
2      Q.   Yes.
3      A.   I worked at ENT Associates in
4  Springfield. Here in Springfield.
5      Q.   And did you start that position in
6  '91?
7      A.   No, because I finished in December,
8  '91. So I started that in March, '92.
9      Q.   Okay. And what did you do in
10  between December of '91 and March of '92?
11      A.   I was on maternity leave.
12      Q.   Okay. So I take it you have kids?
13      A.   Yes.
14      Q.   How many kids do you have?
15      A.   Two.
16      Q.   Two.
17           How old are they?
18      A.   14 and 11.
19      Q.   Okay. And are you married?
20      A.   Yes.
21      Q.   Do you live in this area?
22      A.   Yes, I do.
23      Q.   I won't ask you your home address.
24           Okay. And you started working for

**TOMMA HENCKEL**
**November 10, 2006**

6 (Pages 18 to 21)

Page 18

1  ENT Associates in March of '92, correct?
2      A.   Mm-hmm.
3      Q.   And was that a full time position?
4      A.   Yes.
5           Well, what's full time?
6      Q.   Well, how many hours did you work?
7      A.   32. So it was four days a week.
8      Q.   That's a good schedule after coming
9  back from maternity leave.
10     A.   Well, but then I did that part-time
11  at UMass. So that overlapped.
12     Q.   Okay. So you were working at the
13  same time then part-time at UMass?
14     A.   Mm-hmm.
15     Q.   So you really had no flexible hours
16  at all?
17     A.   And I had another job, too.
18     Q.   Did you really?
19          What were you doing?
20     A.   I was consulting for the VA here
21  from -- I'm not sure exactly when it started, but
22  it was while I was at ENT Associates. I did a
23  half day at UMass and a half day at the VA. So
24  that was my fifth day. And that went on until

Page 19

1  just this past December.
2      Q.   Oh, wow. Okay.
3           Let me focus on ENT Associates
4  first.
5           What was your position with them?
6      A.   Audiologist.
7      Q.   And how long did you work for
8  them?
9      A.   Almost three years.
10     Q.   So until 1995?
11     A.   Yeah. December, 1995.
12     Q.   Who was your supervisor during that
13  time?
14     A.   The doctors were Dr. Jacob -- it
15  changed over time.
16     Q.   Okay.
17     A.   -- Reiner, R-E-I-N-E-R. And
18  Tradstein (phonetic) were the most recent ones.
19     Q.   And why did you leave that
20  position?
21     A.   Because I felt that the one at UMass
22  was a step up and, also, it was closer to home.
23     Q.   And your position with -- actually,
24  let me back up a little bit.

Page 20

1           Your position working at Hampshire
2  Eye and Ear.
3           What was your -- you said you were
4  an audiometric technician.
5           What were your specific
6  responsibilities and duties as a technician?
7      A.   To do hearing testing for the
8  doctors, for the physicians.
9      Q.   And how would you go about doing
10  hearing testing? What's the process at that time
11  that you were working for Hampshire Eye and
12  Ear?
13     A.   Bringing in the patient, looking at
14  what was -- the doctors would say what they
15  wanted, how much testing they wanted or what kind
16  of testing they wanted. I would do pure-tone
17  hearing testing in the booth. Air conduction and
18  bone conduction. I would do speech testing,
19  speech discrimination testing. I would do
20  tympanometry.
21     Q.   I'm sorry. What was the last one?
22     A.   Tympanometry, which is middle ear
23  testing.
24          And, probably most of it.

Page 21

1           Then I also -- the other
2  audiologist. If there was a down time I would
3  shadow him and he did a lot of other hearing aid
4  related things, too.
5      Q.   Okay. So the doctor would order the
6  specific test that he needed?
7      A.   Sometimes. I mean, sometimes they
8  would just say, do a full eval or something,
9  yeah.
10     Q.   And the full would --
11     A.   yeah, would include everything.
12     Q.   I'm sorry. I didn't mean to
13  interrupt you.
14     A.   That's okay.
15          And then sometimes they would just
16  say, you know, I just need a tympanometry on this
17  because we're following up.
18     Q.   Okay. So you'd get your specific
19  orders as to what tests to do from the doctors
20  whether it was a full set of tests or a specific
21  test?
22     A.   Ultimately.
23     Q.   Tell me exactly.
24          You said you did pure-tone hearing

**TOMMA HENCKEL**
**November 10, 2006**

7 (Pages 22 to 25)

| Page 22 | Page 24 |
|---|---|
| 1   test in the booth. | 1   A.   No, it's just the bone conductor. |
| 2   Can you describe that for me, what | 2   It's a different headphone. But other than that |
| 3   you would do? | 3   the set up is the same. |
| 4   A.   Seat the patient, instruct the | 4   Q.   Okay. Would you also record those |
| 5   patient. | 5   results? |
| 6   Q.   Mm-hmm. | 6   A.   Yes. |
| 7   A.   Put the headphones on. | 7   Q.   And where would you record them? |
| 8   And present tones of different | 8   A.   On the same form. |
| 9   frequencies in each ear separately and have the | 9   Q.   Okay. On the audiogram? |
| 10   patient -- and get threshold, obtain threshold by | 10   A.   Mm-hmm, yes. |
| 11   having the patient respond to the softest they | 11   Q.   And, again, you would write them in |
| 12   could possibly hear. | 12   or draw them in? |
| 13   And then do it a few times, just | 13   A.   Yes. |
| 14   double or triple check that the actual threshold | 14   Q.   Okay. And how about the air |
| 15   is the actual threshold. | 15   conduction test? |
| 16   Q.   Okay. Anything else? | 16   A.   That's that. That was the air |
| 17   A.   For the pure-tone. | 17   conduction. |
| 18   Q.   Right. | 18   Q.   So air conduction and bone |
| 19   A.   Think that's it. | 19   conduction are the same thing? |
| 20   And then we'd do the same thing | 20   A.   Right, except with using different |
| 21   again with the bone conductor if it's | 21   headphones. |
| 22   necessary. | 22   Q.   Okay. And how about speech |
| 23   Q.   Okay. Staying just with the | 23   discrimination. |
| 24   pure-tone hearing test. | 24   How would you test that? |

| Page 23 | Page 25 |
|---|---|
| 1   Did you record the results of the | 1   A.   I would tell the patient -- well, |
| 2   pure-tone hearing test? | 2   actually, there's another test in between. |
| 3   A.   Mm-hmm, yes. | 3   As part of the speech test I would |
| 4   Q.   And how would you record those test | 4   get the speech reception threshold, which is |
| 5   results? | 5   familiarizing the patient with a set of specific |
| 6   A.   On an audiogram. | 6   words that are two-syllable words with equal |
| 7   Q.   And would you actually write that | 7   stress on both syllables. |
| 8   into the audiogram or was that a machine that | 8   And familiarize them with those |
| 9   recorded the results? | 9   words, have them repeat them at a comfortable |
| 10   A.   I wrote them in or drew it in. | 10   level. And then, again, get thresholds saying |
| 11   Q.   Okay. And how was the bone | 11   those same words at a softer and softer level to |
| 12   conduction test done? | 12   see what the softest is that they could recognize |
| 13   A.   It's done similarly, but with a bone | 13   a familiar word. |
| 14   conductor instead of headphones. | 14   Q.   Okay. |
| 15   Q.   Okay. And what's a bone | 15   A.   And then that's the speech reception |
| 16   conductor? | 16   threshold. And I would record that on the |
| 17   A.   It presents the tone more directly | 17   audiogram as well. |
| 18   to the inner ear and bypasses the outer ear and | 18   Q.   Okay. |
| 19   the middle ear. | 19   A.   And then the speech discrimination |
| 20   Q.   And is there a special machine | 20   testing I would do at a comfortable level and |
| 21   that's used to do that? | 21   give them unfamiliar one-syllable words for them |
| 22   A.   Same machine. | 22   to repeat to test their clarity. |
| 23   Q.   Okay. So the same set of | 23   Q.   Okay. |
| 24   headphones? | 24   A.   In other words, do they understand |

**TOMMA HENCKEL**
**November 10, 2006**

8 (Pages 26 to 29)

Page 26

1  the speech sounds, all the speech sounds.
2      Q.    So would it be fair to say that the
3  first test, the reception threshold, is more a
4  volume test and the second one is more a clarity
5  test?
6      A.    Exactly.
7      Q.    Okay.
8      A.    Exactly.
9      Q.    And I'm going to massacre the last
10  word that you told me.
11      A.    Tympanometry?
12      Q.    Yup.
13      A.    Okay. It's a different machine.
14          And what it does is it checks the
15  mobility of the ear drum, how the middle ear
16  system is working. If there is anything wrong
17  with the ear drum. If there's fluid in the ear.
18  If there's a break to the bones in the ear,
19  anything that's middle-ear related would show up
20  on that.
21          And that's completely objective so
22  the patient doesn't have to do anything.
23      Q.    And how is that test performed?
24      A.    It's performed with a probe tube

Page 27

1  that gets inserted in the ear.
2      Q.    And then is there some sort of a
3  reading that shows up on the tube, the probe
4  tube?
5      A.    There's a reading, yeah, that shows
6  up on the unit.
7      Q.    Okay.
8      A.    And that gets recorded as well or it
9  prints out. It prints out its own thing.
10      Q.    So there's a separate printout for
11  that reading; is that correct?
12      A.    Mm-hmm.
13          Sometimes. I mean, you can print it
14  out or you can transfer it onto the audiogram.
15      Q.    Okay. And by transferring it, you
16  mean just write down whatever the printout will
17  have printed out?
18      A.    Right.
19      Q.    Okay. Did somebody -- prior to
20  working at Hampshire ENT, did somebody train you
21  on how to do all of these tests?
22      A.    Yes.
23      Q.    Who was that?
24      A.    The audiologist, Glen Shinner.

Page 28

1      Q.    Okay. And you received that
2  training at --
3      A.    Yes, and I probably got some of it
4  at UMass as well because I already started my
5  master's program.
6      Q.    Okay. So your master's program was
7  a very hands-on program, correct?
8      A.    Yes.
9      Q.    As opposed to law school, which is
10  not.
11      A.    Really. You don't get to play with
12  machines?
13      Q.    No, you don't know what you're doing
14  when you come out.
15          Okay. How much training did you
16  receive from Glen Shinner?
17      A.    0h, constant supervision. I mean,
18  for the whole year.
19      Q.    On the job?
20      A.    Yeah, he trained me up front. I did
21  other testing for them actually, as well,
22  there.
23      Q.    Okay.
24      A.    Which he trained me for. And then

Page 29

1  in the administration, but then also the
2  interpretation.
3      Q.    So it was yearly, a year-long
4  training program where he was working with you
5  side by side and you would sometimes perform the
6  test and he would sometimes perform the test.
7          Is that fair to say?
8      A.    Yeah, or we'd even work parallel.
9          They were paying me to save them
10  time, but he was always there. He was always in
11  the room or that I could refer to him.
12      Q.    Okay. And you said you did some
13  other testing for them as well.
14          What was that?
15      A.    Yeah, we did some ENG testing, which
16  is electronystagmography testing, which is more
17  medically -- it was more performed on people who
18  have balance problems, just try to figure out the
19  vestibular system. What might be going on
20  there.
21      Q.    Okay. And how was that testing
22  done?
23      A.    It's so long ago. There's a lot of
24  different components. The patient has to -- most

**TOMMA HENCKEL**
**November 10, 2006**

9 (Pages 30 to 33)

| Page 30 |
|---|
| 1  of the time the patient is lying on the table and |
| 2  you have them perform different tasks that |
| 3  track -- visual tracking tasks. |
| 4       Some of it involves putting warm or |
| 5  cold water in their ears and measuring -- put on |
| 6  the electrodes. Measuring their eye movements in |
| 7  response, see if there's a weakness to one or the |
| 8  other side. |
| 9       Q.   Is that something that you still |
| 10  perform for UMass? |
| 11       A.   No. |
| 12       Q.   When was the last time that you did |
| 13  the ENG testing? |
| 14       A.   I think at ENT Associates in |
| 15  Springfield. So that would have been, what, 11 |
| 16  years ago. |
| 17       Q.   Okay. When you get to ENT |
| 18  Associates in Springfield in March of 1992? |
| 19       A.   Mm-hmm. |
| 20       Q.   What was your title? |
| 21       A.   Audiologist. |
| 22       Q.   Audiologist. Okay. |
| 23       And did you receive any additional |
| 24  training at ENT Associates other than just, you |

| Page 31 |
|---|
| 1  know, here's our process of doing things? |
| 2       A.   Yeah, I think to some extent, maybe |
| 3  more in speed than in actual procedures. I mean, |
| 4  just, you know. |
| 5       Q.   What do you mean by more in speed? |
| 6       A.   Because there were three doctors or |
| 7  four doctors. You just learn to -- |
| 8       Q.   Go faster? |
| 9       A.   Yeah. |
| 10       Q.   Okay. |
| 11       A.   And we also, in addition to all the |
| 12  other testing there, we also did auditory |
| 13  brainstem response testing, which is a |
| 14  electrophysiological hearing test. |
| 15       Q.   Okay. |
| 16       A.   So that was probably something that, |
| 17  even though I had done it somewhat before, I was |
| 18  fully trained there on it. |
| 19       Q.   Okay. And do you do any of that |
| 20  testing presently for UMass? |
| 21       A.   Yes. |
| 22       Q.   Is that testing that you performed |
| 23  on Mr. Crowther at all? |
| 24       A.   No. |

| Page 32 |
|---|
| 1       Q.   Okay. Then I'm not going to make |
| 2  you go over exactly what the process is. |
| 3       Okay. While working for UMass |
| 4  part-time during that same time frame what were |
| 5  you doing for UMass? |
| 6       A.   I was supervising students. So we |
| 7  were seeing patients with the students. So I was |
| 8  doing it one afternoon so I had one student that |
| 9  I was responsible for. And one afternoon we |
| 10  would see those patients that were scheduled. |
| 11       Q.   Was it a clinical-type program for |
| 12  the students? |
| 13       A.   Yes. |
| 14       Q.   Okay. And how about in your |
| 15  consulting work with the VA. |
| 16       What were you doing with them? |
| 17       A.   Hearing testing. |
| 18       Q.   Okay. And would that be the same |
| 19  hearing testing, the pure-tone hearing, the air |
| 20  and bone conduction, speech discrimination? |
| 21       A.   Yes. |
| 22       Q.   And tympanometry? |
| 23       A.   Yes. And on top of the |
| 24  tympanometry, there is -- which is performed on |

| Page 33 |
|---|
| 1  the same unit, were acoustic reflex testing. |
| 2       Q.   And what's acoustic reflex |
| 3  testing? |
| 4       A.   There's a muscle reflex that |
| 5  responds to really loud sounds in the ear, or in |
| 6  a healthy ear, and that's what we were sort of |
| 7  checking to make sure that both pathways are -- |
| 8       Q.   That it's doing what it's supposed |
| 9  to be doing? |
| 10       A.   That it's doing what it's supposed |
| 11  to be doing, exactly. |
| 12       Q.   Okay. Did you receive any |
| 13  additional training at the VA? |
| 14       A.   No. |
| 15       Q.   Did you receive any additional |
| 16  training at UMass? |
| 17       A.   Once I started there full time. |
| 18       Yes, probably, but more in |
| 19  supervision and instructing students and then |
| 20  just on-going as things change. |
| 21       Q.   Okay. |
| 22       A.   And then at UMass, in addition, |
| 23  started working with hearing aids, which is what |
| 24  I had not done at ENT Associates. |

TOMMA HENCKEL
November 10, 2006

10 (Pages 34 to 37)

Page 34

1    Q.    Okay. I'm just going to take that
2    piece by piece.
3    A.    Yup.
4    Q.    So you had received some training
5    from UMass when you first started there on
6    teaching basically?
7    A.    Yes.
8    Q.    How to teach the students and
9    instruct the students?
10   A.    Right.
11   Q.    In addition to that, you've also,
12   through the years, received training just as far
13   as new developments and certainly things in the
14   field that would have changed; is that fair to
15   say?
16   A.    Right.
17   Q.    And in addition to that, you also
18   started working with hearing aids?
19   A.    Mm-hmm.
20   Q.    And when did you start working with
21   hearing aids?
22   A.    At UMass. When I started at UMass.
23   Q.    When you started on the part-time
24   basis?

Page 35

1    A.    No. I think on the full time
2    basis.
3    Q.    Okay. What sort of work with
4    hearing aids do you do?
5    A.    Anything. Hearing aid evaluations,
6    hearing aid orders, fittings, adjustments,
7    follow-ups, anything that might be involved with
8    repairing.
9    Q.    And what sort of training did you
10   receive in connection with your hearing aid
11   work?
12   A.    A lot of it was self -- sort of
13   self-sought.
14   Q.    Okay.
15   A.    So I would have the hearing aid
16   company representatives come in and train me on
17   their specific software and hearing aids. I
18   would go to seminars.
19   Q.    Did you work with anybody at UMass
20   who had any hearing aid experience?
21   A.    I think probably one of the faculty
22   members maybe was teaching the hearing aid
23   course, probably.
24   Q.    Do you remember that person's

Page 36

1    name?
2    A.    Dr. Karen Helfer.
3    Q.    And, Ms. Henckel, you have --
4    A.    I'm sorry. I had received, during
5    my training, my master's training, I had been
6    trained on hearing aids so it wasn't a completely
7    new thing. It was just that I hadn't done it in
8    the job before.
9    Q.    Okay. So you had received
10   instruction while you were getting your master's
11   and had worked with hearing aids?
12   A.    And had worked at different places
13   that worked with hearing aids, yes.
14   Q.    Okay. As part of your masters
15   program did you do rotations or replacements?
16   A.    Yes.
17   Q.    Okay. And how many of those did you
18   do?
19   A.    Four.
20   Q.    And how long would they last for?
21   A.    Semester.
22   Q.    Semester.
23         And was that at the same time you
24   were doing course work?

Page 37

1    A.    Yes.
2    Q.    So it was sort of hands-on clinical
3    work?
4    A.    Yeah.
5    Q.    So you've been juggling your whole
6    life.
7    A.    It makes the course work more
8    bearable.
9    Q.    Yeah, it's true.
10   A.    You can actually apply it.
11   Q.    Okay. And after your name you have
12   some initials. I'm going to ask you to tell me
13   what they are.
14         I see that you sign it Tomma
15   Henckel, M.A, CCC-A.
16         And the M.A is your master's?
17   A.    Master's of Arts.
18   Q.    Master's of Arts. Okay.
19         And the CCC-A is what?
20   A.    Certificate of Clinical Competence.
21   And the A just stands for audiology.
22   Q.    Okay. And is that a certification
23   program I assume?
24   A.    Yes, the American Speech Language

**TOMMA HENCKEL**
**November 10, 2006**

11 (Pages 38 to 41)

Page 38

1  Hearing Association, which is sort of the
2  licensing. I don't know what they call it. A
3  certification.
4      Q.    A board certification?
5      A.    Yes, exactly.
6            And the reason it says audiology is
7  because they also do speech language pathology.
8      Q.    So the A is just to distinguish it.
9            And when did you receive that
10 certificate?
11     A.    Spring of '93. It had to be nine
12 months after I started at ENT Associates. Maybe
13 January of '93, I would say.
14     Q.    And how did you achieve that
15 certificate?
16     A.    By doing my first year at — or
17 first fine months at ENT Associates were sort of
18 a residency program, clinical fellowship year.
19 That's required after the master's degree to
20 achieve that.
21     Q.    Did you have to take any test
22 associated with that certificate?
23     A.    No.
24     Q.    Okay. And who did you receive your

Page 39

1  training from at ENT Associates?
2      A.    You want the name?
3      Q.    Yes, please.
4      A.    Cheryl Fikucki, F-I-K-U-C-K-I. She
5  was my, what they call, clinical supervisor for
6  the certification process.
7      Q.    Okay. Was that a similar process to
8  when you worked with Glen Shinner that you were
9  working in conjunction with Cheryl?
10     A.    Mm-hmm, yes.
11     Q.    So hands-on training, correct?
12     A.    Yes, and she was always there and we
13 were always working parallel.
14     Q.    And you were both seeing patients at
15 the same time?
16     A.    Mm-hmm.
17     Q.    I'm going to turn your focus to this
18 particular case.
19            As you know, we're here in
20 connection with a case brought by Geoffrey
21 Crowther.
22            And you examined Mr. Crowther,
23 correct?
24     A.    Yes.

Page 40

1      Q.    Okay. Do you remember your
2  examination of Mr. Crowther?
3      A.    Vaguely.
4      Q.    How many patients per day do you see
5  typically?
6      A.    It really varies. Say three to
7  five, three to six.
8      Q.    That would be on average, correct?
9      A.    Yeah, maybe four to six. It really
10 varies.
11     Q.    Do you know that you've been
12 disclosed as an expert in this case?
13     A.    Yes.
14     Q.    And when did you first learn that
15 you had been disclosed as an expert?
16     A.    When I received the subpoena.
17     Q.    And when did you first receive the
18 subpoena if you can remember?
19     A.    I can't remember, but I have it. I
20 think the end of August. I'm not sure if I can
21 be more specific than it.
22     Q.    Do you mind, I'm actually going to
23 mark that as an Exhibit and I'll make sure to
24 give you a copy of it so you have a copy of it on

Page 41

1  your way out.
2            MS. WIRKUS: I'm going to mark as
3  Exhibit No. 1. It's the subpoena in
4  Crowther verses Conrail and CSX for Tomma
5  Henckel. And it's dated September 15th,
6  '06. I'm sorry. It's dated August 17th,
7  '06. And it's for Notice of Deposition for
8  September 15th, '06.
9
10            (Exhibit 1, subpoena, marked)
11
12     Q.    (By Ms. Wirkus) I'm going to show
13 you what has been marked as Exhibit 1, which you
14 handed me from your folder.
15            And this is the subpoena that you're
16 referring to, correct, that you received in
17 connection with this case?
18     A.    Yes.
19     Q.    Okay. And that would have been
20 sometime in mid to late August; is that
21 correct?
22     A.    Right.
23     Q.    Okay. And before that time had you
24 had any conversations with Attorney Joyce's

**TOMMA HENCKEL**
**November 10, 2006**

```
12 (Pages 42 to 45)
```

Page 42

1 office as far as agreeing to serve as an expert
2 in this case?
3     A.    No.
4         MS. WIRKUS: If I can mark as
5     Exhibit No. 2, please, plaintiff's expert
6     witness disclosures. And it is dated July
7     26, 2006.
8
9         (Exhibit 2, document dated July 26,
10        2006)
11
12    Q.    (By Ms. Wirkus) I'll show you
13 what's been marked as Exhibit No. 2, Ms. Henckel.
14        If you can take a look at that.
15 Just briefly the first three pages are the actual
16 pleading, or the first two pages, and let me know
17 if you've ever seen that before?
18    A.    Nope.
19    Q.    No. Okay.
20        And on the second page -- first of
21 all, let me turn to the first page.
22        It's entitled, plaintiff's expert
23 witness disclosure, correct? And then it lists a
24 variety of physicians and medical providers as

Page 44

1 file with you; is that correct?
2     A.    Yes.
3     Q.    Okay. Can you identify the
4 documents that are contained within your file,
5 please?
6     A.    I have the subpoena.
7     Q.    Mm-hmm.
8     A.    I have the report and the hearing
9 test results.
10    Q.    Mm-hmm.
11    A.    I have just some stuff I printed out
12 about noise-induced hearing loss.
13    Q.    Okay. If I could just have a minute
14 to take a look at what's in your file, if that's
15 okay, and see if there's anything we need to have
16 marked.
17        MS. WIRKUS: Do you mind if we take
18     a few minutes to do that?
19        MS. SCHMIDT: That's fine.
20        MS. WIRKUS: Great. We can go off.
21
22        (Break taken)
23
24        MS. WIRKUS: Back on the record.

Page 43

1 experts.
2        Is that fair to say?
3     A.    Yes.
4     Q.    On the second page your name is
5 listed as No. 5 as one of the experts; is that
6 correct?
7     A.    Yes.
8     Q.    And you hadn't had any conversations
9 with Attorney Joyce or anyone in his office in
10 relation to serving as an expert, correct?
11    A.    Correct.
12    Q.    All right. Okay. I'll steal that
13 back from you.
14        Prior to this deposition you had an
15 opportunity to meet with Attorney Schmidt; is
16 that correct?
17    A.    Today?
18    Q.    Yes.
19    A.    Yes, for a few minutes.
20    Q.    Okay. Have you met with anybody
21 else from Attorney Joyce's office prior to this
22 deposition?
23    A.    No.
24    Q.    Okay. You've brought along your

Page 45

1     Q.    (By Ms. Wirkus) Okay. Ms. Henckel,
2 I just made a copy of your folder.
3     A.    Right.
4        MS. WIRKUS: The subpoena and Notice
5     of Deposition, which has been marked as
6     Exhibit No. 1, which I will give you a copy
7     of.
8        I'm just going to go piece by piece
9     what's contained in your folder and mark
10    each as an exhibit.
11        The first is a note from Hanan and
12    Joyce to Ms. Henckel. It's a fax dated
13    10.25.06.
14        If I can have that marked as Exhibit
15    No. 3.
16
17        (Exhibit 3, fax dated 10.25.06,
18        marked)
19
20    Q.    (By Ms. Wirkus) And can you
21 identify Exhibit No. 3 for me, please?
22    A.    Yes.
23    Q.    Okay. What is it?
24    A.    It's the fax that I got telling me

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

13 (Pages 46 to 49)

| Page 46 | Page 48 |
|---|---|
| 1 about the date today. | 1    Q.    Okay.  Mr. Crowther was -- |
| 2    Q.    And that was on 10.25.06? | 2        MS. WIRKUS:  Off the record. |
| 3    A.    Yes. | 3 |
| 4    Q.    And it was in regard to the | 4        (Off record discussion) |
| 5 deposition; is that right? | 5 |
| 6    A.    Yes. | 6        MS. WIRKUS:  Back on the record. |
| 7    Q.    Okay.  I'm going to go a little bit | 7    Q.    (By Mr. Wirkus)  You were referred |
| 8 out of order, so.  Okay. | 8 Mr. Crowther by Hanan and Joyce, correct? |
| 9        MS. WIRKUS:  If I could have marked | 9    A.    Correct. |
| 10 as Exhibit No. 4 a fax to Ms. Henckel and | 10    Q.    Did you receive any documentation |
| 11 also have the letter from my offices to | 11 from them referring you the case? |
| 12 Attorney Schmidt dated October 25, '06, and | 12    A.    No. |
| 13 a Re-notice of Deposition, which is also | 13    Q.    How did you receive the referral? |
| 14 dated October 25, 2006, please. | 14    A.    Think he called it in. |
| 15 | 15    Q.    Okay. |
| 16        (Exhibit 4, document, marked) | 16    A.    He called himself.  I believe.  I'm |
| 17 | 17 not positive. |
| 18    Q.    (By Ms. Wirkus)  If you could | 18    Q.    Okay.  He being Mr. Crowther? |
| 19 identify Exhibit No. 4 for me, please? | 19    A.    Mr. Crowther. |
| 20    A.    It's what you just said. | 20    Q.    And he said that he was referred by |
| 21    Q.    Okay.  And that was sent to you, | 21 Hanan and Joyce, correct? |
| 22 correct? | 22    A.    I believe that's -- |
| 23    A.    That was sent to me yesterday. | 23    Q.    So you don't think that you have any |
| 24    Q.    Okay.  Was yesterday the first time | 24 correspondence or paperwork? |

| Page 47 | Page 49 |
|---|---|
| 1 that you received notice of this deposition? | 1    A.    I know I don't have anything, no. |
| 2    A.    No. | 2    Q.    Okay. |
| 3    Q.    Okay.  So you had known about it | 3    A.    The only thing we got was with him. |
| 4 back in October, correct? | 4 He brought with him is the audiogram to fill |
| 5    A.    Yes.  About today's date? | 5 out. |
| 6    Q.    Yes. | 6    Q.    Okay.  Great.  And we'll go over |
| 7        And this deposition had been | 7 that.  That's contained in his report, correct? |
| 8 scheduled a couple of times and it's been | 8    A.    Yup. |
| 9 rescheduled for today, correct? | 9        MS. WIRKUS:  And you also brought in |
| 10    A.    Yes. | 10 your folder what I'm going to have marked |
| 11    Q.    Okay.  Other than those two pieces | 11 as Exhibit No. 5, please. |
| 12 of correspondence from Attorney Joyce's office, | 12        It's entitled noise-induced hearing |
| 13 do you have any other correspondence that you | 13 loss and it's dated October 27, 2002. |
| 14 received from Attorney Joyce's office? | 14        And it is four pages; is that right? |
| 15    A.    There may have been one more fax | 15        THE WITNESS:  Yes. |
| 16 because it was scheduled once between there. | 16        MS. WIRKUS:  Okay. |
| 17    Q.    Uh-huh. | 17 |
| 18    A.    There may have been another fax to | 18        (Exhibit 5, document dated October |
| 19 that extent. | 19 27, 2002) |
| 20    Q.    Okay. | 20 |
| 21    A.    Like this one I mean. | 21    Q.    (By Ms. Wirkus)  Could you identify |
| 22    Q.    Okay.  Just about the notice of | 22 Exhibit No. 5 for me and tell me what it is? |
| 23 deposition? | 23    A.    Yes, it's a printout that I got |
| 24    A.    Just about the notice. | 24 about noise-induced hearing loss by the American |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

14 (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|
| 1 College of Occupational and Environmental | 1     Q.    (By Ms. Wirkus) I'll show you |
| 2 Medicine. | 2 what's been marked Exhibit 6. |
| 3     Q.    Okay. And when did you get the | 3       And if you can identify that for the |
| 4 printout? | 4 record. |
| 5     A.    This actual copy I just got after I | 5     A.    It's from -- I'm not sure where it's |
| 6 learned about the deposition. | 6 from. I just printed it out in conjunction with |
| 7     Q.    And why did you get this particular | 7 employee testing I was doing at UMass, but also I |
| 8 publication? | 8 figured it might be relevant. |
| 9       In other words, why is it in your | 9       And it describes, what is testing. |
| 10 file about Mr. Crowther? | 10 What is audiometric testing. What is a baseline |
| 11     A.    Because it described his hearing | 11 audiogram or an annual audiogram. What is an |
| 12 loss. | 12 employer required to do following an audiogram |
| 13     Q.    Okay. His type of hearing loss; is | 13 evaluation. When is an employer required to |
| 14 that right? | 14 provide hearing protectors. What training is |
| 15     A.    His type of hearing loss, yes. | 15 required. What exposure and testing records must |
| 16     Q.    Okay. Did you have this article at | 16 employers keep. |
| 17 the time that you examined Mr. Crowther in | 17     Q.    And when did you print that out? |
| 18 November of 2002? | 18     A.    Within the last two or three |
| 19     A.    Not specifically, no. | 19 months. |
| 20     Q.    Okay. In fact, it was actually | 20     Q.    And are those documents documents |
| 21 published, it looks like, probably about a week | 21 that you utilized when you were testing Mr. |
| 22 and a half before his -- | 22 Crowther? |
| 23     A.    Before, yeah. | 23     A.    No. |
| 24     Q.    Okay. Thank you. | 24     Q.    And do you know where pages one and |

| Page 51 | Page 53 |
|---|---|
| 1       MS. WIRKUS: Okay. If I can have | 1 two of that set are? |
| 2 marked as Exhibit No. 6, please. It's a | 2     A.    No. |
| 3 series of documents. | 3     Q.    Okay. Thank you. |
| 4       The first is entitled, what is | 4     A.    I don't know where it came from. |
| 5 audiometric testing. | 5       MS. WIRKUS: I'm going to have |
| 6       The second is, what is baseline | 6 marked as Exhibit 7, please, a publication |
| 7 audiogram. | 7 entitled Study of Noise and Hearing in Jute |
| 8       Third is, what are annual | 8 Weaving. And it is dated December 14th of |
| 9 audiograms.    Forth is, what is an | 9 1964. |
| 10 employer required to do following an | 10 |
| 11 audiogram evaluation. | 11     (Exhibit 7, publication dated |
| 12       And next is, when is an employer | 12     December 14, 1964) |
| 13 required to provide hearing protectors. | 13 |
| 14       The next is, what training is | 14     Q.    (By Ms. Wirkus) I'll show you what |
| 15 required. | 15 has been marked as Exhibit No. 7. And you have a |
| 16       And next is, what exposure and | 16 copy as well, correct? |
| 17 testing records must employers keep. | 17     A.    Correct. |
| 18       And it goes from numbers -- page | 18     Q.    And can you identify that as well? |
| 19 three to page eight; is that correct? | 19     A.    Yes, it's an article about Study of |
| 20       THE WITNESS: Yes. | 20 Noise and Hearing in Jute Weaving. |
| 21       MS. WIRKUS: Okay. And that's all | 21     Q.    And what is jute weaving? |
| 22 Exhibit 6. | 22     A.    It's a weaving of -- jute is a |
| 23 | 23 fiber, so. |
| 24     (Exhibit 6, documents, marked) | 24     Q.    And is there a machine that's used |

**TOMMA HENCKEL**
**November 10, 2006**

15 (Pages 54 to 57)

Page 54

1  in jute weaving?
2  A.  No.
3  Q.  And why is that in Mr. Crowther's
4  file?
5  A.  Because I was looking for articles
6  about the effects of noise, long-term exposures
7  to noise on hearing.
8  Q.  Okay.  And in an occupational
9  setting.  Is that fair to say?
10  A.  Yes.
11  Q.  Do you know if Mr. Crowther was ever
12  involved in any jute weaving?
13  A.  No, I don't know.
14  Q.  Okay.
15  MS. WIRKUS:  Next exhibit I'm going
16  to have marked as Exhibit No. 8.  And this
17  is a series of sketches.  And it's entitled
18  graphs from ISO 1999, data.
19
20  (Exhibit 8, graphs from ISO 1999,
21  data, marked)
22
23  Q.  (By Ms. Wirkus)  And if you could
24  identify what Exhibit No. 8 is for me, please.

Page 55

1  A.  It's graphs from ISO 1999, data.
2  Q.  And you had mentioned off the record
3  that this was not a complete set of graphs; is
4  that right?
5  A.  Right, it's based on a study that
6  was done in our -- some students had done for
7  their -- I think it may have been a doctoral
8  thesis.  It might have been a master's thesis in
9  audiology.
10  Again, studying the effects of
11  long-term noise exposure, occupational noise
12  exposure.
13  Q.  And do you have the complete study
14  some place?
15  A.  I'm not sure I can get my hands on
16  it.
17  Q.  And is this a study that you
18  utilized in testing Mr. Crowther?
19  A.  No.
20  Q.  And why is that in Mr. Crowther's
21  file?
22  A.  Because I forgot to take it out.
23  No, because I had it in there given
24  to me by the same person who gave me the jute

Page 56

1  weaving article.
2  Q.  And who is that person?
3  A.  Faculty member on my -- in my
4  department.
5  Q.  Okay.  And did you discuss this
6  deposition with that faculty member?
7  A.  No.
8  Q.  Okay.  And what was his or her
9  name?
10  A.  Richard Fryman.
11  Q.  Okay.  Why did he give you the
12  article?
13  A.  Because I had just asked for studies
14  on the effects of noise exposure.
15  Q.  Okay.  And when did you ask him
16  that?
17  A.  Two months ago.
18  Q.  So sometime after receiving the
19  first Notice of Deposition?
20  A.  Mm-hmm.
21  MS. WIRKUS:  Okay.  Next I'm going
22  to have marked as Exhibit No. 9.  It's a
23  series of documents entitled Occupational
24  Safety and Health Standards.

Page 57

1  I don't know how to identify it so
2  I'll have Ms. Henckel identify it.
3  THE WITNESS:  I think that's what it
4  is.  Occupational Safety and Health
5  Standards.
6  MS. WIRKUS:  Okay.
7
8  (Exhibit 9, Occupational Safety and
9  Health Standards, marked)
10
11  Q.  (By Ms. Wirkus)  Okay.  I'll show
12  you what was marked as Exhibit 9.
13  You have a copy of that as well,
14  correct?
15  A.  Mm-hmm.
16  Q.  Okay.  And can you tell me what this
17  set of papers actually is?
18  A.  I was looking for materials on
19  occupational safety and health standards and what
20  permissible noise exposures were.
21  And in looking that up, this, I came
22  upon that.  So I just printed the whole thing
23  out.
24  Q.  Okay.

**TOMMA HENCKEL**
**November 10, 2006**

16 (Pages 58 to 61)

| Page 58 | Page 60 |
|---|---|
| 1    A.    But it's not necessarily -- | 1    A.    It's the Criteria for Recommended |
| 2    Q.    Okay. | 2  Standards for occupational noise exposure revised |
| 3    A.    Mostly for the graph in the front. | 3  1998, put out by US Department of Health and |

Page 58
1 A. But it's not necessarily --
2 Q. Okay.
3 A. Mostly for the graph in the front.
4 The permissible noise exposure graph.
5 Q. Okay. And you're referring to table
6 G-16, which is entitled permissible noise
7 exposure, correct?
8 A. Yes.
9 Q. Did you use this particular report
10 in examining Mr. Crowther?
11 A. No.
12 Q. And when did you print this off?
13 A. Two months ago.
14 Q. Okay. And, again, after receiving
15 the Notice of Deposition, correct?
16 A. Right, I believe so. Yes.
17 MS. WIRKUS: Okay. I'm going to
18 have marked Exhibit No. 10. And it's table
19 G-16, which is permissible noise exposure.
20 And I think that's actually the same graph
21 that was contained --
22 THE WITNESS: Yeah, right. And so I
23 was just kind of double checking it I
24 guess.

Page 59
1 MS. WIRKUS: Sure.
2 THE WITNESS: To make sure it was
3 accurate.
4
5 (Exhibit 10, table G-16, marked)
6
7 THE WITNESS: Maybe I figured out
8 how to print it alone without all the other
9 stuff.
10 Q. (By Ms. Wirkus) So the table that's
11 contained in Exhibit No. 10 is really what you
12 were looking at and looking to print, correct?
13 A. Right, correct.
14 MS. WIRKUS: And the last one I'm
15 going to mark is Exhibit 11. It's entitled
16 Criteria for Recommended Standard. And
17 it's dated June of 1998.
18
19 (Exhibit 11, Criteria for
20 Recommended Standard, marked)
21
22 Q. (By Ms. Wirkus) I'll show you
23 what's been marked as Exhibit No. 11.
24 Can you identify that?

Page 60
1 A. It's the Criteria for Recommended
2 Standards for occupational noise exposure revised
3 1998, put out by US Department of Health and
4 Human Services.
5 Q. Did you utilize that particular
6 publication in examining Mr. Crowther?
7 A. No.
8 Q. Okay. And did you also obtain that
9 about two months ago?
10 A. Yes, on the 13th of September.
11 Q. Okay. You're referring down to the
12 bottom corner?
13 A. Yes.
14 Q. And it's September 13 about 8.42
15 p.m. God bless you for working that late on this.
16 Okay. Did you provide any of the
17 publications that we've just gone over from your
18 file to Attorney Joyce's office?
19 A. No.
20 Q. Okay. And have they requested any
21 publications from you?
22 A. No.
23 Q. Have you, at any time, provided any
24 publications to them?

Page 61
1 A. No, except maybe the report.
2 Q. Okay. Just the report?
3 A. That's it.
4 MS. WIRKUS: Okay. Speaking of
5 which, I'm going to have marked as Exhibit
6 No. 12, a document entitled evaluation,
7 which is three pages. And also attached to
8 that is an audiogram. And a Hanan and
9 Joyce hearing test program sheet, a letter
10 to Mr. Crowther dated November 7, 2002.
11 And a letter to Hanan and Joyce dated
12 November 7, 2002. All as part of the same
13 Exhibit 12 packet.
14
15 (Exhibit 12, documents, marked)
16
17 Q. (By Ms. Wirkus) Ms. Henckel, I'll
18 show you what has been marked as Exhibit 12.
19 You also have a copy of that,
20 correct?
21 A. Yes.
22 Q. And this also came from your file;
23 is that right?
24 A. Correct.

# TOMMA HENCKEL
## November 10, 2006

17 (Pages 62 to 65)

Page 62

1    Q.    Okay. And this is the hearing
2  evaluation that you drafted in connection with
3  your examination of Mr. Crowther; is that
4  right?
5    A.    Correct.
6    Q.    I'm just going to ask you a couple
7  more questions before we specifically get to
8  Exhibit 12.
9        When you met with -- had you met Mr.
10  Crowther at any time before November 6, 2002?
11    A.    No.
12    Q.    You had mentioned earlier that you
13  examine employees at UMass.
14        Can you give me the context of those
15  examinations?
16    A.    Yeah, we do employee screenings for
17  people who are working in high-noise areas.
18    Q.    And do you have some sort of
19  contract with the employers or how does that work
20  that you do the screenings, if you know?
21    A.    I'm not sure to tell you the truth.
22  I guess we are the employer. I mean, in a way.
23  It's all part of the same.
24    Q.    Are you actually examining UMass

Page 63

1  employees?
2    A.    Mm-hmm, yes. Physical plant
3  services, landscapers.
4    Q.    Okay. So plant workers,
5  landscapers.
6        Any other employees that you can
7  think of that are screened?
8    A.    I don't know whether power plant,
9  anybody. Carpenters.
10    Q.    All individuals employed by UMass?
11    A.    Construction maybe. Yes.
12    Q.    I'm sorry. I didn't mean to
13  interrupt.
14    A.    That's okay.
15    Q.    So landscapers, people working in
16  physical plants or power plants, carpenters,
17  construction workers.
18        Any other employees that you can
19  think of?
20    A.    I'm not sure whether some
21  transportation services might --
22    Q.    Okay.
23    A.    -- have some people they send
24  over.

Page 64

1    Q.    Any railroad workers?
2    A.    No. UMass railroad.
3    Q.    UMass doesn't have a railroad.
4    A.    Buses, but not --
5    Q.    Okay. Prior to examining and/or
6  screening Mr. Crowther, had you ever screened any
7  other railroad workers before?
8    A.    I'm not sure.
9    Q.    Do you work with any other companies
10  providing screening services for any companies
11  other than UMass?
12    A.    In terms of occupational noise?
13    Q.    Yes. In other words, do you do
14  screenings for any other corporations?
15    A.    I don't think so; although, we would
16  if we had a contract.
17    Q.    Have you ever, prior to examining
18  Mr. Crowther, had you ever done any studies of
19  the noises that railroad workers were exposed
20  to?
21    A.    No.
22    Q.    Have you ever reviewed any studies
23  of railroad workers prior to examining Mr.
24  Crowther?

Page 65

1    A.    I'm not sure. I mean, it may have
2  been as part of a hearing conservation class that
3  that came up.
4    Q.    Okay. But you don't specifically
5  remember any?
6    A.    No.
7    Q.    Have you ever served as an expert
8  witness before?
9    A.    No.
10    Q.    Congratulations.
11        And do you know what you are being
12  paid by Hanan and Joyce to serve as an expert?
13    A.    No.
14    Q.    Have you had any discussions with
15  them about payment?
16    A.    No.
17    Q.    How far did you travel to get here
18  today?
19    A.    25 miles, one way.
20    Q.    Thank you.
21        Again, have you been paid anything
22  from Hanan and Joyce to date?
23    A.    I am not sure. I think our office
24  may have gotten something from handling the

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

18 (Pages 66 to 69)

<table>
<tr><td colspan="2">

Page 66

1  report, sending them the report, but I'm not
2  positive.
3      Q.    Who would be in charge of handling
4  those kinds of payments?
5      A.    Our secretary.
6      Q.    And what's her name?
7      A.    Tyra Hutchinson.
8      Q.    And is she at the same address?
9      A.    Yes.
10     Q.    Okay.  Have you worked with Hanan
11  and Joyce on any other testing or evaluations
12  other than Mr. Crowthers?
13     A.    I believe so.
14     Q.    Who would know that for sure, do you
15  know?
16     A.    They might.  I'm not sure.
17     Q.    Okay.  Is there somebody in your --
18     A.    I don't know how I would go looking
19  for it either because I don't know where -- you
20  know, when it would have happened.
21     Q.    Okay.
22     A.    So in terms of our record-keeping.
23     Q.    Yeah, I think that's what I'm
24  getting at.

</td><td colspan="2">

Page 68

1  big one for us.  Referrals by physicians,
2  referrals by schools.
3      Q.    Okay.
4      A.    Phone book, I guess.
5      Q.    Okay.
6      A.    But we're working on increasing the
7  marketing a little bit.
8      Q.    Okay.  Do you accept insurance?
9      A.    Yes.
10     Q.    Okay.  What types of insurance do
11  you accept, if you know?
12     A.    I know Medicare.  I believe Tufts,
13  Blue Cross/Blue Shield.  Health New England.  GIC
14  or CIP or whatever they call themselves now.
15     Q.    I know, they change every month.
16  Okay.
17     A.    There might be a few more.  I'm not
18  sure.
19     Q.    What would you say the percentages
20  are of the UMass employees that you screen verses
21  the public?
22     A.    Oh, small.
23     Q.    Small amount of employees?
24     A.    It's just a very -- I mean, it's a

</td></tr>
<tr><td colspan="2">

Page 67

1            As far as, is there any way of
2  recording how patients are referred to you?
3      A.    No.  Not yet.
4      Q.    Not yet.  Okay.
5            Is there any way of even segregating
6  patients that you see from UMass verses other
7  patients?
8      A.    No.
9            Take that back.
10           Employees, yes.  I keep those
11  separate.  The UMass employees I keep separate,
12  but, otherwise, anybody who walks in --
13     Q.    Okay.
14     A.    -- has the same file.
15     Q.    Tell me exactly what the make-up of
16  your patients is.  Obviously we've gone over that
17  you do see UMass employees for screenings.
18           What other type of patients do you
19  see?
20     A.    Public.  Lot of people from
21  on-campus or off-campus for children, adults.
22     Q.    Okay.  How are they referred to
23  you?
24     A.    Various ways.  Word of mouth is a

</td><td colspan="2">

Page 69

1  very specific -- and it goes in cycles, so.
2      Q.    Okay.
3      A.    And it's really quick.  So it's
4  not even -- in terms of the time, it's not a
5  big --
6      Q.    Okay.  So the screening is different
7  than the evaluation you would do for a patient?
8      A.    Definitely.
9      Q.    Okay.  And would you say it's less
10  than 10% or more than 10%?
11     A.    Less.
12           In terms of time spent or people?
13     Q.    In terms of patient make-up.
14     A.    Probably still less than 10%, yes.
15     Q.    Okay.  The rest is made up of a
16  variety of the general public from different
17  referral sources, correct?
18     A.    Yes.
19     Q.    Do you often work with law firms in
20  receiving referrals from law firms of potential
21  plaintiffs or patients?
22     A.    No.
23     Q.    Do you know of any other besides
24  Hanan and Joyce?

</td></tr>
</table>

**TOMMA HENCKEL**
**November 10, 2006**

19 (Pages 70 to 73)

Page 70

1      A.    No.
2      Q.    Okay.  Do you recall how many
3   patients you've treated other than Mr. Crowther
4   on behalf of Hanan and Joyce?
5      A.    No, I just know the name sounded
6   familiar.  So I think one or two others maybe.  I
7   really don't know.
8      Q.    Okay.  I'm actually going to refer
9   your attention to page -- it would be, I guess,
10  five assuming that I copied it in the same order
11  that it came in of the packet, which we've
12  labeled as Exhibit No. 12.  And that's labeled
13  Hanan and Joyce hearing test program it looks
14  like.  Is that correct?
15     A.    Yeah, I don't know what the hole
16  punch took out there.  Test.  I don't know,
17  yeah.
18     Q.    So what it looks like is, when it
19  was copied, there had been a prior hole punch
20  there.  And the hole punch took out whatever the
21  wording was on top?
22     A.    Right.
23     Q.    Okay.  And this is in connection
24  with Mr. Crowther, correct?

Page 71

1      A.    Correct.
2      Q.    Okay.  And you had testified earlier
3   that he brought this test with him; is that
4   correct?
5      A.    He brought the blank form with
6   him.
7      Q.    Okay.  So had he filled out any of
8   the information on the form?
9      A.    No.
10     Q.    And is that your handwriting on the
11  form?
12     A.    No.
13     Q.    Whose handwriting is that?
14     A.    It's my students handwriting.
15     Q.    And what is her name?
16     A.    Natalie Sitco.  (Phonetic).
17     Q.    And her name is also in this report,
18  correct?
19     A.    Correct.
20     Q.    And her title is graduate clinician;
21  is that right?
22     A.    Right.
23     Q.    And you worked in connection with
24  her on this particular evaluation; is that right?

Page 72

1      A.    Yes.
2      Q.    Did she perform the audiologic
3   evaluation on Mr. Crowther?
4      A.    Yes.
5      Q.    Is it typical that somebody brings
6   in their own hearing test form, their own audio
7   form?
8      A.    It's not typical, but it's not
9   unusual either.  Depends on what -- some places
10  have their own forms for whatever reasons.
11     Q.    Yeah.  Do you know what the reason
12  is for this form?
13     A.    I think maybe to make sure that the
14  things that are on there get done and get filled
15  out.
16     Q.    Okay.  So, in other words, to make
17  sure that --
18     A.    All these subtests are completed.
19     Q.    Okay.  And let me go over it piece
20  by piece.
21           The first portion of it is, of
22  course, just the information.  The patient's name
23  and address, telephone number, Social Security
24  number, so on and so forth, correct?

Page 73

1      A.    Yes.
2      Q.    And, on this particular form, which
3   is prepared by Hanan and Joyce, it also has a
4   place for a particular railroad; is that right?
5      A.    Yes.
6      Q.    On the top of the form?
7      A.    Yes.
8      Q.    And in this form it's written CSX;
9   is that correct?
10     A.    Yes.
11     Q.    And there's also a portion that says
12  union on it.
13           And that's left blank; is that
14  right?
15     A.    Yes.
16     Q.    All right.  And there is information
17  in the center of the form that's entitled
18  audiological evaluation; is that right?
19     A.    Yes.
20     Q.    Okay.  And that deals with threshold
21  testing and frequencies, correct?
22     A.    Correct.
23     Q.    And in this particular form, this is
24  filled out; is that right?

**TOMMA HENCKEL**
**November 10, 2006**

20 (Pages 74 to 77)

| | Page 74 |
|---|---|

1    A.    (Nonverbal response.)
2    Q.    It was done by Natalie; is that
3 right?
4    A.    Yes.
5    Q.    And what does this particular graph
6 demonstrate to you?
7    A.    It demonstrates that his thresholds
8 in the lower frequencies, from 250 to 2,000
9 hertz, are borderline normal.
10    Q.    Okay.
11    A.    What we consider borderline normal.
12        And our -- show a hearing loss and
13 up to a moderate hearing loss worse at 4,000
14 hertz with some recovery in the higher pitches
15 for both ears symmetrically.
16    Q.    Moderate hearing loss.  And that
17 would be compared to a severe or a mild hearing
18 loss, correct?
19    A.    Correct.
20    Q.    So it would be --
21    A.    Moderate to severe.
22    Q.    A moderate to severe.
23    A.    I think at 4,000 it would be
24 considered moderate to severe.

| | Page 75 |
|---|---|

1    Q.    And what do you mean by at 4,000?
2    A.    At that particular pitch
3 frequency.
4    Q.    Okay.
5    A.    Where it's worse.
6    Q.    So, in other words, he's having
7 difficulty hearing at that particular pitch,
8 correct?
9    A.    He's having the most difficulty
10 hearing at that pitch.
11    Q.    Okay.  He's also having some
12 difficulty hearing at 3,000 and at 2,000 or,
13 actually, between 2,000 and 3,000; is that
14 correct?
15    A.    Yeah, and at 6 and 8 as well.
16    Q.    And the 6 and 8 he starts to recover
17 a bit, but still there's some hearing loss?
18    A.    Right.
19    Q.    Okay.  And, in your opinion, is that
20 consistent with occupational hearing loss?
21    A.    With noise-induced hearing loss.
22    Q.    Okay.  Noise-induced hearing loss?
23    A.    Yes.
24    Q.    Okay.  And why is that consistent

| | Page 76 |
|---|---|

1 with noise-induced hearing loss?
2    A.    Because, classically, noise-induced
3 hearing loss starts out relatively normal in the
4 low frequency, goes down, and gets -- is worst at
5 around 4,000.  It can sometimes be -- or 3 or
6 6,000, but then recovers in the even higher
7 frequencies.
8    Q.    Okay.  Is there any other type of
9 hearing loss other than noise-induced hearing
10 loss that you'd see similar results?
11    A.    No.
12    Q.    Okay.  It's only in noise-induced
13 hearing loss?
14    A.    Right.
15    Q.    Also, on this form.  There is space
16 that says speech threshold.
17        And it looks like for the right ear
18 and the left ear; is that correct?
19    A.    Correct.
20    Q.    And also discrimination score.
21        And that's for the right ear and the
22 left ear, correct?
23    A.    Right.
24    Q.    Okay.  What are the results of Mr.

| | Page 77 |
|---|---|

1 Crowther's speech threshold testing?
2    A.    They are 20 for each ear.
3    Q.    Okay.
4    A.    20 decibels.
5    Q.    And what does that indicate to
6 you?
7    A.    It indicates that he recognizes
8 familiar words that he was taught before.
9    Q.    Okay.
10    A.    At the same threshold as the
11 pure-tone -- the best pure-tone thresholds.
12    Q.    All right.  And does that mean that
13 he has difficulty with speech threshold or not?
14    A.    It's relatively normal as long as
15 he's pre-taught them.  I mean, the words that are
16 familiar to him, two-syllable words.
17    Q.    Okay.  So that test came out
18 relatively normal, correct?
19    A.    Yup.
20    Q.    And what does the discrimination
21 score indicate to you?  It's a 96% in the right
22 ear and a 92% in the left ear.
23    A.    It indicates that he understood 96%
24 or 92% of the words, random one-syllable words

**TOMMA HENCKEL**
**November 10, 2006**

21 (Pages 78 to 81)

| Page 78 | Page 80 |
|---|---|
| 1 presented in quiet at a little bit louder than | 1     Q.    Prior to evaluating Mr. Crowther, |
| 2 normal conversational level. | 2 had you done a significant amount of work in |
| 3     I'm sorry. It doesn't indicate this | 3 relation to noise-induced hearing loss? |
| 4 on this form. | 4     A.    I have seen a lot. I had seen a lot |
| 5     Q.    What's it indicate on this form? | 5 of people who have. |
| 6     A.    Just that he heard the words 96% and | 6     Q.    Okay. |
| 7 92% correct. | 7     A.    Similar. |
| 8     Q.    So he heard a little bit more in his | 8     Q.    What kind of training did you |
| 9 right ear than he did in his left ear, correct? | 9 receive in connection with evaluating |
| 10     A.    Well, not significant. | 10 noise-induced hearing loss? |
| 11     Q.    Okay. Those numbers, 96% and 92%, | 11     A.    It's part of the general training to |
| 12 is that relatively normal? | 12 tease that apart from other hearing losses. |
| 13     A.    Yes. | 13     Q.    Okay. And was that part of your |
| 14     Q.    And what does the speech threshold | 14 course work while you were getting your |
| 15 and discrimination score tell you as far as | 15 master's? |
| 16 noise-induced hearing loss, anything? | 16     A.    Yes. |
| 17     A.    Nothing. | 17     Q.    Okay. And did you take any |
| 18     Q.    They're not relevant to an | 18 continuing education courses in that area of |
| 19 evaluation of noise-induced hearing loss. | 19 noise-induced hearing loss? |
| 20     Is that fair to say? | 20     A.    Before this? |
| 21     A.    Correct. | 21     Q.    Yes, before this. |
| 22     Q.    Okay. | 22     A.    After I graduated. I'm not sure. |
| 23     A.    Doesn't rule it out. | 23     Q.    Do you remember any specifically? |
| 24     Q.    Prior to examining Mr. Crowther -- | 24     A.    I remember, you know, during my |

| Page 79 | Page 81 |
|---|---|
| 1 I'm sorry. Let me back up. Strike that | 1 master's degree a hearing conservation course. |
| 2 question. | 2     Q.    When you say hearing conservation, |
| 3     This evaluation was done by your | 3 what do you mean by that? What is hearing |
| 4 student Natalie Sitco, correct? | 4 conservation? |
| 5     A.    Correct. | 5     A.    Hearing conservation is about the |
| 6     Q.    Okay. Was it done under your | 6 effects of noise, noise-induced hearing loss. |
| 7 supervision? | 7 How to prevent it. How to measure noise in terms |
| 8     A.    Absolutely. | 8 of an environment. |
| 9     Q.    And by under your supervision, does | 9     Q.    And you had taken a class on that in |
| 10 that mean you were standing with her while she | 10 your master's program, correct? |
| 11 was performing the test? | 11     A.    Yes. |
| 12     A.    I was right next to her. | 12     Q.    And since your master's program up |
| 13     Q.    Did you assist her in actually | 13 until the time that you examined Mr. Crowther in |
| 14 preparing the audiogram? | 14 2002, had you taken any other courses in |
| 15     A.    Yes. | 15 noise-induced hearing loss or hearing |
| 16     Q.    And did you assist her in rating the | 16 conservation? |
| 17 threshold numbers and the discrimination score? | 17     A.    I don't think so. |
| 18     A.    In terms of? | 18     Q.    Had you received any additional |
| 19     Q.    When she arrived at these numbers? | 19 training in hearing conservation or noise-induced |
| 20     A.    She ran them by me. I was with | 20 hearing loss since your master's? |
| 21 her. | 21     A.    Not specifically. |
| 22     Q.    Okay. And you approved all this | 22     Q.    Okay. And have you conducted any of |
| 23 information; is that correct? | 23 your own studies since the time of your master's |
| 24     A.    Yes. | 24 to the time that you examined Mr. Crowther in |

**TOMMA HENCKEL**
**November 10, 2006**

22 (Pages 82 to 85)

| | |
|---|---|
| **Page 82** | **Page 84** |

**Page 82**

1  2002?
2      A.    No.
3      Q.    Have you reviewed any particular
4  studies in relation to noise-induced hearing loss
5  or hearing conservation from the time that you
6  graduated to the time that you treated Mr.
7  Crowther?
8      A.    Yes, but I can't be more specific
9  than that.
10     Q.    You don't remember which they are?
11     A.    (Nonverbal response.)
12     Q.    Okay. Fair enough.
13     A.    The other thing is --
14     Q.    Sure.
15     Q.    If I could add something?
16     Q.    Of course.
17     A.    One of my placements during my
18  master's program was on the -- on the mobile van
19  that did provide some of those hearing tests as
20  well. And it was also a hands-on component to
21  that.
22     Q.    And when did you do that, if you can
23  remember?
24     A.    1991. Fall of 1991.

**Page 84**

1  Hanan and Joyce at some point?
2      A.    Yes. I'm not sure. I only sent it
3  once.
4      Q.    Okay. Do you know where you sent it
5  to?
6      A.    It must have been to you.
7      Q.    Okay. I actually received that
8  resume from Hanan and Joyce.
9      A.    Okay. Then I did send it to them.
10     Q.    Okay. So you think you sent it to
11  Hanan and Joyce; is that right?
12     A.    Yeah, I remember somebody asking for
13  it.
14     Q.    Okay. Do you remember the
15  conversation that you would have had with
16  somebody about your resume?
17     A.    I don't think there was any
18  conversation. It was writing a fax request.
19     Q.    Do you have a copy of that
20  request?
21     A.    No.
22     Q.    And do you know when that request
23  was made?

**Page 83**

1      Q.    And what facility did you work
2  for?
3      A.    Mercy Hospital.
4          MS. WIRKUS: Can we have marked as
5  Exhibit No. 13.
6          This is a resume for Tomma Henckel
7  and it's two pages.
8          THE WITNESS: It's been updated. It
9  looks much nicer now.
10         MS. WIRKUS: I'll ask you about
11  that.
12         THE WITNESS: Hasn't changed the
13  information, just looks.
14
15         (Exhibit 13, resume, marked)
16
17     Q.    (By Ms. Wirkus) If I could refer
18  you to Exhibit 13.
19         Is that your current resume?
20     A.    Yes.
21     Q.    Okay.
22     A.    Let me make sure.
23         Yes.
24     Q.    And did you provide that resume to

**Page 85**

1      A.    Sometime after the original
2  subpoena. I don't think it's in here at all.
3      Q.    This looks like it's a fax that's
4  dated August 17, 2006.
5      A.    So it would be the same. That's
6  when I received the subpoena. So it was the same
7  day. Yes.
8      Q.    Okay. Thank you.
9          Now, the mobile hearing test van
10  that you're referring to is on your resume.
11         And that was from September to
12  December of 1991; is that correct?
13     A.    Correct.
14     Q.    Okay. And what kind of testing did
15  you do in the mobile van?
16     A.    For the employees?
17     Q.    Yes.
18     A.    Pure-tone hearing testing, air
19  conduction. So screening.
20     Q.    A screening?
21     A.    Standard employee screenings.
22     Q.    And what sort of employees did you
23  screen?
24     A.    I'm not sure.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# TOMMA HENCKEL
## November 10, 2006

23 (Pages 86 to 89)

Page 86

1   Q.   Okay.
2   A.   Just sort of went around.
3   Q.   Okay. You just traveled in the van
4 and whoever came in you tested?
5   A.   Yeah, we didn't just do employees.
6 We went to different places, but part of it
7 was -- some of them were employee screenings.
8   Q.   Okay. Do you know if you tested any
9 railroad workers during that time?
10   A.   I don't know.
11   Q.   Do you specifically remember going
12 to any railroad yards or railroad tracks?
13   A.   I don't.
14   Q.   Okay. I'm going to show you what's
15 actually page four of Exhibit 12. If I could
16 refer your attention to that.
17       That is a set of tests that's
18 actually on the University of Massachusetts
19 stationary; is that correct?
20   A.   Correct.
21   Q.   Could you explain those tests for
22 me, please?
23   A.   The audiogram.
24   Q.   Okay.

Page 87

1   A.   With the graph is the same that I
2 described before, which describes the pure-tone
3 thresholds.
4   Q.   And that's the exact same graph that
5 we just went over that --
6   A.   It's exactly duplicated on the other
7 form.
8   Q.   Okay. And is this your handwriting
9 on this particular set of tests?
10   A.   No.
11   Q.   Whose handwriting is this?
12   A.   Natalie Sitco's.
13   Q.   And that's just a duplicate and it
14 shows the exact same thing that we just went over
15 on the prior form, correct?
16   A.   Right.
17   Q.   And what else is on this?
18   A.   Below that is the speech audiometry,
19 which has the speech reception of 20, same as the
20 other form.
21   Q.   Okay.
22   A.   Then the speech discrimination
23 scores, which are indicated 96 and 92%, just like
24 the others.

Page 88

1   Q.   And what else is on the form?
2   A.   It also indicates what level -- what
3 presentation level we obtained those scores. It
4 says 40 above them.
5       So it means that we went above the
6 20, which was the threshold. So at 60 decibels
7 we presented.
8       That's what he got when he got these
9 scores.
10   Q.   Okay.
11   A.   Which is a little bit louder than
12 normal conversation on speech level. Then we
13 have a tympanogram, which indicates middle ear
14 function.
15   Q.   Okay. And what were the results of
16 that test?
17   A.   Normal.
18   Q.   Okay. Anything else?
19   A.   Then we have the acoustic reflexes
20 and the pedia reflex (phonetic) thresholds.
21   Q.   And what do those tests reflect?
22   A.   They reflect the muscle reflexes in
23 the middle ear system.
24       And they are normal for this type of

Page 89

1 hearing loss.
2   Q.   Okay. And what else?
3   A.   And then the pure-tone average,
4 which is just averaging out the pure-tone
5 thresholds at 500, 1,000, and 2,000, which is a
6 standard that is used.
7   Q.   The reflex threshold. You said it
8 was normal for this type of hearing loss.
9       In other words, does that also
10 reflect some noise-induced hearing loss?
11   A.   It reflects some hearing loss at
12 4,000 hertz.
13   Q.   So it doesn't necessarily tell you
14 it's noise induced. Is that fair to say?
15   A.   Yes, correct.
16   Q.   And as far as the speech audiometry.
17       Those test indicate that Mr.
18 Crowther was able to hear at a little bit higher
19 than normal conversation level?
20   A.   Mm-hmm. In quiet.
21   Q.   In quiet.
22       So there was no background noise?
23   A.   Correct.
24   Q.   And you said that that doesn't have

TOMMA HENCKEL
November 10, 2006

24 (Pages 90 to 93)

Page 90

1  any bearing on noise-induced hearing loss; is
2  that correct?
3      A.    Yeah, it's not indicative of whether
4  it's noise or not.
5      Q.    Is it indicative of some sort of
6  hearing loss though?
7      A.    No.
8      Q.    So is that still within a normal
9  range?
10     A.    Yes.
11          Can I add one more thing?
12     Q.    Yes, of course.
13     A.    To the pedia reflex threshold.
14     Q.    Sure.
15     A.    The one thing I can see out of this,
16 because the reflexes are normal, is that it's a
17 cochlear loss. In other words, it's a loss in
18 the hearing organ as opposed to a neuro loss,
19 which is higher up.
20     Q.    Okay. And what does that indicate
21 to you?
22     A.    It indicates that the damage is not
23 to any neurological --
24     Q.    Okay.

Page 91

1      A.    -- damage.
2      Q.    Okay. And is that typically
3  associated with noise-induced hearing loss or is
4  that just anybody with hearing loss can have
5  either one of the neurological or the inner ear
6  loss?
7      A.    Anyone with hearing loss can have
8  both, but a noise-induced hearing loss is always
9  cochlear. So if it were a neuro loss then I
10 would know it's not -- at least not purely noise
11 induced, so.
12     Q.    Yet, people who have just regular
13 hearing loss, not noise induced, can also have
14 cochlear?
15     A.    Cochlear, yes.
16     Q.    Okay. Just getting back to the
17 first form that we took a look at. That was the
18 Hanan and Joyce form.
19          Have you ever seen a law firm who
20 gives a potential patient this kind of a form
21 before?
22     A.    I haven't seen a law firm that I
23 know of.
24     Q.    Okay. Maybe you might have seen

Page 92

1  Hanan and Joyce, but you can't remember?
2      A.    Right.
3      Q.    So you've never seen a law firm hand
4  one of their clients a form like this to bring to
5  your office. Is that fair to say? Other than
6  this form.
7      A.    Yes. But I know other people do
8  have their own forms for whatever reasons.
9      Q.    And by other people, what do you
10 mean by other people?
11     A.    It might be employers themselves.
12     Q.    Okay.
13     A.    If they send people or insurance
14 companies. I know some people -- maybe even
15 schools that may have their own form that they
16 want to --
17     Q.    Okay. When Mr. Crowther came in to
18 meet with you, did you take some sort of history
19 from him?
20     A.    Yes.
21     Q.    And how did you go about the process
22 of taking a history?
23     A.    My student and I interviewed him
24 directly.

Page 93

1      Q.    And do you have a particular form
2  that you use when interviewing patients?
3      A.    No.
4      Q.    Do you interview patients with
5  suspected noise-induced hearing loss differently
6  than you would a regular patient?
7      A.    No.
8      Q.    So it's the same interview that you
9  always give?
10     A.    Well, interview is more fluid than
11 that. It depends a little bit on the complaints
12 they come in with. So if that's a topic they
13 bring up we might spend more time on that.
14     Q.    In your evaluation you note that Mr.
15 Crowther was referred by Hanan and Joyce and that
16 he had recently been screened at work, which is
17 CSX, for whom he had worked for 27 years and
18 wanted to follow-up with those screening results.
19          So did that indicate to you that
20 this was a possible noise-induced hearing loss?
21     A.    The railroad part did. I have to
22 say, I did not know what Hanan and Joyce was.
23     Q.    Okay.
24     A.    As a referral service. I had no

**TOMMA HENCKEL**
**November 10, 2006**

Page 94

1  idea that it was an attorney's office or
2  anything.
3      Q.   Okay.  So all you knew is that he
4  had worked for the railroads for a long time?
5      A.   Yes.
6      Q.   Okay.  So did that make you
7  instantly suspect that perhaps there is a
8  noise-induced component that you should be
9  looking for?
10     A.   I'm not sure that that came up
11  before his complaint.  His complaint.  That he
12  may have brought up the noise before he brought
13  up where he was employed himself.  So I'm not
14  sure.
15     Q.   All right.  Just by reason of the
16  fact that -- let's take it as a hypothetical.
17      If he had told you that he had been
18  working for a railroad for the past 27 years and
19  he was having, not even specifically describing
20  symptomatolgy, but describing some sort of
21  hearing loss.
22      Would that make you think, just
23  because of his history at the railroad for 27
24  years, would you suspect noise-induced hearing

Page 95

1  loss?
2      A.   I would always consider it during my
3  testing.
4      Q.   Okay.
5      A.   But I do that with probably anybody
6  anyway.
7      Q.   Oh, sure.  I understand that.
8      Okay.  You went over, to some
9  extent, what Mr. Crowther's background was,
10  correct?  In connection with his employment; is
11  that correct?
12     A.   Correct.
13     Q.   Okay.  And that information is
14  included in his background information.  And I'm
15  just going to read it out loud for the record.
16      And it states that Mr. Crowther
17  worked in the engineering department at CSX
18  Railroad up until about ten years ago.
19      He built tracks and made repairs.
20  He now works as a welding foreman.  He is often
21  around loud construction equipment.  He also uses
22  company radios frequently.  The radios are also
23  very loud.
24      Just taking those portions.  I'm

Page 96

1  going to go step by step.
2      First of all, did I read that
3  correctly?
4      A.   Yes.
5      Q.   Have you ever been in the
6  engineering department of CSX Railroad?
7      A.   No.
8      Q.   And have you ever been around any
9  railroad track workers?
10     A.   No.
11     Q.   Okay.  While they are doing their
12  job?
13     A.   No.
14     Q.   And have you ever been around
15  railroad workers while they are making repairs
16  other than, like, passing by in your car?
17     A.   No.
18     Q.   Okay.
19     A.   Train tracks go behind my house.
20     Q.   Okay.  You also note that he's now
21  working as a welding foreman?
22      What did you understand his
23  responsibilities to be as a welding foreman?
24      Let me phrase it another way.

Page 97

1      Do you understand what he did as a
2  welding foreman?
3      A.   I assumed he was responsible for a
4  group of people who were welding tracks,
5  including himself.
6      Q.   Okay.  And do you know whether he
7  actually participated in any of the welding?
8      A.   No, I don't know for sure.
9      Q.   Okay.  Do you remember whether you
10  asked him that or not?
11     A.   No.
12     Q.   You also state that he's often
13  around loud construction equipment; is that
14  correct?
15     A.   Correct.
16     Q.   Do you know what particular
17  construction equipment he was around?
18     A.   No.
19     Q.   Did you ask him what kind of
20  construction equipment?
21     A.   I don't remember.
22     Q.   And how do you know that it was loud
23  construction equipment?
24     A.   This is all based on his report.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# TOMMA HENCKEL
## November 10, 2006

26 (Pages 98 to 101)

**Page 98**

1  Q.   So it's everything he told you?
2  A.   Everything he said.
3  Q.   Do you know how often he was around
4  loud construction equipment?
5  A.   No.
6  Q.   It also states he uses company
7  radios frequently.  The radios are also very
8  loud, correct?
9  A.   Correct.
10  Q.   Did you ever listen to the radios
11  that he listened to?
12  A.   No.
13  Q.   And do you know specifically how
14  loud the radios were?
15  A.   No.
16  A.   No.
17      That information came specifically
18  from Mr. Crowther, correct?
19  A.   Yes.
20  Q.   Okay.  It also goes on to say in
21  relation to his hearing protection.
22      That it was not until the 1990s when
23  CSX started screening their employees hearing and
24  providing ear protection.

**Page 99**

1      Were you familiar with CSX's hearing
2  loss protection program or hearing conservation
3  program?
4  A.   No.
5  Q.   No.  Okay.
6      Did that information also come from
7  Mr. Crowther?
8  A.   Yes.
9  Q.   Okay.  Also, Mr. Crowther reported
10  that he wears ear plugs at work about 50% of the
11  time that he spends in loud noise.
12      Again, that came from Mr.
13  Crowther?
14  A.   Yes.
15  Q.   You never observed him using hearing
16  protection; is that fair to say?
17  A.   Yes.
18  Q.   Okay.  Once again, you've never done
19  any studies in connection with noise-induced
20  hearing loss in railroad workers; is that
21  correct?
22  A.   Correct.
23  Q.   Have you ever reviewed any studies
24  relative to railroad employees or workers and

**Page 100**

1  noise-induced hearing loss?
2  A.   I'm not sure.
3  Q.   Okay.  Do you know if on the time or
4  right before the time that you examined Mr.
5  Crowther in November of 2002, whether or not you
6  had reviewed any kind of studies as they relate
7  to railroad workers and noise-induced hearing
8  loss?
9  A.   Same answer.
10  Q.   You don't remember?
11  A.   I don't remember.
12  Q.   Okay.  Did Mr. Crowther bring with
13  him that hearing test that he was referring to
14  that was performed by CSX?
15  A.   No.
16  Q.   Other than the form that was -- that
17  Hanan and Joyce audiogram form, did he bring
18  anything with him at all?
19  A.   No.
20  Q.   And is it your typical practice to
21  review medical records or medical histories as
22  they relate to hearing loss or alleged hearing
23  loss in connection with your examination of a
24  patient?

**Page 101**

1  A.   If they bring it.  We do generally
2  ask them to bring background information.
3      I'm not sure it was done in this
4  particular case.
5  Q.   But usually you do ask somebody if
6  they have other results, bring them with you?
7  A.   Yes.
8      MS. WIRKUS:  Okay.  If you don't
9  mind, I'm just going to take a two-minute
10  break to use the lady's room if that's
11  okay.
12
13      (Break taken)
14
15      MS. WIRKUS:  Back on the record.
16  Q.   (By Ms. Wirkus)  Okay.  Do you know
17  when Mr. Crowther started experiencing his
18  symptoms?
19  A.   Nope.
20  Q.   You also went through a bit of
21  family history with him; is that correct?
22  A.   Yes.
23      Well, in terms of?
24  Q.   Just sort of a general background

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**TOMMA HENCKEL**
**November 10, 2006**

27 (Pages 102 to 105)

| Page 102 |
| --- |

1  which related to his --
2      A.    Yeah.
3      Q.    -- condition.
4          And you state that he does complain
5  sometimes -- that his kids complain sometimes
6  that the TV is on too high; is that right?
7      A.    Mm-hmm.
8      Q.    Okay. And that he reported having
9  some difficulty hearing in the presence of
10  background noise. Is that fair to say?
11      A.    Yes.
12      Q.    And that often times he doesn't hear
13  names?
14      A.    Mm-hmm.
15      Q.    Okay. And in regard to his specific
16  symptoms.
17          Mr. Crowther states that he had been
18  experiencing tinnitus for a few years; is that
19  right?
20      A.    Right.
21      Q.    Okay. What is tinnitus?
22      A.    It is a ringing in the ears.
23      Q.    And is tinnitus indicative of
24  noise-induced hearing loss?

| Page 103 |
| --- |

1      A.    Yes.
2      Q.    Okay. Is tinnitus indicative of
3  other types of hearing loss?
4      A.    Possibly.
5      Q.    Mr. Crowther states his tinnitus has
6  been going on for a few years.
7          Do you know how many years?
8      A.    No.
9      Q.    But that it had been constant and in
10  both ears; is that right?
11      A.    Yes.
12      Q.    And is that type of tinnitus, which
13  is constant as opposed to intermittent, more
14  indicative of noise-induced hearing loss?
15      A.    Yes; although, not necessarily, but
16  yes. Yes.
17      Q.    Okay. And he reports that he had
18  been having equilibrium problems for a few years;
19  is that correct?
20      A.    Correct.
21      Q.    Is that indicative of a
22  noise-induced hearing loss?
23      A.    No.
24      Q.    It's not.

| Page 104 |
| --- |

1          And you also went over his medical
2  history. To a certain extent, he didn't seem to
3  have much of a history, correct?
4      A.    Right.
5      Q.    And, again, this is all based on his
6  reports?
7      A.    Absolutely, yes.
8      Q.    And then you go through a
9  description of the tests that were administered;
10  is that correct?
11      A.    Mm-hmm.
12      Q.    And then also your assessment; is
13  that right?
14      A.    Right.
15      Q.    And the assessment is basically a
16  description of what the test results were. Is
17  that fair to say?
18      A.    Right, my interpretation.
19      Q.    Okay.
20          MS. WIRKUS: Can we have marked as
21  Exhibit No. 14. This is a Conrail report
22  of screening event. And it's dated
23  5.25.84.
24

| Page 105 |
| --- |

1          (Exhibit 14, Conrail report dated
2  5.25.84, marked)
3
4      Q.    (By Ms. Wirkus) Ms. Henckel, take a
5  look at that for me, please.
6          Have you ever seen that document
7  before?
8      A.    No.
9      Q.    And could you describe to me, the
10  top is the results of an audiogram, I assume; is
11  that correct?
12      A.    Yes, not in graph form, but in
13  numerical form.
14      Q.    Okay. So it's a chart; is that
15  right?
16      A.    Yes.
17      Q.    Okay. And could you take a look at
18  the numbers that are indicated on the chart and
19  tell me whether any of those numbers are
20  reflective of hearing loss at any thresholds?
21      A.    No, they are within normal limits.
22      Q.    Okay. And if you look at the bottom
23  of the page, Mr. Crowther had apparently circled
24  measles, mumps, and chickenpox as a prior

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

28 (Pages 106 to 109)

---

Page 106

1  history.
2          Did he report any of those events to
3  you?
4      A.   No.
5      Q.   Okay.  And are those events at all
6  significant to you in evaluating his hearing
7  loss?
8      A.   No.
9          MS. WIRKUS:  Okay.  And I'm going to
10  have marked as Exhibit No. 15.  This is
11  actually from Berkshire Medical Center.
12  And it's the result of an audiogram, or at
13  least it appears to be, from 12.17.87.
14
15          (Exhibit 15, audiogram dated
16          12.17.87, marked)
17
18      Q.   (By Ms. Wirkus)  Take a look at
19  Exhibit 15.
20          Have you seen that document
21  before?
22      A.   No.
23      Q.   Okay.  Can you tell me what that
24  appears to be up at the top?

---

Page 107

1      A.   It shows normal hearing at all
2  frequencies.
3      Q.   And that's also audiogram results in
4  chart form, correct?
5      A.   Chart form, yes.
6          MS. WIRKUS:  Okay.  I'm going to
7  have marked as Exhibit No. 16, a Conrail
8  form, which is employees audiogram analysis
9  dated 1.21.88.
10
11
12          (Exhibit 16, audiogram analysis
13          dated 1.21.88, marked)
14
15          MS. WIRKUS:  Thank you.
16      Q.   (By Ms. Wirkus)  Okay.  And if you
17  could tell me what these particular numbers
18  indicate?  There's two test result dates.
19  Appears to be one for 5.25.84 and one for
20  12.17.87; is that correct?
21      A.   Correct.
22      Q.   Okay.  And is there any diminution
23  in hearing from the 5.25.84 test to the 12.17.87
24  hearing test?

---

Page 108

1      A.   No.
2      Q.   Okay.  And is there any hearing loss
3  reflected on that piece of paper?
4      A.   No.
5          MS. WIRKUS:  Okay.  If I could have
6  marked as Exhibit No. 17, please.
7          And this is a Conrail report of an
8  audiogram dated 12.17.87 for Mr. Crowther.
9
10          (Exhibit 17, audiogram dated
11          12.17.87, marked).
12
13      Q.   (By Ms. Wirkus)  Okay.  If I could
14  show you what's been marked as Exhibit 17,
15  please.
16      A.   Okay.
17      Q.   And that's dated 12.17.87; is that
18  correct?
19      A.   Correct.
20      Q.   And, once again, up at the top
21  there's a chart of an audiogram; is that right?
22      A.   Yes.
23      Q.   And does that reflect any hearing
24  loss?

---

Page 109

1      A.   No.
2          MS. WIRKUS:  And if I could have
3  marked as Exhibit 18.
4          A Conrail audiogram for Mr. Crowther
5  dated 8.3.89.
6
7          (Exhibit 18, audiogram dated 8.3.89,
8          marked)
9
10      Q.   (By Ms. Wirkus)  Okay.  If I could
11  show you Exhibit 18.
12          Have you ever seen that before?
13      A.   No.
14      Q.   You've never seen any of the Conrail
15  documents of screening, correct?
16      A.   Right.
17      Q.   And if you could tell me what the
18  chart on the top reflects?
19      A.   His hearing thresholds.
20      Q.   Okay.
21      A.   At that time.
22      Q.   Does that reflect any hearing
23  loss?
24      A.   Yeah, it's beginning to.

---

**TOMMA HENCKEL**
**November 10, 2006**

29 (Pages 110 to 113)

| Page 110 | Page 112 |
|---|---|

**Page 110**

1    Q.    Okay.  And describe what that
2  hearing loss is?
3    A.    At 4,000 hertz, thresholds for the
4  right ear is borderline normal.  For the left ear
5  is just below normal.
6    Q.    Okay.  And is that consistent with
7  noise-induced hearing loss on the left?
8    A.    Yes, because it gets better at
9  6,000.
10    Q.    So had you seen Mr. Crowther on
11  August 3rd, 1989, would you have opined that he
12  was starting to experience noise-induced hearing
13  loss in his left ear?
14    A.    Yes.  Actually, in both ears.
15    Q.    In both ears?
16    A.    Yeah.  Even though it's borderline
17  normal at 4,000.  The shape that it's getting
18  better at 6,000 would already alert me to that.
19    Q.    Okay.  So it looks like he's
20  starting in both ears; is that correct?
21    A.    Yes.
22    MS. WIRKUS:  And if I could have
23  marked as Exhibit No. 19, please.
24    And this is the employee audiogram

**Page 111**

1    analysis for 8.29.89.
2
3    (Exhibit 19, audiogram dated
4    8.29.89, marked)
5
6    Q.    (By Ms. Wirkus)  If you could take a
7  look at that document for me, please.
8    A.    Okay.
9    Q.    Have you ever seen that before?
10    A.    No.
11    Q.    And that's basically a printout of
12  results of audiograms, correct?
13    A.    Yes, it's a summary of the last
14  three that you showed me, I believe.
15    Q.    Okay.  And, once again, the test for
16  5.25.84 and 12.17.87, don't reflect any kind of a
17  hearing loss, correct?
18    A.    Right.
19    Q.    And then on 8.3.89.  That's when you
20  start to see noise-induced hearing loss in both
21  ears, correct?
22    A.    Yes.
23    Q.    Based on these markings?
24    A.    Correct.

**Page 112**

1    MS. WIRKUS:  Okay.  If I could have
2  marked as Exhibit No. 20, please.
3    And this is the Conrail report of
4  audiogram for Mr. Crowther dated
5  4.24.1990.
6
7    (Exhibit 20, audiogram dated
8    4.24.1990, marked)
9
10    Q.    (By Ms. Wirkus)  Okay.  And, Ms.
11  Henckel, if I could show you Exhibit 20.
12    Have you ever seen that document
13  before?
14    A.    No.
15    Q.    Okay.  And if I could refer you,
16  once again, to the top of the document there's
17  audiogram results in chart form; is that
18  correct?
19    A.    Correct.
20    Q.    Okay.  And what do they reflect?
21    A.    They reflect, again, a lower or
22  worse threshold at 4,000 hertz for the left
23  ear.
24    Q.    Okay.  And are those results

**Page 113**

1    consistent with the results in the '89, report?
2    A.    Yes, I believe so.
3    Q.    Okay.  Let me show you the '89,
4  report again, which has been marked as Exhibit
5  No. 18.
6    So comparing 18 and then 20.  Are
7  those consistent results?
8    A.    They are very similar.  It's a tiny
9  bit better for the right ear; otherwise, there's
10  no significant.  But it's similar, yes.
11    Q.    And, once again, if you were to look
12  at this particular audiogram set of results would
13  you have opined that Mr. Crowther suffered from
14  noise-induced hearing loss in both ears?
15    A.    The left ear would be definitely
16  more.
17    Q.    And would the right ear be
18  borderline?
19    A.    Mm-hmm, yeah.
20    MS. WIRKUS:  Okay.  Can I have
21  marked as Exhibit 21, please, a CSX medical
22  department audiogram systems audiogram.
23    And it's dated 3.31.03.
24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

30 (Pages 114 to 117)

| Page 114 |
|---|

```
 1          (Exhibit 21, audiogram dated
 2      3.31.03, marked)
 3
 4      Q.    (By Ms. Wirkus)  I'm going to show
 5  you what has been marked as Exhibit No. 21.
 6          Have you ever seen this document
 7  before?
 8      A.    No.
 9      Q.    And could you describe to me what
10  that document appears to be to you?
11      A.    It appears to be a whole range of
12  annual -- results of annual audiograms, hearing
13  screenings.
14      Q.    Okay.  And it starts in May 24, '84.
15  And it appears to go through April 5th of 2001;
16  is that correct?
17      A.    Correct.
18      Q.    Okay.  And can you describe to me
19  these results and whether or not you see any
20  noise-induced hearing loss?
21      A.    Yes, at 4,000 hertz.
22      Q.    Okay.
23      A.    The hearing threshold gets
24  increasingly worse.
```

| Page 116 |
|---|

```
 1      A.    Yes.
 2      Q.    Okay.
 3          MS. WIRKUS:  If I could have marked
 4      as Exhibit 22, please.
 5          It's actually a two-page report
 6      dated April 2, 2002.  And it's from the TK
 7      Group in Rockford, Illinois.  And it's to
 8      Mr. Crowther in relation to audiogram
 9      results.
10
11          (Exhibit 22, report dated April 2,
12      2002, marked)
13      Q.    (By Ms. Wirkus)  If I could show you
14  what's been marked as Exhibit 22.
15          Have you ever seen that before?
16      A.    No.
17      Q.    Okay.  And referring your attention
18  to the middle of that page.  Well, first of all,
19  backing up just a little bit.
20          This appears to be a letter to Mr.
21  Crowther; is that correct?
22      A.    Yes.
23      Q.    And it's informing him about his
24  audiogram results; is that correct?
```

| Page 115 |
|---|

```
 1      Q.    Okay.  Is that in both ears?
 2      A.    With some exception every now and
 3  then.
 4          It's in both ears, yes.
 5      Q.    And the some exceptions every now
 6  and then.  Is that somewhat normal to see that?
 7      A.    Yeah, it's sort of an annual
 8  aberration.
 9      Q.    Okay.  And that starts in 1989; is
10  that correct?
11      A.    Yes.
12      Q.    Where you start to see diminution in
13  the hearing?
14      A.    Correct.
15      Q.    Okay.  And from 1989, through 2001,
16  both ears are getting progressively worse; is
17  that fair to say?
18      A.    Yes.
19      Q.    And it's also noise-induced hearing
20  loss based on your opinion, correct?
21      A.    Correct.
22      Q.    And that would be your opinion to a
23  reasonable degree of medical certainty; is that
24  correct?
```

| Page 117 |
|---|

```
 1      A.    Yes.
 2      Q.    Okay.  And in these results there's
 3  also a printout of his audiograms, is that right,
 4  for -- I'm sorry.  Turn it around.  5.25.84,
 5  4.5.01, and 4.2.02; is that correct?
 6      A.    Correct.
 7      Q.    Okay.  And the 04.02.02 test that's
 8  referenced.
 9          Does that indicate noise-induced
10  hearing loss also?
11      A.    Yes.
12      Q.    And did Mr. Crowther bring this
13  document with him when he came to visit you?
14      A.    No.
15      Q.    Do you know if this was the document
16  that he was referring to in connection with
17  recently being told that he was suffering from
18  hearing loss from CSX?
19      A.    I don't know.
20      Q.    Okay.  And is it your opinion within
21  a reasonable degree of medical certainty that Mr.
22  Crowther started suffering from noise-induced
23  hearing loss in approximately 1989, based on the
24  documents that you've just reviewed?
```

**TOMMA HENCKEL**
**November 10, 2006**

31 (Pages 118 to 121)

| Page 118 |
| --- |

```
 1    A.   Yes.
 2    Q.   That's it.  I have --
 3    A.   Well, that's when it showed up.  I
 4  don't know when he started suffering from it.
 5    Q.   Okay.  But that's when it first
 6  reared its ugly head, so to speak?
 7    A.   Right.
 8         MS. WIRKUS:  Fair enough.  Thank you
 9  very much.  I appreciate it.
10         THE WITNESS:  That's it?
11         MS. WIRKUS:  I'm all set unless
12  Elizabeth has some questions.
13         MS. SCHMIDT:  No, I don't have
14  anything.
15         MS. WIRKUS:  Great.  Okay.
16
17         (Deposition concluded at 12.40 p.m.)
18
19
20
21
22
23
24
```

| Page 119 |
| --- |

```
 1    I, JESSICA M. DESANTIS, a Notary Public in and
 2  for the Commonwealth of Massachusetts, do hereby
 3  certify that TOMMA HENCKEL appeared before me,
 4  satisfactorily identified herself, on the 10th
 5  day of November, 2006, at Springfield,
 6  Massachusetts, and was by me duly sworn to
 7  testify to the truth and nothing but the truth as
 8  to her knowledge touching and concerning the
 9  matters in controversy in this cause; that she
10  was thereupon examined upon her oath and said
11  examination reduced to writing by me; and that
12  the statement is a true record of the testimony
13  given by the witness, to the best of my knowledge
14  and ability.
15    I further certify that I am not a relative or
16  employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20    WITNESS MY HAND this 28th day of December,
21  2006.
22
23  Jessica M. DeSantis    My Commission expires:
24  Notary Public          June 23, 2011
```

| Page 120 |
| --- |

```
 1  Today's date:     December 28, 2006
 2  To:               Elizabeth L. Schmidt, Esq.
 3  Copied to:        Lori Wirkus, Esq.
 4  From:             Jessica M. DeSantis
 5  Deposition of:    Tomma Henckel
 6  Taken:            November 10, 2006
 7  Action:           GEOFFREY CROWTHER
 8                    Vs. CONSOLIDATED RAIL
 9                    CORPORATION
10
11
12    Enclosed is a copy of Ms. Henckel's
13  deposition.  Pursuant to the rules of Civil
14  Procedure, Ms. Henckel has thirty days to sign
15  the deposition from today's date.
16    Please have Ms. Henckel sign the enclosed
17  signature page.  If there are any errors, please
18  have her mark the page, line and error on the
19  enclosed correction sheet.  She should not mark
20  the transcript itself.  This addendum should be
21  forwarded to all interested parties.
22    Thank you for your cooperation in this
23  matter.
24
```

| Page 121 |
| --- |

```
 1      UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3        Civil Action No.: 05-30140-MAP
 4
 5
 6  ************************************
 7  GEOFFREY CROWTHER,            *
 8  v.                            *
 9  CONSOLIDATED RAIL CORPORATION *
10  AND CSX TRANSPORTATION, INC.  *
11  ************************************
12
13    I, TOMMA HENCKEL, do hereby certify, under
14  the pains and penalties of perjury, that the
15  foregoing testimony is true and accurate, to the
16  best of my knowledge and belief.
17    WITNESS MY HAND, this    day of
18  2007.
19
20    ------------------------------
21       Tomma Henckel
22
23
24  jmd
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**TOMMA HENCKEL**
**November 10, 2006**

32 (Page 122)

Page 122

```
 1              CORRECTION SHEET
 2    DEPONENT:  Tomma Henckel
 3    CASE:      Geoffrey Crowther
 4    DATE TAKEN: November 10, 2006
 5    *******************************************
 6    PAGE/LINE/CHANGE OR CORRECTION AND REASON
 7    *******************************************
 8        ___/___/_____
 9        ___/___/_____
10        ___/___/_____
11        ___/___/_____
12        ___/___/_____
13        ___/___/_____
14        ___/___/_____
15        ___/___/_____
16        ___/___/_____
17        ___/___/_____
18        ___/___/_____
19        ___/___/_____
20        ___/___/_____
21        ___/___/_____
22        ___/___/_____
23        ___/___/_____
24        ___/___/_____
```

# EXHIBIT 3



UNIVERSITY of
MASSACHUSETTS

17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

Center for Language, Speech
and Hearing

413.545.2565

| | | | |
|---|---|---|---|
| Client's Name: | Geoffrey Crowther | Date of Visit: | 11/6/02 |
| Client's Address: | 119 Massasoit St. | Birthdate: | 5/7/51 |
| | Northampton, MA 01060 | File Number: | 21602 |
| Phone Number: | 413-586-7188 | Referral: | Hannon & Joyce |

Curtis Center Suite 450
Independence Square West
Philadelphia, PA 19106

## Hearing Evaluation

**Statement of Problem**

    Mr. Crowther visited the Center for Language, Speech and Hearing on November 6, 2002 through a referral from Hannon & Joyce. He recently had his hearing screened at work, which is the CXS Railroad, where he has worked for twenty-seven years. In his most recent screening, his thresholds had risen significantly since the previous year so he wanted to follow-up with a full hearing evaluation.

**Background Information**

    Mr. Crowther worked in the engineering department at CXS Railroad up until about ten years ago. He built tracks and made repairs. He now works as a welding foreman. He is often around loud construction equipment. He also uses company radios frequently. The radios are also very loud. It was not until the 1990s that CXS started screening their employees' hearing and providing ear protection. Mr. Crowther reported that he wears ear plugs at work about 50% of the time that he spends in loud noise. He stated that for safety reasons, he cannot wear the ear protection 100% of the time.

    Mr. Crowther reported that his family, specifically his children, seem to notice the hearing loss the most. His children often complain that the television volume is too high. Mr. Crowther reported that he has the most difficulty hearing in dinner situations, in the presence of background noise, and during introductions. He stated that he often does not hear names. He reported that he also has trouble at work. Mr. Crowther said that there have been times when he has not heard the radio, and it has lead to arguments with his boss.

    Mr. Crowther does not have ear pain, but he has been experiencing tinnitus for a few years. The tinnitus is constant and is heard as a ringing in both ears. However, Mr. Crowther stated that he seems to experience more tinnitus in the right ear. He also has

Page 1 of 3: GC

been experiencing equilibrium problems for a few years. Mr. Crowther loses his balance when he makes quick movements or ceases movement too quickly.

Mr. Crowther reported no family history of hearing loss. He has never had any head or neck surgery or injury. He reported no chronic medical conditions, and he is not on any medications.

**Tests Administered**

Pure tone air conduction thresholds were found to be on the low end of normal in both the right and left ears between 250 and 2000 Hz. These thresholds fell between 20 and 25 dB HL. At 3000 Hz pure tone thresholds began to rise. The right ear threshold was found at 30 dB HL, and the left ear threshold was found at 40 dB HL. At 4000 Hz, Mr. Crowther's thresholds rose even higher to 65 dB HL and 60 dB HL in the right and left ears respectively. The thresholds began to drop again at 6000 and 8000 Hz creating a noise notch in the audiogram. At 6000 Hz the right and left ear thresholds were found at 45 dB HL. At 8000 Hz the right ear threshold was found at 40 dB HL and the left ear at 35 dB HL. Three frequency pure tone averages for the right and left ears were found at 23 dB HL. Pure tone bone conduction thresholds were found to be normal.

Speech reception thresholds were found at 20 dB HL for both the right and left ears. Speech discrimination was administered at 40 dB SL in both ears. Mr. Crowther was able to correctly discriminate 96% of words in the right ear and 92% of words in the left ear.

Tympanometric testing was administered and found to be normal in both ears. Acoustic reflexes and acoustic reflex decay were tested in response to Mr. Crowther's equilibrium difficulties. Acoustic reflexes were present at normal and reduced sensation levels ipsilaterally and contralaterally for both ears. Contralateral reflex decay at 10 dB SL at 1000 Hz was negative bilaterally.

**Assessment**

Mr. Crowther's thresholds reveal normal low frequency hearing sloping to moderate sensorineural hearing loss in the high frequencies. The notch found in the high frequencies confirms that noise exposure is likely the cause of the hearing loss. Middle ear function was found to be normal. Acoustic reflex and acoustic reflex decay testing revealed that retro-cochlear function is normal. However, the presence of reflexes at lower sensation levels suggest that the loss is cochlear in nature.

**Recommendations**

The following recommendations were made to Mr. Crowther.

Page 2 of 3:  GC

1. Mr. Crowther should return have his hearing re-evaluated yearly to monitor any change in thresholds.

2. Mr. Crowther should continue to wear his ear protection as often as possible to conserve his hearing ability.

3. Mr. Crowther should see his physician regarding his imbalance problems.


Cc: Geoffrey Crowther
    119 Massasoit St.
    Northampton, MA 01060

Cc: Hannon & Joyce
    Curtis Center Suite 450
    Independence Square West
    Philadelphia, PA 19106-3323


*Natalie Sitko*

Natalie Sitko, B.S.
Graduate Clinician


*Tomma Henckel*

Tomma Henckel, M.A., CCC-A.
Clinical Instructor/Audiologist


Page 3 of 3: GC



# UNIVERSITY of MASSACHUSETTS

17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

**UMASS.**

Center for Language, Speech
and Hearing

413.545.2565

NAME _Geoffrey Crowther_ AGE _51_ BIRTHDATE _5/7/51_ SEX _M_
ADDRESS _19 Massasoit St Northampton, MA_ AUDIOLOGIST _NS/TH_ TEST NO. _1_
REFERRED BY _Hannon + Joyce_ FILE NO. _01060 21602_ DATE _11/6/02_



PURE TONE AUDIOGRAM

Frequency in Hz

TYMPANOGRAM

HEARING THRESHOLD LEVEL IN DECIBELS

COMPLIANCE

AIR PRESSURE

Effective Masking Level in dB in Non Test Ear

AC

BC

### STAPEDIUS REFLEX THRESHOLD

|  | | Contralateral | | | | Ipsilateral | |
|---|---|---|---|---|---|---|---|
|  | .5K | 1K | 2K | 4K | | 1K | 2K |
| R | 105 | 95 | 90 | NR | | 90 | 95 |
| Decay | | 105 | C1= | | | | |
| L | 100 | 95 | 90 | 110 | | 90 | 90 |
| Decay | | 105 | C1= | | | | |

### SPEECH AUDIOMETRY

| Test | R | L | SF | |
|---|---|---|---|---|
| Sp. Reception Threshold (SRT) | 20 dB | 20 dB | | dB |
| SL | 40 96 | 40 92 | | |
| S/N | | | | |
| Masking Level dB | dB | dB | dB | dB |
| Tolerance Level | dB | dB | dB | dB |
| Most Comfortable Loudness | dB | dB | dB | dB |

MLV ☑   RECORDING ☐           W-22 ☐   NU-6 ☑

### PURE TONE AVERAGES
(500, 1000, 2000 Hz)

| EAR | BETTER TWO FREQ. | ALL THREE FREQ. |
|---|---|---|
| RIGHT | 23 | 23 |
| LEFT | 23 | 23 |

### AUDIOGRAM CODE

| | AIR | | BONE | | |
|---|---|---|---|---|---|
| EAR | Un-Masked | Masked | Un-Masked | Masked | Color |
| R | O–O | △–△ | <·< | [·[ | Red |
| L | X–X | ☐–☐ | >·> | ]·] | Blue |

_Tomma Henckel, MA, CCC-A_
SUPERVISOR

## HANNON & JOYCE HEARING TESTING PROGRAM

Patient Name: Geoffrey Crowther    Social Security No.: 028362353

Street Address: 19 Massasoit St. Northampton    City/State/Zip: Northampton, MA 01060

Telephone: (413) 586-7188    Date of Birth: 5/7/51

Railroad: CSX    Union: _____    Are you Retired: no    If so, what year _____

### AUDIOLOGIC EVALUATION



0dB = 1969 ANSI THRESHOLDS    FREQUENCY IN HERTZ

Speech Threshold: R 20 dB    L 20 dB

Discrimination Score: dBSL R 96 %    dBSL L 92 %

Audiologist Name: Tomma Henckel
Center for Language, Speech & Hearing
Address: 17 Arnold House UMass
City/State/Zip: Amherst, MA 01003-0410 (413) 545-2565
Date of Test: 11/6/02

### AUDIOGRAM CODE

| | R | L |
|---|---|---|
| Air Conduction | O | X |
| Masked Air Conduction | ▲ | ■ |
| Bone Conduction | [ | ] |
| No Response | ↓ | ↓ |
| Could Not Test | CNT | |

Hearing Aid Use _____

_____

_____

Please return this form to Hannon & Joyce, The Curtis Center, Suite 450, Independence Square West
Philadelphia, Pennsylvania 19106 ATTN: Hearing Testing Program (215) 446-4460



UNIVERSITY of
MASSACHUSETTS
17 Arnold House
715 North Pleasant St.
Amherst, MA 01003-9304

Center for Language, Speech
and Hearing

413.545.2565

November 7, 2002

Hannon & Joyce
Curtis Center Suite 450
Independence Square West
Philadelphia, PA 19106-3323

To Whom It May Concern,

Enclosed please find a copy of Geoffrey Crowther's Hearing Evaluation Report. Please contact our office at 413-545-2565 should you have any questions or need additional information. Thank you for the referral. It was a pleasure working with Mr. Crowther.

Sincerely,


Natalie Sitko, B.S.
Graduate Clinician

Tomma Henckel, M.A., CCC-A
Clinical Instructor/Audiologist

**EXHIBIT 4**

## Resume for:
## TOMMA HENCKEL, MA, CCC-A

**Address:** 38 Hedgerow Lane
Amherst, MA 01002

**Tel:** (413) 256-6076
**e-mail:** thenckel@comdis.umass.edu

**Work Experience:**

**Full-time CLINICAL INSTRUCTOR and AUDIOLOGIST**
University of Massachusetts – Amherst, MA          Jan 1996-present

Conducted a wide range of diagnostic testing and hearing rehabilitation, including managing a full hearing aid program. Conducted direct service and extensive clinical supervision of up to 6 Audiology students every semester.

Supervision of students includes, but is not limited to, clinical supervision, editing all clinical reports, conducting student evaluations, placing students in off-campus internship sites, acting as liaison with off-campus supervisors, and conducting a regular clinicians' meeting/group.

Managed a hearing screenings program in the public schools for surrounding towns and coordinating presentations to area senior and community centers as well as health fairs.

Initiated community outreach programs, generated referrals and marketed our clinic to the public.

**CONSULTING AUDIOLOGIST**
Veterans Administration Medical Center – Leeds, MA          Dec 1994-Nov 2005

Initially conducted all diagnostic testing of veterans and referred for further follow-up, medical and rehabilitative. Also performed regular screenings of the VA employees. Later on, once the site was approved for fitting hearing aids for the vets, set up a hearing aid fitting program, including making recommendations on programming, testing and verification equipment to order.

**CLINICAL AUDIOLOGIST**
ENT Associates of Springfield, MA          Apr 1992-Dec 1995

Performed a wide range of diagnostic testing, including ENG and ABR testing as well as interpretations. Worked together with the other audiologists, the physicians and the office staff to help the office run as smoothly as possible.

**Part-time CLINICAL SUPERVISOR**
University of Massachusetts – Amherst, MA          Sep 1994-Dec 1995

**CFY SUPERVISOR & SUPERVISOR of Graduate Interns**
ENT Associates of Springfield, MA          Jun 1993-Jul 1995

**AUDIOLOGY INTERNSHIPS**

Weldon Center - Mercy Hospital, Springfield, MA          Sep-Dec 1991

Mercy Hospital Mobile Hearing Test Van          Sep-Dec 1991

Holyoke Hospital, Holyoke, MA          Jun-Aug 1991

UMass Communication Disorders Clinic          Sep 1990-May 1991

**AUDIOMETRIC TECHNICIAN**
Hampshire Eye & Ear Associates, Northampton, MA          Sep 1989-Aug 1990

**Other Work Experience:**

RESEARCH ASSISTANT in psychology for various postgraduate psychology students

ASSISTANT OFFICE MANAGER
Boston Institute for Psychotherapy, Inc., an outpatient mental health clinic and post-graduate training facility for psychotherapists

STUDENT MANAGER
SAGA Foodservices, Hampshire College

TEACHER'S AND RESEARCH ASSISTANT
Summer Studies in Mathematics at Hampshire College

ACADEMIC and RESIDENTIAL COUNSELOR
Summer Studies in Mathematics at Hampshire College

**Education:**

MASTERS OF ARTS/Audiology – Univ. of Mass/Amherst; Dec 1991.

BACHELOR OF ARTS/Communications & Cognitive Science (Linguistics) Hampshire College - Amherst, MA; May 1985

ABITUR: John-F.-Kennedy-School; a bilingual, bicultural school in Berlin, Germany; Dec 1980.

**Publications:**

ON THE CONJUNCTION OF COORDINATE STRUCTURES in University of Massachusetts Occasional Papers in Linguistics, Vol. 6, 1984.

**Memberships:**

American Speech-Language-Hearing Association (ASHA)

Massachusetts Speech-Language-Hearing Association (MSHA)

American Academy of Audiology (AAA)